**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SAN ROCCO THERAPEUTICS, LLC, <br><br>       Plaintiff, <br><br>  v. <br><br>NICK LESCHLY, MITCHELL FINER, PHILIP REILLY, THIRD ROCK VENTURES, LLC, BLUEBIRD BIO, INC, 2SEVENTY BIO, INC., <br><br>     Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff San Rocco Therapeutics, LLC ("SRT"), formerly known as Errant Gene Therapeutics, LLC ("EGT"), for its Complaint against Defendants Nick Leschly ("Leschly"), Mitchell Finer ("Finer"), Philip Reilly ("Reilly"), Third Rock Ventures, LLC ("Third Rock"), bluebird bio, Inc. ("bluebird"), and 2seventy bio, Inc. ("2seventy"), collectively "Defendants," hereby alleges, on knowledge as to its own actions, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.     SRT brings this action against Defendants for civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(a), (b), (c), and (d) ("Federal RICO") and Mass. Gen. Laws ch. 93A, § 11.

2.     In addition, SRT brings a cause of action against Defendants for fraudulent inducement of, including conspiracy to fraudulently induce, SRT to execute a confidential settlement agreement (the "Settlement Agreement") on November 2, 2020.

3.      SRT is a biopharmaceutical company, established in 1993 by its founder and CEO, Mr. Patrick Girondi, after his son was diagnosed with Beta Thalassemia, a rare inherited blood disorder.

4.      In 2000, SRT began financially supporting the research of Drs. Michel Sadelain and Stefano Rivella, both of whom were medical researchers and scientists at Memorial Sloan Kettering Cancer Center ("MSKCC") and the Sloan Kettering Institute for Cancer Research ("SKI"), collectively "MSK".  As a result of SRT's unyielding commitment, it has successfully developed recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as Sickle Cell Disease ("SCD") and Beta Thalassemia.  There are over 2,000 Sickle Cell Disease and Thalassemia patients in Massachusetts.

5.      SRT and MSK executed an exclusive license agreement (the "2005 Agreement") with the goal of commercially developing the intellectual property to be utilized for the public interest.  SRT's tireless efforts and work with Drs. Sadelain, Rivella, and others, resulted in the development of the TNS9.3.55 lentiviral vector (the "TNS9 Vector" or "SRT's TNS9 Vector") for the treatment of Beta Thalassemia.

6.      At a June 16, 2011, meeting, MSKCC proposed a new agreement (the "2011 Agreement").  Under the 2011 Agreement, SKI would take control of the clinical trials from SRT and SKI would head the commercialization of the TNS9 Vector, including the filing of the Investigational New Drug Application ("IND") for SRT's TNS9 Vector.  However, all of SRT's trade secrets and know-how concerning the clinical grade formulation for the TNS9 Vector remained the property of SRT.

7.      Third Rock, Leschly, Finer, and Reilly established bluebird in 2010 to develop and market lentiviral vectors for the treatment of Beta Thalassemia and SCD.  Bluebird is a direct

competitor of SRT in the field of gene therapy treatments using lentiviral vectors for SCD and Beta Thalassemia patients.  Bluebird, however, could not efficiently and safely produce lentiviral vectors that were safe for clinical use in patients.

8.     Unable to acquire SRT's TNS9 Vector and proprietary information directly from SRT, Defendants Leschly, Third Rock, Reilly, Finer, and bluebird conspired and worked collectively to fraudulently obtain the clinical grade TNS9 Vector and unlawful competitive intelligence (confidential information) related thereto.

9.     Defendants Leschly, Third Rock, Reilly, Finer, and bluebird entered into and engaged in a conspiracy to fraudulently wrest control of SRT's TNS9 Vector and to eliminate bluebird's only competition.

10.     Defendants fraudulently obtained SRT's TNS9 Vector and confidential proprietary information related to vector titration and formulation for producing a safe clinical grade lentiviral vector under the false pretense that bluebird was interested in working with MSK to further develop the TNS9 Vector and assist with the IND.  However, Defendants' only objective was to steal SRT's trade secrets and gain unlawful competitive intelligence (confidential information) that bluebird would later use to obtain approval from the U.S. Federal Drug Administration ("FDA") for bluebird's purported BB305 lentiviral vector (the "BB305 Vector").

11.     In January 2017, SRT commenced a civil action against SKI and bluebird in the Supreme Court of the State of New York, entitled *Errant Gene Therapeutics, LLC v. Sloan Kettering Institute for Cancer Research and Bluebird Bio, Inc*., Index No. 150856/2017 (hereafter the "New York Litigation"), alleging the following causes of action: (1) fraud against SKI; (2) breach of contract against SKI based on the 2011 Agreement; (3) breach of contract against SKI based on the 2005 Agreement; (4) civil conspiracy to defraud against SKI and bluebird; (5) unfair

3

competition against bluebird; (6) injunctive relief against bluebird; and (7) unjust enrichment against bluebird.

12.     In June 2019, SRT commenced a civil action against Third Rock and Leschly in the Superior Court of Massachusetts, entitled *Errant Gene Therapeutics, LLC v. Third Rock Ventures, LLC and Nick Leschly,* Civil Action No. 19-1832 (hereafter the "Massachusetts Litigation"), alleging the following causes of action: (1) tortious interference with contractual relations; (2) tortious interference with business relations; (3) misappropriation of trade secrets; (4) violations of Massachusetts General Laws ch. 93, § 42; (5) civil conspiracy; (6) unjust enrichment; and (7) violations of Massachusetts General Laws ch. 93A, § 11.

13.     On November 2, 2020, during trial in the New York Litigation, SRT, MSK, and bluebird executed the Settlement Agreement.  The parties executed the Settlement Agreement to resolve any and all disputes related to the 2005 and 2011 Agreements, and the New York and Massachusetts Litigations.

14.     After November 2, 2020, Defendants Leschly, Third Rock, Reilly, Finer, bluebird, and 2seventy committed additional fraudulent and unlawful acts against SRT as part of their ongoing scheme involving fraudulent inducement of SRT in connection with the Settlement Agreement and the fraudulent spin-off of 2seventy — all of which were committed in furtherance of their objectives to shut down SRT, get ahead of bluebird's only competitor, and protect financial interests and earnings that resulted from Defendants' predicate acts of racketeering activities.

15.     In addition to fraud, Defendants' scheme also involves perjured testimony and concealing the correct identity of bluebird's purported BB305 Vector approved by the FDA with orphan drug market exclusivity.

16.     SRT's goal is to make gene therapy accessible for all patients.  SRT's gene therapy product is projected to cost much less—**over 2 million dollars less**—per patient than bluebird's BB305 Vector which is priced at 2.8 million dollars per treatment.  The projected price of SRT's TNS Vector gene therapy treatment is $700,000 per patient.

17.     After execution of the Settlement Agreement, Defendants Leschly, Third Rock, Reilly, Finer, bluebird, and 2seventy committed additional predicate acts involving fraud thereby establishing a civil RICO claim based on Defendants' collective predicate acts.  Defendants' predicate acts involving fraud and targeting SRT is evidence of a pattern of racketeering.

18.     In violation of Federal RICO, Defendants engaged in an enterprise to commit fraud and theft in furtherance of their objective to shut down SRT, eliminate bluebird's competition, and gain FDA approval for the BB305 Vector with market exclusivity.

19.     SRT has been injured by one or more of Defendants' predicate acts committed in furtherance of their scheme involving racketeering activities.  Indeed, each Defendant has committed and/or directly participated in the racketeering activities against SRT.  Defendants' scheme to defraud SRT and shut down SRT's lentiviral gene therapy program encompasses their acts of deceit and each Defendant intended to deprive SRT of its business, property, and money.

20.     In furtherance of their objectives, Defendants engaged in mail and wire fraud involving a scheme based on (i) theft of SRT's trade secrets; (ii) fraudulent inducement of SRT in connection with the Settlement Agreement; and (iii) the fraudulent spin-off of 2seventy in order to protect financial gains and profits that resulted from their scheme to eliminate SRT as a competitor and obtain FDA approval with market exclusivity based on stolen unlawful competitive intelligence (confidential information).

5

21.     By means of this action, SRT seeks that all Defendants be jointly and severally found liable to the extent of: (i) treble the damages incurred by SRT due to Defendants' unlawful activity, including attorneys' fees and cost pursuant to Federal RICO statutes; (ii) attorneys' fees spent bringing this action; (iii) pursuant to 18 U.S.C. § 1961 *et seq*., recoverable damages to SRT's "business or property," which is an amount in excess of $500 million or an amount otherwise determined at trial; and (iv) an amount to be decided at trial in the form of punitive damages for Defendants' illegal and fraudulent actions.

22.     By means of this action, SRT seeks that all Defendants have violated Mass. Gen. Laws ch. 93A, § 11 because Defendants' fraud and deceptive business practices occurred in Massachusetts and SRT has been harmed in Massachusetts.

23.     Furthermore, by means of this action, SRT seeks a judgment finding Defendants Leschly, Third Rock, Finer, Reilly, and bluebird have fraudulently induced SRT into agreeing to the Release and Dispute Resolution provisions of the Settlement Agreement and ordering rescission of SRT's release of claims that were dismissed in the Massachusetts Litigation, thereby allowing SRT to revive all claims asserted against Leschly and Third Rock in the Massachusetts Litigation.

**THE PARTIES**

24.     SRT is a Delaware limited liability company with its principal place of business at 308 East Emily Street, Tampa, Florida 33603.   It regularly transacts business within Massachusetts.

25.     Third Rock is a Delaware limited liability company with business offices located at 29 Newbury Street, 3rd Floor, Boston, Massachusetts 02116.   Third Rock is registered to conduct and regularly conducts business in the Commonwealth of Massachusetts.

6

26.     2seventy is a corporation incorporated in the State of Delaware with principal executive offices and a place of business located at 60 Binney Street, Cambridge, Massachusetts 02142.  2seventy is registered to conduct and regularly conducts business in the Commonwealth of Massachusetts.

27.     Bluebird is a corporation incorporated in the State of Delaware with principal executive offices and a place of business located at 455 Grand Union Blvd, in Somerville, Massachusetts.

28.     Leschly is an individual who resides at 68 School Street, Weston, Massachusetts. Leschly is the Chief Executive Officer ("CEO") of 2seventy and former CEO of bluebird.

29.     Reilly is an individual who resides in Massachusetts.  Reilly is a Venture Partner at Third Rock Ventures and former Chief Medical Officer of bluebird.

30.     Finer is an individual who resides in Massachusetts.

## SUBJECT MATTER JURISDICTION AND VENUE

31.     Pursuant to 18 U.S.C. § 1964, the Court has subject-matter jurisdiction over this action arising under 18 USC §1962 (a), (b), (c), and (d) because of Defendants' multiple Federal RICO violations, all of which substantially occurred within this District.

32.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject-matter jurisdiction over the state law claims arising under Mass. Gen. Laws, ch. 93A, § 11 because those claims are related to the Federal RICO claims as part of the same case or controversy.

33.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject-matter jurisdiction over SRT's fraudulent inducement claims because those claims are related to the Federal RICO claims as part of the same case or controversy.

34.     Pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, venue in this District is proper because all of the acts, or a substantial part of the acts, giving rise to Plaintiff's claims occurred within this District.  All or a substantial part of the events or omissions giving rise to this action occurred in Massachusetts, and Defendants fraudulently induced SRT to execute a Settlement Agreement with a release provision, which caused the illegal dismissal of the Massachusetts Litigation.

## PERSONAL JURISDICTION

35.     The Court has personal jurisdiction over Third Rock because Third Rock has a principal place of business in Massachusetts and is registered to conduct business within this District.

36.     The Court has personal jurisdiction over 2seventy because 2seventy has a principal place of business in Massachusetts and is registered to conduct business within this District.

37.     The Court has personal jurisdiction over Leschly because Leschly resides in Massachusetts.

38.     The Court has personal jurisdiction over Finer because Finer resides in Massachusetts.

39.     The Court has personal jurisdiction over Reilly because Reilly resides in Massachusetts.

40.     The Court has personal jurisdiction over bluebird because bluebird has a principal place of business in Massachusetts and is registered to conduct business within this District.

## FACTUAL BACKGROUND

41.     SRT is a biopharmaceutical company, established in 1993 by its founder and CEO, Mr. Patrick Girondi, after his son was diagnosed with Beta Thalassemia, a rare inherited blood disorder.  Since that time, and for three decades, SRT had dedicated itself to developing treatments for life-threatening diseases, with a special focus on rare diseases (commonly referred to as orphan diseases) through the use of gene therapy—a scientific technique that treats genetic disorders by modifying, replacing, and/or inactivating mutated genes responsible for causing the disease.

42.     As a result of its tireless efforts, SRT has successfully developed recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as Sickle Cell Disease ("SCD") and Beta Thalassemia.

43.     SCD is a genetic disease that affects millions of people throughout the world and is particularly common amongst those with ancestors from sub-Saharan Africa, Spanish-speaking regions in the Western hemisphere (South America, the Caribbean, and Central America), Saudi Arabia, India, and Mediterranean countries such as Turkey, Greece, and Italy.  SCD is an inherited mutated β-globin, which causes red blood cells to become sticky and rigid, giving them the shape of a sickle or crescent moon.  These irregular shaped red blood cells lead to blockages and acute pain, which can cause organ damage and a shortened life span.

44.     Beta Thalassemia (a cousin to SCD) is a rare, inherited blood disorder caused by mutations in the hemoglobin beta ("HBB") gene, which prevents the body from properly producing hemoglobin, the protein in red blood cells that transports oxygen to organs and tissues. While Beta Thalassemia affects a large population of children worldwide—most often people who are of Mediterranean (Greek, Italian, and Middle Eastern), Asian or African descent—it is rare in the United States.  Beta Thalassemia and SCD are considered "orphan diseases" and are often overlooked.

9

45.     People with Beta Thalassemia often develop severe anemia, which can cause damage to the heart, liver, and hormone producing glands, and they may suffer from bone deformities, enlarged spleens, delayed growth rates, and congenital heart failure.

46.     The only established cure for Beta Thalassemia is a bone marrow or stem cell transplant, yet fewer than 25% of patients have compatible donors.  Short of such a transplant, people with Beta Thalassemia require blood transfusions every 14 to 28 days, which in turn, require them to undergo painful iron chelation medications to reduce iron build-up in the blood from the transfusions themselves.  Even with frequent blood transfusions, Beta Thalassemia most often results in death by the time a person reaches their late twenties.  Indeed, the average age of mortality is 28 years.

47.     From 1993–1998 SRT ran clinical trials with Drs. Susan Perrine of Boston University and Nica Cappellini of University of Milano using the experimental drugs Arginine Butyrate and Isobutyramide.

48.     In 1995, SRT opened San Rocco Medical Center in Altamura, Italy to treat, free of charge, Thalassemia and SCD patients from four Italian regions.  In 2000, SRT became pioneers in gene therapy through their support of Dr. Michel Sadelain of MSK.

49.     In 2000, SRT began financially supporting the research of Drs. Michel Sadelain and Stefano Rivella, both of whom are medical researchers and scientists at MSK and SKI.

50.     SRT's tireless efforts and work with Drs. Sadelain, Rivella and others, resulted in the development of the TNS9.3.55 lentiviral vector (the "TNS9 Vector" or "SRT's TNS9 Vector") for the treatment of Beta Thalassemia.  SRT committed every available resource to producing the TNS9 Vector in accordance with the U.S. Federal Drug Administration's ("FDA") stringent approval process for investigational new drugs.

10

51.     As a result of SRT's unyielding commitment, it successfully developed recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as Sickle Cell Disease and Beta Thalassemia.  SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector.

52.     SRT committed every available resource to produce the TNS9 Vector—what became trademarked by SRT as Thalagen—in accordance with the FDA's stringent IND approval process.

53.     In addition, SRT diligently, through various agreements with MSK and other top medical centers, continued testing and refining the TNS9 Vector to ensure patient safety, and to ensure conformance with the highest manufacturing and testing standards, designated by the FDA as chemical Good Manufacturing Practice ("cGMP").

54.     In 2005 SRT signed with MSK for the worldwide commercial rights to, and purchased, Michel Sadelain's gene therapy project for Sickle Cell Disease and Thalassemia, which afflicts Mr. Girondi's son, Rocco.  Under the 2005 Agreement, MSK granted SRT an exclusive license agreement to the intellectual property related to the lentiviral vectors invented by Drs. Sadelain and Rivella.  SRT's tireless efforts and work with Drs. Sadelain, Rivella and others, resulted in the development of the SRT's TNS9 Vector for the treatment of Beta Thalassemia.

55.     From 2005 to 2010 SRT invested several million dollars and, together with MSK, improved the TNS9 Vector.  From 2005–2009, SRT commandeered and paid for 55 iterations and modifications of lentiviral vectors that led to SRT's TNS9 Vector.

56.     SRT's Director of Gene Therapy, Dr. Christopher Ballas, created an innovative and proprietary vector production and formulation process, which is worth in excess of hundreds of millions of dollars.

57. In January 2006, the FDA granted SRT an "Orphan Drug Designation" for the TNS9 Vector. An "orphan disease" is a disease, such as Thalassemia, which affects a small percentage of the population. Assigning "orphan" status to a disease is intended to increase investment in research to treat medical conditions which, because they are so rare, would not be profitable to produce without government assistance. One benefit of obtaining an Orphan Drug Designation is that it leads to market exclusivity. Once a company is awarded orphan drug market exclusivity, the FDA is generally barred from approving any other Orphan Drug Designation for the same orphan disease for seven years.

58. SRT was awarded Orphan Drug Designation in the United States for the TNS9 Vector in 2006, which was years ahead of bluebird, which received its Orphan Drug Designation many years later in 2013.

59. In 2007, MSK's work to make a clinical grade vector was failing and, in fact, MSK's lentiviral vector production was inefficient and not ready to treat patients.

60. In 2007, SRT evaluated and improved (i) the lentiviral-based transduction of CD34+ cells; and (ii) determined TNS9 lentiviral integration using Taqman multiplexed Q-PCR. In addition, SRT evaluated and improved the (i) titration of lentiviral vectors and (ii) worked on the preparation of CD34+ methocult-based colony formation assays.

61. Using SRT's proprietary vector production protocol, and working under certain written agreements, a successful clinical grade lentiviral vector was finally produced by SRT to be used to treat patients involved in clinical trials.

62. In 2007, SRT became the first entity to pass the FDA Recombinant DNA Committee for gene therapy in Beta Thalassemia (and future applications in Sickle Cell Disease) and did so many years ahead of bluebird.

12

63.     In 2008, SRT successfully requested a pre-investigation New Drug ("IND") meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector.  The IND program is the means by which a pharmaceutical company obtains permission to start human clinical trials and to ship an experimental drug across state lines.

64.     In 2008, SRT successfully completed a pre-IND meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector.

65.     SRT became the first company to obtain Orphan Drug Designation for Beta Thalassemia in the United States and Europe, and the first to produce a commercial batch (8–10 patients) of gene therapy for Beta Thalassemia.

**Defendants Engage In A Criminal Enterprise And Fraud To Obtain Unlawful Competitive Intelligence (Confidential Information) And Eliminate SRT As A Competitor**

66.     Genetix Pharmaceuticals, Inc. ("Genetix") was founded in 1992 as a biotechnology company focused on developing gene therapies.  In 2010, Third Rock acquired Genetix and changed the company's name to bluebird bio.  Genetix had in development a gene therapy treatment intended for Beta Thalassemia patients.

67.     In or around May 2009, Genetix's / bluebird's lentiviral vector caused a Thalassemia patient in France to develop a condition known as "clonal dominance," which is a precursor to cancer.  As a result, in June 2009, both the French government and the FDA banned all gene therapy trials for several months.

68.     Like SRT's TNS9 Vector, bluebird's (formerly Genetix's) gene therapy relied on a vector delivery system.  SRT and bluebird are direct competitors.

69.     In 2007, SRT passed the FDA Recombinant DNA Committee for gene therapy in Beta Thalassemia (and future applications in Sickle Cell Disease) years ahead of bluebird, which passed its Recombinant DNA Committee many years later in 2012.

70.     SRT's TNS9 Vector was years ahead of the purported BB305 Vector in terms of development.  The successful development of the TNS9 Vector was the direct result of SRT's substantial investment in improving and commercializing its gene therapy for Thalassemia and SCD.

71.     In an email comparing bluebird's vector, Dr. Sadelain stated the following:

> We've [*i.e.*, SRT and MSK] just spent 2 years improving the manufacturing. We made enough vector for 10 patients in one production run.  [bluebird/Genetix] makes one batch at the time for one patient.  That is not viable.  [SRT's] process is. [bluebird's] vector has an unstable structure (it "rearranges," as found in their second patient).  That makes it very unlikely that it will ever be commercialized, at least with its current sequence.  Our vector [*i.e.*, TNS9 Vector] is structurally very stable.  Based on published mouse studies, our vector expresses better than theirs.

72.     SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector.  Among other things, SRT has entered into nondisclosure agreements ("NDAs") or other confidentiality agreements with all outside partners and vendors with access to SRT's confidential information; restricts access to its facilities; keeps sensitive information in locked cabinets and offices; secures its computers with passwords; hosts its e-mail and web servers on a private, secure platform maintained with the highest security standards; requires a private key to make modifications to electronic files containing highly sensitive information; and takes measures to mark documents containing trade secrets or other sensitive or proprietary information as "Confidential."

73.     In a September 2009 email, Third Rock's founder Leschly wrote to Dr. Sadelain regarding a "Third Rock Visit to MSKCC / Dr. Sadelain."

14

74.     In an October 5, 2009 email, Dr. Sadelain wrote to Leschly (Third Rock) and Philip

Reilly (Third Rock), in which he informed Leschly and Reilly that "it may be more appropriate

for you and Phil to meet with [SRT], to whom we have licensed our globin-related technology and

with whom we are planning clinical trials in the US and Europe, than with MSKCC."

75.     In an October 8, 2009 email, Dr. Sadelain wrote to Leschly (Third Rock), Sam

Salman (President of SRT), and Reilly (Third Rock) about the subject "MSKCC globin gene

transfer program and [SRT]."

76.     In the October 8, 2009 email to Leschly (Third Rock), Reilly (Third Rock), and

Sam Salman (SRT), Dr. Sadelain wrote the following:

> It is my pleasure to introduce you to each other, at least by e-mail.  I recently met
> Nick's colleague Dr. Philip Reilly, at a meeting focusing on gene therapy for
> hemophilia.  Phil and Nick recently informed me of their growing interest in the
> genetic treatment of several orphan disorders, including thalassemia.
>
> They have requested to meet with me to further discuss our plans for the treatment
> of globin disorders.  Since MSKCC has licensed our globin vector technology to
> [SRT], Dr. Viviane Martin, who heads MSKCC's Office of Industrial Affairs, has
> recommended that Third [*sic*] Third Rock Ventures directly contact Sam Salman,
> President of [SRT].  You are now in contact….!
>
> I remain available if you need me at any point.

77.     On or around October 19, 2009, Leschly and Reilly met with SRT at Third Rock's

headquarters in Boston, Massachusetts.  During the meeting, Leschly expressed Third Rock's

desire to develop a "platform" for the development of gene therapies for Thalassemia and SCD.

Leschly advised SRT that Third Rock was considering an investment in the gene therapy invented

by Sadelain (and under development by SRT) and/or the competing gene therapy purportedly

invented by a Dr. Leboulch (and under development by Genetix).

15

78.     In a March 20, 2010, email, Finer and Reilly wrote to Sadelain seeking a meeting

to discuss potential synergies and how Genetix may be able to work with Sadelain and MSK.

79.     In a May 12, 2010, email, Finer (Genetix) wrote to Sadelain stating:

Michel, great meeting with you, Isabelle and your tech transfer guys.  Perhaps we
can catch up some time at ASGT.  We have initiated the contacts with the [SRT]
guys through the help of your institution.

80.     In May 2010, Defendants again approached MSKCC to purchase the TNS9 Vector,

knowing that the TNS9 Vector incorporated SRT's trade secrets and know-how related to

producing clinical and commercial grade globin lentiviral vectors.

81.     In a May 2, 2010 email, Finer (Genetix), together with Leschly (Third Rock) and

Reilly (Third Rock) wrote to Sadelain stating:

Michel, our interests are in building the best gene therapy company to treat severe
genetic disease . . . with Third Rock . . .  joining us, we have the ability to build
beyond the existing activities at Genetix to insure success.  What Phil [Third Rock]
and I would like to do is to update you on our progress and plans in thal and other
activities at the company.  We would like to get an update on your progress and
plans as well.  We would follow-up with a discussion of what potential synergies
and how we could work together.  Let me know what you think.

Thanks, Mitch.

82.     In a May 3, 2010 email, Viviane Martin of MSKCC's Office of Industrial Affairs

wrote to Sadelain:

I don't quite see how 3rd Rock/Genetix can make the best out of MSK/Genetix
technology w/o [without] letting one sit on a shelf.  Also they [*i.e.*, Third Rock]
know that we entered into a license with [SRT], and they are coming to you, not to
[SRT] when they [*i.e.*, Third Rock] perfectly knew that they [*i.e.*, Third Rock]
should talk to [SRT] to get rights to the technology. **I honestly do not see what
they are seeking . . . besides them doing competitive intelligence**.

83.     In a May 27, 2010 email, Finer (Genetix) wrote to Patrick Girondi (SRT) stating

the following:

16

I want to introduce myself as the CSO of Genetix.  I don't want to get in the way with the business discussions that you are having with Nick [Third Rock] and Phil [Third Rock], but I want to reiterate our commitment to have a serious discussion with you and your colleagues. . . . I've been in the gene therapy field doing research and drug development through market launch for 25+ years . . . Michel [Sadelain] can provide a reference for the quality of my science.

I also understand your sense of urgency of having these discussions – I'm also the parent of a child with a genetic disorder and while her condition is not as severe as beta thalassemia, that life experience has pushed [me] very hard  . . . when working with companies, foundations and when I was actively doing drug development in the field of her disorder harder compared to people who are only doing drug development as an academic or business pursuit.

So please accept our apologies in the delay in getting back to you – Nick [Third Rock] and Phil [Third Rock] will contact you soon.  I have the greatest scientific respect for Michel [Sadelain's] . . . work and its potential to impact the thalassemia community.

Thanks for your patience.

84.     In a June 1, 2010 email, Finer (Genetix) wrote to Patrick Girondi (SRT) about scheduling a meeting with the Third Rock Team, and in that email Finer copied Leschly (Third Rock), Neil Exter (Third Rock), and Reilly (Third Rock).

85.     On or about June 8, 2010, Sam Salman and Patrick Girondi visited Leschly of Third Rock to discuss a potential collaboration for a meaningful therapy.

86.     In June 2010, Third Rock attempted to collaborate with SRT and/or acquire rights to SRT's TNS9 Vector and its proprietary know-how related to globin lentiviral vectors, but the negotiations broke down.

87.     In a June 2010 email, Dr. Sadelain wrote to SRT stating: "The stakes are very high now and in the next few weeks.  You can count on Genetix [now bluebird] to proactively sabotage all your efforts."

88.    In a June 18, 2010, email with the subject line "updated list," Leschly (Third Rock) wrote to Finer (Genetix) stating:

Pat Girondi – need to shut him down…curious what he called about…my emails were clear **want to get him to buy into a CDA to review Michel [Sadelain's] data. Be nice, suck up, etc… if you think (and I think) that Michel has valuable data.**

(Bold and ellipses in original).

89.    On June 20, 2010, in response to Leschly's June 18, 2010 email with the subject line "updated list," Finer (Genetix) responded as follows:

See below in red.

Pat Girondi – need to shut him down…curious what he called about…my emails were clear **he really wants to do a deal with us and wants to learn more about our program.  He just has a screwed up way of interacting with people like us. I told him you would follow-up. Perhaps he should go to France when we are there, meet Yves, Marina, etc… I want to have a review under CDA of Michel [Sadelain's] data.  This is all we have to get out of him. I can get that out of him.**

(bold, red and ellipses in original).

90.    In June 2010, the negotiations between Third Rock and SRT broke down when SRT refused to execute a confidential disclosure agreement ("CDA") with Leschly (Third Rock) and Finer (Genetix).

91.    In a September 9, 2010 press release, Genetix stated that (i) "it has changed the company name from Genetix Pharmaceuticals, Inc. to bluebird bio, Inc., effective immediately," and (ii) "bluebird bio has also announced that Leschly, formerly interim president of bluebird bio and partner of Third Rock Ventures, has been appointed the company's president and chief executive officer."

92.    Genetix's / bluebird's September 9, 2010 press release further states that Leschly is a "partner of Third Rock Ventures since its founding in 2007, he became interim president of

18

bluebird bio in March 2010 in conjunction with Third Rock's investment in the company's Series B round.  Leschly has played an integral role in the identification, formation and business strategy of several of Third Rock's portfolio companies."

93.    After Third Rock finalized its $35 million investment in Genetix, sometime in 2010, Leschly "got bad news," according to an interview Leschly gave to the New York Times, published in November 2017.  Bluebird could not efficiently and safely produce lentiviral vectors that were safe for clinical use in patients.  The New York Times published an article titled "Gene Therapy Hits a Peculiar Roadblock: A Virus Shortage," which discuss the events that happened at bluebird:

> Few gene-therapy companies have the factories or expertise to make the viruses for use in clinical trials, where **standards are exacting and comprehensive** . . . .

> [A]s officials at Bluebird Bio can attest, whether you have any product at all.  The company was formed in 2010 . . . Then, said Nick Leschly, the company's chief executive, he got bad news. **Using Bluebird's recipe, the manufacturing company said it was going to cost Bluebird a million dollars to create enough viruses to treat one patient**.

> The company scurried to find ways to **improve the efficiency of its recipe**. Finally, they were ready to start anew. Manufacturing began, but months later there was nothing to show for it.

> "**We got no virus**," Mr. Leschly said.  "It was an Apollo 13 moment," he added. "We put everyone in a room and said, 'We have to figure this out. Everything at the company is now stopped. Nothing can be done without virus.'"

See Gina Kolata, *Gene Therapy Hits a Peculiar Roadblock: A Virus Shortage*, N.Y. Times, (Nov. 27, 2017) (emphasis added).

94.    Around the time of this "Apollo 13 moment," Defendants Third Rock, bluebird, Leschly, Finer, and Reilly realized that access to SRT's proprietary lentiviral vector production

and formulation technology was essential in overcoming the problems plaguing the BB305 Vector and bluebird's formulation manufacturing process for lentiviral vectors.

95.     Prior to October 2010, SRT delivered its proprietary TNS9 Vector made to cGMP standards, which was enough vector to treat at least 10 Beta Thalassemia patients.

96.     Unable to acquire the TNS9 Vector directly from SRT, Defendants bluebird, Third Rock, Leschly, Finer, and Reilly entered into and engaged in a conspiracy to fraudulently induce SKI into an agreement where they fraudulently obtained samples of SRT's clinical grade TNS9 Vector, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT.

97.     Unable to convince SRT to execute a CDA and share SRT's trade secrets and confidential data with bluebird, Defendants Third Rock, Leschly, Finer, Reilly, and bluebird entered into and engaged in a conspiracy to fraudulently obtain SRT's trade secrets and confidential information, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT.

98.     Unbeknownst to SRT, on October 29, 2010, Leschly executed a 2010 CDA between bluebird and SKI as part of Defendants' scheme to steal unlawful competitive intelligence (confidential information) and trade secrets related to the TNS9 Vector and belonging to SRT.

99.     The 2010 CDA was signed by Leschly on October 29, 2010 and Andrew Maslow (Director, Office of Industrial Affairs, MSK) on November 2, 2010.

100.     With respect to confidential information, section 2 of the 2010 CDA states:

As used in this Agreement, the term "Confidential Information" means any technical or business information furnished by a Disclosing Party in any manner to a Recipient in connection with the proposed business relationship, regardless of whether such information is specifically designated as confidential and regardless of whether such information is in written, oral, electronic, or other form. Such

Confidential Information may include, without limitation, trade secrets, know-how, inventions, technical data or specifications, testing methods, business or financial information, research and development activities, control and inspection practices, manufacturing processes and methods; product and marketing plans, and customer and supplier information . . . Each Recipient acknowledges that each Disclosing Party's Confidential Information is that Disclosing Party's sole, exclusive and extremely valuable property. Accordingly; each Recipient agrees to segregate all Confidential Information from information of other companies.

101.    Defendants Leschly, Third Rock, Finer, Reilly, and bluebird were aware that MSK was disclosing confidential information that was exclusive and extremely valuable property. However, each Defendant had the intent of misappropriating the confidential information, including SRT's trade secrets related to the clinical grade TNS9 Vector.

102.    With respect to the non-disclosure of confidential information, section 3 of the 2010 CDA states:

The Recipient shall hold in confidence and shall not disclose any Confidential Information of the Disclosing Party, except (i) as expressly permitted under this Agreement, or (ii) as required by applicable law or legal process, in which instance the Recipient shall provide the Disclosing Party with prior written notice of any such disclosure so that the Disclosing Party can seek an appropriate protective order.  The Recipient shall disclose such Confidential Information only to its employees and consultants, and to those employees and consultants of its affiliates . . . The Recipient shall use Confidential Information only for the purpose for which it was disclosed and shall not use or exploit such Confidential Information for the Recipient's own benefit or for the benefit of another without the prior written consent of the Disclosing Party, including without limitation, for the filing or support of any patent application.  Each Recipient shall not use or attempt to use any such Confidential Information in any manner which may injure or cause loss, or may be calculated to injure or cause loss, whether directly or indirectly, to the Disclosing Party.

103.    Defendants Leschly, Third Rock, Finer, Reilly, and bluebird knew of the requirement not to use or exploit the confidential information for bluebird's own benefit. However, each Defendant had the intent of using and exploiting SRT's TNS9 Vector and trade secrets related thereto as well as the competitive intelligence (confidential information) embodied in the IND for the TNS9 Vector.

21

104.    With respect to the return and destruction of confidential information, section 7 of

the 2010 CDA states:

> Each Recipient acknowledges and agrees that all Property of a Disclosing Party
> shall be and remain the Disclosing Party's property.  At the Disclosing Party's
> direction, the Recipient shall, within thirty (30) days of the Expiration Date, return
> to the Disclosing Party or destroy all such "Property" . . . based on or embodying
> any of the Confidential Information received by the Recipient pursuant to this
> Agreement, whether in writing or presented, stored or maintained in or by
> electronic, magnetic or other means.  Notwithstanding the foregoing, if the
> Disclosing Party has not directed the Recipient to return or destroy the foregoing,
> the Recipient shall return all of the foregoing to the Disclosing Party in accordance
> with this Section 7.

105.    According to the 2010 CDA, sections 3 and 7 shall survive the expiration or earlier

termination of the 2010 CDA.

106.    Defendants intentionally caused bluebird to not comply with its obligation and/or

intentionally caused bluebird to breach its objections set forth in the 2010 CDA.   Indeed,

Defendants never had any intentions of complying with the 2010 CDA.

107.    In a 2011 internal presentation, Defendants Leschly, Third Rock, Reilly, Finer, and

bluebird acknowledged that SRT's TNS9 Vector has had "significant progress on vectorology

versus [bluebird] leading to 3–5x improvement in per copy expression versus [the bluebird]

vector."   In the 2011 presentation Defendants indicated that obtaining SRT's TNS9 Vector

"eliminates [bluebird's] most threatening competitor," and "increases probability of success and

magnitude of success," which is written in the pros-versus-con discussion part of the presentation.

108.    With the objective of destroying bluebird's only competitor and protecting their

individual investments, Third Rock, bluebird, Leschly, Reilly, and Finer were involved in the

negotiation of a November 2011 option agreement (the "2011 Option Agreement") between

bluebird and SKI.  However, Defendants entered into the 2011 Option Agreement under false

pretenses in order to fraudulently obtain SRT's TNS9 Vector and proprietary know-how related thereto, fully aware that the clinical grade GMP formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets.

109.    According to the 2011 Option Agreement, bluebird expressed an interest to SKI regarding an option agreement in the area of gene therapy for hemoglobinopathies, and SKI desired to grant bluebird the right to exclusively license certain of SKI's intellectual property, and bluebird desired a period of time in which to evaluate the intellectual property and determine whether to execute a license.

110.    Defendants Third Rock, Leschly, Finer, and Reilly caused bluebird to execute the 2011 Option Agreement under false pretenses in order to gain access to SRT's TNS9 Vector and proprietary know-how related thereto, fully aware that the clinical grade GMP formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets.

111.    With respect to licensed know-how, section 1.4 of the 2011 Option Agreement states:

> "Licensed Know-How" means all know-how and information developed by SKI or its former licensees [SRT] that is necessary or reasonably useful (a) in the Field; and (b) to either (i) practice any of the Licensed Patents or (ii) make, use and/or sell the Vector.

112.    The "Licensed Know-How" under the 2011 Option Agreement included the patent applications listed in Appendix A, titled "Licensed Patent."

113.    The Licensed Know-How under the 2011 Option Agreement included U.S. Patent Application No. 10/188,221, filed on July 1, 2002, "Vector Encoding Human Globin Gene and Use thereof in Treatment of Hemoglobinopathies"; U.S. Provisional Applications Nos. 60/301,861, filed on June 29, 2001 and 60/302,852 filed on July 2, 2001; and International

Application No. PCT/US2002/020988, which were previously the intellectual property listed in the 2005 Agreement between SRT and MSK

114.    The Licensed Know-How under the 2011 Option Agreement included U.S. Patent Nos. 7,541,179 ("the '179 Patent) and 8,058, 061 ("the '061 Patents").  The '179 and '061 Patents were also included in the intellectual property licensed in the 2005 Agreement between SRT and MSK.

115.    With the objective of destroying bluebird's only competitor and protecting their individual investments, Third Rock, bluebird, Leschly, Reilly, and Finer caused bluebird to execute the 2011 Option Agreement for the purpose of obtaining SRT's know-how (*i.e.*, trade secrets) related to the TNS9 Vector, and they were fully aware the SRT's know-how (*i.e.*, trade secrets) was incorporated into the TNS9 Vector.

116.    In November 2011, Defendants were fully aware that SRT was the "former licensee" of MSK's patent applications that related to the TNS9 Vector.  In November 2011, Defendants included SRT's know-how into the definition of "Licensed Know-How" because Defendants' objective was to steal SRT's trade secrets related to the TNS9 Vector, but the only way to get SRT's trade secrets was to falsely represent that bluebird was interested in helping MSK with the IND for the TNS9 Vector.

117.    With respect to vector, section 1.6 of the 2011 Option Agreement states:

"Vector" means clinical grade vector TNS9.3.55 that was manufactured for use in a clinical trial for beta-thalassemia patients and any modification of such that was reasonably within contemplation of SKI and [SRT] at the time the vector was finalized as of September 30, 2010, for the purpose of using the vector TNS9.3.55 for the treatment of sickle cell disorder as opposed to thalassemia.

118.    Defendants were aware that the "Vector" referenced in section 1.6 of the 2011 Option Agreement was SRT's clinical grade vector TNS9.3.55 that was manufactured by SRT for

use in a clinical trial for Beta Thalassemia patients.  Defendants Third Rock, Leschly, Finer, Reilly, and bluebird caused bluebird to execute the 2011 Option Agreement even though they had no intention of using the TNS9 Vector for the treatment of sickle cell disorder.

119.    With respect to modified vector, section 1.7 of the 2011 Option Agreement states:

"Modified Vector" means any modification or improvement of the Vector, but only to the extent that such modification or improvement is such that the US Food and Drug Administration ("FDA") would not require a new Investigational New Drug Application (an "IND") to be filed over the existing IND for the TNS9.3.55 vector.

120.    Defendants were aware that the "Modified Vector" referenced in section 1.7 of the 2011 Option Agreement referred to modifications and variations of SRT's clinical grade vector TNS9.3.55 that were manufactured using SRT's know-how.

121.    With respect to the option, section 2.1 of the 2011 Option Agreement states:

SKI hereby grants to [bluebird] (a) the exclusive right to obtain an exclusive license under the (i) Licensed Patents, (ii) Biological Materials and (iii) any other SKI-owned or controlled intellectual property reasonably required or necessary to make, use and/or sell the Vector, Modified Vector, or Independent Vector that is available for licensing ; and (b) the right to obtain a non-exclusive license under the Licensed Know-How, in each case in the Field in the Territory for the duration of the Option Period (the "Option").

122.    Eventually, bluebird did not exercise its Option under the 2011 Option Agreement because Defendants never intended for bluebird to exercise such Option.

123.    Unable to acquire the TNS9 Vector directly from SRT, Defendants entered into and engaged in a conspiracy and fraud to obtain SRT's TNS9 Vector and trades secrets embodied therein as part of Defendants' objective to eliminate SRT as a direct competitor.

124.    Bluebird fraudulently obtained physical possession of SRT's TNS9 Vector and its proprietary recipe and titration process related to the formulation of safe clinical grade lentiviral vectors.

125.    In a January 27, 2012, email from Leschly to Finer (bluebird), Dr. Gabor Veres

(Vice President of Pre-clinical Research and Development, bluebird), Jeffrey Walsh (Chief

Strategy Officer, bluebird), Cyrus Mozayeni (Vice President, Global Head of Business

Development, bluebird), and Anne-Virginie Eggimann (Vice President, Regulatory Science,

bluebird), with the subject line titled "MSK/Michel Discussion," Leschly wrote the following:

> Let's schedule a breakfast meeting early'ish next week to about this one as a small
> group since this we all know could be problematic on many levels if not
> quarterbacked in the right manner.  First and foremost getting Michel to agree to
> process the same via **Dr. Christof von Kalle** is critical as you said (if he doesn't
> **we need to go postal**).

> Anyway let's make sure we get on same page with plan/timing etc…this has
> diligence/etc implications that we should discuss as well as we sort out when we
> will know what, when and/should we share and with whom.

> Gabor/Cyrus mentioned you are talking to Michel today or over the weekend – this
> I think is VERY IMPORTANT – we MUST get him to see this the right way.

(capitalization in original).

126.    It was critical for bluebird to send SRT's TNS9 Vector to Dr. Christof von Kalle

(one of bluebird's collaborating scientists in Germany) in order to gain access to SRT's trade

secrets and proprietary information embodied in the TNS9 Vector formulation.

127.    At the direction of Third Rock, Leschly, Finer, Reilly, and bluebird, samples of the

TNS9 Vector containing SRT's proprietary formulation and made by SRT's proprietary vector

production process was sent to bluebird's collaborating scientists in Germany, such as Dr. von

Kalle.

128.    Defendants instructed bluebird's Dr. Veres to send SRT's TNS9 Vector to Dr. von

Kalle in Germany.

129.    In addition, Dr. Veres testified that he sent samples of tumors that had developed

in mice treated with SRT's TNS9 Vector to an unidentified collaborator in Germany.  In March

2012, Dr. Veres sent the tumor samples treated with SRT's TNS9 Vector to Dr. Cynthia Bartholoma in Germany.

130.    On May 17, 2012, Sadelain emailed Mozayeni, Veres, and Finer about the TNS9 Vector data update and IND response, in which Sadelain wrote the following:

Dear Cyrus [Mozayeni], Gabor [Veres], and Mitch [Finer]:

The FDA did not approve the IND.  The reason is: insufficient characterization of the lymphoma.  Can you get your German collaborators to do something  **It isn't really believable that they could not analyze three tumor samples in 5 months**.

131.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird conspired to delay the analysis of the tumor samples that was supposed to be conducted by bluebird's German collaborators.

132.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, caused bluebird's German collaborators to perform analyses on SRT's TNS9 Vector for the purpose of stealing and misappropriating SRT's trade secrets.

133.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, instructed bluebird's German collaborators to perform reverse engineering analyses and testing of SRT's TNS9 Vector.

134.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, instructed bluebird's German collaborators to delay and stall testing of tumor samples in order to intentionally sabotage the IND for the TNS9 Vector that was submitted to the FDA.

135.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird fraudulently obtained the physical TNS9 Vector; stole SRT's trade secrets embodied in the TNS9 Vector; fraudulently obtained unlawful competitive intelligence (confidential information) related to

SRT's TNS9 Vector; and then used SRT's trade secrets and competitive intelligence (confidential information) in connection with bluebird's development of its lentiviral vector, which was purportedly identified as the BB305 Vector, and in connection with bluebird's IND for the BB305 Vector submitted to the FDA.

136.    MSK filed the IND for SRT's TNS9 Vector with FDA in November 2010, which was over two years before bluebird submitted its IND for the BB305 Vector in December 2012.

137.    Based on Defendants' fraudulent representations, bluebird obtained a copy of the IND for the TNS9 Vector, which was submitted to the FDA years before bluebird submitted the IND for its BB305 Vector, for the purpose of obtaining unlawful competitive intelligence (confidential information) and to shut down SRT, bluebird's only competitor.

138.    Leschly, Reilly, Finer, Third Rock, and bluebird engaged in a scheme to obtain SRT's proprietary clinical grade TNS9 Vector from MSK under the fraudulent pretense that bluebird was interested in assisting with the IND submission to the FDA; and they did so in order to obtain unlawful competitive intelligence (confidential information) about SRT's TNS9 Vector and proprietary methods for making a clinical grade lentiviral vector for gene therapy.

139.    Bluebird had no intention of actually helping MSK file its IND with the FDA. Based on false representations, Defendants obtained SRT's TNS9 Vector and proprietary information related thereto.

140.    Defendants never had any intentions of actually collaborating with and assisting MSK.

141.    Defendants fraudulently induced MSK to provide bluebird and Dr. Veres with SRT's TNS9 Vector and related proprietary information, including the confidential IND for the TNS9 Vector for the common purpose of obtaining unlawful competitive intelligence (confidential

information), eliminating bluebird's only competitor, and stealing SRT's proprietary information to get ahead of SRT in the market.

142.    Leschly, Reilly, Finer, Third Rock, and bluebird engaged in a scheme to obtain access to SRT's confidential information embodied in the IND for the TNS9 Vector so that bluebird could (i) benefit from the confidential information and competitive intelligence embodied in the IND; (ii) use such information to gain a commercial advantage over SRT; and (iii) use such unlawful competitive intelligence (confidential information) in connection with the submission of the IND for bluebird's BB305 Vector.

**The Deceit And Fraud Continues Throughout the New York Litigation**

143.    On January 18, 2019, Dr. Veres was deposed in the New York Litigation and such deposition was held in Boston, Massachusetts.  During his deposition, Dr. Veres testified that bluebird conducted experiments on SRT's TNS9 Vector.

144.    On April 11, 2019, Dr. Veres testified that bluebird received SRT's proprietary TNS9 Vector from SKI.  Dr. Veres testified that he and other bluebird scientists were given SKI's information, which included SRT's TNS9 Vector for the limited purpose of conducting comparative analyses between the BB305 and TNS9 Vector.  Dr. Veres further testified he and the other bluebird scientists were aware that SKI's information, which included SRT's TNS9 Vector, must not be used for bluebird's own purposes.  And, Dr. Veres falsely testified that bluebird abided by this restriction.

145.    During his deposition, Dr. Veres testified that bluebird had received the plasmid and genetic sequencing of the TNS9 Vector.

146.    During his deposition, Dr. Veres testified that bluebird was able to create the TNS9 Vector in its laboratory based on obtaining the TNS9 Vector itself from MSK.  In other words,

once bluebird fraudulently obtained SRT's TNS9 Vector, bluebird began to create exact copies of the TNS9 Vector.

147.    Bluebird has not identified how many copies of SRT's TNS9 Vector were created and/or retained by bluebird.  Bluebird did not have permission or authority to create or retain copies of SRT's TNS9 Vector.

148.    Defendants were aware that the TNS9 Vector was created using SRT's proprietary lentiviral vector manufacturing process.

149.    Defendants were aware that the clinical grade TNS9 Vector complied with the GMP standards because the vector was created using SRT's proprietary vector production process.

150.    During the New York Litigation, on March 25, 2019, Leschly submitted a notarized verification of his interrogatory responses attesting that his responses were true to the best of his personal knowledge.  Leschly's interrogatory responses were completed in Massachusetts and electronically submitted from Massachusetts to New York.

151.    In responding to the interrogatories, Leschly intentionally falsely testified that no one at bluebird used any information from SKI to develop or improve bluebird's lentiviral vector.

152.    In responding to the interrogatories, Leschly intentionally falsely testified that he never directly or indirectly discussed or planned with anyone associated with SKI to have bluebird misappropriate the TNS9 Vector or any of SRT's know-how, proprietary information, or intellectual property.  In responding to interrogatories, Leschly intentionally falsely testified that he had no involvement in negotiating agreements signed between SKI and bluebird.

153.    During the New York Litigation, Dr. Veres intentionally misrepresented that bluebird did not use SRT's proprietary TNS9 Vector and confidential information related thereto for bluebird's business purposes.

154.    During this deposition, Dr. Veres testified that bluebird examined a sample of SRT's TNS9 Vector, which was delivered to bluebird by SKI.

155.    On April 11, 2019, Dr. Veres testified that he cloned a new globin gene vector for bluebird, which was named BB305, in May 2011.  Dr. Veres further testified that, if changes were made to the sequence of the BB305, then it would have been given a new name; however, this testimony was false.

156.    During his deposition, Dr. Veres testified as follows:

Q.  Have any other vectors been developed by bluebird for gene therapy of thalassemia since the BB305 was cloned?
A.  No.

157.    During his deposition, Dr. Veres testified as follows:

Q.  So Bluebird doesn't have several vectors in development for the treatment of thalassemia.
A.  No.

158.    Contrary to Dr. Veres' testimony, a May 3, 2011 entry in a bluebird lab notebook titled "New Globin Vector" specifically identifies other lentiviral vectors in development to treat Beta Thalassemia, and such vectors were identified as BB304, BB305, BB306, BB307, BB308, BB309, BB310, and BB311.

159.    Contrary to Dr. Veres' testimony, a bluebird lab notebook titled "New Globin Vector" that predates Dr. Veres' testimony shows that bluebird had multiple names for an identical construct of the vector, and which specifically states: "BB305 (and other identical constructs terms BB304, BB306, BB307)."

160.    At the direction of Third Rock, Leschly, Reilly, Finer, and bluebird, Dr. Veres falsely testified that bluebird did not have several vectors in development for the treatment of Thalassemia other than the BB305 Vector.

31

161.    Contrary to Dr. Veres' testimony, in the New York Litigation, bluebird's attorney told Judge Ostrager that bluebird had multiple lentiviral vectors designed to treat hemoglobinopathies, such as Beta Thalassemia.

### Defendants' Fraudulent Inducement Causing the Release and Dispute Resolution Provisions To Be Incorporated into the Settlement Agreement

162.    The central issue in the New York and Massachusetts Litigations concerned conspiracy and fraud to obtain physical possession of SRT's TNS9 Vector and proprietary know-how (*e.g.*, recipe) for refining titration of lentiviral vectors to ensure patient safety conformance.

163.    SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector.  SRT alleged that bluebird fraudulently obtained physical possession of SRT's TNS9 Vector and its proprietary recipe and titration process related to the formulation of safe clinical grade lentiviral vectors.

164.    On November 2, 2020, SRT, MSK, and bluebird executed the Settlement Agreement to resolve any and all disputes among them, including any and all disputes related to (i) the 2005 Agreement between MSK and SRT; (ii) the 2011 Agreement between MSK and SRT; (iii) SRT's claims asserted against MSK and bluebird in the New York Litigation; and (iv) SRT's claims asserted against Leschly and Third Rock in the Massachusetts Litigation.

165.    Under the Settlement Agreement, MSK granted SRT an "exclusive, royalty-free commercial license" to the intellectual property licensed in the 2005 Agreement, which includes the '179 and '061 Patents (collectively, the "Licensed Patents").  The Licensed Know-How under the expired 2011 Option Agreement between bluebird and MSK included the '179 and '061 Patents.

166.    In addition, pursuant to the Settlement Agreement, SRT was granted "an exclusive, royalty-free commercial license to any intellectual property, whether owned in whole by MSK or jointly with any other party, or licensed to MSK, to the extent MSK has the rights to do so, and for which developing making, having made, using, importing, selling or offering to sell . . . any modified or related lentiviral vector **would be or could be infringed**."  (emphasis added).

167.    As of November 3, 2020, SRT has an exclusive (worldwide) commercial license to any process, service, or any product, or part thereof made, used or sold that is covered by any claim of the Licensed Patents for any field of use.

168.    As of November 3, 2020, SRT has an exclusive (worldwide) commercial license to any process, service, or any product, or part thereof made, used, or sold that is manufactured by using a process covered by any claim of Licensed Patent for any field of use.

169.    As of November 3, 2020, SRT has the primary responsibility for enforcing the patent rights to the Licensed Patents because SRT is the exclusive (worldwide) commercial licensee having all substantial rights in the Patents-in-Suit.

170.    In the Settlement Agreement, bluebird did not reserve any rights or waivers to make, market, and sell any lentiviral vector, like the BB305 lentiviral vector, that would come within the scope of the claims of the Licensed Patents.  This fact is also not surprising, especially (i) given that MSK (the patent owner) has never accused bluebird or Third Rock of patent infringement; and (ii) the specifics of the BB305 lentiviral vector were concealed from SRT prior to and at the time of the execution of the Settlement Agreement.

171.    Under the Settlement Agreement, bluebird was not granted any type of license, including without limitation, a commercial license to the '179 and '061 Patents.  Bluebird has never had or has never been granted a commercial license to the '179 and '061 Patents.

172.     The Mutual Release provision states that "[t]he Parties exchange mutual general releases . . . the mutual general releases shall release all claims, both at law and in equity, accrued or unaccrued, known or unknown, suspected, or unsuspected that were brought or could have been brought by [SRT] in the New York Litigation and the Massachusetts Litigation."

173.     The Mutual Release provision additionally states:

[SRT] Releasors fully, finally, and forever release, relinquish, acquite [*sic*] and discharge . . . (collectively the "BBB Releasees") from and against any and all claims, causes of action, demands, disputes, suits, debts, dues, liabilities, sums of money, accounts, reckonings, specialties, bonds, covenants, contracts, agreements, controversies, promises, assessments, rights, damages, costs and/or expenses whether based on a tort, contract or any other theory of recovery, in law, admiralty or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, that [SRT] Releasors may have, ever had or now has against the BBB Releasees or any of them, for upon or by reason of any cause or thing, **from the beginning of the world to the Parties' execution of this Confidential Settlement Agreement**.

(emphasis added) (the "Release").

174.     Likewise, MSK provided an identical Mutual Release to SRT and bluebird.  And, bluebird provided the same Mutual Release to MSK and SRT.

175.     Bluebird released claims against MSK, and likewise MSK released claims against bluebird, that bluebird may have had, ever had, or now has against MSK from the beginning of the world to the Parties' execution of the Settlement Agreement.

176.     Any claims that bluebird may have or had against MSK (and vice versa) that arose out of or concerned the 2010 CDA or 2011 Option Agreement were released and forever waived by bluebird.  Prior to November 2, 2020, any claims that the '179 and/or '061 Patents should have never been awarded to MSK because the U.S. Patent Office made a material error in issuing those patents were claims that bluebird released to MSK.  In other words, bluebird waived its right to

any claim that the United State Patent and Trademark Office ("USPTO") improperly granted and issued the '179 and/or '061 Patents to MSK.

177.    SRT's release to bluebird and MSK applies to claims that SRT may have or had against bluebird from the beginning of the world to the parties' execution of the Settlement Agreement.

178.    The Dispute Resolution provision in the Settlement Agreement only applies to disputes concerning the "Confidential Settlement Agreement, its construction, or its actual or alleged breach[.]"

179.    The Dispute Resolution provision in the Settlement Agreement does not apply to causes of action that arose after execution of the Settlement Agreement.

180.    Given that construction of section 2.a. of the Settlement Agreement—unambiguously and unequivocally—provides that "MSK shall: Give [SRT] an exclusive, royalty-free commercial license to the intellectual property licensed in the 2005 Agreement[,]" SRT agreed to the Dispute Resolution provision.

181.    SRT agreed to enter into the Dispute Resolution provision since there would be no dispute concerning the construction of the Settlement Agreement with respect to SRT having an exclusive commercial license to the intellectual property licensed in the 2005 Agreement.

182.    To assure, and make it further clear, that SRT had an exclusive (worldwide) commercial license to the intellectual property licensed in the 2005 Agreement, section 2.[e] was included in the Settlement Agreement.

183.    The Settlement Agreement arose from SRT's assertion that bluebird sabotaged SRT's life-saving vector, TNS9; stalled SRT's clinical trials; and obtained SRT's proprietary recipe for making a lentiviral vector safe for clinical use.

35

184.    Upon execution of the Settlement Agreement, SRT dismissed with prejudice its civil action complaint filed against Third Rock and Nick Leschly in the Massachusetts Litigation, which released Third Rock and Leschly from the following causes of action that arose prior to execution of the Settlement Agreement: (1) tortious interference with contractual relations; (2) tortious interference with business relations; (3) misappropriation of trade secrets; (4) violations of Massachusetts General Laws ch. 93, § 42; (5) civil conspiracy; (6) unjust enrichment; and (7) violations of Massachusetts General Laws ch. 93A, § 11.

185.    In 2021, bluebird started engaging in commercial activities with the BB305 lentiviral vector that infringe SRT's Licensed Patents.

186.    In September 2021, bluebird completed the submission of its Biologics License Application ("BLA") to the FDA for its Infringing Drug Product, which is manufactured using (and containing) the BB305 Vector.  However, bluebird has engaged and continues to engage in non-regulatory conduct and post-FDA submission activities related to the commercialization of the BB305 Vector, which infringes SRT's Licensed Patents.

187.    On April 24, 2023, bluebird announced the submission of a Biologics License Application (BLA) to the US Food and Drug Administration (FDA) for lovotibeglogene autotemcel (lovo-cel) gene therapy in patients with sickle cell disease.

188.    Patent infringement was not a claim that could have been brought by SRT against bluebird in the New York and Massachusetts Litigations because SRT did not have an exclusive (worldwide) license for the patents until after November 2, 2020, and the cause of action for patent infringement arose in 2021.

189.    On October 21, 2021, SRT filed a complaint in the United States District Court for the District of Delaware against bluebird alleging willful infringement of the Licensed Patents,

*San Rocco Therapeutics, LLC v. Bluebird Bio*, No. 21-1478 RGA (D. Del. Jul. 26, 2022) (the "Delaware Action").

190.    On November 17, 2021, SRT filed an Amended Complaint in the Delaware Action, adding Third Rock as a defendant and alleging that Third Rock willfully induced bluebird's direct infringement of the Licensed Patents.

191.    On January 14, 2022, bluebird and Third Rock filed a motion to dismiss or, alternatively, compel arbitration and stay the Delaware Action.  SRT filed an unopposed motion for leave to file a Second Amended Complaint, on March 4, 2022, which was granted on March 7, 2022.  On April 6, 2022, bluebird and Third Rock filed another motion to dismiss the Delaware Action under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of constitutional standing, and lack of statutory standing, respectively.

### Defendants' Fraud and Deception Is Revealed in 2022

192.    In their brief submitted on May 20, 2022 in the Delaware Action, bluebird and Third Rock claimed that the Settlement Agreement granted bluebird a right to practice (*e.g.*, an implied commercial license) to the very same patents exclusively licensed to SRT under the Settlement Agreement on November 2, 2020.

193.    Contrary to the parties' settlement discussions, bluebird and Third Rock denied that the Settlement Agreement grants SRT an exclusive commercial license to Licensed Patents.

194.    Contrary to the parties' settlement discussions, bluebird and Third Rock claimed that bluebird had a right to use the same intellectual property exclusively licensed to SRT pursuant to the Settlement Agreement.

195.    In 2022, Defendants claimed that the Release permits bluebird to commercially operate (royalty-free) within the scope of the very same patents exclusively commercially licensed

37

(royalty-free) to SRT under the Settlement Agreement, which is contrary to Leschly's, bluebird's, Reilly's, Third Rock's, and Finer's representations made (directly and/or indirectly) during discussions about the Release and Dispute Resolution provisions in November 2020, prior to execution of the Settlement Agreement.

196.   On July 26, 2022, Judge Andrews stayed the Delaware Action pending the determination of an arbitrator regarding the interpretation of the license and release provisions.

197.   The Delaware Action was referred to arbitration to resolve the following issues: whether, pursuant to the Settlement Agreement: (i) SRT has an exclusive commercial license to the Patents-in-Suit, with all substantial rights, including the right to exclude others from commercially using the Patents-in-Suit; and (ii) the Release precludes SRT from asserting patent infringement claims against bluebird and Third Rock.

198.   On August 30, 2022, SRT filed a Demand for Arbitration and Statement of Claim against bluebird and Third Rock Ventures before the American Arbitration Association, Case No. 01-22-0003-6927 (the "Arbitration").

199.   However, prior to August 30, 2022, MSK (the patent owner) confirmed in court submissions that, pursuant to the Settlement Agreement, it granted SRT an exclusive (worldwide) commercial license to the '179 and '061 Patents.  Despite MSK's repeated statements that it granted SRT an exclusive commercial license to the '179 and '061 Patents, bluebird and Third Rock continued to claim that bluebird had the right to use the '179 and '061 Patents under the Settlement Agreement.

200.   MSK has denied taking part in any scheme to fraudulently induce SRT in connection with the Settlement Agreement.

201.    During the Arbitration, on October 18, 2022, bluebird and Third Rock filed two petitions for *inter partes* review ("IPR") to invalidate SRT's Licensed Patents with the United States Patent Trial and Appeal Board ("PTAB") despite bluebird's claims that it had the right to use SRT's Licensed Patents under the Settlement Agreement.

202.    The Arbitrator was so perplexed by bluebird's and Third Rock's IPR petitions that he presented the parties with the following question:

> Are bluebird's petitions for Inter Partes Review seeking invalidation of the MSK/SRT '179 and '061 Patents-in-Suit ***inconsistent with*** bluebird's position in this Arbitration that the mutual releases in the Settlement Agreement were intended to release patent claims within their scope? Why? Why not?

(emphasis added).

203.    During Arbitration, it became apparent that bluebird filing IPR petitions against MSK (patent owner) seeking to invalidate the '179 and '061 Patents was contrary to the Release provision in the Settlement Agreement.  For example, the Arbitrator presented the parties with the following question:

> Given that the Settlement Agreement releases are mutual, does the Settlement Agreement release all claims of any kind, known or known, by all three of SRT, bluebird and MSK, against one another, including patent claims at least up to the execution of the settlement agreement? Why? Why not?

204.    During Arbitration, on October 19, November 30, and December 1, 2022, MSK (patent owner) made it clear, again and again, that SRT has an exclusive, commercial license to the '179 and '061 Patents.  Yet Defendants continued with their fraudulent scheme that bluebird has rights to practice the Licensed Patents under the Settlement Agreement, all the while concurrently continuing with their fraudulent scheme to invalidate the patents.

205.    On February 7, 2023, the Arbitration issued a final award holding:

> Pursuant to paragraph 2 of the November 2, 2020 Settlement Agreement, as supplemented by the December 1, 2022 Exclusive Patent License Agreement

among MSK and SRT under the "further action" provision of paragraph 2 of the Settlement Agreement, SRT has an "exclusive, royalty-free commercial license" to U.S. patent Nos. 7,541,179 and 8,058,061, with (a) exclusionary rights and (b) all substantial rights.

The "Mutual Releases" provision of paragraph 5 of the November 2, 2020 Settlement Agreement does not release SRT's patent claims against Respondents for infringement of the 7,541,179 and 8,058,061 patents.

206.    During Arbitration, but before the final hearing, "on December 1, 2022 SRT and MSK executed a detailed Exclusive Patent License Agreement, providing that, in furtherance of the 'further action' provision in Paragraph 2 of the Settlement Agreement, 'this License Agreement formally documents and memorializes MSKCC's, SKI's and SRT's rights and obligations with regards to the licensing of the '179 and '061 patents . . . on the execution of the Settlement Agreement on November 2, 2020.'"   However, Third Rock and bluebird continued with their fraudulent claims that bluebird had the right to practice the Licensed Patents pursuant to the Release provision of the Settlement Agreement.

207.    The Arbitrator determined that:

Based on the ***plain, unambiguous language of the Settlement Agreement***, SRT did not release its Delaware Litigation claims that bluebird's competing BB305 vector infringed the MSK '179 and '061 Patents-in-Suit.  One principal reason for this is that at the time of execution of the releases, it is ***undisputed*** that SRT did not yet have any patent rights to release.

Moreover, one of the two principal items of compensation that SRT was receiving in the Settlement Agreement was the transfer back by MSK to SRT of the "exclusive" commercial rights to the Patents-in-Suit, the TNS 9.3.55 vector and other intellectual property that had once been licensed to or developed by SRT under the 2005 Agreement.

(emphasis added).

208.    In ruling in favor of SRT, the Arbitrator stated that "[t]he transfer by MSK of 'an exclusive, royalty free commercial license' to the '179 and '061 patents would have had ***made no sense if SRT's one and only commercial competitor, bluebird***, was being given a release to

40

practice the very patent that was being promised in the same agreement to be commercially exclusive."

209.     The Arbitrator ruled in SRT's favor on all issues presented in Arbitration.  As a result, the stay in the Delaware Action, where SRT is asserting claims for willful patent infringement against bluebird and Third Rock, was lifted.

210.     In carrying out their fraud related to the Settlement Agreement, Defendants caused SRT to incur substantially and needless legal fees and cost in connection with the Arbitration.

211.     In November 2020, during discussions about the Release, prior to the execution of the Settlement Agreement, Defendants Leschly, bluebird, Third Rock, Finer, and Reilly acknowledged and agreed that: (i) SRT would have an exclusive commercial license to MSK's intellectual property covering lentiviral vectors for gene therapy treatments, which includes the Licensed Patents; (ii) SRT would be the only company to practice the Licensed Patents; and (iii) bluebird would not interfere with any of the MSK owned lentiviral vector intellectual property exclusively licensed to SRT, which includes seeking to invalidate the Licensed Patents at the PTAB.  The Licensed Patents are part of the intellectual property defined as "Licensed Know-How" under the 2011 Option Agreement between bluebird and MSK that bluebird declined to exercise after Defendants Leschly, Third Rock, Finer, Reilly, and bluebird had already fraudulently acquired SRT's TNS9 Vector, trade secrets, and unlawful competitive intelligence (confidential information).  Defendants knew that their misrepresentations were of a material fact that would induce SRT into agreeing to the Release provision of the Settlement Agreement.

212.     In November 2020, during discussions about the Release, prior to the execution of the Settlement Agreement, Defendants Leschly, bluebird, Third Rock, Reilly, and Finer falsely represented and agreed that SRT would be the only company to commercially practice the

41

Licensed Patents and, as such, SRT would have an exclusive (worldwide) commercial license to the Licensed Patents.  Defendants knew that their misrepresentation was a material fact that would induce SRT into agreeing to the Release provision of the Settlement Agreement.

213.   In November 2020, during discussion about the Release, prior to the execution of the Settlement Agreement, Defendants failed to disclose their plans to bring to market lentiviral vector treatments covered by SRT's Licensed Patents (*i.e.*, their plans to, knowingly and intentionally market a lentiviral vector that would or could infringe the Licensed Patents) prior to the expiration of SRT's Licensed Patents, which was part of Defendants' ongoing scheme to eliminate bluebird's competition and obtain FDA market exclusivity ahead of SRT.  Defendants knew that an omission of such material facts would induce SRT into agreeing to the Release and Dispute Resolution provisions of the Settlement Agreement.

214.   In November 2020, during discussions about the Release, prior to the execution of the Settlement Agreement, Defendants Leschly, bluebird, Third Rock, Reilly, and Finer made intentional omissions of material facts about Defendants' plans to invalidate SRT's Licensed Patents, which was part of Defendants' ongoing scheme to eliminate and harm bluebird's competition and obtain FDA approval with market exclusivity ahead of SRT.  Defendants knew that an omission of such material facts would induce SRT into agreeing to the Release and Dispute Resolution provisions of the Settlement Agreement.

215.   In November 2020, during discussions about the Release, prior to the execution of the Settlement Agreement, Defendants made intentional omissions of material facts, which included Defendants' plans to later claim that bluebird has the right to operate within the scope the claims of the very same patent exclusively licensed to SRT under the Settlement Agreement as part of their ongoing scheme to eliminate and harm SRT and obtain FDA approval with market

exclusivity ahead of SRT.  Defendants knew that an omission of such material facts would induce SRT into agreeing to the Release provision of the Settlement Agreement.

216.    In June 2019, bluebird admitted that SRT had no knowledge about BB305 in its Statement of Undisputed Facts filed in the New York Litigation.  During the New York Litigation, bluebird concealed the correct identity of the actual lentiviral vector contained in transduced cells used in bluebird's gene therapy treatments.  Defendants knew that concealing the true and correct identity of the actual purported BB305 Vector was an omitted material fact, and that such omission would induce SRT into agreeing to the Release and Dispute Resolution provisions in the Settlement Agreement.

217.    During the New York Litigation, bluebird documents show multiple names for lentiviral vectors that had identical genetic constructs as the purported BB305 Vector.  Bluebird presented a naming system for its lentiviral vectors that is inconsistent and deceiving because bluebird had multiple names for identical genetic constructs of the vector, which is contrary to the sworn testimony provided by bluebird's Chief Scientific Officer Dr. Veres.

218.    During the New York Litigation, bluebird improperly prevented SRT from obtaining discovery about the actual BB305 Vector, claiming that the BB305 Vector was not relevant and that the name "BB305 Vector" was vague and ambiguous because bluebird had multiple lentiviral vectors in development to treat Beta Thalassemia.  Bluebird successfully prevented discovery about the correct purported BB305 Vector that Defendants would eventually market, which was a part of the ongoing fraudulent scheme of Defendants Leschly, Third Rock, Finer, Reilly, and bluebird.

219.    During the Arbitration, the Arbitrator realized that bluebird concealed information about the identity of the purported BB305 Vector.  For example, the Arbitrator presented the

parties with the following question:  Did bluebird successfully oppose production of its BB305 vector IP in the New York litigation? If so, on what ground?  The final arbitration award states that "discovery concerning the precise composition of BB305 was successfully objected to by bluebird, and the trial judge denied a motion for production of such material."

220.    The genetic sequence of the purported BB305 Vector and the true identity of the actual BB305 Vector that bluebird subsequently brought to market was intentionally misidentified, concealed, and wrongfully withheld from discovery during the New York Litigation.  Defendants knew that concealing the genetic sequence of the actual purported BB305 Vector which they planned to market was an omitted material fact, and that such omission would induce SRT into agreeing to the Release and Dispute Resolution provisions in the Settlement Agreement.

221.    If SRT knew that Defendants Third Rock and bluebird would claim that bluebird had a right to practice within the scope of the claims of its Licensed Patents, then SRT would not have agreed to the Release and Dispute Resolution provisions in the Settlement Agreement.

222.    If SRT knew that the Defendants would cause bluebird to knowingly and intentionally commercially market and sell the BB305 Vector within the scope of the claims of SRT's Licensed Patents prior to the expiration of the Licensed Patents, then SRT would not have agreed to the Release provision in the Settlement Agreement.

223.    Had Defendants disclosed to SRT the complete genetic makeup and correct identity of the BB305 Vector approved by the FDA and/or that the BB305 Vector that is within the scope of the claims of SRT's Licensed Patents would be marketed prior to the expiration of the Licensed Patents, then SRT would not have agreed to the Release or Dispute Resolution provisions in the Settlement Agreement

224.    If SRT knew of Defendants' plans to invalidate its Licensed Patents, then SRT would not have agreed to the Release or the Dispute Resolution provisions in the Settlement Agreement.

225.    SRT's reliance on Defendants Leschly's, bluebird's, Third Rock's, Finer's, and Reilly's false representations were reasonable, at least, because: (i) Leschly testified (under oath) that no one at bluebird used any information from SKI to develop or improve bluebird's vector; (ii) MSK (patent owner) did not assert any cross-claims for patent infringement against bluebird or accuse bluebird of patent infringement; and (iii) bluebird concealed the genetic makeup and actual identity of the BB305 that would be approved by the FDA during the New York Litigation.

226.    SRT's reliance of Defendants Leschly's, bluebird's, Finer's, Third Rock's, and Reilly's false representations were reasonable, at least, because under the 2010 CDA and 2011 Option Agreement bluebird was not granted any rights to use the Licensed Patents.

227.    SRT's reliance of Defendants Leschly's, bluebird's, Finer's, Third Rock's, and Reilly's false representations were reasonable, at least, because bluebird did not elect to proceed with its partnership with MSK under the 2011 Option Agreement.

228.    Among others, bluebird, Third Rock, Leschly, Finer, and Reilly were responsible for making the above fraudulent misstatements and omissions of material facts during discussions leading up to and prior to the execution of the Settlement Agreement.

229.    To its detriment, SRT relied on Leschly's, bluebird's, Finer's, Third Rock's, and Reilly's false representations that SRT would be the only company to commercially operate within the scope of the Licensed Patents and that bluebird would not sell any lentiviral vectors that would or could infringe the Licensed Patents.

230.    To its detriment, SRT relied on Leschly's, bluebird's, Finer's, Third Rock's, and Reilly's false representations that bluebird would not commercially market any lentiviral vector that would or could be within the scope claims of the Licensed Patent prior the expiration of those patents.

231.    To its detriment, SRT relied on Leschly's, bluebird's, Finer's, Third Rock's, and Reilly's false representations that it would abide by the Mutual Release provision, which precludes bluebird from invalidating the Licensed Patents.

### The Fraudulent "Spin-off" of 2seventy Bio

232.    On February 22, 2021 SRT publicly announced that it would move forward with the TNS9 vector.

233.    After execution of the Settlement Agreement, Defendants became aware that SRT was moving forward with its TNS9 Vector.

234.    Defendants Leschly, Finer, Reilly, Third Rock, and bluebird knew that the purported BB305 approved by the FDA was within the scope of the claims of SRT's Licensed Patents, and, thus, Defendants anticipated that SRT could discover the identity of the BB305 approved by the FDA and bluebird's infringement prior to expiration of the Licensed Patents. Defendants Leschly, Finer, Reilly, Third Rock, and bluebird knew that if their concealment and fraud was eventually discovered by SRT, then SRT would file a willful patent infringement suit against bluebird.

235.    In furtherance of Defendants' scheme and to protect their assets derived from their prior fraudulent acts, Defendants knew that depleting bluebird of valuable assets would preclude SRT from recovering monetary damages against bluebird, which would also protect their investments in bluebird.

236.    On January 11, 2021, bluebird transmitted a press release via electronic wire announcing an intent to separate its severe genetic disease and oncology businesses into differentiated and independent publicly-traded companies, and that Leschly would lead the new entity, Oncology NewCo, as CEO.

237.    On May 5, 2021, bluebird transmitted another press release via electronic wire stating that Oncology NewCo would be named 2seventy bio and the members of the leadership team would include Leschly as CEO.  This same press release quotes Leschly as stating: "The name 2seventy was selected to signify this speed and our team's translation of thought to action as we advance our next generation pipeline of transformative cell therapies to help cancer patients urgently in need."

238.    Bluebird's May 5, 2021 press release also states that bluebird anticipated the separation of its severe genetic disease and oncology businesses into two independent, publicly-traded companies (bluebird bio and 2seventy bio) to be completed by the end of 2021.

239.    On September 8, 2021, bluebird transmitted a press release via electronic wire stating that bluebird entered into an agreement for a $75 million private placement of common stock and common stock equivalents with a healthcare investment fund selected as part of a competitive process and proceeds from the financing would support ongoing R&D and commercialization investments for bluebird bio and for 2seventy bio, which planned to launch as independent companies in October 2021.

240.    In bluebird's September 8, 2021 press announcement, which was transmitted via electronic wire, Leschly made the following public statements:

> "When combined with the approximately $900 million of cash expected at the time of separation, this $75 million equity investment further strengthens the starting financial position of both businesses," said Nick Leschly, chief bluebird. "We look

47

forward to sharing more detail on the innovative and transformative therapies being developed as well as the pipeline, milestones, and strategic outlook for both companies as we head into separation and beyond."

241.    On October 8, 2021, bluebird transmitted a press release via electronic wire, *inter alia*, announcing the filing by 2seventy bio of an updated Form 10 Registration Statement with the U.S. Securities and Exchange Commission (SEC) and stating that this Form 10 reflected bluebird's plans for a tax-free spin-off of its oncology programs and portfolio into 2seventy bio as a publicly-traded company.

242.    In bluebird's October 8, 2021 press announcement, which was transmitted via electronic wire, Leschly made the following public statements:

"As we approach separation, we have been strategic and diligent in setting up each business for success," said Nick Leschly, chief bluebird and expected chief kairos officer, 2seventy bio. "The first part of this year was largely directed toward focusing and shaping our internal operations and continuing to advance the transformative gene and cell therapy products that sit on both sides of the current business."

243.    The October 8, 2021, bluebird announcement further states:

Upon separation, bluebird bio plans to distribute 100% of the outstanding shares of 2seventy bio common stock to bluebird's shareholders in a 3:1 ratio. For every three shares of bluebird bio stock, current shareholders will receive one share of 2seventy bio stock.

The company anticipates that its cash, cash equivalents and marketable securities balance at separation will be approximately $1.0B . . . bluebird bio expects to fund 2seventy bio with approximately $480M in cash upon separation, with the balance to be retained by bluebird bio. Together with existing and emerging sources of revenue and other anticipated cash inflows, which includes the potential sale of priority review vouchers that would be issued with anticipated U.S. regulatory approvals of BLAs for bluebird's therapies in beta-thalassemia and cerebral adrenoleukodystrophy, the Company expects its cash, cash equivalents and marketable securities balance will be sufficient to fund operations for bluebird bio and 2seventy bio into 2023 under current business plans.

244.    At the launch of 2seventy, Defendants stripped bluebird of profitable assets, which included bluebird's immune-oncology cell therapy products and $480,000,000 in cash.

245.    Most of the foregoing cash and investments resulted from Defendants bluebird's, Leschly's, Third Rock's, Finer's Reilly's, and 2seventy's ongoing fraudulent scheme to harm SRT and eliminate bluebird's competition and obtain FDA approval for the BB305 Vector with market exclusivity.

246.    On November 4, 2021, bluebird transmitted a press release via electronic wire stating that it has completed the tax-free spin-off of its oncology programs and portfolio into 2seventy bio, Inc., an independent, publicly-traded company and that bluebird bio would continue its work focused on severe genetic disease.

247.    Defendants caused bluebird to announce that they created 2seventy to spin off the oncology program; however, these statements were false and/or intentionally misleading and were part of Defendants Leschly's, Reilly's, Finer's, Third Rock's, and bluebird's fraudulent scheme to transfer their capital gains and investments out of bluebird into another company as a way to avoid paying subsequent damages and liabilities owed to SRT.

248.    Defendants caused bluebird to announce that they created 2seventy to spin off the oncology program; however, these statements were false and/or intentionally misleading because, *inter alia*, bluebird subsequently granted and transferred to 2seventy rights and/or ownership in the BB305 Vector.

249.    After SRT filed its patent infringement suit against bluebird, on February 23, 2023, bluebird assigned to the 2seventy all of its rights, obligations and interests under the license agreement dated as of September 13, 2011, by and between Institut Pasteur and bluebird pertaining to any and all uses of the licensed intellectual property in connection with lentiviral vectors (*e.g.*, BB305 Vector) to treat Beta Thalassemia and SCD patients.

250.     In addition, bluebird sublicensed certain intellectual property rights to 2seventy under an intellectual property license agreement, by and between bluebird bio and 2seventy, which was entered into in connection with the separation of the 2seventy from bluebird, and which allows 2seventy to use bluebird's intellectual property related to lentiviral vectors for gene therapy treatments.

251.     Defendants Leschly, Third Rock, Finer, Reilly, and bluebird caused bluebird to sublicense the rights to the BB305 Vector to 2seventy as part of their ongoing scheme of fraud and to shut down SRT, obtain FDA approval with market exclusivity ahead of SRT, and protect their capital gains derived from their fraudulent scheme.

252.     Defendants Leschly, Third Rock, Finer, Reilly, and bluebird caused bluebird to assign and transfer ownership of the intellectual property related to the BB305 Vector to 2seventy so that 2seventy could then market and sell the BB305 Vector for the treatment of SCD and Beta Thalassemia patients, and this was a part of their ongoing scheme of fraud to shut down SRT, obtain FDA approval with market exclusivity ahead of SRT, and protect their capital gains derived from their fraudulent scheme.

253.     Leschly is currently the President, CEO, and a member of the board of directors at 2seventy.  As founding member and partner at Third Rock, Leschly (i) was a substantial shareholder of bluebird stock; (ii) played an integral role in the overall formation, development and business strategy of bluebird; (iii) served as the CEO at bluebird for eleven years; and (iv) currently serves as a Board member of bluebird.

254.     In 2018, Leschly was the highest compensated CEO in biopharma, raking in $24,000,000; and between 2010 and 2021, Leschly sold over $100,000,000 in shares of bluebird. Leschly currently owns substantial stock in 2seventy.

255.    As a founding member and partner at Third Rock, Reilly served in a key leadership role at bluebird.  As a partner at Third Rock, Reilly (i) was instrumental in creating bluebird; (ii) served on the scientific advisory board of bluebird; and (iii) served as the Chief Medical Officer at bluebird.  Upon creation of 2seventy, Reilly served as its Chief Scientific Officer.  Reilly has sold millions of dollars of shares of bluebird and currently owns stock in 2seventy.

256.    As Chief Scientific Officer and major shareholder of bluebird bio, Finer (i) played an integral role in the overall formation, development and business strategy of bluebird; and, (ii) served as the Chief Scientific Officer at bluebird for over 5 years.  Finer has sold millions of dollars of shares of bluebird.

257.    Each Defendant received income and/or investments that were generated as a direct or proximate result of Defendants' ongoing fraud and scheme (i) to shut down SRT (bluebird's only competitor); (ii) fraudulently obtain unlawful competitive intelligence (confidential information) that they used in the submission of bluebird's IND for the BB305 Vector, which resulted in FDA approval and Orphan Drug market exclusivity, and therefore, achieving Defendants' objective of increasing the stock price and valuable of bluebird.  Each Defendant profited from the increase in the stock price and market valuation of bluebird prior to spinning off 2seventy.

258.    Each Defendant currently owns substantial shares of stock in 2seventy.

259.    Each Defendant derived income and capital gains as a direct result of their fraudulent schemes.

260.    At the time of the spin-off, the majority of 2seventy's shares were owned by Leschly, Finer, Reilly, and Third Rock.

261.    Each Defendant profited from an increase in the stock price and market valuation of 2seventy, which was a direct result of Defendants' ongoing fraud and scheme (i) to shut down SRT (bluebird's only competitor); and (ii) fraudulently obtain unlawful competitive intelligence (confidential information) that they used in the submission of bluebird's IND for the BB305 Vector, which resulted in FDA approval and Orphan Drug market exclusivity.

262.    Each Defendant used the income generated and/or received from bluebird (*e.g.*, stock, salary, profits, bonuses) and invested part of that income into 2seventy and/or another biotechnology company created by Third Rock.

**THE SUBSTANTIAL HARM CAUSE BY DEFENDANTS' UNLAWFUL CONDUCT**

263.    SRT has suffered harm to its business and property, including economic injuries as a result of Defendants' repeated fraud and harmful acts carried out to shut down SRT and eliminate bluebird's competition, and obtain FDA approval with market exclusivity ahead of SRT.

264.    As a result of Defendants' scheme to shut down SRT and fraudulent acquisition of unlawful competitive intelligence (confidential information), SRT has suffered direct injuries to its business and property, including but not limited to, the clinical grade TNS9 Vector and SRT's trade secrets.

265.    For example, SRT has lost profits as a result of Defendants' actions because, but for Defendants' actions, SRT would have received FDA approval with market exclusivity for lentiviral gene therapy treatments in Sickle Cell and Beta Thalassemia patients before bluebird.

266.    SRT relied on Defendants' misrepresentations and omissions of material facts to its detriment, which caused SRT to dismiss, with prejudice, its civil action filed against Third Rock and Nick Leschly in the Massachusetts Litigation where SRT's damages were in excess of $100 million.

267.    Because Defendants directed and caused bluebird and Third Rock to submit the IPR petitions to invalidate SRT's Licensed Patents, which was carried out in furtherance of Defendants' fraudulent schemes, SRT has spent significant funds to file responsive papers, exhibits, inventor and expert declarations, all of which include filing fees, litigation costs, and attorney fees.

268.    Because Defendants directed and caused bluebird and Third Rock to continue their fraudulent claims during Arbitration, which was carried out in furtherance of their fraudulent scheme, SRT has incurred substantial and needless legal cost and fees.

269.    As a direct result of Defendants' harmful and fraudulent actions, SRT has suffered an economic injury from Defendants' interference with SRT's business and property, including its ability to recover monetary damages from bluebird, which is on the verge of insolvency.

270.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion.

271.    As a direct result of Defendants' harmful and fraudulent actions, patients continue to suffer from a disease treatable with SRT's technology.  Those patients are faced with a lack of access to SRT's IND due to Defendants' actions as discussed above, as well as Defendants' multimillion-dollar demands for the BB305 treatment based on SRT's intellectual property.

## FIRST CLAIM FOR RELIEF
## FEDERAL CIVIL RICO

272.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 271 as if fully set forth herein.

273.     Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(a).  For example, "racketeering" includes wire fraud or committing fraud by means of electronic transmissions over wire.

274.     As previously discussed, Defendants have engaged in multiple instances of wire and mail fraud, which includes, at least, the following:

(i)      obtaining and then delivering the TNS9 Vector and SRT's stolen trade secrets to collaborators in Germany via mail in 2012;

(ii)     submitting materials to the FDA containing stolen trade secrets and fraudulently obtained unlawful competitive intelligence (confidential information) in 2013 via mail and wire;

(iii)    transmitting a settlement payment and submitting the executed Settlement Agreement via wire in November 2020;

(iv)     submitting documents to the Securities and Exchange Commission and distributing materials related to the spinoff of 2seventy via wire and mail in 2021;

(v)      transmitting numerous press announcements about the spin-off of 2seventy via wire and mail in 2021;

(vi)     submitting two IPR petitions to the PTAB via wire in October 2022;

(vii)    transmitting documents and making payments to the American Arbitration Association (AAA) for administrative fees via wire in December 2022 and January 2023; and

(viii)   submitting payment to SRT for the reimbursement of administrative fees of the AAA and compensation for the Arbitration, pursuant to the arbitration award, via wire in March 2023.

275.     In addition, "racketeering" includes theft of trade secrets.  *See* 18 U.S.C. §§ 1961, 1832.  As previously discussed, the Defendants engaged in a campaign to steal SRT's trade secrets relating to the TNS9 Vector.  For example, Defendants acted with intent to convert a trade secret (*e.g.* confidential information concerning the TNS9 Vector) related to a product intended for use in interstate or foreign commerce (*e.g.*, the TNS9 Vector) to their economic benefit and intended or knew that the offense will injure SRT; and, knowingly (a) stole and obtained by fraud or deception SRT's trade secrets, (b) without authorization, copied, duplicated, downloaded,

uploaded, transmitted, delivered, sent, mailed, communicated, or conveyed the trade secrets, (c) received, bought, or possessed the trade secrets, knowing the same to have been stolen or obtained without authorization, (d) attempted to commit the offenses in (a)–(c), and (e) conspired amongst themselves to commit the offenses in (a)–(c) and took steps in furtherance of the acts described in (a)–(c).

276.     In addition, "racketeering" includes transportation and receipt of stolen goods. *See* 18 U.S.C. §§ 1961, 2314, 2315.  As previously discussed, Defendants engaged in a campaign to steal SRT's TNS9 Vector.  For example, Defendants (a) transported, transmitted, or transferred in interstate and/or foreign commerce the TNS9 Vector (worth far in excess of $5,000), knowing the same to have been stolen, converted, or taken by fraud, and (b) devised a scheme or artifice to defraud SRT or obtain the TNS9 Vector by means of false or fraudulent pretenses, representations, or promises; and transported or caused the TNS9 Vector to be transported in interstate and/or foreign commerce in the execution or concealment of a scheme or artifice to defraud SRT's property.  Likewise, Defendants received, possessed, concealed, stored, and disposed of the TNS9 Vector (worth far in excess of $5,000), which had crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken.

277.     Defendants committed the predicate acts willfully and/or with actual knowledge of the illegal activities.  All of the foregoing illegal acts were part of a pattern of racketeering activity and done in furtherance of Defendants' fraud and illegal scheme to shut down SRT (bluebird's only competitor) and obtain FDA approval for the BB305 Vector with market exclusivity status ahead of SRT and in order to protect Defendants' capital gains and profits derived from their fraudulent scheme.  The predicate acts were related, having the same or similar purposes and

results (*e.g.*, to shut down SRT, advance the competing BB305 Vector, and shield associated assets); involved the same or similar participants (*e.g.*, Defendants) and victims (*e.g.*, SRT); and involved the same or similar methods of commission or otherwise were interrelated by distinguishing characteristics.  The predicate acts were also continuous, as part of a past and ongoing scheme to shut down SRT, advance the competing BB305 Vector, and shield associated assets.

278.    SRT's cause of action to bring civil Federal RICO alleged herein arose after execution of the Settlement Agreement.

279.    At least one or more of Defendants' predicate acts required to establish a Federal RICO civil action occurred after November 2, 2020.

280.    As detailed below, SRT alleges four different causes of action for federal RICO violations.  In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, Section 1962(a) provides relief against parties who use income generated through a pattern of racketeering activity, Section 1962(b) provides relief against parties who use a pattern of racketeering activity to acquire or maintain an interest or control over an enterprise, and Section 1962(d) provides relief against those who conspire to violate the racketeering laws. Defendants are liable under each of these four sections of the statute.

***Culpable Persons and Enterprise***

281.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 280 as if fully set forth herein.

282.    18 U.S.C. § 1961(3) defines a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property[.]"

283.    The culpable persons are Defendants Leschly, Finer, Reilly, Third Rock, bluebird, and 2seventy, herein referred to collectively as the "Leschly Enterprise."

284.    The Leschly Enterprise consists of the Defendants acting collectively as an association in fact to shut down SRT as a competitor of bluebird, obtain FDA approval for the BB305 Vector with market exclusivity ahead of SRT, fraudulently induce SRT to execute the Settlement Agreement, and preclude subsequent enforcement damages owed to SRT by the fraudulent creation of 2seventy.

285.    All of the Defendants have worked together and coordinate as the Leschly Enterprise, and each of the Defendants contributes to the operation and organization of the Leschly Enterprise.

### Interstate and Foreign Commerce

286.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 285 as if fully set forth herein.

287.    The cost of bluebird's BB305 Vector is $2.8 million a treatment per patient. However, SRT's TNS9 Vector is projected to cost less than $700,000 per patient.

288.    Defendants' racketeering activities have a nexus to interstate and foreign commerce.

289.    The Leschly Enterprise has a substantial effect on interstate and foreign commerce. Each Defendant has a substantial effect on interstate and/or foreign commerce.

290.    After Defendants fraudulently obtained SRT's TNS9 Vector and trade secrets related thereto, Defendants shipped samples to scientists in Germany, thereby engaging in mail fraud.

291.    In furtherance of Defendants' fraudulent inducement of SRT, Defendants engaged in and affected interstate commerce by way of wiring the money in connection with their fraud and using interstate wires to further Defendants' scheme.

292.    In furtherance of Defendants' fraudulent inducement of SRT, Defendants used the Internet and other electronic facilities to carry out the IPR petitions in their attempt to invalidate the Licensed Patents, thereby engaging in and affecting interstate commerce.

293.    The Leschly Enterprise is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce through each of their individual activities and/or collectively involvement in the business operations of Third Rock, bluebird, and 2seventy.

294.    Bluebird is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

295.    2seventy is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

296.    Third Rock is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

*Racketeering*

297.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 296 as if fully set forth herein.

298.    SRT alleges that Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c).  For example, under Federal law "racketeering" is defined to include fraudulent inducement, wire fraud, or committing fraud by means of electronic transmission over wire, as well as theft of trade secrets and transportation/receipt of stolen goods.  *See* 18 U.S.C. § 1961.

299.     As detailed herein, SRT alleges four different causes of action for federal RICO violations.  In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, Section 1962(a) provides relief against parties who use income generated through a pattern of racketeering activity, Section 1962(b) provides relief against parties who use a pattern of racketeering activity to acquire or maintain an interest or control over an enterprise, and Section 1962(d) provides relief against those who conspire to violate the racketeering laws. Defendants are liable under each of these four sections of the statute.

300.     18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

301.     Defendants have a continuous and ongoing scheme to shut down bluebird's direct competitor based on an intent to defraud and Defendants use mail and/or wires in furtherance of their scheme.  Defendants' scheme encompasses acts of artifice or deceit intended to deprive SRT of its business or property.

302.     In furtherance of their scheme, which involved the use of mail and wires, Defendants have engaged in, at least, the following fraudulent activities:

(i)     fraudulently obtaining SRT's TNS9 Vector in order to steal SRT's trade secrets and obtain unlawful competitive intelligence (confidential information);

(ii)     fraudulently inducing SRT to agree to the Release provision of the Settlement Agreement; and

(iii)     fraudulently creating and spinning off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements awarded against bluebird.

## Count I: Violation of 18 U.S.C. § 1962(c)

303.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 302 as if fully set forth herein.

304.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . . " 18 U.S.C. § 1962(c).

305.    As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

306.    As discussed above, the Defendants are each employed by or associated with the Leschly Enterprise.

307.    As discussed above, the Leschly Enterprise is engaged in, or the activities of which affect, interstate or foreign commerce.

308.    As discussed above, the Defendants' conduct or participation, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

309.    Defendants' activities include at least two acts of racketeering activity since 2012, one of which occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

310.    One such act took place in 2012, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently obtained and sent SRT's TNS9 Vector and trade secrets embodied therein, to Germany.

60

311.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

312.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

313.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.  But for Defendants' actions, SRT would have remained ahead of bluebird.  For example, Defendants delayed and sabotaged the IND for TNS9 Vector, derailed legal proceedings through fraudulent inducement into settlement, used SRT trade secrets to enable and accelerate bluebird's clinical vector, and obtained early launch by violating SRT's intellectual property.  But for Defendants' theft of SRT's TNS9 Vector and trade secrets, bluebird would not have any vector in the market. Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

314.    Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

**Count II: Violation of 18 U.S.C. § 1962(a)**

315.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 314 as if fully set forth herein.

316.    18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

317.    As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

318.    As discussed above, Defendants have received income derived, directly and indirectly, from a pattern of racketeering activity.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

319.    Defendants' activities include at least two acts of racketeering activity since 2012, one of which occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

320.    One such act took place in 2012, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently obtained and sent SRT's TNS9 Vector and trade secrets embodied therein, to Germany.

321.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

322.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off

2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

323.    Defendants used or invested, directly and indirectly, part of such income, or the proceeds of such income in the acquisition of an interest in, and the establishment and operation of 2seventy, which has affected interstate and foreign commerce.   For example, Defendants invested proceeds from the pattern of racketeering activity in the development and launch of 2seventy.

324.    As discussed above, the Leschly Enterprise is engaged in, and the activities of which affect interstate and foreign commerce.

325.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.   But for Defendants' actions, SRT would have remained ahead of bluebird.   For example, Defendants delayed and sabotaged the IND for TNS9 Vector, derailed legal proceedings through fraudulent inducement into settlement, used SRT trade secrets to enable and accelerate bluebird's clinical vector, and obtained early launch by violating SRT's intellectual property.   But for Defendants' theft of SRT's TNS9 Vector and trade secrets, bluebird would not have any vector in the market. Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

326.    Because of Defendants' violations of 18 U.S.C. § 1962(a), Defendants are liable to SRT for three times the damages SRT has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## Count III: Violation of 18 U.S.C. § 1962(b)

327.     SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 326 as if fully set forth herein.

328.     18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

329.     As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

330.     As discussed above, Defendants have engaged in a pattern of racketeering.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

331.     Defendants' activities include at least two acts of racketeering activity since 2012, one of which occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

332.     One such act took place in 2012, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently obtained and sent SRT's TNS9 Vector and trade secrets embodied therein, to Germany.

333.     One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

334.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently creating and spinning off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird and maintain control of the Leschly enterprise.

335.    Defendants used the pattern of racketeering to acquire and maintain, directly and indirectly, an interest in and control of the Leschly Enterprise.  For example, Defendants used the pattern of racketeering activity to acquire and maintain interest in and control over the BB305 Vector operations, bluebird, and 2seventy.

336.    As discussed above, the Leschly Enterprise is engaged in, and the activities of which affect, interstate and foreign commerce.

337.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.  But for Defendants' actions, SRT would have remained ahead of bluebird.  For example, had Defendants not delayed and sabotaged the IND for TNS9 Vector, derailed legal proceedings through fraudulent inducement into settlement, used SRT trade secrets to enable and accelerate bluebird's clinical vector, and obtained early launch by violating SRT's intellectual property.  But for Defendants' theft of SRT's TNS9 Vector and trade secrets, bluebird would not have any vector in the market.  Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

338.    Because of Defendants' violations of 18 U.S.C. § 1962(b), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## Count IV: Violation of 18 USC §1962(d)

339.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 338 as if fully set forth herein.

340.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section" 18 U.S.C. § 1962(d).

341.    As discussed above, the Defendants violated 18 U.S.C. § 1962(a), (b), and (c).

342.    As discussed above, the Defendants conspired to violate 18 U.S.C. § 1962(a), (b), and (c).

343.    As discussed above, the Defendants agreed to facilitate the operation of the Leschly Enterprise through a pattern of racketeering activity.  Furthermore, and as discussed above, the Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

344.    Defendants' activities include at least two acts of racketeering activity since 2012, one of which occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

345.    One such act took place in 2012, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently obtained and sent SRT's TNS9 Vector and trade secrets embodied therein, to Germany.

346.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

347.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently creating and spinning off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

348.    Defendants actions constitute a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

349.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.  But for Defendants' actions, SRT would have remained ahead of bluebird.  For example, Defendants delayed and sabotaged the IND for TNS9 Vector, derailed legal proceedings through fraudulent inducement into settlement, used SRT trade secrets to enable and accelerate bluebird's clinical vector, and obtained early launch by violating SRT's intellectual property.  But for Defendants' theft of SRT's TNS9 Vector and trade secrets, bluebird would not have any vector in the market. Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

350.    Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### Count V: Fraudulent Inducement

351.    Plaintiff repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 350 as if fully set forth herein.

352.     The Settlement Agreement is governed by New York law.  Under New York law, fraudulently inducing SRT into entering into the Settlement Agreement voids the Release provision in the Settlement Agreement.

353.     As previously discussed, in 2020, prior to execution of the Settlement Agreement, Defendants made materially false representations that caused SRT to agree to the Release and Dispute Resolution provisions in the Settlement Agreement.

354.     As previously discussed, in 2020, prior to execution of the Settlement Agreement, Defendants made false statements and omissions of material facts with the intent of inducing SRT into entering into the Dispute Resolution provision.

355.     Defendants knew that such representations were false and that SRT would rely on Defendants' false representations.

356.     Defendants made false statements and omissions of material facts with the intent of inducing SRT into entering into the Dispute Resolution provision.

357.     As a result of material omissions and false representations made by Defendants, SRT gave up viable claims and causes of action (both asserted and non-asserted) against Third Rock and Leschly in the Massachusetts Litigation that arose from the beginning of the world to the parties' execution of the Mutual Release and Dispute Resolution provisions.

358.     As a result of Defendants' actions, SRT has been harmed and damaged.  For example, as a result of Defendants' material omissions and false representations, SRT incurred substantial legal fees in connection with asserting its legal rights under the Settlement Agreement.

359.     SRT is also entitled to recover punitive damages under New York law because, in addition to Defendants knowingly committing a fraudulent inducement upon SRT, Defendants also committed a fraud upon patients and the respective courts, and, therefore, directed these

actions not only against SRT but the public generally, evincing a high degree of moral turpitude and demonstrating such wanton dishonesty to imply criminal indifference to civil obligations.

### THIRD CLAIM FOR RELIEF
### Count IV: Violation of Mass Gen. Laws ch. 93A, § 11

360.    SRT repeats, realleges, and incorporates by reference the allegations in paragraphs 1 through 359 as if fully set forth herein.

361.    By way of background, deceptive business practices and unlawful actions by pharmaceutical companies repeatedly have had an adverse impact on patients and individuals located in Massachusetts, by risking patient lives and costing billions to taxpayers located within Massachusetts.  For example, according to public records and publications, the U.S. Department of Justice issued an 3 billion dollar fine to SmithKline Beecham involving the drug Paxil® that was administered to patients located in Massachusetts, where the company was accused of hiding and falsifying clinical data that resulted in deaths of over 60,000 children, some of which are located in Massachusetts; and at this time the CEO of SmithKline Beecham was Jan Leschly. Deceptive business practice and unlawful actions in the pharmaceutical industry have included falsifying clinical data, sabotaging competitors with competing products, "shelving" superior and safer products and bribing doctors to prescribe drugs through commissions and kickbacks—all of which adversely impacts and harms other competing pharmaceutical companies that lawfully distribute safe, effective and lower cost treatment to patients located in Massachusetts.

362.    Mass. Gen. Laws ch. 93A, § 11 makes it unlawful to engage in an unfair method of competition or commit an unfair or deceptive act or practice, as defined by Mass. Gen. Laws ch. 93A, § 2.

363.    In violation of Mass Gen. Laws ch. 93A, § 11, Defendants' unfair and deceptive business acts include fraud and conspiracy.

364.    At all times relevant, Defendants committed their acts of deceit and carried out their racketeering activities in the Commonwealth of Massachusetts.

365.    While located in Massachusetts, Defendants engaged in multiple unfair methods of competition and committed multiple unfair and/or deceptive acts or practices by, *inter alia*, fraudulently obtaining and sending SRT's TNS9 Vector and trade secrets embodied therein, to Germany; falsely and fraudulently executing and transmitting the Settlement Agreement; and fraudulently creating and spinning off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

366.    As a result of Defendants' multiple unfair and/or deceptive acts, and multiple unfair methods of competition, SRT has been deprived of, *inter alia*, its intellectual property, including the value of its trade secret, and Defendants' actions have also delayed SRT's ability to obtain FDA approval with market exclusivity for a treatment that impacts Beta Thalassemia and SCD patients located in Massachusetts.  In addition, SRT has been delayed from providing a safer and a much less expensive (over $1.8 million cheaper) gene therapy treatment to patients located in Massachusetts.

367.    Furthermore, as a result of fraud made by Defendants, SRT gave up viable claims and causes of action (both asserted and non-asserted) against Third Rock and Leschly in the Massachusetts Litigation.

368.    There is a causal connection between Defendants' actions and SRT's losses incurred in the Commonwealth of Massachusetts.  For example, Defendants' fraudulently induced SRT to dismiss its claims asserted in the Massachusetts Litigation, which resulted in a loss of

monetary damages owed to SRT in excess of over 100 million as a result of Defendants Third Rock's and Leschly's intentionally misappropriation of SRT's trade secrets and other crimes against SRT.

369.   Each of Defendants' acts have engaged primarily and substantially in Massachusetts, as the majority of Defendants' deceptive acts occurred within the Commonwealth; SRT was substantially deceived within Massachusetts; and the situs of much of SRT's losses occurred within Massachusetts.

370.   Third Rock aided and abetted and engaged in civil conspiracy with Leschly and 2seventy to create unfair competition, deceptive business act, and fraud against SRT within Massachusetts.

371.   As discussed, Defendants committed the majority of their deceptive acts within Massachusetts, and as a direct and proximate result of Defendants' actions, SRT was substantially deceived and acted on the deception within Massachusetts.

372.   Because of Defendants' knowing and/or willful violations of Mass. Gen. Laws ch. 93A, § 11, Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

373.   Defendants are further entitled to any equitable relief that the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor against Defendants, and provide Plaintiff with the following relief:

A.      That all Defendants are jointly and severally liable for all damage caused to SRT;

B.      That Defendants have fraudulently induced SRT into the Release provision of the Settlement Agreement;

C.      That SRT's Release to bluebird under the Settlement Agreement is to be void;

D.      That SRT shall revive and refile all claims previously filed in *Errant Gene Therapeutics, LLC v. Third Rock Ventures, LLC and Nick Leschly*, Civil Action No. 19-1832, in the Commonwealth of Massachusetts, Superior Court Department of the Trial Court;

E.      Awarding SRT monetary damages in an amount not less than $1 billion, said amount to be proven at trial;

F.      Awarding SRT enhanced (treble) monetary damages pursuant to 18 U.S.C. § 1961, *et seq.* and Mass. Gen. Laws, ch. 93, § 11;

G.      Awarding SRT its litigation expenses, including reasonable attorneys' fees, costs, and disbursements;

H.      Awarding SRT punitive damages in the sum of not less than $250 million or an amount otherwise to be decided by a jury; and

I.      Granting SRT such relief as the case may require or as the Court deems equitable and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 27, 2023                              Respectfully submitted,

72

<u>/s/ Erika Page</u>
Erika Page
FOX ROTHSCHILD LLP
33 Arch Street, Suite 3110
Boston, MA 02110
(617) 848 4000
epage@foxrothschild.com

Wanda French-Brown (pro hac vice pending)
Erika Levin (pro hac vice pending)
Howard Suh (pro hac vice pending)
James McConnell (pro hac vice pending)
FOX ROTHSCHILD LLP
101 Park Avenue, 17th Floor
New York, NY 10178
(646) 601-7617
wfrench-brown@foxrothschild.com
elevin@foxrothschild.com
hsuh@foxrothschild.com
jmcconnell@foxrothschild.com

Lenore Horton (pro hac vice pending)
HORTON LEGAL STRATEGIES PLLC
11 Broadway, Suite 615
New York, NY 10004
(212) 888-9140
lenore@hortonlegalstrategies.com

*Attorneys for Plaintiff San Rocco Therapeutics,
LLC*