# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SAN ROCCO THERAPEUTICS, LLC,

          Plaintiff,

   v.

NICK LESCHLY, MITCHELL FINER, PHILIP
REILLY, THIRD ROCK VENTURES, LLC,
BLUEBIRD BIO, INC., and 2SEVENTY BIO,
INC.,

          Defendants.

Civil Action No. 1:23-cv-10919-ADB

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' <u>MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u>

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION .................................................................................................. 1

II.  FACTUAL BACKGROUND ................................................................................ 2

    A.   The Parties ................................................................................................ 2

    B.   The Origin of the Feud ............................................................................. 3

    C.   SRT's Initial Litigation Campaign ........................................................... 4

    D.   The 2020 Settlement Agreement .............................................................. 5

    E.   SRT's Renewed Litigation Campaign ...................................................... 7

III. THE CLAIMS ARE ALL BARRED BY *RES JUDICATA* AND RELEASE .................. 8

    A.   *Res Judicata* Bars All of SRT's Claims .................................................... 8

    B.   The 2020 Settlement Agreement's
        General Release Bars All of SRT's Claims ............................................. 10

IV.  THE FOUR RICO COUNTS (COUNTS I-IV) FAIL .......................................... 12

    A.   The Alleged Predicate Acts to All RICO Counts Are Precluded ........................ 12

    B.   The RICO Counts Are All Time-Barred ................................................. 13

    C.   The RICO Counts All Sound in Fraud, But Do Not Satisfy Rule 9(b) ................ 14

        1.   The Alleged Predicate Acts of Mail/Wire
            Fraud Are Insufficiently Pled ......................................................... 15

        2.   The Alleged Predicate Acts of Theft of Trade Secrets Are
            Insufficiently Pled, and Not Viable as a Matter of Law .............................. 20

        3.   The Alleged Predicate Acts of Receipt/Transport
            of Stolen Property Are Insufficiently Pled ....................................... 20

    D.   The Alleged Predicate Acts Fail to Satisfy
        Closed- or Open-ended Continuity ........................................................ 21

    E.   The Alleged Predicate Acts Are Not Sufficiently Related ................................ 22

    F.   Each Count Fails on Additional and Independent Grounds ................................ 23

        1.   Count I under RICO 1962(c) Should Also
            Be Dismissed on Separate Grounds ................................................. 23

        2.   Count II under RICO 1962(a) Should Also
            Be Dismissed on Separate Grounds ................................................. 25

        3.   Count III under RICO 1962(b) Should Also
            Be Dismissed on Separate Grounds ................................................. 26

        4.   Count IV under RICO 1962(d) Should Also
            Be Dismissed on Separate Grounds ................................................. 27

## TABLE OF CONTENTS
### (continued)

**Page**

V.    THE FRAUDULENT INDUCEMENT COUNT (COUNT V) FAILS ........................... 28

    A.    SRT Fails to Satisfy Rule 9(b) ............................................................ 28

    B.    SRT Fails to Allege a Misrepresentation of Present Fact ..................... 29

    C.    SRT Fails to Allege a Duty of Disclosure ............................................ 30

    D.    The Fraudulent Inducement Count Is Barred by Disclaimers ............. 31

    E.    The Fraudulent Inducement Count Was Waived by Ratification ......... 32

VI.   THE CHAPTER 93A COUNT (COUNT VI) FAILS ....................................... 32

    A.    SRT's Wrongful Inducement Allegations
        Fail for Lack of Duty to Disclose ........................................................ 33

    B.    SRT's Misappropriation Allegations
        Are Barred by the General Release ....................................................... 33

    C.    SRT's 2seventy Spin-off Allegations
        Are Speculative ................................................................................... 34

VII.  THE CLAIMS AGAINST FINER, REILLY
    AND 2SEVENTY ARE EVEN MORE BASELESS ..................................... 35

VIII. CONCLUSION ........................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
 483 U.S. 143 (1987)................................................................................................13

*Airframe Sys., Inc. v. Raytheon Co.*,
 601 F.3d 9 (1st Cir. 2010)......................................................................................8, 9

*Aleshire v. Wells Fargo Home Mortg., Inc.*,
 No. 10-12066, 2011 WL 4595250 (D. Mass. Sept. 30, 2011)...................................3

*Allen v. Riese Org., Inc.*,
 106 A.D.3d 514 (1st Dept. 2013)............................................................................32

*Álvarez-Maurás v. Banco Popular of P.R.*,
 919 F.3d 617 (1st Cir. 2019)...................................................................................13

*Anoush Cab, Inc. v. Uber Techs., Inc.*,
 8 F.4th 1 (1st Cir. 2021).........................................................................................33

*Arbogast v. Pfizer*,
 No. 22-10156, 2023 WL 1864295 (D. Mass. Feb. 9, 2023)..................................8, 9

*Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*,
 No. 07-9694, 2009 WL 1110783 (S.D.N.Y. Apr. 21, 2009) ..................................30

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..........................................................................................15, 34

*Attia v. Google LLC*,
 No. 17-6037, 2018 WL 2971049 (N.D. Cal. June 13, 2018)..................................25

*Attia v. Google LLC*,
 No. 17-6037, 2019 WL 1259162 (N.D. Cal. Mar. 19, 2019),
 *aff'd*, 983 F.3d 420 (9th Cir. 2020).......................................................................22

*Augustine Med., Inc. v. Progressive Dynamics, Inc.*,
 194 F.3d 1367 (Fed. Cir. 1999)..............................................................................10

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)................................................................................................15

*Bongo Apparel, Inc. v. Iconix Brand Grp., Inc.*,
 856 N.Y.S.2d 22 (2008)..........................................................................................10

*Brooklands, Inc. v. Sweeney*,
 No. 14-81298, 2015 WL 1930239 (S.D. Fla. Apr. 28, 2015)..................................11

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Capone v. City of Columbia*,
  No. 19-2490, 2020 WL 633739 (D.S.C. Feb. 11, 2020)...........................................................19

*Cavallaro v. UMass Mem'l Health Care, Inc.*,
  No. 09-40152, 2010 U.S. Dist. LEXIS 96558 (D. Mass. July 2, 2010) ...................................26

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
  17 N.Y.3d 269 (2011) ..............................................................................................................11

*In re Colonial Mortg. Bankers Corp.*,
  324 F.3d 12 (1st Cir. 2003)..........................................................................................................8

*Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*,
  57 F.3d 56 (1st Cir. 1995).....................................................................................................26, 27

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
  544 F. Supp. 2d 178 (S.D.N.Y. 2008)......................................................................................11

*Danann Realty Corp. v. Harris*,
  5 N.Y.2d 317 (1959) ................................................................................................................31

*Day v. Johns Hopkins Health Sys. Corp.*,
  907 F.3d 766 (4th Cir. 2018) ...................................................................................................19

*Deane v. Weyerhaeuser Mortg. Co.*,
  967 F. Supp. 30 (D. Mass. 1997) .............................................................................................25

*DiMuro v. Clinique Lab'ys, LLC*,
  572 F. App'x 27 (2d Cir. 2014) ...............................................................................................29

*Divot Golf Corp. v. Citizens Bank of Massachusetts*,
  No. 02-10654, 2002 WL 31741472 (D. Mass. Nov. 26, 2002) ...............................................12

*Donovan v. Aeolian Co.*,
  270 N.Y. 267 (1936) ................................................................................................................30

*Douglas v. Hirshon*,
  63 F.4th 49 (1st Cir. 2023)..........................................................................................................3

*Dowling v. United States*,
  473 U.S. 207 (1985)..................................................................................................................21

*Doyle v. Hasbro, Inc.*,
  103 F.3d 186 (1st Cir. 1996).....................................................................................................25

### TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

*Duplessis v. Wells Fargo Bank, Nat'l Ass'n,*
  91 Mass. App. Ct. 1125 (2017)......................................................................34

*DynCorp v. GTE Corp.,*
  215 F. Supp. 2d 308 (S.D.N.Y. 2002)..........................................................31

*Eagle Inv. Sys. Corp. v. Tamm,*
  146 F. Supp. 2d 105 (D. Mass. 2001) ..........................................................24

*ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009)..........................................................................28

*Efron v. Embassy Suites (P.R.), Inc.,*
  223 F.3d 12 (1st Cir. 2000)......................................................................22, 27

*In re Elan Corp. Sec. Litig.,*
  543 F. Supp. 2d 187 (S.D.N.Y. 2008).........................................................29

*Feinstein v. Resolution Tr. Corp.,*
  942 F.2d 34 (1st Cir. 1991)...........................................................................15

*Ferrer v. Int'l Longshoremen's Ass'n (ILA) AFL-CIO,*
  No. 08-1505, 2009 WL 1361953 (D.P.R. May 11, 2009) .......................22

*George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.,*
  114 A.D.2d 930 (2d Dept. 1985) ..................................................................30

*Giuliano v. Fulton,*
  399 F.3d 381 (1st Cir. 2005)..........................................................................14

*H.J. Inc. v. Nw. Bell Tel. Co.,*
  492 U.S. 229 (1989).................................................................................21, 22

*Halvorssen v. Simpson,*
  No. 18-2683, 2019 WL 4023561 (E.D.N.Y. Aug. 26, 2019),
  *aff'd,* 807 F. App'x 26 (2d Cir. 2020)........................................................23

*Harsco Corp. v. Segui,*
  91 F.3d 337 (2d Cir. 1996)......................................................................31, 32

*Home Orthopedics Corp. v. Rodriguez,*
  781 F.3d 521 (1st Cir. 2015).........................................................................21

*Iconics, Inc. v. Massaro,*
  266 F. Supp. 3d 449 (D. Mass. 2017) ..........................................................20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*,
    44 F.3d 40 (1st Cir. 1995) .................................................................................................33

*Kingvision Pay-Per-View, Ltd. v. Vergas*,
    No. 00-0407, 2001 WL 311199 (D.N.H. Mar. 26, 2001) .......................................................35

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ...........................................................................................................13

*Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*,
    438 Mass. 459 (2003) .........................................................................................................33

*Langan v. Smith*,
    312 F. Supp. 3d 201 (D. Mass. 2018) .............................................................................19, 27

*Lares Grp., II v. Tobin*,
    221 F.3d 41 (1st Cir. 2000) .................................................................................................13

*Lawson v. FMR LLC*,
    554 F. Supp. 3d 186 (D. Mass. 2021) ...................................................................8, 12, 13, 23

*Lemelson v. Wang Lab'ys, Inc.*,
    874 F. Supp. 430 (D. Mass. 1994) ....................................................................................23, 24

*Lerner v. Colman*,
    26 F.4th 71 (1st Cir. 2022) .............................................................................................18, 27

*Lily Transp. Corp. v. Royal Institutional Servs., Inc.*,
    64 Mass. App. Ct. 179 (2005), *review denied*, 445 Mass. 1105 (2005) .................................33

*Line v. Astro Mfg. Co.*,
    993 F. Supp. 1033 (E.D. Ky. 1998) ......................................................................................24

*Lithero, LLC v. AstraZeneca Pharms. LP*,
    No. 19-2320, 2020 WL 4699041 (D. Del. Aug. 13, 2020) .....................................................20

*Loksen v. Columbia Univ.*,
    No. 12-7701, 2013 WL 5549780 (S.D.N.Y. Oct. 4, 2013) .....................................................32

*Longo v. Butler Equities II, L.P.*,
    278 A.D.2d 97 (1st Dept. 2000) ..........................................................................................30

*Lu v. Menino*,
    98 F. Supp. 3d 85 (D. Mass. 2015) ......................................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
   140 S. Ct. 1589 (2020) ........................................................................................8

*In re Lupron Mktg. and Sales Practices Litig.*,
   295 F. Supp. 2d 148 (D. Mass. 2003) ...............................................15, 16, 17, 18

*Mattel, Inc. v. MGA Ent., Inc.*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011) .............................................................25

*McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*,
   904 F.2d 786 (1st Cir. 1990)......................................................................16, 18

*Medina-Rodríguez v. $3,072,266.59 in U.S. Currency*,
   471 F. Supp. 3d 465 (D.P.R. 2020)...............................................................16, 17

*Milliken & Co. v. Duro Textiles, LLC*,
   451 Mass. 547 (2008) ...................................................................................33

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)...........................................................................29

*Moweta v. Citywide Home Improvements of Queens, Inc.*,
   267 A.D.2d 438 (2d Dept. 1999) ...................................................................32

*Mulder v. Kohl's Dep't Stores, Inc.*,
   865 F.3d 17 (1st Cir. 2017)............................................................................15

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
   567 F.3d. 8 (1st Cir. 2009)............................................................................15

*Neder v. United States*,
   527 U.S. 1 (1999)........................................................................................15

*Orix Credit All., Inc. v. R.E. Hable Co.*,
   256 A.D.2d 114 (1st Dept. 1998)....................................................................29

*Palantir Techs., Inc. v. Abramowitz*,
   No. 19-6879, 2020 WL 9553151 (N.D. Cal. July 13, 2020) ................................25

*Patane v. Babson Coll.*,
   No. 20-11603, 2021 WL 1989951 (D. Mass. May 18, 2021),
   *aff'd*, No. 21-1432, 2022 WL 17348380 (1st Cir. July 11, 2022) ...........................9

*Rhone v. Energy N., Inc.*,
   790 F. Supp. 353 (D. Mass. 1991) ..................................................................35

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Rodriguez v. Banco Central*,
    777 F. Supp. 1043 (D.P.R. 1991), *aff'd*, 990 F.2d 7 (1st Cir. 1993) .......................................25

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................................................29

*Rubycz-Boyar v. Mondragon*,
    15 A.D.3d 811 (3d Dept. 2005) ......................................................................................10

*Salvati v. Fireman's Fund Ins. Co.*,
    368 F. Supp. 3d 85 (D. Mass. 2019) ............................................................................8, 9

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).........................................................................................................23

*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*,
    628 F.3d 25 (1st Cir. 2010).............................................................................................34

*Shirokov v. Dunlap, Grubb & Weaver, PLLC*,
    No. 10-12043, 2012 WL 1065578 (D. Mass. Mar. 27, 2012) .................................................24

*Simons v. Crowley*,
    112 N.Y.S.2d 851 (1952) ................................................................................................32

*SNS Bank, N.V. v. Citibank, N.A.*,
    7 A.D.3d 352 (1st Dept. 2004).........................................................................................30

*Starr v. Fordham*,
    420 Mass. 178 (1995) ......................................................................................................31

*Tele-Cons, Inc. v. Feit Elec. Co.*,
    No. 03-11250, 2011 U.S. Dist. LEXIS 129820 (D. Mass. Nov. 9, 2011) ...............................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................................28

*Traverse v. Gutierrez Co.*,
    No. 18-10175, 2021 WL 3475723 (D. Mass. Aug. 6, 2021), *appeal dismissed*,
    Nos. 21-1703, 21-1754, 2022 WL 964095 (1st Cir. Jan. 5, 2022) .........................................18

*Turner v. Johnson & Johnson*,
    809 F.2d 90 (1st Cir. 1986).............................................................................................31

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012)..............................................................................................21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Coviello,*
   225 F.3d 54 (1st Cir. 2000)....................................................................................21

*United States v. Kreimer,*
   609 F.2d 126 (5th Cir. 1980) ................................................................................17

*United States v. Raytheon Co.,*
   334 F. Supp. 3d 519 (D. Mass. 2018) .....................................................................8

*United States v. Sawyer,*
   85 F.3d 713 (1st Cir. 1996)...................................................................................18

*United States v. Stepanets,*
   989 F.3d 88 (1st Cir. 2021)....................................................................................21

*United States v. Velazquez-Fontanez,*
   6 F.4th 205 (1st Cir. 2021)....................................................................................35

*United States v. William Cramp & Sons Ship & Engine Bldg. Co.,*
   206 U.S. 118 (1907)..............................................................................................10

*Vázquez-Baldonado v. Domenech,*
   847 F. Supp. 2d 281 (D.P.R. 2012), *aff'd*, 595 F. App'x 5 (1st Cir. 2015) ...........27

*Wade Park Land Holdings, LLC v. Kalikow,*
   589 F. Supp. 3d 335 (S.D.N.Y. 2022).....................................................................11

*Watkins v. Smith,*
   No. 12-4635, 2012 WL 5868395 (S.D.N.Y. Nov. 19, 2012),
   *aff'd*, 561 F. App'x 46 (2d Cir. 2014)....................................................................22

*Watterson v. Page,*
   987 F.2d 1 (1st Cir. 1993).......................................................................................3

*Williams v. Affinion Grp., LLC,*
   889 F.3d 116 (2d Cir. 2018)..................................................................................14

*Wolfson v. Wolfson,*
   No. 03-0954, 2004 WL 224508 (S.D.N.Y. Feb. 5, 2004)......................................29

*Zirvi v. Flatley,*
   433 F. Supp. 3d 448 (S.D.N.Y. 2020),
   *aff'd*, 838 F. App'x 582 (2d Cir. 2020)..................................................................20

## TABLE OF ABBREVIATIONS

| RELEVANT ENTITIES | |
|---|---|
| SRT | Plaintiff San Rocco Therapeutics, LLC |
| bluebird | Defendant bluebird bio, Inc. |
| Third Rock | Defendant Third Rock Ventures, LLC |
| 2seventy | Defendant 2seventy bio, Inc. |
| Sloan Kettering | Sloan Kettering Institute for Cancer Research |
| **BRIEF REFERENCES** | |
| Ex. ___ | Exhibits submitted with the Declaration of Jeffrey S. Robbins in Support of Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), filed concurrently herewith |
| Compl. ¶ ___ | Complaint filed on April 27, 2023 by SRT in the instant case (D.I. 1) |
| **RELATED LITIGATIONS** | |
| the Delaware Litigation | *San Rocco Therapeutics, LLC v. bluebird bio, Inc. and Third Rock Ventures, LLC*, D. Del. Case No. 1:21-cv-01478-RGA |
| the 2015 S.D.N.Y. Litigation | *Errant Gene Therapeutics, et al. v. Sloan-Kettering Institute for Cancer Research*, S.D.N.Y. Case No. 1:15-cv-2044-AJN-SDA |
| the 2021 S.D.N.Y. Litigation | *Errant Gene Therapeutics v. Memorial Sloan-Kettering Cancer Center, et al.*, S.D.N.Y. Case No. 1:21-cv-08206-VSB |
| the New York Litigation | *Errant Gene Therapeutics v. Sloan-Kettering Institute for Cancer Research, et al.*, New York Supreme Court Case No. 150856/2017 |
| the Massachusetts Litigation | *Errant Gene Therapeutics v. Third Rock Ventures, LLC, et al.*, Mass. Superior Court Case No. 1984CV01832-BLS1 |
| the Illinois Litigation | *Errant Gene Therapeutics v. bluebird bio, Inc.*, Ill. Circuit Court Case No. 2016-L-009541 |
| **RELEVANT AGREEMENTS** | |
| the 2005 Agreement | License Agreement between Sloan-Kettering Institute for Cancer Research and Errant Gene Therapeutics, LLC, dated March 7, 2005 |
| the 2011 Agreement | Agreement between Sloan-Kettering Institute for Cancer Research and Errant Gene Therapeutics, LLC, dated June 17, 2011 |
| the 2011 Option Agreement | Option Agreement between Sloan-Kettering Institute for Cancer Research and bluebird bio, Inc., dated November 21, 2011 |
| the 2020 Agreement | Confidential Settlement Agreement among Errant Gene Therapeutics, LLC, Patrick Girondi, Memorial Sloan Kettering Cancer Center, The Sloan Kettering Institute for Cancer Research, and bluebird bio, Inc., dated November 2, 2020 |
| **OTHER** | |
| PTAB | The United States Patent and Trademark Office's Patent Trial and Appeal Board |
| the '179 patent | U.S. Patent No. 7,541,179 |
| the '061 patent | U.S. Patent No. 8,058,061 |

I.     **<u>INTRODUCTION</u>**

The Complaint is the latest salvo from serial litigator San Rocco Therapeutics, LLC

("SRT") in a decade-long feud spawning lawsuits in three state courts and now three federal

courts, an arbitration, and a proceeding before the United States Patent and Trademark Office's

Patent Trial and Appeal Board ("PTAB").  The core allegations are not new.  They were

previously alleged and settled.  That, however, has not prevented SRT—through its founder and

President Patrick Girondi—from pursuing his personal vendetta[1] against bluebird bio, Inc.

("bluebird"), and the companies and individuals formerly affiliated with it.

The Court should dismiss the Complaint with prejudice.  ***First***, SRT released the claims

in a 2020 settlement agreement, and *res judicata* bars them.  ***Second***, the RICO counts are all

time-barred, inadequately pled, and based on conduct that cannot qualify as predicate acts.

Emblematic of the Complaint's myriad flaws, SRT alleges Defendants committed the predicate

act of "mail and wire fraud" by "making payments to the American Arbitration Association"

(Compl. ¶ 274), for an arbitration that was court-ordered and initiated by SRT.  ***Third***, the

fraudulent inducement count fails the Rule 9(b) pleading standard, and fails to allege a

misrepresentation of present fact or a duty of disclosure.  Instead, SRT conjures a conspiracy to

induce it into a nearly three-year-old settlement, based on alleged misrepresentations it never

identifies, and alleged omissions about bluebird's future business plans that are not actionable as

a matter of law.  ***Fourth***, the Chapter 93A count merely repackages all these implausible

allegations, and fails to allege any cognizable damages.  ***Fifth***, the Complaint includes no

---

[1]  *Author Patrick Girondi on Becoming Free from the Fear of Failure*, April 29, 2022, (Girondi: "The hardest thing for me to deal with is that I was outsmarted by Bluebird Bio and Third Rock Ventures. . . . I know that if I wanted to eliminate them, hunt them down and take their lives, I could easily do so.  It's not arrogance.  90% of murders in the US are never solved."), available at https://medium.com/authority-magazine/author-patrick-girondi-on-becoming-free-from-the-fear-of-failure-54b6112801a1.

allegations explaining why SRT has subjected Defendants Finer, Reilly, and 2seventy bio, Inc. to this baseless lawsuit.

## II.   FACTUAL BACKGROUND

### A.   The Parties

Plaintiff SRT, a private company with no products or discernible revenue, apparently operates out of the Tampa home of its founder Mr. Girondi.  (*See* Compl. ¶ 24; *see also* https://floridaparcels.com/property/39/182912ZZZ000005864400A.)  SRT holds a license to two patents obtained via settlement—one expired and one set to expire next year—and has done nothing with either, other than file legal actions.  Based on public statements and appearances, its business objective includes seeking to harm bluebird, including through litigation and a vindictive public relations campaign.[2]

Defendant bluebird is a publicly owned biotechnology company founded in 1992, and based in Somerville, Massachusetts.  It has a pipeline of products in clinical and preclinical trials, and two FDA approved therapies:  Zynteglo® for the treatment of beta-thalassemia, and Skysona® for the treatment of cerebral adrenoleukodystrophy.  It has been working hard to bring these therapies to market and to patients in need.

Defendant Third Rock Ventures, LLC ("Third Rock") is a venture capital firm in Boston, Massachusetts, and past shareholder of bluebird.  It does not currently own any bluebird stock.  Defendant 2seventy bio, Inc. ("2seventy") is a biopharmaceutical company in Cambridge, Massachusetts, with a focus on oncology.  It was formed in November 2021, as a spinoff of

---

[2]  *See, e.g.*, SRT Website's, Press & Publications, "*RICO Lawsuit against pharma bosses*," available at https://sanroccotherapeutics.com/2023/05/05/rico-lawsuit-against-pharma-bosses/; *id.*, "*Simmering feud between bluebird and rival continues with allegations of patent fraud*," available at https://sanroccotherapeutics.com/2021/10/25/bluebird-patent-fraud/.

bluebird's oncology business.  Defendants Leschly, Finer and Reilly are former officers of

bluebird.  Mr. Leschly left bluebird in 2021, Mr. Finer left in 2015, and Mr. Reilly left in 2011.

### B.    The Origin of the Feud

On June 17, 2011, SRT and non-party Sloan Kettering Institute for Cancer Research

("Sloan Kettering") agreed to terminate SRT's license to use two Sloan Kettering patents ("the

2011 Agreement").  (*See* Compl. ¶ 114.)  The two patents are U.S. Patent Nos. 7,541,179 ("the

'179 patent") and 8,058,061 ("the '061 patent").  They cover a Sloan Kettering vector known as

"TNS9" that had once been studied for possible use in gene therapy.[3]  Sloan Kettering had

granted a license to use the TNS9 Vector to SRT back in 2005 ("the 2005 Agreement"), which

SRT purportedly used to try to develop a treatment for beta thalassemia.[4]  (*See id.* ¶ 54.)  SRT

failed to do so and, to this day, has failed to do develop any FDA-approved product.  SRT has

alleged all sorts of nefarious reasons why Sloan Kettering terminated SRT's rights under the

2005 Agreement (*see, e.g.*, *id.* ¶¶ 66-161), but that was all alleged in prior litigations, settled as

discussed below, and Plaintiff has not named Sloan Kettering in this action.[5]

On November 21, 2011, Sloan Kettering and bluebird entered into an agreement granting

bluebird the option to obtain a license to use the '179 and '061 patents ("the 2011 Option

Agreement").  (*Id.* ¶ 108.)  But bluebird never exercised this option.  (*Id.* ¶ 122.)  Instead,

---

[3]  Vectors are used in gene therapy to carry and deliver genetic material into cells to provide the desired therapeutic effect.

[4]  Beta thalassemia is a blood disorder that reduces the production of hemoglobin leading to anemia and, as a result, oxygen delivery to the body is compromised.

[5]  The Court may consider the pleadings and filings in the prior litigations, as well as the settlement agreement because they are all referenced in and central to SRT's claims and the authenticity of these documents is not in dispute.  *See, e.g.*, *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993); *see also Douglas v. Hirshon*, 63 F.4th 49, 57 (1st Cir. 2023); *Aleshire v. Wells Fargo Home Mortg., Inc.*, No. 10-12066, 2011 WL 4595250, at *3 (D. Mass. Sept. 30, 2011).

bluebird continued to develop its own vector known as "BB305" for use in treating beta thalassemia.  (*Id*. ¶ 10.)  This is the vector bluebird uses today in Zynteglo®.

### C.     SRT's Initial Litigation Campaign

Jilted by Sloan Kettering, SRT began a scorched earth litigation campaign more than eight years ago, which continues to this day.  In 2015, SRT sued Sloan Kettering in the Southern District of New York, alleging fraud and breach of contract.  (*See* Ex.1.)  The Court sanctioned SRT over $88,000 for discovery violations and ultimately dismissed the case.  (*See* Ex. 2.)  In 2016, SRT sued bluebird in Illinois state court, alleging fraud and breach of contract.  (*See* Ex. 3.)  SRT voluntarily dismissed this case a month later.  (*See* Ex. 4.)

In 2017, SRT sued both Sloan Kettering and bluebird in New York state court, alleging fraud, breach of contract, civil conspiracy, unfair competition, injunctive relief, and unjust enrichment.  (*See* Ex. 5.)  In 2019, while that case was pending, SRT expanded its target list by suing Third Rock and Mr. Leschly in Massachusetts state court, alleging tortious interference, misappropriation of trade secrets, violations of Mass. Gen. ch. 93, civil conspiracy, unjust enrichment, and violations of Mass. Gen. ch. 93A.  (*See* Ex. 6.)  The state courts eventually dismissed the cases following the execution of the 2020 settlement agreement discussed below.

In the Complaint, SRT repeats the central dispute in all these prior cases.  According to SRT, it failed to develop the TNS9 Vector not because of bad luck or bad science, but because it was somehow "sabotaged" by bluebird and others, in all sorts of different ways, so that bluebird could reach the market first with its gene therapy using the BB305 Vector.  For the Court's convenience, Defendants attach Appendix A, detailing the substantial overlap among the allegations here and in the New York and Massachusetts Litigations.

D.      **The 2020 Settlement Agreement**

Trial in the New York Litigation began on October 29, 2020.  After two days of

testimony, the parties agreed to settle, as documented in a Confidential Settlement Agreement

executed on November 2, 2020 ("the 2020 Settlement Agreement").  (Ex. 7; *see also* Compl. ¶

164.)  The parties to the 2020 Settlement Agreement were SRT, Girondi, Sloan Kettering, and

bluebird.  They expressly agreed to "resolve any and all disputes among them, including, without

limitation, any and all disputes related to the 2005 Agreement, the 2011 Agreement, the New

York Litigation and the Massachusetts Litigation."  (Ex. 7, preamble.)  They did so "to avoid

further disputes and the risks of further litigation."  (Ex. 7, whereas clause.)[6]

Under the 2020 Settlement Agreement, Sloan Kettering gave SRT "an exclusive, royalty-

free commercial license to the intellectual property licensed in the 2005 Agreement," *i.e.*, the

'179 and '061 Patents. (Ex. 7 § 2.)  Additional consideration was provided as well.  (*Id.* § 1.)  In

return, SRT agreed to "dismiss with prejudice" all claims against all defendants in the New York

and Massachusetts Litigations.  The parties also exchanged a general release covering "all

claims" "relate[d] to or arising out of" the 2005 Agreement, the 2011 Agreement, or the New

York and Massachusetts Litigations.  (*Id.* § 5; *see also* Compl. ¶ 164.)

Defendants Leschly and Third Rock were not parties to 2020 Settlement Agreement, but

it resolved the Massachusetts Litigation against them.  Defendants Finer and Reilly had already

left bluebird years before the 2020 Settlement Agreement and were not parties to the prior

litigations.  Defendant 2seventy did not yet exist at the time of settlement.  Nevertheless, SRT

provided in the 2020 Settlement Agreement a general release that covered them as well.

Specifically, SRT provided a general release to bluebird, as well all other "BBB Releasees,"

---

[6]  They also agreed that the 2020 Settlement Agreement shall be governed by New York law.
(Ex. 7 § 6; *see also* Compl. ¶ 352.)

which was defined to include bluebird's "past and present . . . shareholders . . . directors, officers . . . [and] successors." (*Id.* § 5.) This definition includes ***all Defendants in this action*** including Third Rock (bluebird's former shareholder), 2seventy bio (bluebird's successor with respect to bluebird's former oncology business), Mr. Leschly (bluebird's former CEO), Mr. Reilly (bluebird's former Chief Medical Officer), and Mr. Finer (bluebird's former Chief Scientific Officer). This general release expressly covers:

> any and all claims . . . whether based on a tort, contract or any other theory of recovery . . . whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, that [SRT] may have, ever had or now has against the BBB Releasees or any of them, for upon or by reason of any cause or thing, from the beginning of the world to the Parties' execution of this Confidential Settlement Agreement.

(*Id.* § 5.)

No provision in the 2020 Settlement Agreement states, or remotely suggests, that bluebird would shut down the development of its flagship product Zynteglo®, which uses the BB305 Vector. Nor is there any allegation in the Complaint that anyone even discussed this. Moreover, the 2020 Settlement Agreement provides an integration clause that would supersede any such discussion even if it happened (which it did not):

> This Confidential Settlement Agreement sets forth the entire agreement and understanding between the Parties and supersedes and cancels all previous negotiations, agreements and commitments, whether oral or in writing, with respect to the subject matter hereof.

(*Id.* § 10.) It also contains a mutual "Representation" by all parties that they are "not relying on any promise, understanding, or representation of any other party, except as set forth herein." (*Id.* § 8.) This bars SRT's fraudulent inducement claim under New York law.

Further, in the New York Litigation SRT originally had sought an injunction to force bluebird to stop developing the BB305 Vector but SRT *dropped* this claim specifically because it decided *not* to delay bluebird's development. Mr. Girondi testified in a sworn affidavit:

6

> [SRT] decided to dismiss the Sixth Cause of Action for an injunction because Bluebird is very close to approval of its gene therapy for treatment of certain thalassemia patients in Europe. ***[SRT] could not in good conscience pursue any action that could delay or withhold treatment of a single patient of Bluebird.*** [SRT] was forced to provide a cure to thalassemic patients and its decision to forego its claim for an injunction is based on what is best for patients.

(Ex. 8, emphasis added.)  Thus, the core premise of SRT's fraudulent inducement claim—that Defendants supposedly misled SRT into thinking bluebird would shut down its BB305 development (*see e.g.* Compl. ¶¶ 222-23)—is contradicted by the terms of the 2020 Settlement and Mr. Girondi's own prior sworn testimony.

### E.    SRT's Renewed Litigation Campaign

Eleven months after executing the 2020 Settlement Agreement, SRT renewed its litigation campaign.  On October 5, 2021, SRT sued Sloan Kettering in the Southern District of New York, seeking declaratory relief regarding the '179 and '061 Patents, and alleging unfair competition.  (*See* Ex. 9.)  This case is ongoing.

On October 21, 2021, SRT filed a Complaint in the District of Delaware against bluebird (and subsequently added Third Rock as a defendant) alleging that bluebird's BB305 Vector infringes the '179 and '061 patents.  (*See* Ex. 10.)  The Delaware Litigation led to a court-ordered arbitration on various threshold issues.  SRT initiated the arbitration as Claimant in August 2022.  The arbitration was concluded in February 2023, and the Delaware Litigation is ongoing.  (Compl. ¶¶ 198, 205.)  On October 18, 2022, bluebird filed IPR petitions with the PTAB, to assert its congressionally mandated right to seek to invalidate the two patents it is being accused of infringing.  (*Id.* ¶ 201.)  The PTAB instituted the IPR proceedings on April 24, 2023.  Three days later, SRT filed the instant Complaint.

III.   **THE CLAIMS ARE ALL BARRED BY *RES JUDICATA* AND RELEASE**

The claims in the Complaint are repackaged versions of allegations SRT previously made in prior litigations, including the New York and Massachusetts Litigations, layered on top with implausible allegations of an ongoing conspiracy that SRT already settled and released.  (*See* Appendix A.)  As demonstrated below, *res judicata* and release bar SRT's latest claims.

A.   ***Res Judicata* Bars All of SRT's Claims**

Dismissal for *res judicata* is appropriate if "(1) [an] earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related."  *Salvati v. Fireman's Fund Ins. Co.*, 368 F. Supp. 3d 85 (D. Mass. 2019) (quoting *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010)).  In assessing these factors, the Court may rely on "the allegations of the complaint, the documents (if any) incorporated therein, matters of public record, and other matters of which the court may take judicial notice."  *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003).

Here, Defendants easily can establish all three factors.  ***First***, SRT voluntarily dismissed the New York and Massachusetts Litigations with prejudice.  (*See* Ex. 7 § 3.)  This resulted in a "final judgment on the merits."  *Arbogast v. Pfizer*, No. 22-10156, 2023 WL 1864295, at *3 (D. Mass. Feb. 9, 2023) (quoting *United States v. Raytheon Co.*, 334 F. Supp. 3d 519, 524 (D. Mass. 2018) ("[A] voluntary dismissal with prejudice is a final judgment on the merits, even if the dismissal is made in conjunction with a settlement.").

***Second***, the claims in the Complaint are "sufficiently identical or related" to the New York and Massachusetts Litigations for *res judicata* purposes because "they aris[e] from the same transaction, or involve a common nucleus of operative facts."  *Lawson v. FMR LLC*, 554 F. Supp. 3d 186, 199 (D. Mass. 2021) (quoting *Lucky Brand Dungarees, Inc. v. Marcel Fashions*

*Grp., Inc.*, 140 S. Ct. 1589, 1595 (2020)); *see also Arbogast*, 2023 WL 1864295, at *4 (quoting

*Airframe Sys.*, 601 F.3d at 15) (whether "asserted causes of action are sufficiently identical or

related for claim preclusion purposes" depends on "factors including 'whether the facts are

related in time, space, origin or motivation,' 'whether they form a convenient trial unit,' and

'whether treating them as a unit conforms to the parties' expectations.'").  Here, the vast majority

of Plaintiff's factual averments pre-date the 2020 Settlement Agreement, and many were

previously alleged in the New York and Massachusetts Litigations.  (*See* Appendix A.)  All of

SRT's claims rely on the same alleged fraud, theft, and unlawful use of the TNS9 Vector alleged

in the prior proceedings.  As such, these claims arise from the same set of facts, "form a

convenient trial unit," and "conform[ ] to the parties' expectations" in litigating related claims

together.  *Arbogast*, 2023 WL 1864295, at *4.

     ***Third***, "the parties in the two suits are sufficiently identical or closely related."  *Salvati*,

368 F. Supp. 3d at 85.  Where defendants "acted together with the defendants" of a prior suit,

they may have a "sufficiently close relationship" to satisfy this factor, even if not originally

named.  *Patane v. Babson Coll.*, No. 20-11603, 2021 WL 1989951, at *10 (D. Mass. May 18,

2021), *aff'd*, No. 21-1432, 2022 WL 17348380 (1st Cir. July 11, 2022).  This factor "does not

require privity between parties in the two suits," and employee-defendants acting within the

scope of their employment are sufficiently related if their "employer is a defendant in the first

case."  *Id.*  Here, three Defendants were named in the prior litigations (bluebird, Third Rock, and

Leschly) and the rest (2seventy, Reilly, and Finer) allegedly "worked together" with them or

were employed by them.  (*See, e.g.*, Compl. ¶ 285.)

### B.    The 2020 Settlement Agreement's
###         General Release Bars All of SRT's Claims

When parties agree to a general release, they must "expressly reserve . . . any rights that they wish to maintain beyond the date of the settlement of the agreement."  *Tele-Cons, Inc. v. Feit Elec. Co.*, No. 03-11250, 2011 U.S. Dist. LEXIS 129820, at \*6 (D. Mass. Nov. 9, 2011) (citing *Augustine Med., Inc. v. Progressive Dynamics, Inc.*, 194 F.3d 1367 (Fed. Cir. 1999)). The intent of the settling parties as embodied by a written agreement should be honored.  *See Augustine Med.*, 194 F.3d at 1373 (quoting *United States v. William Cramp & Sons Ship & Engine Bldg. Co.*, 206 U.S. 118, 128 (1907) ("If the parties intend to leave some things open and unsettled, their intent so to do should be made manifest.")).

The preamble to the mutual general release provisions in the 2020 Settlement Agreement states that the parties release "all claims" "relate[d] to or arising out of" the 2005 Agreement, the 2011 Agreement, or the New York and Massachusetts Litigations.  (Ex. 7 § 5.)  SRT also provided a general release that applies to all Defendants, as "BBB Releasees."  (*Id.*)  It releases "any and all claims," regardless of the theory of law, that SRT "may have, ever had or now has" against them, "for upon or by reason of any cause or thing, from the beginning of the world to the Parties' execution of this Confidential Settlement Agreement."  (*Id.*)  This general release bars SRT's latest allegations, all of which SRT bases on a purported conspiracy whose origins predated the release.  (*See, e.g.* Compl. ¶ 8.)  New York law, which governs the 2020 Settlement Agreement, confirms this result.  *See, e.g.*, *Rubycz-Boyar v. Mondragon*, 15 A.D.3d 811, 812 (3d Dept. 2005) (applying general release to a claim "not yet asserted" at time of agreement); *Bongo Apparel, Inc. v. Iconix Brand Grp., Inc.*, 856 N.Y.S.2d 22, at \*9 (2008) (claims which "ultimately arose out of, and relate to, defendants' breach . . . are barred by the Settlement Agreement, regardless of when plaintiff may have discovered [defendant's] prior intent.").

10

SRT's attempt to re-characterize its old claims as RICO violations does not change this result. *See, e.g.*, *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 365 (S.D.N.Y. 2022) (RICO claims released by settlement agreement contemplating the release of "known and unknown" fraud claims); *Brooklands, Inc. v. Sweeney*, No. 14-81298, 2015 WL 1930239, at *5 (S.D. Fla. Apr. 28, 2015) (dismissing RICO claims based on post-release predicate acts that are "new overt acts within an ongoing conspiracy rather than new claims.").

Nor can SRT's allegations of fraudulent inducement resuscitate the claims.  Under governing New York law, "a party that releases a fraud claim may later challenge that release as fraudulently induced *only* if it can identify a separate fraud from the subject of the release." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (emphasis added); *see also Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 191-192 (S.D.N.Y. 2008) (finding an "intent to release all claims, including those of fraudulent inducement," even though "no semblance of fraud had come to light" before execution).  Here, SRT's latest fraudulent inducement theory involves the same motivation, subject, injury, and parties as the fraud alleged in the prior litigations.  (*See* Appendix A.)  If re-alleging already released allegations to argue against the enforcement of a release were permitted, "no party could ever settle a fraud claim with any finality."  *Centro Empresarial Cempresa*, 17 N.Y.3d at 276.

SRT also bases its fraudulent inducement claim on alleged "perjured" testimony during the New York Litigation (Compl. ¶ 15), including during depositions (*see id.* ¶ 144) and in interrogatory responses (*see id.* ¶ 150).  But SRT fails to allege any basis to support its contentions besides allegedly conflicting discovery that SRT obtained in the New York Litigation.  SRT had this discovery and clearly knew of the allegedly perjured testimony *before* signing the agreement that settled that case.  (*See* Compl. ¶¶ 158-59.)  Thus, even assuming,

*arguendo*, that any testimony was perjured (none was), SRT released any claim for fraud based on such testimony when it settled the New York Litigation and provided a general release to all Defendants.

## IV.   THE FOUR RICO COUNTS (COUNTS I-IV) FAIL

Plaintiff alleges four counts of RICO violations:  Count I - RICO 1962(c); Count II - RICO 1962(a); Count III - RICO 1962(b); and Count IV - RICO 1962(d).  (*See* Compl. ¶¶ 272-350.)  The Court should dismiss them all because:  (1) the alleged predicate acts are precluded; (2) the counts are time-barred; (3) the Complaint does not meet the pleading standard; (4) the allegations fail to satisfy closed- or open-ended continuity; (5) the alleged misconduct is not sufficiently related; and (6) SRT fails to allege other required elements for each RICO count.

### A.   The Alleged Predicate Acts to All RICO Counts Are Precluded

Previously litigated and settled claims cannot serve as predicate acts to a RICO claim. *See Lawson*, 554 F. Supp. 3d at 199 (preventing previously litigated claims from being included as RICO predicate acts); *Divot Golf Corp. v. Citizens Bank of Massachusetts*, No. 02-10654, 2002 WL 31741472, at *4 n.2 (D. Mass. Nov. 26, 2002) (A general release would similarly "eliminate any pre-existing RICO predicate acts.").  Here, the alleged predicate acts all relate to either alleged misrepresentations that occurred pre-settlement, or post-settlement statements regarding continuing use of the same information.  (*See* Appendix A.)  More than 100 paragraphs in the Complaint detail an alleged "Criminal Enterprise" that began in 2009, based on stale allegations litigated and then settled in the New York and Massachusetts Litigations.  (*See* Compl. ¶¶ 61-184.)  Accordingly, there are no viable predicate acts.  This warrants dismissal of all four RICO counts.

**B.      The RICO Counts Are All Time-Barred**

A four-year statute of limitations governs civil RICO claims.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987).  A RICO cause of action accrues for statute of limitations purposes when the plaintiff discovers, or reasonably should have discovered, its injury.  *See Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 625-28 (1st Cir. 2019) (finding claims accrued when plaintiff "knew of his injury, at the very latest, by the time he filed his [arbitration] claim" even though he did not yet know the "methods" used to injure him); *Lares Grp., II v. Tobin*, 221 F.3d 41, 43-44 (1st Cir. 2000).  Accrual occurs even "before the plaintiff knows of a *pattern* of injurious practice," so a plaintiff that discovers that it has been injured must uncover and allege the RICO pattern within four years or lose its cause of action.  *Lawson*, 554 F. Supp. 3d at 194 (citations omitted).

At the latest, the alleged RICO violations accrued when SRT filed suit in the New York Litigation in 2017, alleging fraud and other claims predicated on the same alleged theft of the TNS9 Vector.  (Compl. ¶¶ 11, 162; *see also* Ex. 5.)  More than 90 allegations in support of SRT's RICO counts are factually similar and closely related to allegations from the 2017 New York Litigation, which SRT filed *over six years ago*.  (*See* Ex. 5.)  SRT cannot salvage its time-barred RICO claims by alleging more recent acts of alleged fraud, including based on the 2020 Settlement Agreement itself, and subsequent litigation and arbitration (*see* Compl. ¶¶ 192-94, 201, 204, 206, 211-215, 232-50, 274(iii-viii)), because these allegations all rest on the same RICO injury resulting from the alleged theft and use of the TNS9 Vector that SRT alleged years ago.  Any alleged "new" RICO predicate acts do not reset the clock absent a new RICO injury.  *Lawson*, 554 F. Supp. 3d at 194 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("a new predicate act can be used to obtain recovery for injuries related to that new predicate act, but cannot be used as a 'bootstrap to recover for injuries caused by other earlier predicate acts

that took place outside the limitations period.'").  Thus, the Court should dismiss the four RICO counts as outside the four-year statute of limitations.

### C.    The RICO Counts All Sound in Fraud, But Do Not Satisfy Rule 9(b)

To sustain a RICO claim based on fraud allegations, claimants must satisfy Federal Rule of Civil Procedure 9(b).  *Giuliano v. Fulton*, 399 F.3d 381, 388 (1st Cir. 2005) (evaluating fraud-based RICO claim "through the particularity prism of Fed. R. Civ. P. 9(b)") (internal quotations omitted); *see also Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (RICO claims alleging fraud must be plead "with particularity," and "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.").

SRT's four RICO counts are premised on alleged mail and wire fraud, fraudulent theft of trade secrets, and transport/receipt of stolen goods, and the Complaint includes at least 125 allegations of fraud.  (*See, e.g.*, Compl. ¶¶ 274, 310-312, 320-322, 332-334, 345-347.)  SRT generally and insufficiently alleges without the requisite specificity that Defendants:

1. "fraudulently obtained and sent SRT's TNS9 Vector and trade secrets embodied therein, to Germany" (*id.* ¶¶ 310, 320, 332, 345);
2. "falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires" (*id.* ¶¶ 311, 321, 333, 346); and
3. "fraudulently created and spun off 2seventy to prevent SRT from recovering any monetary judgements award against bluebird" (*id.* ¶¶ 312, 322, 334, 347).

SRT further alleges Defendants engaged in mail and wire fraud acts that effectively subsume the above three acts, again, across all four RICO counts, by allegedly:

1. obtaining and delivering the TNS9 Vector to collaborators in Germany (*id.* ¶ 274(i));
2. submitting materials to the FDA containing SRT's confidential information (*id.* ¶ 274(ii));
3. transmitting a settlement payment and submitting the executed 2020 Settlement Agreement;

4.  submitting documents to the SEC and distributing materials and press announcements related to the spinoff of 2seventy (*id.* ¶ 274(iv) and (v));

5.  submitting two IPR petitions to the PTAB (*id.* ¶ 274(vi)); and

6.  transmitting documents and making payments in connection with the Arbitration between bluebird and SRT (*id.* ¶ 274(vii) and (viii)).

Courts consistently dismiss claims like these because "general claims of fraud and also [] associated claims where the core allegations effectively charge fraud," must comply with Rule 9(b).  *Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 21-22 (1st Cir. 2017) (affirming dismissal).  A party must plead fraud with particularity and "go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud."  *Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 42 (1st Cir. 1991) (affirming dismissal of RICO claim).  This includes "identifying the basis for inferring scienter," in addition to "specifying the false statements and by whom they were made."  *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 9, 13 (1st Cir. 2009) (affirming dismissal of fraudulent inducement claim).  Here, the predicate acts fail to satisfy the heightened pleading requirements of Rule 9(b), and thus should similarly be dismissed.[7]

### 1.   The Alleged Predicate Acts of Mail/Wire Fraud Are Insufficiently Pled

Mail and wire fraud require "proof that (1) defendants knowingly devised or participated in a scheme to defraud, (2) to obtain money or property by means of false or fraudulent pretenses, representations and promises, and (3) that the mails or interstate wire facilities were used in carrying out the scheme."  *In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148 (D. Mass. 2003) (citing *Neder v. United States*, 527 U.S. 1, 20 (1999)).  The "scheme to

---

[7]  SRT's allegations also fail *Twombly*'s plausibility standard.  *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007), *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570) (citations omitted).

defraud must include some false statement, representation or promise." *Id.* This means "false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud," including "the knowing concealment of facts." *Id.* SRT's Complaint fails to meet this standard for three reasons.

*First*, the acts described in Complaint paragraphs 274(i) and (ii) are merely conclusory allegations of fraudulent misappropriation and unlawful use of Plaintiff's trade secrets. However, "[d]eprivation of the right to control 'does not render every transaction [allegedly] induced by deceit actionable under the mail and wire fraud statutes.'" *Medina-Rodríguez v. $3,072,266.59 in U.S. Currency*, 471 F. Supp. 3d 465, 478 (D.P.R. 2020). SRT cannot create a fraud claim by simply labeling allegations with fraud. Mail and wire fraud require a scheme "calculated to deceive persons of ordinary prudence" used "to deprive another of property." *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir. 1990). Furthermore, any alleged "false statements or assertions" must "concern a material aspect of the matter in question," including "the knowing concealment of facts." *In re Lupron*, 295 F. Supp. 2d at 165. SRT has not alleged any such deceptive scheme or knowing false statement or representation. The alleged misappropriation and unlawful use of SRT's intellectual property does not manifest an actionable mail or wire fraud claim without the requisite basis for inferring scienter or specifying a known materially false or misleading statement. *Id.* As pled, Defendants' commercial activities and alleged representations made during negotiations over access to SRT's confidential information do not amount to attempts to "deceive" SRT through misrepresentations or false statements of material fact. While SRT discusses at length bluebird's commercial activities and communications, the Complaint provides only conclusory allegations

of fraudulent inducement to obtain "samples of SRT's clinical grade TNS9 Vector," which do not amount to "knowing concealment of facts."  *Id.*

> **Second**, the acts described in connection with the 2020 Settlement Agreement (*see* Compl. ¶ 274(iii)), do not sufficiently plead a scheme to defraud.  A later disagreement about a contractual term in the 2020 Settlement Agreement, *i.e.*, whether SRT's patent rights precluded bluebird from continuing to develop its BB305 Vector, does not constitute a "scheme to defraud."  *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980) ("[T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract.").  "[S]chemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes [unless they] depend for their completion on a misrepresentation of an essential element of the bargain."  *Medina-Rodríguez*, 471 F. Supp. 3d at 478 (citations omitted).

> In support of its fraud claims, SRT points toward legal positions over whether "SRT would have an exclusive commercial license" and whether "SRT would be the only company to commercially practice the Licensed Patents."  (Compl. ¶¶ 211-12.)  SRT also asserts that Defendants "failed to disclose their plans" to market allegedly related vector treatments and to react to SRT's patent infringement claims through the defenses of patent invalidity and non-infringement.  (Compl. ¶¶ 213-15.)  Alleged changes in "legal positions" to defend oneself in litigation, however, are not "material falsehoods that would support wire fraud."  *Lu v. Menino*, 98 F. Supp. 3d 85, 99 (D. Mass. 2015).  SRT provides no requisite statement of "affirmative misrepresentation" or omission of present material fact that caused it to enter the agreement.  *See In re Lupron*, 295 F. Supp. 2d at 168.  It merely lists the settlement terms Defendants allegedly breached (*see* Compl. ¶¶ 167-184), which is insufficient.

**Third**, the acts described in paragraphs 274(iv) and (v) relate to alleged misrepresentations in submitting investor materials and publicizing the activities of 2seventy. (*Id.* ¶¶ 274(iv) and (v).)  Mail and wire fraud requires a scheme "calculated to deceive persons of ordinary prudence" used "to deprive another of property."  *See McEvoy Travel Bureau,* 904 F.2d at 791.  Activity cannot amount to a private claim of mail and wire fraud where the "effective reach of the deception stopped" at third parties or regulatory associations, rather than deceiving the party allegedly deprived of property.  *Id.* at 794.  Although there is no "invariable requirement" of "convergence" between "the person deceived" and the "person deprived of the money or property by the fraud," there must be an actual "affirmative misrepresentation."  *In re Lupron*, 295 F. Supp. 2d at 168.  Nothing SRT alleges explains how statements in 2seventy's financial statements were "intended to deceive another."  *See Traverse v. Gutierrez Co.*, No. 18-10175, 2021 WL 3475723, at *16 (D. Mass. Aug. 6, 2021), *appeal dismissed*, Nos. 21-1703, 21-1754, 2022 WL 964095 (1st Cir. Jan. 5, 2022) (dismissing RICO claim because it lacked facts to show how financial statement communications were actually "intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct") (citing *McEvoy Travel Bureau,* 904 F.2d at 791).

Moreover, general statements about 2seventy's future intentions made to the public and the SEC, *e.g.*, that it will serve only as an oncology program, were not "inten[ded] to deceive" SRT, even if the activities of 2seventy allegedly disadvantaged SRT.  *United States v. Sawyer*, 85 F.3d 713, 732 (1st Cir. 1996).  Further, SRT cannot rely on "any conduct that would have been actionable as securities fraud" as a predicate RICO act.  *Lerner v. Colman*, 26 F.4th 71, 82 (1st Cir. 2022) ("the PSLRA bar in section 1964(c) prohibits RICO plaintiffs from relying on as predicate acts any conduct that would have been actionable as securities fraud").

*Fourth*, the acts described in paragraphs 274(vi), (vii), and (viii) of the Complaint relate to alleged fraud in connection with Defendants' "routine litigation activities" by responding to SRT's patent action in the District of Delaware and the associated arbitration.  *Langan v. Smith*, 312 F. Supp. 3d 201 (D. Mass. 2018) (finding "routine litigation activities" did not constitute RICO predicate acts of fraud).  These are not circumstances where Defendants have engaged in malicious, ongoing, sustained, or regular litigation.  With the exception of the IPR proceedings, which Defendants initiated to pursue an ordinary and congressionally authorized defense to SRT's own infringement claims, ***all other past and present litigation were initiated by SRT***, including the arbitration compelled by the District of Delaware.  The only plausible pattern of mail and wire fraud one can infer from these acts is that of SRT's—not Defendants'—continuing and repeated misuse of the legal system.

Furthermore, communications and representations made during "routine litigation activities" cannot amount to predicate acts of racketeering.  *Langan,* 312 F. Supp. 3d at 207.  An alleged false statement alone is insufficient to constitute mail or wire fraud, and this "is particularly true in the context of communications relating to litigation where parties frequently take differing positions as to the facts in a context that provides an opportunity to present opposing positions."  *Capone v. City of Columbia*, No. 19-2490, 2020 WL 633739, at *4 (D.S.C. Feb. 11, 2020) (dismissing RICO claim based on alleged false communications made during litigation).  The litigation privilege prevents SRT from relying on these communications made during the course of litigation to support its claims.  *See Day v. Johns Hopkins Health Sys. Corp.*, 907 F.3d 766 (4th Cir. 2018) ("Witness Litigation Privilege" bars RICO predicate acts of fraud).

### 2.     The Alleged Predicate Acts of Theft of Trade Secrets Are Insufficiently Pled, and Not Viable as a Matter of Law

SRT fails to satisfy Rule 9(b) with respect to the alleged predicate acts relating to theft of trade secrets.  SRT merely mechanically restates the elements of a trade secrets claim, (Compl. ¶ 275), and never defines the alleged trade secrets at issue besides "clinical data, know-how, and other trade secrets, including the physical TNS9 Vector."  (Compl. ¶ 51.)  This is insufficient. *See Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 455-56 (D. Mass. 2017) (citation omitted) (under the Defend Trade Secrets Act ("DTSA")'s civil provision, "[a] plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue"); *Lithero, LLC v. AstraZeneca Pharms. LP*, No. 19-2320, 2020 WL 4699041, at *1 (D. Del. Aug. 13, 2020) (citation omitted) (dismissing DTSA claim where plaintiff described alleged trade secret only in broad terms).

Moreover, as a matter of law, alleged trade secret theft cannot serve as a predicate act to a RICO claim unless it occurred after May 11, 2016, the date of the statutory enactment of the DTSA under 18 U.S. Code § 1961(a), and the addition of such violations as a RICO predicate. *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 463-64 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) ("to the extent that the plaintiffs allege misappropriation of trade secrets in violation of federal law to be the RICO predicates, that claim fails because the plaintiffs have not alleged any violation of the DTSA that post-dated the statutory enactment").  SRT alleges theft of trade secrets only in 2012 and 2013.  (*See* Compl. ¶¶ 135, 274(i)-(ii).)  Thus, the alleged predicate acts of theft of trade secrets fail.

### 3.     The Alleged Predicate Acts of Receipt/Transport of Stolen Property Are Insufficiently Pled

To invoke predicate acts under 18 U.S.C. §§ 2314 and 2315 ("NSPA"), SRT merely provides a mechanical recitation of the elements.  (*See* Compl. ¶ 276.)  Nothing is said about the

nature of the fraud, when, how, and where it occurred, how it was transmitted in interstate commerce, or the nature of the alleged "scheme."  Furthermore, the NSPA does not apply to purely intangible property.  *See Dowling v. United States*, 473 U.S. 207, 216 (1985); *United States v. Coviello*, 225 F.3d 54, 68 (1st Cir. 2000); *United States v. Aleynikov*, 676 F.3d 71, 77 (2d Cir. 2012) ("the theft and subsequent interstate transmission of purely intangible property is beyond the scope of the NSPA").  SRT's allegations center on the alleged theft of its intellectual property.  At most, its allegations pertain to a single transfer of a physical TNS9 Vector sample, but these allegations are bare, and contain no articulation of the sample's value or other tangible features.  No other physical transfer is alleged, and a single general allegation is insufficient.

### D. The Alleged Predicate Acts Fail to Satisfy Closed- or Open-ended Continuity

A plaintiff may establish close-ended continuity "by proving a series of related predicates extending over a substantial period of time."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989); *United States v. Stepanets*, 989 F.3d 88, 108 (1st Cir. 2021).  Courts also consider "whether the defendants were involved in multiple schemes, as opposed to 'one scheme with a singular objective'; whether the scheme affected many people, or only a 'closed group of targeted victims'; and whether the scheme had the potential to last indefinitely, instead of having a 'finite nature.'"  *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 529 (1st Cir. 2015) (citations omitted).  A plaintiff may show open-ended continuity by adequately alleging "past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.  SRT has pled neither.  Even if the Court sustains at least two predicate acts, SRT still fails to establish a pattern of sufficient duration, quality, or threat of repetition to satisfy either closed- or open-ended continuity.  At most, SRT has alleged a narrow pattern of limited activity, based on the alleged use of the TNS9 Vector, *i.e.*, a single instance of alleged misappropriation.

21

After removing the most clearly precluded and released claims that pre-date the 2020

Settlement Agreement, SRT is left with a pattern beginning at its earliest in September 2021,

after the 2020 Settlement Agreement (*see* Compl. ¶ 186), resulting in a single year of ongoing

(largely defensive or court-ordered) litigation activity to form a supposed "pattern" of

racketeering activity.  Under law, one year is insufficient duration, particularly in the absence of

other continuity factors.  *See e.g., Ferrer v. Int'l Longshoremen's Ass'n (ILA) AFL-CIO*, No. 08-

1505, 2009 WL 1361953, at *7 (D.P.R. May 11, 2009) (an alleged "period of racketeering

activity of less than two years does not satisfy the closed-ended continuity requirements") (citing

*Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).  As alleged, this is a single

scheme to obtain access to the TNS9 Vector, affecting only SRT.  This is demonstrated by the

fact that SRT alleges the theft of the TNS9 Vector as multiple predicate acts for alleged mail and

wire fraud, and violations of the NSPA and DTSA.  Duplicative predicate acts based on common

underlying facts do not constitute separate predicates, but SRT has little else to help create the

illusion of a pattern.  *See Watkins v. Smith*, No. 12-4635, 2012 WL 5868395, *4-5 (S.D.N.Y.

Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014) ("[I]t is not proper under RICO to charge

two predicate acts where on[e] action violates two statutes.").  Similarly, SRT cannot articulate

an expectation of future criminal conduct because it is purely speculative (and implausible) to

expect Defendants to engage in further activities similar to those alleged to have occurred after

the 2020 Settlement Agreement.

### E.     The Alleged Predicate Acts Are Not Sufficiently Related

Predicate acts must "have the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise are interrelated by distinguishing characteristics and are

not isolated events."  *H.J. Inc.*, 492 U.S. at 240; *see also Attia v. Google LLC*, No. 17-6037, 2019

WL 1259162, at *5 (N.D. Cal. Mar. 19, 2019), *aff'd*, 983 F.3d 420 (9th Cir. 2020) (finding "two

isolated lawsuits" and licensing negotiations were not sufficiently "related" for RICO claim).

"[W]here the enterprise in question is not primarily in the business of racketeering, overlapping

participants, without more, are insufficient to show horizontal relatedness." *Halvorssen v.*

*Simpson*, No. 18-2683, 2019 WL 4023561, at *5 (E.D.N.Y. Aug. 26, 2019), *aff'd*, 807 F. App'x

26 (2d Cir. 2020) (citation omitted).

SRT alleges a series of disparate and unrelated acts, seeking to convert myriad disputes

over use, ownership, and the right to certain confidential information into a RICO enterprise.

These predicate acts encompass allegations related to:  a shape-shifting group supposedly

engaged in the theft of trade secrets; statements to the SEC and the public regarding standard

business transactions; settlement negotiations; patent litigation; and arbitration following SRT's

own suit.  All four RICO counts should be dismissed for insufficient relatedness among the

predicate acts.

### F.    Each Count Fails on Additional and Independent Grounds

#### 1.    Count I under RICO 1962(c) Should Also Be Dismissed on Separate Grounds

SRT's section 1962(c) claim also fails because it does not allege a proper RICO injury.

To bring a RICO claim, a plaintiff must plead "concrete financial loss" to "business or property."

*Lawson* 554 F. Supp. 3d at 196.  The racketeering activity must be the factual and proximate

cause of the RICO injury.  *See Lemelson v. Wang Lab'ys, Inc.*, 874 F. Supp. 430, 433 (D. Mass.

1994) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-497 (1985)).  Here, SRT alleges

in conclusory form four types of injury, none of which are sufficient to satisfy the RICO injury

standing requirements:  (1) inducement of the 2020 Settlement Agreement; (2) litigation costs

related to arbitration and IPR proceedings; (3) delays in SRT's development of the TNS9 Vector;

and (4) losses from Defendants' alleged use of the TNS9 Vector.  (*See* Compl. ¶¶ 265-268, 313.)

When SRT generally alleges that Defendants "derailed legal proceedings through fraudulent inducement into settlement," it neither pleads with sufficient basis to form a plausible inference nor establishes a viable RICO injury as a matter of law.  (*See id.* ¶ 313.)  Where "an alleged RICO violation induces a plaintiff to enter into a contract on which the plaintiff does not lose money, the plaintiff has suffered no injury and, therefore, lacks standing to bring a RICO claim." *Line v. Astro Mfg. Co.*, 993 F. Supp. 1033, 1037 (E.D. Ky. 1998).  Far from plausibly alleging any loss of money, SRT *received* compensation as part of the 2020 Settlement Agreement, and it offers nothing but a conclusory statement to assert this settlement caused economic injury, with no detail on the magnitude, nature, or mechanism—much less how any injury was allegedly a proximate result of Defendants' alleged RICO activity.

SRT's alleged injury in the form of litigation costs associated with arbitration and IPR proceedings fares no better, particularly where SRT caused the arbitration and IPR proceedings by initiating the related patent action that gave rise to both the arbitration and the IPR proceedings.  (Compl. ¶¶ 189, 198, 201, 267-68.)  The expenditure of legal fees is not a viable injury for RICO purposes unless the plaintiff expended the legal fees as an "intended consequence" of a defendant's racketeering activities.  *Shirokov v. Dunlap, Grubb & Weaver, PLLC*, No. 10-12043, 2012 WL 1065578, at *29 (D. Mass. Mar. 27, 2012); *see also Lemelson*, 874 F. Supp. at 433; *Eagle Inv. Sys. Corp. v. Tamm*, 146 F. Supp. 2d 105, 110 (D. Mass. 2001).  SRT offers no factual basis to support a plausible inference that Defendants intended to cause SRT's legal fees in connection with the arbitration or IPR proceedings.  To the contrary, neither would have arisen but for SRT's own initiation of the Delaware Litigation.  (*See* Compl. ¶¶ 192-193, 201.)  SRT further suggests it was injured because Defendants' actions delayed and "sabotaged" development of the TNS9 Vector.  (*Id.* ¶ 313.)  But it does not plausibly allege how

Defendants did so.  Nor does it plausibly allege concrete injury resulting from any delay
Defendants caused.

Finally, SRT alleges Defendants caused injury through the use of SRT's trade secrets.
(Compl. ¶ 313.)  This is insufficient, however, as "[p]laintiffs must allege more than a property
right to their trade secrets and misappropriation of those trade secrets."  *Palantir Techs., Inc. v.
Abramowitz*, No. 19-6879, 2020 WL 9553151 (N.D. Cal. July 13, 2020) (quoting *Attia v. Google
LLC*, No. 17-6037, 2018 WL 2971049, at *13 (N.D. Cal. June 13, 2018)); *Mattel, Inc. v. MGA
Ent., Inc.*, 782 F. Supp. 2d 911, 1019 (C.D. Cal. 2011) (loss of exclusive control over trade
secrets is insufficient to establish concrete financial loss).  SRT offers nothing to support that
Defendants caused any specific, concrete injury to SRT.[8]

### 2. Count II under RICO 1962(a) Should Also Be Dismissed on Separate Grounds

Count II also fails because SRT insufficiently alleges (1) income received and invested in
an enterprise, and (2) distinct investment injury.  A violation of RICO 1962(a) applies against
persons using income derived from a pattern of racketeering activity, in which said person
participated as a principal, in an acquisition of interest in the establishment or operation of any
enterprise.  *See* 18 U.S.C. § 1962(a).  Here, SRT fails to allege plausibly that Defendants

---

[8]  SRT also fails to sufficiently allege a RICO enterprise distinct from the RICO persons named
in Count I (the Defendants).  "A RICO person cannot also serve as the RICO enterprise that the
person is allegedly conducting in violation of section 1962(c)."  *Doyle v. Hasbro, Inc.*, 103 F.3d
186, 190-91 (1st Cir. 1996) (affirming dismissal of RICO claim where plaintiff failed to identify
an enterprise distinct from defendant).  "[T]he person committing the illegal acts must be an
entity distinct from the enterprise."  *Deane v. Weyerhaeuser Mortg. Co*., 967 F. Supp. 30, 33 (D.
Mass. 1997) (citation omitted).  "If the plaintiff chooses to identify the corporation as the
enterprise through which its employees, as persons, conducted the RICO activity, the corporation
is insulated from liability."  *Rodriguez v. Banco Central*, 777 F. Supp. 1043, 1054 (D.P.R. 1991),
*aff'd*, 990 F.2d 7 (1st Cir. 1993).

received income that they then invested in an enterprise to satisfy Rule 8, much less the governing Fed. R. Civ. P. Rule 9(b) pleading standard.  (*See* Compl. ¶ 318.)

SRT's allegations include only a rote recitation of the elements involving the receipt of income.  Otherwise, SRT simply re-alleges the same three predicate acts as alleged under Counts I and III under sections 1962(c) and 1962(b).  (*Compare* Compl. ¶¶ 310-312 as to Count I *with* Compl. ¶¶ 320-322 as to Count II *and* Compl. ¶¶ 332-334 as to Count III.)  Only one of these three acts even indirectly relates to investment in an enterprise related to the spin-off of 2seventy from bluebird, but this is implausible and inherently contradictory because these statements suggest bluebird invested in 2seventy by spinning it off from bluebird.  (Compl. ¶¶ 322-23.)

SRT also fails to allege investment injury distinct from any injury resulting from predicate acts.  "In the First Circuit, the 'investment use rule; requires plaintiffs asserting a section 1962(a) cause of action to allege a specific injury flowing from the investment and use of racketeering proceeds."  *Cavallaro v. UMass Mem'l Health Care, Inc.*, No. 09-40152, 2010 U.S. Dist. LEXIS 96558, at *15 (D. Mass. July 2, 2010) (citing *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 91-92 (1st Cir. 1995) (plaintiff must "prove that they were harmed by reason of [defendant]'s use or investment of income derived from a pattern of racketeering activity in some enterprise" under section 1962(a))).  The law requires a distinct injury to sustain this count, but SRT instead alleges the exact same injury from Count I.  (*Compare* Compl. ¶ 313 as to Count I *with* Compl. ¶ 325 as to Count II.)

### 3.  Count III under RICO 1962(b) Should Also Be Dismissed on Separate Grounds

Count III also insufficiently alleges (1) acquisition of an interest in an enterprise and (2) unique investment injury.  A violation of section 1962(b) applies to persons who, through a pattern of racketeering activity, acquired or maintained interest in or control of an enterprise.

*See* 18 U.S.C. § 1962(b).  SRT does not plausibly allege an acquisition of interest in an enterprise resulting from a pattern of racketeering activity because Count III relies on the same three stated predicate acts as Counts I and II, each of which SRT alleges only in conclusory form.  (*Compare* Compl. ¶¶ 310-312 as to Count I *with* Compl. ¶¶ 320-322 as to Count II *and* Compl. ¶¶ 332-334 as to Count III.)  SRT provides no specific facts to demonstrate a plausible inference that a customary corporate transaction (the spin-off of 2seventy) constituted racketeering.  Moreover, rather than allege a discrete injury required to save Count III, the Complaint alleges *verbatim* the same injury as Counts I and II.  This is insufficient.  *See Compagnie De Reassurance D'Ile de France*, 57 F.3d at 91-92.

### 4.   Count IV under RICO 1962(d) Should Also Be Dismissed on Separate Grounds

If "the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails."  *Efron*, 223 F.3d at 21; *see also Lerner*, 26 F.4th at 77 n.2; *Langan,* 312 F. Supp. 3d at 208-09 (dismissing RICO conspiracy claim for failure to allege viable substantive RICO violation).  SRT's RICO conspiracy claim fails because the substantive RICO claims under Counts I through III fail.

Moreover, "[t]o prove a RICO conspiracy, a plaintiff must show . . . ***that each defendant agreed to commit, or in fact committed, two or more predicate acts***."  *Vázquez-Baldonado v. Domenech*, 847 F. Supp. 2d 281, 286 (D.P.R. 2012), *aff'd*, 595 F. App'x 5 (1st Cir. 2015) (emphasis added).  Here, all SRT alleges is that "Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme" through "a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of

stolen goods." (Compl. ¶ 343.)  This is a purely conclusory assertion that is insufficient to support a plausible inference of agreement by each Defendant to commit the predicate acts.[9]

## V.   THE FRAUDULENT INDUCEMENT COUNT (COUNT V) FAILS

SRT alleges that Defendants fraudulently induced it into the 2020 Settlement Agreement through alleged misrepresentations and omissions regarding:  (1) whether bluebird would continue to develop its BB305 product after settlement (*see* Compl. ¶¶ 221-222); (2) the "genetic makeup" of the BB305 Vector (*see id.* ¶ 223); and (3) bluebird's "plans" to file IPR proceedings in response to infringement allegations that SRT did not even assert until a year after the settlement (*see id.* ¶ 224).  In addition to being illogical and barred by *res judicata* and release (*see supra* Part III), the fraudulent inducement count fails to:  (1) satisfy Rule 9(b); (2) allege a misrepresentation of present fact; or (3) allege a duty of disclosure.  Plus, any such claim is (4) barred by disclaimers in the 2020 Settlement Agreement; and (5) waived by SRT's ratification of that Agreement.  Each of these failures independently warrants dismissal.[10]

### A.   SRT Fails to Satisfy Rule 9(b)

Fraudulent inducement allegations must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See, e.g., ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)).  Rule 9(b) requires that a complaint specify the fraudulent statement as well as the speaker, the location, the time, and the basis for alleging the

---

[9]  Additionally, if the Court dismisses the federal RICO counts, then it should also dismiss the fraudulent inducement and unfair competition counts, pursuant to 28 U.S.C. 1367(c), because these are state law claims that SRT brought under the Court's supplemental jurisdiction.  (*See* Compl. ¶¶ 32-33.)

[10]  The fraudulent inducement count is governed by New York because the parties agreed that the 2020 Settlement Agreement would be governed by New York law, and it was executed in New York.  (*See* Ex. 7 § 6.)  SRT agrees.  (*See* Compl. ¶ 352.)

statement was fraudulent. *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27, 30 (2d Cir. 2014)

(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *Rombach v.*

*Chang*, 355 F.3d 164, 172, 175 (2d Cir. 2004) ("To meet the pleading requirement of Rule 9(b),

plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain

why"); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 222 n.32 (S.D.N.Y. 2008) ("The bald

assertion that the certifications were false provides no explanation why the certification was

fraudulent and therefore fails to satisfy the Rule 9(b) requirement that fraud must be pled with

particularity").

      SRT's allegations do not meet these requirements.  Its allegations are vague as to

substance, speaker, time, location, reliance, or even as to alleged falsity.  For example, SRT

alleges that Defendants made misrepresentations and omissions about bluebird's plans to

continue developing its BB305 Vector after the settlement.  (*See e.g.*, Compl. ¶ 221-22.)  But

SRT nowhere alleges the who, what, when, where, or why.  (*See id.*, ¶ 221-22; *see also id.* ¶ 195

(alleging that Defendants made unspecified misrepresentations "during discussions about the

Release" in the 2020 Settlement Agreement); *id.* ¶ 228 (alleging "the above" unspecified

"fraudulent misstatements and omissions of material facts"); *id.* ¶ 266 (alleging unspecified

misrepresentations and omissions of material facts); *id.* ¶ 271 (alleging unspecified "harmful and

fraudulent actions"); *id.* ¶ 354, 356 (alleging unspecified "false statements and omissions of

material facts"); *id.* ¶ 357 (alleging unspecified "material omissions and false representations").)

    **B.**      **SRT Fails to Allege a Misrepresentation of Present Fact**

      "[A] viable claim of fraud concerning a contract must allege misrepresentations of

present facts (rather than merely future intent) that were collateral to the contract and which

induced the allegedly defrauded party to enter into the contract."  *Orix Credit All., Inc. v. R.E.*

*Hable Co.*, 256 A.D.2d 114, 115 (1st Dept. 1998); *see also Wolfson v. Wolfson*, No. 03-0954,

2004 WL 224508, at *8 (S.D.N.Y. Feb. 5, 2004) (fraud claims cannot be based on "opinions or prognostications"); *Longo v. Butler Equities II, L.P.*, 278 A.D.2d 97, 97 (1st Dept. 2000) (dismissing fraud allegations based on opinion).

Here, SRT merely alleges that it was defrauded by representations and omissions regarding what Defendants might or might not do in the future.  For example, SRT invokes Defendants' purported "***plans*** to invalidate its Licensed Patents."  (Compl. ¶ 224; *see also id.* ¶ 211 (alleging Defendants misrepresented "bluebird ***would*** not interfere with any of the . . . lentiviral vector intellectual property exclusively licensed to SRT") (emphasis added); *id.* ¶ 212 (alleging Defendants misrepresented "SRT ***would*** be the only company to commercially practice the Licensed Patents") (emphasis added); *id.* ¶ 221 (alleging Defendants omitted that "bluebird ***would*** claim that bluebird had a right to practice within the scope of the claims of its Licensed Patents") (emphasis added).)  A fraud claim that "merely adds vague and conclusory allegations as to what defendants 'would' do" is not sufficient.  *Armored Grp., LLC v. Homeland Sec. Strategies, Inc.*, No. 07-9694, 2009 WL 1110783, at *1 (S.D.N.Y. Apr. 21, 2009).

### C.      SRT Fails to Allege a Duty of Disclosure

Fraud by omission requires proof that defendants had a duty to disclose material omitted information.  *Donovan v. Aeolian Co.*, 270 N.Y. 267 (1936).  There is no duty to disclose absent a fiduciary or other special relationship.  *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 356 (1st Dept. 2004) ("an omission did not constitute fraud unless there was a fiduciary relationship"); *George Cohen Agency, Inc. v. Donald S. Perlman Agency, Inc.*, 114 A.D.2d 930, 831 (2d Dept. 1985) ("In the absence of a special relationship between two parties to a contract, no duty to disclose exists.").  Here, SRT alleges fraud by omission (*see e.g.*, Compl. ¶ 228), but does not allege any fiduciary or special relationship between it and Defendants, because there is none.  Based on SRT's own allegations, SRT and bluebird are "direct competitors."  *Id.* ¶ 68.

30

SRT appears to contend bluebird was required to make disclosures about the "genetic makeup" of its BB305 Vector, but instead "successfully prevented discovery" about this in the New York Litigation.  (Compl. ¶¶ 218, 223; *see also id.* ¶ 220.)  In the New York Litigation, bluebird provided discovery about its BB305 Vector, in accordance with its discovery obligations.  That bluebird "successfully" defeated various discovery requests (*id.* ¶ 218), cannot save SRT's claims.  Defendants had no duty to disclose that which they had no duty to disclose. In any event, SRT—knowing it lost these discovery disputes—chose to settle anyway.

### D.   The Fraudulent Inducement Count Is Barred by Disclaimers

Under New York law, courts routinely dismiss fraud claims in the face of contractual disclaimers that negate reasonable reliance.  *See e.g. DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 319 (S.D.N.Y. 2002) (dismissing fraud claims on the pleadings due to contractual disclaimers); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959) (same); *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996) ("[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot . . . claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon."); *Starr v. Fordham*, 420 Mass. 178, 188 (1995) (quoting *Turner v. Johnson & Johnson*, 809 F.2d 90, 97 (1st Cir. 1986)) ("if the contract was fully negotiated and voluntarily signed, [then] plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue.'").  "If [the Court] were to rule otherwise, the strong New York policy, giving autonomy to contracting parties to allocate risks, and rights, obligations, warranties and disclaimers, as they see fit, would be compromised." *DynCorp*, 215 F. Supp. 2d at 319.

Here, the 2020 Settlement Agreement expressly disclaims reliance on non-contract representations.  It contains an integration clause providing that the 2020 Settlement Agreement

"sets forth the entire agreement and understanding between the Parties and supersedes and cancels all previous negotiations, agreements and commitments, whether oral or in writing, with respect to the subject matter hereof."  (Ex. 7 § 10.)  Section 8 of the 2020 Settlement Agreement goes further, explicitly providing that "[e]ach of the Parties represents and warrants that . . . [it] is not relying on any . . . representation of any other party, except as set forth herein."  (*Id.* § 8.) That is a clear disclaimer of any and all alleged misrepresentations and omissions that induced SRT into entering the 2020 Settlement Agreement.  *See, e.g.*, *Harsco*, 91 F.3d at 343.

### E.    The Fraudulent Inducement Count Was Waived by Ratification

Ratification of an agreement by a party waives any claim of fraudulent inducement into such agreement.  *See Moweta v. Citywide Home Improvements of Queens, Inc*., 267 A.D.2d 438, 438-39 (2d Dept. 1999); *Loksen v. Columbia Univ.*, No. 12-7701, 2013 WL 5549780, at *6 (S.D.N.Y. Oct. 4, 2013).  "Ratification occurs when a party accepts the benefits of a contract and fails to act promptly to repudiate it."  *Allen v. Riese Org., Inc.*, 106 A.D.3d 514, 515 (1st Dept. 2013).  Here, SRT ratified the 2020 Settlement Agreement by accepting the benefits accruing under it, including the settlement consideration, and by failing to repudiate it.  Tellingly, SRT seeks to "void" only the "Release" provisions in the 2020 Settlement Agreement (Compl. ¶ 352), but not the provisions providing it consideration, including the settlement consideration it accepted long ago.  Pursuing such *partial* rescission is both hypocritical and contrary to New York law.  *See, e.g.*, *Simons v. Crowley*, 112 N.Y.S.2d 851, 856 (1952) ("rescission is not fractional. . . .  It is an all or nothing process.")

## VI.    THE CHAPTER 93A COUNT (COUNT VI) FAILS

To state a valid claim under Chapter 93A, § 11, a plaintiff must allege sufficient facts to show that:  (1) the plaintiff and defendants were engaged in trade or commerce; (2) the defendants used an unfair method of competition or committed an unfair or deceptive act or

practice; and (3) in doing so, the defendants caused the plaintiff to suffer a loss of money or property.  *See* M.G.L.c. 93A, §11; *Anoush Cab, Inc. v. Uber Techs., Inc.*, 8 F.4th 1, 16 (1st Cir. 2021); *Milliken & Co. v. Duro Textiles, LLC*, 451 Mass. 547, 562-63 (2008).  The plaintiff must also allege that the misconduct occurred "primarily and substantially" in Massachusetts.  *See Kuwaiti Danish Comput. Co. v. Digit. Equip. Corp.*, 438 Mass. 459, 470 (2003).  SRT's Chapter 93A claim consists of three distinct components, none of which satisfies these requirements.

### A.      SRT's Wrongful Inducement Allegations Fail for Lack of Duty to Disclose

SRT alleges Defendants violated Chapter 93A by wrongfully inducing SRT to execute the 2020 Settlement Agreement.  (*See* Compl. ¶¶ 211-231, 365-68.)  SRT, however, has not alleged, and cannot allege, that Defendants had any duty to disclose any of the information that Defendants allegedly wrongfully omitted in the course of settling their prior litigation, and Chapter 93A, § 11 does not impose any general duty of disclosure.  *See Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995); *Lily Transp. Corp. v. Royal Institutional Servs., Inc.*, 64 Mass. App. Ct. 179, 205 (2005), *review denied*, 445 Mass. 1105 (2005) (duty to disclose under § 11 is limited to fiduciary duty).

### B.      SRT's Misappropriation Allegations Are Barred by the General Release

SRT alleges that the Defendants violated Chapter 93A by misappropriating the TNS9 Vector.  (*See* Compl. ¶¶ 66-142, 365.)  These allegations fail because SRT released any such claims in the 2020 Settlement Agreement.  Indeed, the misappropriation allegations are merely a rehashed version of stale allegations SRT made against bluebird in the New York Litigation, and against Third Rock and Mr. Leschly in the Massachusetts Litigation.  (*See* Appendix A.)  The central dispute in these prior cases concerned an alleged fraud and conspiracy to misappropriate SRT's rights to the TNS9 Vector, to compete improperly against SRT in connection with the

development of the BB305 Vector.  (*See* Compl. ¶ 162.)  SRT settled these claims in the 2020

Settlement Agreement and provided a general release.  (*See* Ex. 7 § 5.)[11]

### C.    SRT's 2seventy Spin-off Allegations Are Speculative

Finally, SRT alleges that Defendants created 2seventy bio in 2021 to deplete the assets of

bluebird, to prevent SRT from recovering any monetary judgment awards against bluebird.  *See*

Compl. ¶¶ 232-262.  But SRT fails to allege any non-speculative facts to support this.  *See*

*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010) (a complaint "must

state a plausible, not a merely conceivable, case for relief."); *see also Ashcroft*, 556 U.S. at 678

("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it

'stops short of the line between possibility and plausibility of 'entitlement to relief.'").  Instead,

SRT cites bluebird press releases publicly announcing the creation of 2seventy, which expressly

provide the legitimate and non-fraudulent business purpose for doing so, to "spin-off" bluebird's

oncology programs into a separate publicly traded company.  (*See* Compl. ¶ 241.)

Further, SRT's speculation that the creation of 2seventy may prevent it from recovering

some theoretical monetary judgment fails to satisfy the "actual loss of 'money or property'"

element required to sustain a 93A claim.  *See Duplessis v. Wells Fargo Bank, Nat'l Ass'n*, 91

Mass. App. Ct. 1125, at *3 n.10 (2017) ("a business-to-business c. 93A claim is available only to

a party who has suffered an actual loss of 'money or property'").

---

[11]  To the extent SRT's Chapter 93A claim is based on any independent alleged unfair acts of
trade secret misappropriation occurring on or after October 1, 2018—the effective date of the
Massachusetts Uniform Trade Secrets Act ("MUTSA")—then such allegations are preempted by
the MUTSA, which "shall supersede any conflicting laws of the commonwealth providing civil
remedies for the misappropriation of a trade secret."  Mass. Gen. Law ch 93 § 42F(a).

## VII.   THE CLAIMS AGAINST FINER, REILLY AND 2SEVENTY ARE EVEN MORE BASELESS

"If the complaint involves multiple defendants, then each defendant's role must be particularized with respect to their alleged involvement in the fraud." *Rhone v. Energy N., Inc*., 790 F. Supp. 353, 361 (D. Mass. 1991); *Kingvision Pay-Per-View, Ltd. v. Vergas*, No. 00-0407, 2001 WL 311199, at *2 (D.N.H. Mar. 26, 2001) (Rule 9(b) requires that "claims of fraud be pled with particularity as to each defendant.")  Similarly, in the First Circuit, a plaintiff pursuing a RICO claim must show "that *each defendant* knowingly agreed that at least two racketeering acts would be committed in furtherance of [the conspiracy]." *United States v. Velazquez-Fontanez*, 6 F.4th 205, 213 (1st Cir. 2021) (emphasis added).

Here, SRT has not pled any cognizable particularized allegations regarding at least Finer, Reilly, or 2seventy.  The Complaint contains no allegation that Finer or Reilly did or agreed to anything after they left bluebird in 2015 and 2011, respectively, or played any role in negotiating (or even saw) the 2020 Settlement Agreement that is the supposed lynchpin of every claim. (Compl. ¶¶ 2, 311, 325, 337, 349, 354-55. 365.)  As for 2seventy, it did not exist until a year after the 2020 Settlement Agreement was executed.  (*Id.* ¶ 236.)  Moreover, it is an oncology company (*id.*), and thus does not plausibly compete with SRT and SRT does not allege otherwise.  Further, neither Finer, Reilly, nor 2seventy were parties to any of the prior litigations involving SRT, nor are they parties to any of the ongoing litigations that SRT alleges in support of its RICO claims.  (*Id*. ¶ 274.)  Thus, while the Court should dismiss the entire Complaint against all Defendants, the claims against Finer, Reilly, and 2Seventy are especially baseless.

## VIII.   CONCLUSION

For these reasons, SRT's claims all fail and the Court should dismiss the Complaint in its entirety, with prejudice.

Dated: July 3, 2023

Respectfully submitted,

OF COUNSEL:

*/s/ Jeffrey S. Robbins*
Jeffrey S. Robbins (#421910)
Patrick S. Tracey (#659626)
Evan Gotlob (#704771)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
(617) 723-3300
jeffrey.robbins@saul.com
patrick.tracey@saul.com
evan.gotlob@saul.com

Eric W. Dittmann (*pro hac vice)*
Joshua M. Bennett (*pro hac vice*)
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Naveen Modi (*pro hac vice*)
Jeff A. Pade (*pro hac vice*)
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1700

*Attorneys for Defendants*

**APPENDIX A**

**TABLE SHOWING SIMILARITY OF ALLEGATIONS ACROSS PLAINTIFF'S COMPLAINT IN THIS ACTION,
ITS DECEMBER 2017 SECOND AMENDED COMPLAINT IN THE RELATED NEW YORK LITIGATION,
AND ITS SEPTEMBER 2019 AMENDED COMPLAINT IN THE RELATED MASSACHUSETTS LITIGATION**

| #1 - ALLEGATIONS RELATED TO 2005 AGREEMENT BETWEEN MSK AND SRT TO DEVELOP GENE THERAPY | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "In 2005 SRT signed with MSK for the worldwide commercial rights to, and purchased, Michel Sadelain's gene therapy project for Sickle Cell Disease and Thalassemia, which afflicts Mr. Girondi's son, Rocco. Under the 2005 Agreement, MSK granted SRT an exclusive license agreement to the intellectual property related to the lentiviral vectors invented by Drs. Sadelain and Rivella. SRT's tireless efforts and work with Drs. Sadelain, Rivella and others, resulted in the development of the SRT's TNS9 Vector for the treatment of Beta Thalassemia." Compl. ¶ 54. | "In March 2005, with no other parties interested in saving the abandoned project, SKI sold the exclusive worldwide rights to exploit the potential gene therapy treatment which became the EGT Vector for use in blood disorders known as hemoglobinopathies, including (also known as Cooley's Anemia), and Sickle Cell Disease. A cure for patients with Thalassemia and Sickle Cell Diseases became the sole goal of EGT. A copy of the agreement (the '2005 Agreement') is attached hereto as Exhibit A." NYS Litigation Compl. ¶ 15. | "In 2005, with no other pharmaceutical companies interested in Sadelain's drug therapy, EGT purchased from SKI the exclusive, worldwide license and right to exploit Sadelain's drug therapy for use in blood disorders, including in sickle cell disease and thalassemia. Without EGT's acquisition of the rights to the drug therapy, Sadelain's research would have ended. EGT's purchase of these rights was memorialized in a license agreement between EGT and SKI dated March 7, 2005 (the '2005 Agreement')." MA Litigation Compl. ¶ 21. |
| "From 2005 to 2010 SRT invested several million dollars and, together with MSK, improved the TNS9 Vector. From 2005–2009, SRT commandeered and paid for 55 | "At the time of the 2005 Agreement, no known human clinical data existed to support the viability of gene therapies for | "From 2005 to 2009, EGT, with the assistance of Sadelain, and in partnership with SKI and other research institutions, developed a revolutionary gene therapy to |

| #1 - ALLEGATIONS RELATED TO 2005 AGREEMENT BETWEEN MSK AND SRT TO DEVELOP GENE THERAPY | | |
| --- | --- | --- |
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| iterations and modifications of lentiviral vectors that led to SRT's TNS9 Vector. SRT's Director of Gene Therapy, Dr. Christopher Ballas, created an innovative and proprietary vector production and formulation process, which is worth in excess of hundreds of millions of dollars."  Compl. ¶¶ 55-56.

"In January 2006, the FDA granted SRT an 'Orphan Drug Designation' for the TNS9 Vector. An 'orphan disease' is a disease, such as Thalassemia, which affects a small percentage of the population. Assigning "orphan" status to a disease is intended to increase investment in research to treat medical conditions which, because they are so rare, would not be profitable to produce without government assistance. One benefit of obtaining an Orphan Drug Designation is that it leads to market exclusivity. Once a company is awarded orphan drug market exclusivity, the FDA is generally barred from approving any other Orphan Drug Designation for the same orphan disease for seven years."  Compl. ¶ 57. | Thalassemia and Sickle Cell Disease." NYS Litigation Compl. ¶ 16

"SKI was unwilling to fund and unable to secure outside funding for the research, and without the transfer to EGT, the research would have died." NYS Litigation Compl. ¶ 17.

"Upon entering into the 2005 Agreement, EGT immediately began implementing the research, funding at least three separate, scientific contracts with SKI and engaging international specialists and researchers. This culminated into over four years of research and the development of the EGT Vector." NYS Litigation Compl. ¶ 19.

"In 2007, EGT obtained Orphan Drug Designation in the United States which provides the designee with a period of market exclusivity for an approved drug." NYS Litigation Compl. ¶ 29.

"In 2007, EGT obtained the unanimous approval of the NIH Recombinant DNA | treat thalassemia in accordance with the highest manufacturing and testing standards. EGT named its gene therapy treatment 'Thalagen.'" MA Litigation Compl. ¶ 22.

"Between 2006 and 2009, EGT achieved several significant milestones with respect to its development of the EGT Vector." MA Litigation Compl. ¶ 25

"In January 2006, the Food and Drug Administration (the 'FDA') granted EGT an 'orphan drug designation' for its vector. An 'orphan disease' is a disease, such as thalassemia, which affects a small percentage of the population. Assigning 'orphan' status to a disease is intended to increase investment in research to treat medical conditions which, because they are so rare, would not be profitable to produce without government assistance. One benefit of obtaining an orphan drug designation is that it leads to market exclusivity. Once a company is awarded orphan drug exclusivity, the FDA is generally barred from approving any other |

| #1 - ALLEGATIONS RELATED TO 2005 AGREEMENT BETWEEN MSK AND SRT TO DEVELOP GENE THERAPY | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "SRT was awarded Orphan Drug Designation in the United States for the TNS9 Vector in 2006, which was years ahead of bluebird, which received its Orphan Drug Designation many years later in 2013." Compl. ¶ 58.

"In 2007, MSK's work to make a clinical grade vector was failing and, in fact, MSK's lentiviral vector production was inefficient and not ready to treat patients. In 2007, SRT evaluated and improved (i) the lentiviral-based transduction of CD34+ cells; and (ii) determined TNS9 lentiviral integration using Taqman multiplexed Q-PCR. In addition, SRT evaluated and improved the (i) titration of lentiviral vectors and (ii) worked on the preparation of CD34+ methocult-based colony formation assays." Compl. ¶¶ 59-60.

"Using SRT's proprietary vector production protocol, and working under certain written agreements, a successful clinical grade lentiviral vector was finally produced by SRT to be used to treat patients involved in clinical trials. In 2007, SRT became the first entity to pass the FDA Recombinant DNA Committee for gene therapy in Beta Thalassemia (and | Advisory Committee (RAC)." NYS Litigation Compl. ¶ 30.

"In 2008, EGT completed the pre-IND (Investigative New Drug) meeting with the FDA and trademarked the name 'Thalagen' for its therapy for Sickle Cell Disorder and Thalassemia therapy. In 2009, EGT was awarded Orphan Drug Designation in Europe." NYS Litigation Compl. ¶ 31. | orphan drug designation for the same orphan disease for seven years." MA Litigation Compl. ¶ 26.

"In 2007, NIH's Recombinant DNA Advisory Committee unanimously approved the EGT Vector. At that time, such committee approval was a necessary hurdle for all gene therapies." MA Litigation Compl. ¶ 27.

"In 2008, EGT completed the Pre-IND (Investigational New Drug) Consultation Program with the FDA. The IND program is the means by which a pharmaceutical company obtains permission to start human clinical trials and to ship an experimental drug across state lines." MA Litigation Compl. ¶ 28.

"In 2009, EGT was awarded orphan drug designation in Europe by the European Medicines Agency (the 'EMA'), the European equivalent of the FDA. Once a company is awarded orphan drug exclusivity by the EMA, the EMA is generally barred from approving any |

| #1 - ALLEGATIONS RELATED TO 2005 AGREEMENT BETWEEN MSK AND SRT TO DEVELOP GENE THERAPY | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| future applications in Sickle Cell Disease) and did so many years ahead of bluebird. In 2008, SRT successfully requested a pre-investigation New Drug ("IND") meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector. The IND program is the means by which a pharmaceutical company obtains permission to start human clinical trials and to ship an experimental drug across state lines. In 2008, SRT successfully completed a pre-IND meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector." Compl. ¶¶ 61-64. | | other orphan drug designations for the same orphan disease for ten years." MA Litigation Compl. ¶ 29.

"More importantly, by 2010, EGT had transformed the EGT Vector from a technology with little commercial interest into viable treatment for individuals suffering from thalassemia. As a result, the EGT Vector and associated know-how was worth at least tens of millions of dollars and, upon the successful completion of a credible clinical program, demonstrating safety in humans, hundreds of millions of dollars." MA Litigation Compl. ¶ 31. |

| #2 – ALLEGATIONS RELATED TO 2010 CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
| --- | --- | --- |
| Plaintiff's Allegations in D. Mass. Complaint | Corresponding Allegations in New York Litigation (Second Amended Complaint) | Corresponding Allegations in Massachusetts Litigation (Amended Complaint) |
| "Around the time of this 'Apollo 13 moment,' Defendants Third Rock, bluebird, Leschly, Finer, and Reilly realized that access to SRT's proprietary lentiviral vector production and formulation technology was essential in overcoming the problems plaguing the BB305 Vector and bluebird's formulation manufacturing process for lentiviral vectors." Compl. ¶ 94.<br><br>"Unable to acquire the TNS9 Vector directly from SRT, Defendants bluebird, Third Rock, Leschly, Finer, and Reilly entered into and engaged in a conspiracy to fraudulently induce SKI into an agreement where they fraudulently obtained samples of SRT's clinical grade TNS9 Vector, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT." Compl. ¶ 96.<br><br>"Unable to convince SRT to execute a CDA and share SRT's trade secrets and confidential data with bluebird, Defendants Third Rock, Leschly, Finer, Reilly, and bluebird entered into and engaged in a conspiracy to | "In March 2010, with only a vector that was deemed so unsafe that all gene therapy was banned, Third Rock's first step was to approach SKI to purchase the EGT Vector. Such purchase would have eliminated Bluebird's competition which was poised to start clinical trials and would have provided Bluebird with the intellectual property necessary to make a safe vector." NYS Litigation Compl. ¶ 49.<br><br>"Third Rock and Bluebird executives met with SKI. Third Rock wanted to purchase the EGT Vector, claiming that it was superior to the Bluebird vector which they had just purchased in a $35 million deal from Sadelain's former Harvard classmate." NYS Litigation Compl. ¶ 51.<br><br>"On August 1, 2010, it was reported on the front page of the *Wall Street Journal* that Dr. Craig B. Thompson was named CEO of SKI. Such appointment provided Bluebird with the opportunity to obtain the EGT | "After TRV finalized its $35 million investment in Genetix, . . . the manufacturer of the Genetix Vector advised Leschly that it would cost $1 million to create enough of the Genetix Vector to treat a single patient. 'It was an Apollo 13 moment,' Leschly said." MA Litigation Compl. ¶ 48.<br><br>"Upon information and belief, it was at or around the time of this 'Apollo 13 Moment' that TRV and Leschly determined that access to EGT's technology was essential in overcoming the problems plaguing the Genetix Vector." MA Litigation Compl. ¶ 49.<br><br>"Unable to acquire the EGT Vector from EGT on TRV's terms - and increasingly concerned that it had invested $35 million in an inferior gene therapy - Defendants entered into and engaged in a conspiracy and partnership with SKI to block clinical trials for the EGT Vector, wrongfully wrest control of the EGT Vector from EGT, and remove EGT from competition for orphan drug exclusivity. |

| #2 – ALLEGATIONS RELATED TO 2010 CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
| --- | --- | --- |
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| fraudulently obtain SRT's trade secrets and confidential information, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT." Compl. ¶ 97.<br><br>"[O]n October 29, 2010, Leschly executed a 2010 CDA between bluebird and SKI as part of Defendants' scheme to steal unlawful competitive intelligence (confidential information) and trade secrets related to the TNS9 Vector and belonging to SRT. The 2010 CDA was signed by Leschly on October 29, 2010 and Andrew Maslow (Director, Office of Industrial Affairs, MSK) on November 2, 2010." Compl. ¶¶ 98-99.<br><br>"[E]ach Defendant had the intent of misappropriating the confidential information, including SRT's trade secrets related to the clinical grade TNS9 Vector." Compl. ¶ 101.<br><br>"[E]ach Defendant had the intent of using and exploiting SRT's TNS9 Vector and trade secrets related thereto as well as the competitive intelligence (confidential | technology for free and eliminate EGT, which was years ahead of Bluebird, as a competitor." NYS Litigation Compl. ¶ 61.<br><br>"SKI entered into a secret partnership with Bluebird for the purpose of fraudulently inducing EGT to transfer to SKI the physical EGT Vector and all of EGT's know-how, proprietary information and exclusive rights to patented technology (the 'EGT Intellectual Property'). Pursuant to a secret agreement with Bluebird, SKI agreed to give the EGT Intellectual Property to Bluebird for free and share all results of clinical trials to allow Bluebird to develop a safe vector (hereinafter the 'Secret Agreement'). . . . Bluebird would have the ability to use all of EGT's Intellectual Property to create a safe Bluebird vector and then shelve the EGT vector by refusing to provide any funding. This was contrary to all the prior discussions concerning the necessity to maintain a competitive advantage over Bluebird to | Defendants concocted their unlawful scheme in Massachusetts – and carried out their unfair and deceptive acts in furtherance of their scheme from Massachusetts - where both TRV and Leschly are engaged in business. TRV and Leschly actively participated in and directed SKI's dealings with EGT in furtherance of the conspiracy." MA Litigation Compl. ¶ 57.<br><br>"In August 2010, Dr. Craig B. Thompson was named Chief Executive Officer of SKI. Thompson has a deep, long-standing relationship with Leschly, TRV, and BBB. Among other things, TRV had invested more than $33 million in Agios Pharmaceuticals, the company founded by Thompson, and Leschly had served as the Chief Business Officer for Agios in 2009-2010. Defendants seized upon Thompson's appointment as CEO of SKI to obtain SKI's assistance to 'shut down' EGT – BBB's only competitor." MA Litigation Compl. ¶ 59. |

| #2 – ALLEGATIONS RELATED TO 2010 CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| information) embodied in the IND for the TNS9 Vector." Compl. ¶ 103.

"Defendants intentionally caused bluebird to not comply with its obligation and/or intentionally caused bluebird to breach its objections set forth in the 2010 CDA. Indeed, Defendants never had any intentions of complying with the 2010 CDA." Compl. ¶ 106. | obtain Orphan Drug Exclusivity." NYS Litigation Compl. ¶ 71. | "In October 2010, TRV, Leschly, and BBB arranged a November 2, 2010 meeting with SKI. According to the proposed agenda for the meeting, Sadelain was scheduled to make a 'Technical Presentation' to Leschly and others at TRV and BBB that would last almost two hours. EGT was never advised of the November 2, 2010 meeting or that technical data concerning its intellectual property would be disclosed to its only competitor." MA Litigation Compl. ¶ 60.

"On November 2, 2010, the same day of the secret meeting, BBB and SKI executed a CDA (the '2010 CDA'). Leschly signed the 2010 CDA on behalf of BBB. Neither the existence nor the contents of the 2010 CDA was disclosed to EGT." MA Litigation Compl. ¶ 61.

"The 2010 CDA provides that SKI would be disclosing to BBB 'trade secrets, knowhow, inventions, technical data or specifications, testing methods . . . research and development activities, |

| #2 – ALLEGATIONS RELATED TO 2010 CONFIDENTIAL DISCLOSURE AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| | | control and inspection practices, [and] manufacturing processes and methods.' . . . This agreed-upon prohibition on disclosure of the discussions between SKI and Defendants 'in furtherance of a business relationship with the other' memorialized that the dealings between SKI and Defendants would be concealed. The concealment of these discussions from EGT was critical to the success of Defendants' fraudulent scheme." MA Litigation Compl. ¶ 62.

"In view of the 2010 CDA, EGT can only infer that Sadelain presented confidential trade secrets and know-how about the EGT Vector to TRV, Leschly, and BBB during their November 2, 2010 meeting." MA Litigation Compl. ¶ 63. |

| #3 – ALLEGATIONS RELATED TO 2011 OPTION AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "In a 2011 internal presentation, Defendants Leschly, Third Rock, Reilly, Finer, and bluebird acknowledged that SRT's TNS9 Vector has had 'significant progress on vectorology versus [bluebird] leading to 3–5x improvement in per copy expression versus [the bluebird] vector.'  In the 2011 presentation Defendants indicated that obtaining SRT's TNS9 Vector 'eliminates [bluebird's] most threatening competitor,' and 'increases probability of success and magnitude of success,' which is written in the pros-versus-con discussion part of the presentation." Compl. ¶ 107.

"With the objective of destroying bluebird's only competitor and protecting their individual investments, Third Rock, bluebird, Leschly, Reilly, and Finer were involved in the negotiation of a November 2011 option agreement (the '2011 Option Agreement') between bluebird and SKI. However, Defendants entered into the 2011 Option Agreement under false pretenses in order to fraudulently obtain SRT's TNS9 Vector and proprietary know-how related thereto, fully aware that the clinical grade GMP | "On November 21, 2011, SKI signed an Option Agreement and a Research Collaboration Agreement with Bluebird to memorialize what had been secretly agreed to in 2010. . . .  SKI scientists later accurately referred to the agreement with Bluebird as the 'Deadly Agreement' which Plaintiff will adopt for purposes of this Complaint." NYS Litigation Compl. ¶ 115.

"The Deadly Agreement: gave to Bluebird all EGT Intellectual Property and all SKI technology and know-how and all results from clinical trials of the EGT Vector, for free; provided Bluebird with the consulting services of SKI scientists to improve the Bluebird vector and incorporate the EGT Intellectual Property into the Bluebird vector, for free; did not require Bluebird to fund any clinical trials or vector manufacture of the EGT Vector or provide any significant funding to develop the EGT Vector; gave Bluebird an exclusive long-term option to license the EGT Vector at a deeply discounted price; and which made it impossible for | "Unbeknownst to EGT, and in furtherance of Defendants' unlawful scheme, BBB entered into additional secret agreements with SKI in November 2011. As discussed in greater detail below, TRV, Leschly, BBB, and SKI kept these agreements hidden for years, until Leschly disclosed their existence in a public court filing in October 2016." MA Litigation Compl. ¶ 78.

"On November 21, 2011, with the knowledge and/or participation of TRV and Leschly, SKI and BBB secretly executed an 'Option Agreement' whereby SKI granted to BBB the right to obtain an exclusive license to the proprietary information developed by EGT, including information necessary to make, use, and sell the EGT Vector. On the same day, November 21, 2011, SKI and BBB also entered into a 'Collaboration Agreement,' under which SKI and BBB agreed to 'work together to discover and develop next generation lentiviral vectors for the treatment of beta |

| #3 – ALLEGATIONS RELATED TO 2011 OPTION AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets." Compl. ¶ 108.

"According to the 2011 Option Agreement, bluebird expressed an interest to SKI regarding an option agreement in the area of gene therapy for hemoglobinopathies, and SKI desired to grant bluebird the right to exclusively license certain of SKI's intellectual property, and bluebird desired a period of time in which to evaluate the intellectual property and determine whether to execute a license."  Compl. ¶ 109.

"Defendants Third Rock, Leschly, Finer, and Reilly caused bluebird to execute the 2011 Option Agreement under false pretenses in order to gain access to SRT's TNS9 Vector and proprietary know-how related thereto, fully aware that the clinical grade GMP formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets." Compl. ¶ 110.

"The 'Licensed Know-How' under the 2011 Option Agreement included the patent | SKI to obtain funding from any other source to fund clinical trials of the EGT Vector." NYS Litigation Compl. ¶ 116.

"In June 2012, an SKI internal review of the Deadly Agreement provided a succinct summary of the legion of one-sided provisions intended to give Bluebird the power to kill the development of the EGT Vector. . . . BBB is given access to data and reports arising from collaboration but this obligation is not reciprocal . . . [and] is granted a NERF [nonexclusive royalty-free license] to 'Know-How' which encompasses information, material and data developed during the collaboration or outside of it that relates to lentiviral gene therapy for hemoglobinopathy." NYS Litigation Compl. ¶ 117.

"After transferring the EGT Information to Bluebird to allow Bluebird to develop a safe vector and re-start its clinical trials, the EGT Vector was abandoned by Bluebird. SKI was able to perform highly successful clinical trials on three patients, and share the results with Bluebird, and [] | hemoglobinopathies." MA Litigation Compl. ¶ 79.

"The Option Agreement gives BBB a 'fully paid-up, and royalty-free' license to use the EGT Vector and know-how for 'internal research purposes.' This provision, in combination with a corresponding provision in the Collaboration Agreement, permits BBB to incorporate all of the intellectual property associated with the EGT Vector into the Genetix Vector, in BBB's discretion." MA Litigation Compl. ¶ 80.

"[T]he Option Agreement gives BBB an exclusive, royalty-free license to use the EGT Vector, and prevents SKI from collaborating with any other commercial source to fund clinical trials or to manufacture the EGT Vector." MA Litigation Compl. ¶ 81.

"Under the terms of these agreements, TRV, BBB, and Leschly could effectively take EGT's technology and |

| #3 – ALLEGATIONS RELATED TO 2011 OPTION AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| applications listed in Appendix A, titled 'Licensed Patent.'" Compl. ¶¶ 112-114.<br><br>"With the objective of destroying bluebird's only competitor and protecting their individual investments, Third Rock, bluebird, Leschly, Reilly, and Finer caused bluebird to execute the 2011 Option Agreement for the purpose of obtaining SRT's know-how (*i.e.*, trade secrets) related to the TNS9 Vector, and they were fully aware the SRT's know-how (*i.e.*, trade secrets) was incorporated into the TNS9 Vector." Compl. ¶ 115.<br><br>"Defendants included SRT's know-how into the definition of 'Licensed Know-How' because Defendants' objective was to steal SRT's trade secrets related to the TNS9 Vector, but the only way to get SRT's trade secrets was to falsely represent that bluebird was interested in helping MSK with the IND for the TNS9 Vector." Compl. ¶ 116.<br><br>"Defendants Third Rock, Leschly, Finer, Reilly, and bluebird caused bluebird to execute the 2011 Option Agreement even though they had no intention of using the | thereafter SKI was precluded by the Deadly Agreement from obtaining any commercial funding to continue the clinical trials." NYS Litigation Compl. ¶ 119.<br><br>"As intended by the secret partnership between Bluebird and SKI in 2010, Bluebird was given the right to decide whether to fund the EGT Vector or allow it to die." NYS Litigation Compl. ¶ 140.<br><br>"Bluebird and SKI engaged in fraudulent conduct in furtherance of the secret agreement between SKI and Bluebird. The overt acts included the conspiracy to fraudulently induce EGT to enter into the 2011 Agreement to eliminate the only competition to Bluebird, and the ultimate abandonment of the EGT Vector." NYS Litigation Compl. ¶ 289. | put the EGT Vector 'on the shelf.'" MA Litigation Compl. ¶ 84.<br><br>"BBB, Leschly, and TRV were so intent on concealing BBB's secret partnership and conspiracy to defraud EGT that they were willing to withhold from the SEC and the public the, material fact that it had entered into multiple agreements with SKI in connection with the EGT Vector." MA Litigation Compl. ¶ 85.<br><br>"Defendants acquired, used, and personally benefitted from EGT's trade secrets and confidential business information through improper means and used EGT's trade secrets without EGT's consent in violation of Mass. Gen. Laws ch. 93, §42." MA Litigation Compl. ¶ 126. |

| #3 – ALLEGATIONS RELATED TO 2011 OPTION AGREEMENT BETWEEN SKI AND BLUEBIRD | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| TNS9 Vector for the treatment of sickle cell disorder."  Compl. ¶ 118.<br><br>"Defendants were aware that the 'Modified Vector' referenced in section 1.7 of the 2011 Option Agreement referred to modifications and variations of SRT's clinical grade vector TNS9.3.55 that were manufactured using SRT's know-how."  Compl. ¶ 120.<br><br>"bluebird did not exercise its Option under the 2011 Option Agreement because Defendants never intended for bluebird to exercise such Option."  Compl. ¶ 122. | | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "Like SRT's TNS9 Vector, bluebird's (formerly Genetix's) gene therapy relied on a vector delivery system. SRT and bluebird are direct competitors. In 2007, SRT passed the FDA Recombinant DNA Committee for gene therapy in Beta Thalassemia (and future applications in Sickle Cell Disease) years ahead of bluebird, which passed its Recombinant DNA Committee many years later in 2012. SRT's TNS9 Vector was years ahead of the purported BB305 Vector in terms of development. The successful development of the TNS9 Vector was the direct result of SRT's substantial investment in improving and commercializing its gene therapy for Thalassemia and SCD." Compl. ¶¶ 68-70.<br><br>"In an email comparing bluebird's vector, Dr. Sadelain stated . . . 'our vector expresses better than theirs.'" Compl. ¶ 71.<br><br>"SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector. Among other things, SRT has entered into nondisclosure agreements ("NDAs") or other confidentiality agreements | "Third Rock wanted to purchase the EGT Vector, claiming that it was superior to the Bluebird vector which they had just purchased in a $35 million deal from Sadelain's former Harvard classmate." NYS Litigation Compl. ¶ 51.<br><br>"SKI entered into a secret partnership with Bluebird for the purpose of fraudulently inducing EGT to transfer to SKI the physical EGT Vector and all of EGT's know-how, proprietary information and exclusive rights to patented technology (the 'EGT Intellectual Property'). Pursuant to a secret agreement with Bluebird, SKI agreed to give the EGT Intellectual Property to Bluebird for free and share all results of clinical trials to allow Bluebird to develop a safe vector (hereinafter the 'Secret Agreement'). The Secret Agreement provided that SKI would be totally reliant on Bluebird for funding of clinical trials and manufacture of vector, while providing that Bluebird had absolutely no obligation to provide the funding. Bluebird would have the | "Defendants entered into and engaged in a conspiracy and partnership with SKI to block clinical trials for the EGT Vector, wrongfully wrest control of the EGT Vector from EGT, and remove EGT from competition for orphan drug exclusivity. Defendants concocted their unlawful scheme in Massachusetts – and carried out their unfair and deceptive acts in furtherance of their scheme from Massachusetts - where both TRV and Leschly are engaged in business. TRV and Leschly actively participated in and directed SKI's dealings with EGT in furtherance of the conspiracy." MA Litigation Compl. ¶ 56.<br><br>"In view of the 2010 CDA, EGT can only infer that Sadelain presented confidential trade secrets and know-how about the EGT Vector to TRV, Leschly, and BBB during their November 2, 2010 meeting." MA Litigation Compl. ¶ 62.<br><br>"The Option and Collaboration Agreements executed by SKI and BBB memorialized what Leschly, TRV, and |

| #4 – Allegations Related to Misappropriation of TNS9 Vector and Related Trade Secrets | | |
| --- | --- | --- |
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| with all outside partners and vendors with access to SRT's confidential information; restricts access to its facilities; keeps sensitive information in locked cabinets and offices; secures its computers with passwords; hosts its e-mail and web servers on a private, secure platform maintained with the highest security standards; requires a private key to make modifications to electronic files containing highly sensitive information; and takes measures to mark documents containing trade secrets or other sensitive or proprietary information as 'Confidential.'" Compl. ¶ 72.

"In a September 2009 email, Third Rock's founder Leschly wrote to Dr. Sadelain regarding a 'Third Rock Visit to MSKCC / Dr. Sadelain.'  In an October 5, 2009 email, Dr. Sadelain wrote to Leschly (Third Rock) and Philip Reilly (Third Rock), in which he informed Leschly and Reilly that 'it may be more appropriate for you and Phil to meet with [SRT], to whom we have licensed our globin-related technology and with whom we are planning clinical trials in the US and Europe, than with MSKCC.' In an October 8, 2009 email, Dr. Sadelain wrote to Leschly | ability to use all of EGT's Intellectual Property to create a safe Bluebird vector and then shelve the EGT vector by refusing to provide any funding. This was contrary to all the prior discussions concerning the necessity to maintain a competitive advantage over Bluebird to obtain Orphan Drug Exclusivity." NYS Litigation Compl. ¶ 71.

"The first step to halting clinical trials was to secure possession of the physical EGT Vector." NYS Litigation Compl. ¶ 75.

"A joint plan was implemented by SKI and Bluebird to wrest the physical EGT Vector away from EGT." NYS Litigation Compl. ¶ 77.

"The transfer of the vector was a ruse to secure physical possession of the EGT Vector to SKI under false pretenses by claiming that it was urgently needed at SKI to complete the mobilization study necessary for EGT to conduct clinical trials." NYS Litigation Compl. ¶ 80. | BBB had been planning for many months. They effectively permit BBB to 'shut down' EGT and the EGT Vector by withholding funding for development and commercialization of the EGT Vector. The Option Agreement gives BBB a 'fully paid-up, and royalty-free' license to use the EGT Vector and know-how for 'internal research purposes.' This provision, in combination with a corresponding provision in the Collaboration Agreement, permits BBB to incorporate all of the intellectual property associated with the EGT Vector into the Genetix Vector, in BBB's discretion." MA Litigation Compl. ¶ 79.

"Under the terms of these agreements, TRV, BBB, and Leschly could effectively take EGT's technology and put the EGT Vector 'on the shelf.' The agreements gave BBB discretion to provide funding to SKI while also prohibiting SKI from obtaining alternative financing." MA Litigation Compl. ¶ 83. |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| (Third Rock), Sam Salman (President of SRT), and Reilly (Third Rock) about the subject 'MSKCC globin gene transfer program and [SRT].' In the October 8, 2009 email to Leschly (Third Rock), Reilly (Third Rock), and Sam Salman (SRT), Dr. Sadelain wrote . . . . 'It is my pleasure to introduce you to each other.'" Compl. ¶¶ 73-76.

"On or around October 19, 2009, Leschly and Reilly met with SRT at Third Rock's headquarters in Boston, Massachusetts. During the meeting, Leschly expressed Third Rock's desire to develop a 'platform' for the development of gene therapies for Thalassemia and SCD. Leschly advised SRT that Third Rock was considering an investment in the gene therapy invented by Sadelain (and under development by SRT) and/or the competing gene therapy purportedly invented by a Dr. Leboulch (and under development by Genetix)." Compl. ¶ 77.

"In a March 20, 2010, email, Finer and Reilly wrote to Sadelain seeking a meeting to discuss potential synergies and how Genetix | "Unsuccessful in its $4,000,000 extortion demand, and with the disclosure of the EGT Intellectual Property well under way, SKI halted the clinical trial process by refusing to deliver the EGT Vector to NIH to commence clinical trials." NYS Litigation Compl. ¶ 88

"SKI failed to disclose the Secret Agreement with Bluebird. SKI failed to disclose the secret meetings with Bluebird to transfer the EGT Intellectual Property to Bluebird to allow Bluebird to improve its vector. SKI failed to disclose the warnings to SKI from its executives and scientists that Bluebird intended to put the EGT Vector on the shelf and sabotage the EGT Vector. SKI failed to disclose that it did not intend to make any commercially reasonable efforts to exploit the EGT Vector and it had already agreed to enter into an agreement with Bluebird that would assure that the EGT Vector would be killed. SKI failed to disclose its Secret Agreement with Bluebird that was for the sole benefit of Bluebird and its investors under which | "BBB, Leschly, and TRV were so intent on concealing BBB's secret partnership and conspiracy to defraud EGT that they were willing to withhold from the SEC and the public the material fact that it had entered into multiple agreements with SKI in connection with the EGT Vector." MA Litigation Compl. ¶ 84.

"[T]he EGT Vector had been put 'on a shelf,' and EGT - BBB's only competitor- had been eliminated. Meanwhile, the Genetix Vector is proceeding to market with the benefit of EGT's know-how and trade secrets, and the rights and property that EGT was fraudulently induced to transfer to SKI." MA Litigation Compl. ¶¶ 93-94. |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| Plaintiff's Allegations in D. Mass. Complaint | Corresponding Allegations in New York Litigation (Second Amended Complaint) | Corresponding Allegations in Massachusetts Litigation (Amended Complaint) |
| may be able to work with Sadelain and MSK." Compl. ¶ 78.<br><br>"In May 2010, Defendants again approached MSKCC to purchase the TNS9 Vector, knowing that the TNS9 Vector incorporated SRT's trade secrets and know-how related to producing clinical and commercial grade globin lentiviral vectors." Compl. ¶ 80.<br><br>"In a May 3, 2010 email, Viviane Martin of MSKCC's Office of Industrial Affairs wrote to Sadelain: '. . . I honestly do not see what they are seeking . . . besides them doing competitive intelligence.'" Compl. ¶ 82.<br><br>"In a June 1, 2010 email, Finer (Genetix) wrote to Patrick Girondi (SRT) about scheduling a meeting with the Third Rock Team, and in that email Finer copied Leschly (Third Rock), Neil Exter (Third Rock), and Reilly (Third Rock). On or about June 8, 2010, Sam Salman and Patrick Girondi visited Leschly of Third Rock to discuss a potential collaboration for a meaningful therapy. In June 2010, Third Rock attempted to collaborate with SRT and/or acquire rights | Bluebird would have no obligation to fund any clinical trials or vector manufacture or other development if the EGT Vector, yet would be able to incorporate all EGT Intellectual Property into the Bluebird Vector. SKI failed to disclose its Secret Agreement with Bluebird under which Bluebird would be the sole source for funding of trials and development of the EGT Vector, yet Bluebird would have no obligation to provide any funding." NYS Litigation Compl. ¶¶ 101-106.<br><br>"The conspiracy to defraud EGT into transferring the EGT Intellectual Property resulted in a 'deal' that was the ultimate sweetheart deal to benefit only Bluebird and its investors and kill the development of the EGT Vector. Bluebird was not even required to purchase the EGT Vector to shelve it (which EGT had refused to allow)." NYS Litigation Compl. ¶ 115.<br><br>"SKI never disclosed to EGT that it had entered into a secret partnership with | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| to SRT's TNS9 Vector and its proprietary know-how related to globin lentiviral vectors, but the negotiations broke down." Compl. ¶¶ 84-86.<br><br>"In a June 2010 email, Dr. Sadelain wrote to SRT stating: 'The stakes are very high now and in the next few weeks. You can count on Genetix [now bluebird] to proactively sabotage all your efforts.'" Compl. ¶ 87.<br><br>"In a June 18, 2010, email with the subject line 'updated list,' Leschly (Third Rock) wrote to Finer (Genetix) stating: . . . 'want to get him to buy into a CDA to review Michel [Sadelain's] data. Be nice, suck up, etc… if you think (and I think) that Michel has valuable data.'" Compl. ¶ 88.<br><br>"On June 20, 2010, in response to Leschly's June 18, 2010 email with the subject line 'updated list,' Finer (Genetix) responded as follows:  'Pat Girondi – need to shut him down…curious what he called about…my emails were clear he really wants to do a deal with us and wants to learn more about our program. He just has a screwed up way of | Bluebird to wrest control of the EGT Vector and EGT Intellectual Property from EGT to eliminate EGT as competition with Bluebird. SKI never disclosed to EGT that it had entered into the Secret Agreement to benefit only Bluebird. SKI never disclosed that it had already began the transfer of the EGT Intellectual Property and all SKI know-how to Bluebird for free to allow Bluebird to develop its own vector and re-start clinical trials. SKI never disclosed that its scientists were working for Bluebird for free to develop the Bluebird vector. SKI never disclosed to EGT that it agreed that Bluebird would be the sole source of financing for the EGT Vector and Bluebird had no obligation to provide any financing. EGT never disclosed that pursuant to the Secret Agreement, SKI secured possession of the physical EGT Vector to prevent EGT from commencing clinical trials. EGT never disclosed that pursuant to the Secret Agreement, on October 19, 2010, SKI attempted to halt the clinical trial process by demanding $4 million in | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| Plaintiff's Allegations in D. Mass. Complaint | Corresponding Allegations in New York Litigation (Second Amended Complaint) | Corresponding Allegations in Massachusetts Litigation (Amended Complaint) |
| interacting with people like us. I told him you would follow-up. Perhaps he should go to France when we are there, meet Yves, Marina, etc… I want to have a review under CDA of Michel [Sadelain's] data. This is all we have to get out of him. I can get that out of him.'" Compl. ¶ 89.<br><br>"In June 2010, the negotiations between Third Rock and SRT broke down when SRT refused to execute a confidential disclosure agreement ('CDA') with Leschly (Third Rock) and Finer (Genetix)." Compl. ¶ 90.<br><br>"Unable to acquire the TNS9 Vector directly from SRT, Defendants entered into and engaged in a conspiracy and fraud to obtain SRT's TNS9 Vector and trades secrets embodied therein as part of Defendants' objective to eliminate SRT as a direct competitor." Compl. ¶ 123.<br><br>"Bluebird fraudulently obtained physical possession of SRT's TNS9 Vector and its proprietary recipe and titration process related to the formulation of safe clinical grade lentiviral vectors." Compl. ¶ 124. | cash in advance ($400,000 per patient) to which it was not entitled. Maslow offered to treat Patrick Girondi's son for free if EGT acceded to all of SKI's demands. SKI failed to disclose that it had a grant to pay for the clinical trials. SKI used this ruse despite the fact that it knew EGT had funding for clinical trials." NYS Litigation Compl. ¶¶ 173-179.<br><br>"SKI has abandoned the clinical trials of the promising EGT Vector while Bluebird with its clinical trials sails towards exclusive orphan drug designation. SKI used all of the Vector produced by EGT and has failed to produce any more. SKI has informed EGT of its refusal to provide any more funding for the project yet, SKI has rejected offers from biotech companies to fund the clinical trials or to acquire the EGT Vector." NYS Litigation Compl. ¶ 216.<br><br>"SKI and Bluebird entered into a secret partnership and conspiracy for the purpose of wresting the rights to the EGT | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "In a January 27, 2012, email from Leschly to Finer (bluebird), Dr. Gabor Veres (Vice President of Pre-clinical Research and Development, bluebird), Jeffrey Walsh (Chief Strategy Officer, bluebird), Cyrus Mozayeni (Vice President, Global Head of Business Development, bluebird), and Anne-Virginie Eggimann (Vice President, Regulatory Science, bluebird), with the subject line titled 'MSK/Michel Discussion,' Leschly wrote the following: . . . 'getting Michel to agree to process the same via Dr. Christof von Kalle is critical . . . this I think is VERY IMPORTANT – we MUST get him to see this the right way.'" Compl. ¶ 125.<br><br>"It was critical for bluebird to send SRT's TNS9 Vector to Dr. Christof von Kalle (one of bluebird's collaborating scientists in Germany) in order to gain access to SRT's trade secrets and proprietary information embodied in the TNS9 Vector formulation." Compl. ¶ 126.<br><br>"At the direction of Third Rock, Leschly, Finer, Reilly, and bluebird, samples of the TNS9 Vector containing SRT's proprietary | Vector from EGT and prevent completion of its clinical trials. The partnership and conspiracy were undertaken to eliminate any competition to Bluebird in the development of a gene therapy for thalassemia and sickle cell diseases. The partnership and conspiracy were undertaken to protect the $1.3 billion investment in Bluebird based largely on the development of such gene therapy. The conspiracy is rooted in the Orphan Drug Act (the 'ODA') which provides a period of seven year exclusivity for the first company that develops a cure for an orphan disease. The conspiracy is rooted in the interlocking relationships between the executives of SKI, Bluebird, and Bluebird's investors." NYS Litigation Compl. ¶¶ 235-238.<br><br>"Bluebird entered into and engaged in a conspiracy and partnership with SKI to fraudulently wrest control of the EGT Vector from EGT to eliminate their competition." NYS Litigation Compl. ¶ 250. | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
| --- | --- | --- |
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| formulation and made by SRT's proprietary vector production process was sent to bluebird's collaborating scientists in Germany, such as Dr. von Kalle. Defendants instructed bluebird's Dr. Veres to send SRT's TNS9 Vector to Dr. von Kalle in Germany." Compl. ¶¶ 127-28.<br><br>"In addition, Dr. Veres testified that he sent samples of tumors that had developed in mice treated with SRT's TNS9 Vector to an unidentified collaborator in Germany. In March 2012, Dr. Veres sent the tumor samples treated with SRT's TNS9 Vector to Dr. Cynthia Bartholoma in Germany." Compl. ¶ 129.<br><br>"On May 17, 2012, Sadelain emailed Mozayeni, Veres, and Finer about the TNS9 Vector data update and IND response, in which Sadelain wrote the following: . . . 'It isn't really believable that they could not analyze three tumor samples in 5 months.'" Compl. ¶ 130.<br><br>"In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird conspired to delay | "In September 2010, a conspiracy commenced to illegally halt clinical trials of the EGT Vector, to take possession of EGT's technology, eliminate Bluebird's competition and eliminate the threat to the investments of Thompson's partners in Agios. The conspiracy was carried out through the series of actions which includes those specified below. Pursuant to the Secret Agreement between SKI and Bluebird, SKI urgently requested that EGT deliver the EGT Vector to SKI under the guise that it was needed to complete the mobilization study. The request was a ruse to gain possession of the EGT Vector and prevent clinical trials by EGT. Pursuant to the Secret Agreement, on October 19, 2010, SKI blocked the clinical trials of the EGT Vector by demanding $4 million in cash in advance ($400,000 per patient for up to 10 patients). SKI made such demand knowing that it had received a grant to fund clinical trials and EGT had arranged funding for clinical trials. In order to further delay clinical trials by EGT under the Secret Agreement, SKI demanded | |

| #4 – Allegations Related to Misappropriation of TNS9 Vector and Related Trade Secrets | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| the analysis of the tumor samples that was supposed to be conducted by bluebird's German collaborators. In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, caused bluebird's German collaborators to perform analyses on SRT's TNS9 Vector for the purpose of stealing and misappropriating SRT's trade secrets. In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, instructed bluebird's German collaborators to perform reverse engineering analyses and testing of SRT's TNS9 Vector. In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, instructed bluebird's German collaborators to delay and stall testing of tumor samples in order to intentionally sabotage the IND for the TNS9 Vector that was submitted to the FDA. In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird fraudulently obtained the physical TNS9 Vector; stole SRT's trade secrets embodied in the TNS9 Vector; fraudulently obtained unlawful competitive intelligence (confidential information) related | that EGT partner with a larger pharmaceutical company. SKI had already entered into the Secret Agreement with Bluebird." NYS Litigation Compl. ¶¶ 253-256.<br><br>"At the June 16, 2011, meeting Maslow knowingly made false statements to Girondi and Salman to induce EGT to enter into a new agreement with SKI, as set forth in paragraph 74 above. Maslow failed to disclose material facts regarding the Secret Agreement with Bluebird set forth above, including paragraphs 178-190 above. The Secret Agreement and the conspiracy to wrest control of the EGT Vector resulted in the 2011 Agreement, giving SKI control of the development of the EGT Vector. In 2011, EGT was years ahead of Bluebird. Thereafter the conspiracy between SKI and Bluebird allowed Bluebird to catch up to and surpass EGT in the race for a cure for thalassemia and for Orphan Drug Exclusivity. Clinical trials of the EGT Vector were hopelessly delayed, underfunded and ultimately abandoned, | |

| #4 – Allegations Related to Misappropriation of TNS9 Vector and Related Trade Secrets | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| to SRT's TNS9 Vector; and then used SRT's trade secrets and competitive intelligence (confidential information) in connection with bluebird's development of its lentiviral vector, which was purportedly identified as the BB305 Vector, and in connection with bluebird's IND for the BB305 Vector submitted to the FDA." Compl. ¶¶ 131-135.

"MSK filed the IND for SRT's TNS9 Vector with FDA in November 2010, which was over two years before bluebird submitted its IND for the BB305 Vector in December 2012." Compl. ¶ 136.

"Based on Defendants' fraudulent representations, bluebird obtained a copy of the IND for the TNS9 Vector, which was submitted to the FDA years before bluebird submitted the IND for its BB305 Vector, for the purpose of obtaining unlawful competitive intelligence (confidential information) and to shut down SRT, bluebird's only competitor." Compl. ¶ 137.

"Leschly, Reilly, Finer, Third Rock, and bluebird engaged in a scheme to obtain SRT's | leaving Bluebird as the sole company developing a gene therapy for thalassemia and sickle cell diseases. SKI's IND was not filed immediately as promised, but in September 2011, and then was rejected by the FDA as not ready for submission. The IND was finally accepted by the FDA in or about June 2012. The IND was delayed for months by Bluebird by failing to return necessary samples to SKI. The first patient was treated by SKI in November of 2012." NYS Litigation Compl. ¶¶ 261-265.

"Bluebird and SKI engaged in fraudulent conduct in furtherance of the secret agreement between SKI and Bluebird. The overt acts included the conspiracy to fraudulently induce EGT to enter into the 2011 Agreement to eliminate the only competition to Bluebird, and the ultimate abandonment of the EGT Vector." NYS Litigation Compl. ¶ 289.

"Bluebird was aware that the EGT Vector of its competitor, EGT, was better | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| proprietary clinical grade TNS9 Vector from MSK under the fraudulent pretense that bluebird was interested in assisting with the IND submission to the FDA; and they did so in order to obtain unlawful competitive intelligence (confidential information) about SRT's TNS9 Vector and proprietary methods for making a clinical grade lentiviral vector for gene therapy. Bluebird had no intention of actually helping MSK file its IND with the FDA. Based on false representations, Defendants obtained SRT's TNS9 Vector and proprietary information related thereto. Defendants never had any intentions of actually collaborating with and assisting MSK. Defendants fraudulently induced MSK to provide bluebird and Dr. Veres with SRT's TNS9 Vector and related proprietary information, including the confidential IND for the TNS9 Vector for the common purpose of obtaining unlawful competitive intelligence (confidential information), eliminating bluebird's only competitor, and stealing SRT's proprietary information to get ahead of SRT in the market. Leschly, Reilly, Finer, Third Rock, and bluebird engaged in a scheme to obtain access to SRT's confidential | than its own product. Bluebird also knew that it could not obtain the EGT's rights in the EGT Vector by negotiating with EGT since it had been rejected by EGT in June 2010. Accordingly, it entered into the Secret Agreement with SKI in 2010 to halt clinical trials and fraudulently induce EGT to transfer the EGT Vector and EGT Intellectual Property to SKI. Under the Secret Agreement, the EGT Intellectual Property was transferred by SKI to Bluebird for free to allow Bluebird to develop a safe vector. Such transfers occurred during secret meetings in 2010 and 2011 prior to the June 2011 Agreement between SKI and EGT. Bluebird had the ability to incorporate all of EGT's Intellectual Property into the Bluebird vector. Bluebird received the free services of SKI scientists as consultants to develop a safe Bluebird vector using the EGT Intellectual Property." NYS Litigation Compl. ¶¶ 293-296.<br><br>"Under the Secret Agreement, EGT's clinical trials were halted, EGT was | |

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| information embodied in the IND for the TNS9 Vector so that bluebird could (i) benefit from the confidential information and competitive intelligence embodied in the IND; (ii) use such information to gain a commercial advantage over SRT; and (iii) use such unlawful competitive intelligence (confidential information) in connection with the submission of the IND for bluebird's BB305 Vector." Compl. ¶¶ 138-142.<br><br>"[O]nce bluebird fraudulently obtained SRT's TNS9 Vector, bluebird began to create exact copies of the TNS9 Vector." Compl. ¶ 146.<br><br>"Defendants have engaged in multiple instances of wire and mail fraud, which includes, at least, the following: obtaining and then delivering the TNS9 Vector and SRT's stolen trade secrets to collaborators in Germany via mail in 2012; [and] submitting materials to the FDA containing stolen trade secrets and fraudulently obtained unlawful competitive intelligence (confidential information) in 2013 via mail and wire." Compl. ¶ 274. | defrauded into signing its Intellectual Property to SKI, it was used to develop the Bluebird vector and the EGT Vector was abandoned. Bluebird engaged in such conduct not out of any effort to develop a better drug, but instead to destroy the development of the EGT Vector and eliminate EGT as a competitor so Bluebird and to enable Bluebird to receive Orphan Drug Exclusivity. Bluebird acted with malice and bad faith against EGT, SKI and patients suffering from this fatal disorder. Bluebird developed its own vector, incorporating the EGT Intellectual Property and palmed off the vector as its own product." NYS Litigation Compl. ¶¶ 299-302.<br><br>"Bluebird[] (i) misappropriate[ed] EGT Intellectual Property to incorporate it into its own medical treatments or drugs; (ii) [undertook] efforts to permanently hinder the development of the EGT Vector; and [to] (iii) eliminate EGT as a competitor." NYS Litigation Compl. ¶ 310. | |

APPENDIX A

| #4 – ALLEGATIONS RELATED TO MISAPPROPRIATION OF TNS9 VECTOR AND RELATED TRADE SECRETS | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "Defendants engaged in a campaign to steal SRT's trade secrets relating to the TNS9 Vector [and] engaged in a campaign to steal SRT's TNS9 Vector." Compl. ¶¶ 275-276. | "Defendant Bluebird has been unjustly enriched by having misappropriated the EGT Intellectual Property and know-how and all results from clinical trials of the EGT Vector without paying any compensation. It is against equity and good conscience to permit Bluebird to retain the EGT Intellectual Property and know-how and all results from clinical trials of the EGT Vector and to use same in connection with sale, licensing or commercial any medical treatment or drug without compensating EGT. Plaintiff is entitled to damages from Bluebird in an amount to be determined at trial and is entitled to punitive damages to deter future misconduct because, as set forth above, Defendant's conduct was willfully, wantonly and maliciously designed to benefit themselves at the expense and diminishment of Plaintiff and the general public." NYS Litigation Compl. ¶¶ 313-315. | |

| #5 – ALLEGATIONS RELATED TO ALLEGED SABOTAGE OF SRT'S ABILITY TO BRING THERAPY TO MARKET FIRST | | |
| --- | --- | --- |
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| "In a June 2010 email, Dr. Sadelain wrote to SRT stating: 'The stakes are very high now and in the next few weeks. You can count on Genetix [now bluebird] to proactively sabotage all your efforts.'" Compl. ¶ 87.

"In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird, either directly and/or indirectly, instructed bluebird's German collaborators to delay and stall testing of tumor samples in order to intentionally sabotage the IND for the TNS9 Vector that was submitted to the FDA." Compl. ¶ 134.

"The predicate acts were . . . part of a past and ongoing scheme to shut down SRT, advance the competing BB305 Vector, and shield associated assets." Compl. ¶ 277. "Defendants delayed and sabotaged the IND for TNS9 Vector . . . [and] used SRT trade secrets to enable and accelerate bluebird's clinical vector, and obtained early launch by violating SRT's intellectual property." Compl. ¶ 313. | "In a June 2010 email, SKI warned EGT about Bluebird's motives in arranging a meeting with EGT. It stated: 'The stakes are very high now and in the next few weeks. You can count on GP (now Bluebird) to proactively sabotage all your efforts…'" NYS Litigation Compl. ¶ 52.

"SKI ignored the warnings of its executives and scientists that were heeded by EGT in rejecting any deal with Bluebird would shelve the EGT/SKI gene therapy and that Bluebird would proactively sabotage all the efforts of SKI and EGT." NYS Litigation Compl. ¶ 69.

"SKI failed to disclose the warnings to SKI from its executives and scientists that Bluebird intended to put the EGT Vector on the shelf and sabotage the EGT Vector." NYS Litigation Compl. ¶ 103.

"A November 28, 2012 email from an SKI scientist states: 'Simply put, they benefited from our expertise as they were | "In August 2010, Dr. Craig B. Thompson was named Chief Executive Officer of SKI. Thompson has a deep, long-standing relationship with Leschly, TRV, and BBB. Among other things, TRV had invested more than $33 million in Agios Pharmaceuticals, the company founded by Thompson, and Leschly had served as the Chief Business Officer for Agios in 2009-2010. Defendants seized upon Thompson's appointment as CEO of SKI to obtain SKI's assistance to 'shut down' EGT - BBB's only competitor." MA Litigation Compl. ¶ 59.

"During a November 2010 presentation to BBB's Board of Directors. . . .  BBB specifically discussed the 'pros/cons' for a BBB partnership with SKI.  One of the 'pros' identified by BBB was that a partnership with SKI 'eliminates [BBB's] most threatening competitor,' EGT. BBB also compared the EGT Vector with the Genetix Vector . . . ." MA Litigation Compl. ¶ 64. |

| #5 – ALLEGATIONS RELATED TO ALLEGED SABOTAGE OF SRT'S ABILITY TO BRING THERAPY TO MARKET FIRST | | |
|---|---|---|
| **Plaintiff's Allegations in D. Mass. Complaint** | **Corresponding Allegations in New York Litigation (Second Amended Complaint)** | **Corresponding Allegations in Massachusetts Litigation (Amended Complaint)** |
| | getting started (getting our full IND before submitting their own and all of our ideas for a song) and later sat on our samples delaying our IND be several months.'" NYS Litigation Compl. ¶ 123.<br><br>"An internal email of SKI confirms that the SKI IND was delayed for several months because Bluebird delayed the return of SKI samples (which had been paid for by EGT) needed to file the IND." NYS Litigation Compl. ¶ 128.<br><br>"Bluebird decided to develop its own vector using the EGT Intellectual Property and all of SKI's know-how and the exclusive consulting services of SKI's chief scientists, all of which they were given free of charge. SKI and Bluebird put the EGT Vector 'on a shelf' and left it to die after the third patient was treated in 2013, allowing Bluebird to continue its clinical trials with no competition." NYS Litigation Compl. ¶ 141. | |