**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

SAN ROCCO THERAPEUTICS, LLC,

        Plaintiff,

   v.

NICK LESCHLY, MITCHELL FINER, PHILIP
REILLY, CRAIG THOMPSON, THIRD ROCK
VENTURES, LLC, BLUEBIRD BIO, INC,
2SEVENTY BIO, INC.,

        Defendants.

Civil Action No. 1:23-cv-10919-ADB

---

## <u>AMENDED COMPLAINT</u>

Plaintiff San Rocco Therapeutics, LLC ("SRT"), formerly known as Errant Gene Therapeutics, LLC ("EGT"), for its Amended Complaint against Defendants Nick Leschly ("Leschly"), Mitchell Finer, Ph.D. ("Finer"), Philip Reilly ("Reilly"), Craig Thompson, M.D. ("Thompson"), Third Rock Ventures, LLC ("Third Rock"), bluebird bio, Inc. ("bluebird"), and 2seventy bio, Inc. ("2seventy"), collectively "Defendants," hereby alleges, on knowledge as to its own actions, and upon information and belief as to all other matters, as follows:

## <u>INTRODUCTION</u>

1.    SRT brings this action against Defendants for civil violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(a), (b), (c), and (d) ("Federal RICO"), Sherman Antitrust Act and Clayton Act, 15 U.S.C. §§ 1, 2, 15, and 26 ("Federal Antitrust"), Mass. Gen. Laws ch. 93A, § 11 ("Massachusetts Unfair Competition"), and Mass Gen. Laws Ch. 93, § 4 and § 5 ("Massachusetts Antitrust"), all of which are causes of action that arose after November 2, 2020 based upon Defendants' unlawful and improper acts that occurred from November 2, 2020 and continues to occur as of the filing date of SRT's Amended Complaint.

2.      In addition, SRT brings a cause of action against Defendants for fraudulent inducement of, including conspiracy to fraudulently induce SRT into agreeing to mutual release and dispute resolution provisions of a confidential settlement agreement (the "Settlement Agreement") executed on November 2, 2020.

3.      Although SRT's causes of action within the present matter did not accrue until after execution of the Settlement Agreement in November 2020, SRT's relationship with Defendants and/or their conspiracy goes as far back as the early 2000s.

4.      SRT is a biopharmaceutical company, established in 1993 by its founder and CEO, Mr. Patrick Girondi, after his son was diagnosed with Beta Thalassemia.

5.      In 2000, SRT began financially supporting the research of Drs. Michel Sadelain and Stefano Rivella, both of whom were medical researchers and scientists at Memorial Sloan Kettering Cancer Center ("MSKCC") and the Sloan Kettering Institute for Cancer Research ("SKI"), collectively "MSK."  As a result of SRT's unyielding commitment, it has successfully developed recombinant vectors that can be used in lentiviral vector gene therapy treatment of rare genetic diseases, such as Sickle Cell Disease ("SCD") and Beta Thalassemia.  There are over 2,000 SCD and Thalassemia patients in Massachusetts.

6.      SRT and MSK executed an exclusive license agreement (the "2005 Agreement") with the goal of commercially developing the intellectual property to be utilized for the public interest.  SRT's tireless efforts and work with Drs. Sadelain, Rivella, and others, resulted in the development of the TNS9.3.55 lentiviral vector (the "TNS9 Vector" or "SRT's TNS9 Vector") for the treatment of SCD and Beta Thalassemia.

7.      At a June 16, 2011, meeting, MSKCC proposed a new agreement (the "2011 Agreement").  Under the 2011 Agreement, SKI would take control of the clinical trials from SRT

and SKI would head the commercialization of the TNS9 Vector, including the filing of the Investigational New Drug Application ("IND") for SRT's TNS9 Vector. However, all of SRT's trade secrets and know-how concerning the clinical grade formulation for the TNS9 Vector remained the property of SRT.

8.      In 2010, Third Rock, Leschly, Finer, and Reilly established bluebird to develop and market lentiviral vectors for the treatment of Beta Thalassemia and SCD. Bluebird is a direct competitor of SRT in the field of lentiviral vector gene therapy treatments using lentiviral vectors for SCD and Beta Thalassemia patients. Bluebird, however, could not efficiently and safely produce lentiviral vectors that were safe for clinical use in patients.

9.      In 2007, Thompson co-founded Agios Pharmaceuticals, Inc. ("Agios Pharma"). In 2008, Third Rock led Agios Pharma's $33 million dollar Series A funding. Thompson's Agios Pharma was a significant investment for Third Rock early on in the firm's existence.

10.     In 2007, while he was a partner at Third Rock, Leschly helped to form the foundation of Agios Pharm with Thompson. The relationship was so close that in 2009, Leschly became the Business Development Officer at Agios. In 2008, Kevin P. Starr was an interim Chief Executive Officer at Agios Pharma and also a partner at Third Rock.

11.     In 2010, Thompson became President and Chief Executive Office of MSK. Prior to joining MSK, Thompson developed a business relationship with Leschly, Reilly, and Third Rock (where Leschly and Reilly were partners and/or directors of Third Rock). For example, Third Rock invested in and led multiple rounds of funding for Thompson's company, Agios Pharma, prior to and after Thompson joined MSK.

12.     In 2011, unable to acquire SRT's TNS9 Vector and proprietary information directly from SRT, Defendants Leschly, Third Rock, and bluebird fraudulently obtained the clinical grade TNS9 Vector and unlawful competitive intelligence (confidential information) related thereto.

13.     In January 2017, SRT commenced a civil action against SKI and bluebird in the Supreme Court of the State of New York, entitled *Errant Gene Therapeutics, LLC v. Sloan Kettering Institute for Cancer Research and Bluebird Bio, Inc.*, Index No. 150856/2017 (hereafter the "New York Litigation"), alleging the following causes of action: (1) fraud against SKI; (2) breach of contract against SKI based on the 2011 Agreement; (3) breach of contract against SKI based on the 2005 Agreement; (4) civil conspiracy to defraud against SKI and bluebird; (5) unfair competition against bluebird; (6) injunctive relief against bluebird; and (7) unjust enrichment against bluebird.

14.     In June 2019, SRT commenced a civil action against Third Rock and Leschly in the Superior Court of Massachusetts, entitled *Errant Gene Therapeutics, LLC v. Third Rock Ventures, LLC and Nick Leschly,* Civil Action No. 19-1832 (hereafter the "Massachusetts Litigation"), alleging the following causes of action: (1) tortious interference with contractual relations; (2) tortious interference with business relations; (3) misappropriation of trade secrets; (4) violations of Massachusetts General Laws ch. 93, § 42; (5) civil conspiracy; (6) unjust enrichment; and (7) violations of Massachusetts General Laws ch. 93A, § 11.

15.     On November 2, 2020, during trial in the New York Litigation, SRT, MSK, and bluebird executed the Settlement Agreement the night before Thompson was supposed to testify in court.  The parties executed the Settlement Agreement to resolve any and all disputes related to the 2005 and 2011 Agreements, and the New York and Massachusetts Litigations.  However, the

Settlement Agreement does not—and could not—cover any future causes of action against these Defendants that had yet to accrue.  D.I. 36-1 Settlement Agreement, ¶ 5.

16.     After execution of the Settlement Agreement, Defendants engaged in unlawful conduct to deprive SRT of its business, property, and money.  The Settlement Agreement was not a license to continue unlawful conduct after execution of the Settlement Agreement.

17.     After November 2, 2020, Defendants Leschly, Third Rock, Reilly, Finer, bluebird, Thompson, and 2seventy committed additional fraudulent and unlawful acts against SRT as part of their ongoing schemes involving, *inter alia*, (i) fraudulent inducement of SRT in connection with the Settlement Agreement; (ii) the fraudulent spin-off of 2seventy; and (iii) conspiracy to make materially false statements and representations to the FDA in violation of criminal statute 18 U.S.C. § 1001 at least five times.  Defendants committed fraudulent and unlawful acts in furtherance of their objectives to, *inter alia*, (i) shut down SRT; (ii) to get ahead (and stay ahead) of SRT in the lentiviral vector gene therapy treatment market; and (iii) to protect their financial interests and earnings that resulted from Defendants' predicate acts of racketeering activities.

18.     After execution of the Settlement Agreement, Defendants Leschly, Third Rock, Reilly, Finer, bluebird, Thompson and 2seventy committed, at least, two RICO predicate acts. After execution of the Settlement Agreement, Defendants Leschly, Third Rock, Reilly, Finer, bluebird, Thompson, and 2seventy committed at least two fraudulent and/or unlawful acts in furtherance of their scheme thereby establishing a civil RICO claim based on Defendants' collective predicate acts.  Defendants' predicate acts involving fraud and deceit with the intent to deprive SRT of its business, property and money is evidence of a pattern of racketeering.

19.     In violation of Federal RICO, Defendants engaged in an enterprise to commit fraud and willfully make false material statements to the U.S. Federal Drug Administration ("FDA") in

furtherance of their objectives to shut down SRT; eliminate bluebird's competition; sabotage SRT's FDA regulatory submissions; destroy SRT's business and property; and protect their unjust financial gains. The results of Defendants' unlawful activities led to an increase in price of bluebird's Zynteglo (*i.e.*, the BB305 drug product) gene therapy treatment that went from an estimated $700,000 to $2,800,000 million dollars per treatment for Beta Thalassemia patients.

20. The culpable persons are Defendants Leschly, Finer, Reilly, Thompson, Third Rock, bluebird, and 2seventy, herein referred to collectively as the "Leschly Enterprise."

21. SRT has been injured by each and every one of Defendants' predicate acts committed in furtherance of their scheme involving racketeering activities, and SRT's injuries are separate and distinct from each other. Indeed, each Defendant has committed and/or directly participated in the racketeering activities against SRT. Defendants' scheme to defraud SRT and shut down SRT's lentiviral gene therapy program encompasses their acts of deceit and each Defendant intended to deprive SRT of its business and property.

22. In furtherance of their objective conspiracy to commit fraud and willfully make false statements to the FDA, Defendants engaged in mail and wire fraud involving their planned conspiracies and schemes based on (i) fraudulent inducement of SRT in connection with the Settlement Agreement; (ii) continued possession and use of SRT's trade secrets after the Settlement Agreement; (iii) interference with SRT's business dealings, including corrupting MSK through Thompson's unlawful direction and instructions of employees at MSK; (iv) the fraudulent spin-off of 2seventy in order to protect financial gains and profits that resulted from their scheme to eliminate SRT as a competitor and obtain FDA approval with market exclusivity; and (v) submitting false statements to the FDA in violation of criminal statute 18 U.S.C. § 1001.

23.     By means of this action, SRT seeks that all Defendants be jointly and severally found liable to at least the extent of: (i) treble the damages incurred by SRT due to Defendants' unlawful activity, including attorneys' fees and cost pursuant to Federal RICO and other applicable statutes; (ii) attorneys' fees spent bringing this action; (iii) pursuant to 18 U.S.C. § 1961 *et seq*., recoverable damages to SRT's "business or property," which is an amount in excess of $500 million or an amount otherwise determined at trial; (iv) an amount to be decided at trial in the form of punitive damages for Defendants' illegal and fraudulent actions, and (v) any additional recovery available to be decided at trial.

24.     In violation of Federal Antitrust and Massachusetts Antitrust, Defendants engaged in anticompetitive acts in furtherance of their objective to shut down SRT and eliminate bluebird's competition, gain FDA approval for the BB305 Vector with market exclusivity, and unlawfully delayed the entry SRT's gene therapy treatment into the market to the detriment of patients and healthcare payors.

25.     SRT's goal is to make gene therapy accessible for all patients.  SRT's gene therapy product is projected to cost much less—**over 2 million dollars less**—per treatment than bluebird's BB305 Vector which is priced at 2.8 million dollars per treatment.  The projected price of SRT's TNS9 Vector gene therapy treatment is approximately $700,000 per treatment.

26.     After the Settlement Agreement was executed, Defendants violated the Federal Antitrust and Massachusetts Antitrust laws to create and maintain their monopoly and extract supra-competitive prices to the detriment of patients and medical insurance payors.  For example, working with the Leschly Enterprise, Defendant Thompson directed and caused MSK to delay providing regulatory documents and materials to SRT in connection with SRT's competing

lentiviral vector gene therapy treatment in an effort to disrupt SRT's operations and delay market entry of a competing treatment to bluebird's gene therapy treatments.

27.     As discussed herein, led by Thompson and Leschly, Defendants fraudulently induced SRT into executing the mutual release and dispute resolution provisions of the Settlement Agreement, which includes statements made in November 2020 by Thompson, Leschly, and bluebird that SRT would receive exclusivity of valid and enforceable intellectual property and omissions with respect to bluebird's continued and planned use of SRT's exclusive intellectual property.  Defendants conspired to trick SRT into dismissing its claims in the Massachusetts Litigation so that they could continue to harm SRT's business, including blocking SRT's goal to make gene therapy for Beta Thalassemia and SCD safe and affordable.

28.     After execution of the Settlement Agreement, led by Thompson and Leschly, the Leschly Enterprise engaged (and continues to do so) in unlawful activities in furtherance of their objective to harm SRT's business and property and block SRT's competing lentiviral vector gene therapy treatments from coming to market.  Defendants received their rewards in August 2022, when bluebird's lentiviral vector gene therapy treatment was approved in the U.S. at $2,800,000 million dollars per treatment, after being rejected in Europe for the ridiculous price of $1,800,000 per treatment.

29.     By means of this action, SRT seeks a judgment finding Defendants Leschly, Finer, Reilly, Thompson, bluebird, and Third Rock fraudulently induced SRT into agreeing to the mutual release and dispute resolution provisions of the Settlement Agreement and ordering reinstatement the claims released that were dismissed in the Massachusetts Litigation, thereby allowing SRT to revive all claims asserted against Leschly and Third Rock in the Massachusetts Litigation.

30.     By means of this action, SRT seeks that all Defendants be jointly and severally found liable for violation of Mass. Gen. Laws ch. 93A, § 11 because Defendants' fraud and deceptive business practices substantially occurred in Massachusetts and SRT has been harmed in Massachusetts.

## **THE PARTIES**

31.     SRT is a Delaware limited liability company with its principal place of business at 308 East Emily Street, Tampa, Florida 33603.

32.     Third Rock is a Delaware limited liability company with business offices located at 29 Newbury Street, 3rd Floor, Boston, Massachusetts 02116.  Third Rock is registered to conduct and regularly conducts business in the Commonwealth of Massachusetts.

33.     2seventy is a corporation incorporated in the State of Delaware with principal executive offices and a place of business located at 60 Binney Street, Cambridge, Massachusetts 02142.  2seventy is registered to conduct and regularly conducts business in the Commonwealth of Massachusetts.

34.     Bluebird is a corporation incorporated in the State of Delaware with principal executive offices and a place of business located at 455 Grand Union Blvd, in Somerville, Massachusetts.

35.     Leschly is an individual who resides at 68 School Street, Weston, Massachusetts. Leschly is the Chief Executive Officer ("CEO") of 2seventy and former CEO of bluebird.

36.     Reilly is an individual who resides in Massachusetts.  Reilly is a Venture Partner at Third Rock Ventures and former Chief Medical Officer of bluebird.

37.     Finer is an individual who resides in Massachusetts.

38.     Thompson founded Agios Pharma, which has a principal place of business at 88 Sidney Street, Cambridge, Massachusetts.  Thompson is a substantial stakeholder of Agios

Pharma. Thompson regularly conducts business in Massachusetts by, *inter alia*, engaging in business relationships with Third Rock, Agios Pharma, Leschly, and Reilly all of whom reside in Massachusetts.  Thompson is the former CEO and current employee of MSKCC and continues to engage with Defendants in Massachusetts.

## SUBJECT MATTER JURISDICTION AND VENUE

39.     Pursuant to 18 U.S.C. § 1964, the Court has subject-matter jurisdiction over this action arising under 18 USC §1962 (a), (b), (c), and (d) because of Defendants' multiple Federal RICO violations, all of which substantially occurred within this District.

40.     Pursuant to 15 U.S.C. § 15, the Court has subject-matter jurisdiction over this action arising under 15 U.S.C. §§ 1 and 2.

41.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject-matter jurisdiction over the state law claims arising under Mass. Gen. Laws, ch. 93A, § 11 because those claims are related to the Federal RICO and Federal Antitrust claims as part of the same case or controversy.

42.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject-matter jurisdiction over the state law claims arising under Mass. Gen. Laws, ch. 93, § 4 and § 5 because those claims are related to the Federal RICO and Federal Antitrust claims as part of the same case or controversy.

43.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental subject-matter jurisdiction over SRT's fraudulent inducement claims because those claims are related to the Federal RICO and Federal Antitrust claims as part of the same case or controversy.

44.     Pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, venue in this District is proper because all of the acts, or a substantial part of the acts, giving rise to SRT's claims occurred within this District.  All or a substantial part of the events or omissions giving rise to this action occurred

Case 1:23-cv-10919-ADB   Document 42   Filed 08/07/23   Page 11 of 124

in Massachusetts, and Defendants fraudulently induced SRT to execute a Settlement Agreement with a mutual release provision that caused the illegal dismissal of the Massachusetts Litigation.

## PERSONAL JURISDICTION

45.     The Court has personal jurisdiction over Third Rock because Third Rock has a principal place of business in Massachusetts and is registered to conduct business within this District.

46.     The Court has personal jurisdiction over 2seventy because 2seventy has a principal place of business in Massachusetts and is registered to conduct business within this District.

47.     The Court has personal jurisdiction over Leschly because Leschly resides in Massachusetts.

48.     The Court has personal jurisdiction over Finer because Finer resides in Massachusetts.

49.     The Court has personal jurisdiction over Reilly because Reilly resides in Massachusetts.

50.     The Court has personal jurisdiction over bluebird because bluebird has a principal place of business in Massachusetts and is registered to conduct business within this District.

51.     The Court has personal jurisdiction over Thompson because Thompson regularly conducts business in this district.  For example, Thompson is a substantial stakeholder of Agios Pharma located at 88 Sidney Street, Cambridge, Massachusetts. Thompson regularly conducts business in Massachusetts by, *inter alia*, engaging in business relationships with Agios Pharma, Third Rock, Leschly, and Reilly.  In addition, the Court has personal jurisdiction over Thompson pursuant to 18 U.S.C. § 1965(b) and pendent personal jurisdiction over Thompson. Thompson conspired and collaborated with Defendants Leschly, Reilly, and Third Rock in carrying out their collective fraudulent schemes and unlawful activities discussed herein, which resulted in, among

other events, the transportation, transmission, or transfer in of SRT's TNS9 Vector and other proprietary information into this district and the creation or retention of copies of SRT's proprietary information within this district, and this Court has personal jurisdiction over the other Defendants.

## FACTUAL BACKGROUND

**Background Of SRT's Gene Therapy Treatment And Interactions With Defendants**

52.     By way of background SRT is a biopharmaceutical company, established in 1993 by its founder and CEO, Mr. Patrick Girondi, after his son was diagnosed with Beta Thalassemia, a rare inherited blood disorder.  Since that time, and for three decades, SRT has dedicated itself to developing treatments for life-threatening diseases, with a special focus on rare diseases (commonly referred to as orphan diseases) through the use of gene therapy—a scientific technique that treats genetic disorders by modifying, replacing, and/or inactivating mutated genes responsible for causing the disease.

53.     As a result of its tireless efforts, SRT has successfully developed recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as Sickle Cell Disease and Beta Thalassemia.

54.     SCD is a genetic disease that affects millions of people throughout the world and is particularly common amongst those with ancestors from sub-Saharan Africa, Spanish-speaking regions in the Western hemisphere (South America, the Caribbean, and Central America), Saudi Arabia, India, and Mediterranean countries such as Turkey, Greece, and Italy.  SCD is an inherited mutated β-globin, which causes red blood cells to become sticky and rigid, giving them the shape of a sickle or crescent moon.  These irregular shaped red blood cells lead to blockages and acute pain, which can cause organ damage and a shortened life span.

55.     Beta Thalassemia (a cousin to SCD) is a rare, inherited blood disorder caused by mutations in the hemoglobin beta ("HBB") gene, which prevents the body from properly producing hemoglobin, the protein in red blood cells that transports oxygen to organs and tissues. While Beta Thalassemia affects a large population of children worldwide—most often people who are of Mediterranean (Greek, Italian, and Middle Eastern), Asian or African descent—it is rare in the United States.  Beta Thalassemia and SCD are considered "orphan diseases" and are often overlooked.

56.     People with Beta Thalassemia often develop severe anemia, which can cause damage to the heart, liver, and hormone producing glands, and they may suffer from bone deformities, enlarged spleens, delayed growth rates, and congenital heart failure.

57.     The only established cure for Beta Thalassemia is a bone marrow or stem cell transplant, yet fewer than 25% of patients have compatible donors.  Short of such a transplant, people with Transfusion-Dependent Thalassemia require blood transfusions every 14 to 28 days, which in turn, require them to undergo painful iron chelation medications to reduce iron build-up in the blood from the transfusions themselves.  Even with frequent blood transfusions, Beta Thalassemia most often results in death by the time a person reaches their late twenties.  Indeed, the worldwide average age of mortality is 28 years.

58.     From 1993 to 1998 SRT ran clinical trials with Drs. Susan Perrine of Boston University and Nica Cappellini of University of Milan using the experimental, gene-enhancing drugs, Arginine Butyrate and Isobutyramide.

59.     In 1995, SRT opened San Rocco Medical Center in Altamura, Italy to treat, free of charge, Thalassemia patients from four Italian regions.  In 2000, SRT became pioneers in gene therapy through their support of Dr. Michel Sadelain of MSK.

60.     In 2000, SRT began financially supporting the research of Drs. Michel Sadelain and Stefano Rivella, both of whom are medical researchers and scientists at MSK.

61.     SRT's tireless efforts and work with Drs. Sadelain, Rivella and others, resulted in the development of the TNS9.3.55 lentiviral vector (the "TNS9 Vector" or "SRT's TNS9 Vector") for the treatment of Beta Thalassemia and SCD.

62.     SRT committed every available resource to producing the TNS9 Vector—what became trademarked by SRT as Thalagen™—in accordance with the FDA's stringent approval process for investigational new drugs.

63.     As a result of SRT's unyielding commitment, it successfully developed recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as SCD and Beta Thalassemia.  SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector.

64.     In addition, SRT diligently, through various agreements with MSK and other top medical centers, continued testing and refining the TNS9 Vector to ensure patient safety, and to ensure conformance with the highest manufacturing and testing standards, designated by the FDA as chemical Good Manufacturing Practice ("cGMP").

65.     In 2005 SRT signed with MSK for the worldwide commercial rights to, and purchased, Dr. Michel Sadelain's gene therapy project for SCD and Thalassemia, which afflicts Mr. Girondi's son, Rocco.  Under the 2005 Agreement, MSK granted SRT an exclusive license agreement to the intellectual property related to the lentiviral vectors invented by Drs. Sadelain and Rivella.  SRT's tireless efforts and work with Drs. Sadelain, Rivella and others, resulted in the development of the SRT's TNS9 Vector for the treatment of Beta Thalassemia and SCD.

14

66.     From 2005 to 2010 SRT invested several million dollars and, together with MSK, improved the TNS9 Vector.  From 2005–2009, SRT commandeered and paid for 55 iterations and modifications of lentiviral vectors that led to SRT's TNS9 Vector.

67.     SRT's Director of Gene Therapy, Dr. Christopher Ballas, created an innovative and proprietary vector production and formulation process, which is worth in excess of hundreds of millions of dollars.

68.     In January 2006, the FDA granted SRT an "Orphan Drug Designation" for the TNS9 Vector.  An "orphan disease" is a disease, such as Thalassemia, which affects a small percentage of the population.  Assigning "orphan" status to a disease is intended to increase investment in research to treat medical conditions which, because they are so rare, would not be profitable to produce without government assistance.  One benefit of obtaining an Orphan Drug Designation is that it can lead to market exclusivity.  Once a company is awarded orphan drug market exclusivity, the FDA is generally barred from approving any other Orphan Drug Designation for the same orphan disease for seven years.

69.     SRT was awarded Orphan Drug Designation in the United States for the TNS9 Vector in 2006, which was years ahead of bluebird, which received its Orphan Drug Designation in 2013.

70.     In 2007, MSK's work to make a clinical grade lentiviral vector was failing and, in fact, MSK's lentiviral vector production was inefficient and not ready to treat patients.  Given MSK's failures, in 2007, SRT evaluated and improved (i) the lentiviral-based transduction of CD34+ cells; and (ii) determined TNS9 lentiviral integration using Taqman multiplexed Q-PCR.  In addition, SRT evaluated and improved the (i) titration of lentiviral vectors and (ii) worked on the preparation of CD34+ methocult-based colony formation assays.

71.     Using SRT's proprietary vector production protocol, and working under certain written agreements, a successful clinical grade lentiviral vector was finally produced by SRT to be used to treat patients involved in clinical trials.

72.     In 2007, SRT became the first entity to pass the FDA Recombinant DNA Committee for gene therapy in Beta Thalassemia (and future applications in SCD) and did so five years ahead of bluebird.

73.     In 2008, SRT successfully requested a pre-investigation New Drug ("IND") meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector.  The IND program is the means by which a pharmaceutical company obtains permission to start human clinical trials and to ship an experimental drug across state lines.

74.     In 2008, SRT successfully completed a pre-IND meeting with the FDA to advance to clinical (*i.e.*, human) trials, the next stage necessary to develop the TNS9 Vector.

75.     SRT's gene therapy treatment obtained Orphan Drug Designation for Beta Thalassemia in the United States in 2006, seven years ahead of bluebird.  SRT's gene therapy treatment obtained Orphan Drug Designation for Beta Thalassemia in Europe in 2009, four years ahead of bluebird.  SRT was the first to produce a commercial batch (enough for 7–10 patients) of gene therapy for Beta Thalassemia in 2010, years ahead of bluebird.  SRT treated the first patients in 2012, years ahead of bluebird.

76.     The CEO of SRT, Mr. Girondi believes his son and all patients should have access to the safest cure that is also affordable and accessible. With this in mind, Mr. Girondi founded SRT and has upheld this mission since the creation of the company.  The proposed price for SRT's gene therapy treatment is over $2,000,000 less than bluebird's gene therapy, which is currently priced at $2,800,000 dollars per treatment.

77.     Defendants Leschly, Thompson, Reilly, Finer, and Third Rock were aware that SRT's proposed price for its gene therapy treatment is approximately $700,000 dollars per treatment.

78.     In 2010, Leschly worked with Third Rock to acquire Genetix Pharmaceuticals, Inc. ("Genetix"), a biotechnology company founded in 1992 and focused on developing gene therapies. Following the acquisition of Genetix, Leschly and Third Rock changed the company's name to bluebird bio, Inc. (now Defendant bluebird).  In 2010, bluebird also became a portfolio company of Third Rock, and is currently listed on Third Rock's website as a portfolio company.

79.     Defendants Leschly and Reilly were venture capital partners at Third Rock for many years prior to the formation of bluebird.  Leschly, Reilly, and Third Rock formed bluebird.

80.     Reilly became the "founding" Chief Medical Officer of bluebird in 2010.  Reilly is currently a venture partner at Third Rock.

81.     Defendant Finer, who had joined Genetix in March 2010, became Chief Scientific Officer at bluebird.

82.     Genetix was far behind SRT in its research and development of gene therapy treatments for Beta Thalassemia and SCD.

83.     In or around May 2009, Genetix's / bluebird's lentiviral vector caused a Thalassemia patient in France to develop a condition known as "clonal dominance," which is a precursor to cancer.

84.     Like SRT's TNS9 Vector, bluebird's (formerly Genetix's) gene therapy relied on a lentiviral vector delivery system.

85.     SRT's TNS9 Vector was years ahead of the purported BB305 Vector in terms of development.  The successful development of the TNS9 Vector was the direct result of SRT's

substantial investment in improving and commercializing its gene therapy for Thalassemia and SCD.

86.     In an email comparing bluebird's vector, Dr. Sadelain stated the following:

We've [*i.e.*, SRT and MSK] just spent 2 years improving the manufacturing. We made enough vector for 10 patients in one production run.   [bluebird/Genetix] makes one batch at the time for one patient.  That is not viable.  [SRT's] process is.  [bluebird's] vector has an unstable structure (it "rearranges," as found in their second patient).  That makes it very unlikely that it will ever be commercialized, at least with its current sequence.  Our vector [*i.e.*, TNS9 Vector] is structurally very stable.  Based on published mouse studies, our vector expresses better than theirs.

87.     Defendants Leschly, Reilly, Finer, Third Rock and ultimately bluebird had a solution, with the assistance of Thompson: steal trade secrets from SRT using MSK.

88.     SRT took great care to protect and guard the secrecy of its clinical data, know-how, and other trade secrets, including the physical TNS9 Vector.  Among other things, SRT has entered into nondisclosure agreements ("NDAs") or other confidentiality agreements with all outside partners and vendors with access to SRT's confidential information; restricts access to its facilities; keeps sensitive information in locked cabinets and offices; secures its computers with passwords; hosts its e-mail and web servers on a private, secure platform maintained with the highest security standards; requires a private key to make modifications to electronic files containing highly sensitive information; and takes measures to mark documents containing trade secrets or other sensitive or proprietary information as "Confidential."

89.     Nevertheless, Leschly and Third Rock began probing for SRT's confidential information in the lead up to Third Rock's purchase of Genetix (which then became bluebird) in 2010.

90.     In a September 2009 email, Third Rock's founder Leschly wrote to Dr. Sadelain (MSK) regarding a "Third Rock Visit to MSKCC / Dr. Sadelain."

91.     In an October 5, 2009 email, Dr. Sadelain wrote to Leschly and Reilly, in which he informed Leschly and Reilly that "it may be more appropriate for you and Phil [Reilly] to meet with [SRT], to whom we have licensed our globin-related technology and with whom we are planning clinical trials in the US and Europe, than with MSKCC."

92.     In an October 8, 2009 email, Dr. Sadelain wrote to Leschly, Sam Salman (President of SRT), and Reilly about the subject "MSKCC globin gene transfer program and [SRT]."

93.     In the October 8, 2009 email to Leschly, Reilly, and Sam Salman (President of SRT), Dr. Sadelain wrote the following:

> It is my pleasure to introduce you to each other, at least by e-mail.  I recently met Nick's [Leschly's] colleague Dr. Philip Reilly, at a meeting focusing on gene therapy for hemophilia.  Phil [Reilly] and Nick [Leschly] recently informed me of their growing interest in the genetic treatment of several orphan disorders, including thalassemia.
>
> They have requested to meet with me to further discuss our plans for the treatment of globin disorders.  Since MSKCC has licensed our globin vector technology to [SRT], Dr. Viviane Martin, who heads MSKCC's Office of Industrial Affairs, has recommended that Third [*sic*] Third Rock Ventures directly contact Sam Salman, President of [SRT].  You are now in contact….!
>
> I remain available if you need me at any point.

94.     On or around October 19, 2009, Leschly and Reilly met with SRT at Third Rock's headquarters in Boston, Massachusetts.  During the meeting, Leschly expressed Third Rock's desire to develop a "platform" for the development of gene therapies for Thalassemia and SCD. Leschly advised SRT that Third Rock was considering an investment in the gene therapy invented by Dr. Sadelain (and under development by SRT) and/or the competing gene therapy purportedly invented by a Dr. Leboulch (and under development by Genetix).

95.     In a March 20, 2010, email, Finer and Reilly wrote to Dr. Sadelain (MSK) seeking a meeting to discuss potential synergies and how Genetix/bluebird may be able to work with Sadelain and MSK.

96.    In a May 12, 2010, email, Finer wrote to Sadelain stating:

Michel [Sadelain], great meeting with you, Isabelle and your tech transfer guys. Perhaps we can catch up some time at ASGT.  We have initiated the contacts with the [SRT] guys through the help of your institution.

97.    In May 2010, Defendants Leschly, Finer, Reilly, bluebird, and Third Rock, again approached MSKCC to purchase the TNS9 Vector, knowing that the TNS9 Vector incorporated SRT's trade secrets and know-how related to producing clinical and commercial grade globin lentiviral vectors.

98.    In a May 2, 2010 email, Finer, together with Leschly and Reilly wrote to Dr. Sadelain stating:

Michel, our interests are in building the best gene therapy company to treat severe genetic disease . . . with Third Rock . . .  joining us, we have the ability to build beyond the existing activities at Genetix to insure success.  What Phil [Third Rock] and I would like to do is to update you on our progress and plans in thal and other activities at the company.  We would like to get an update on your progress and plans as well.  We would follow-up with a discussion of what potential synergies and how we could work together.  Let me know what you think.

Thanks, Mitch.

99.    In a May 3, 2010 email, Viviane Martin of MSKCC's Office of Industrial Affairs wrote to Dr. Sadelain:

I don't quite see how 3rd Rock/Genetix can make the best out of MSK/Genetix technology w/o [without] letting one sit on a shelf.  Also they [*i.e.*, Third Rock] know that we entered into a license with [SRT], and they are coming to you, not to [SRT] when they [*i.e.*, Third Rock] perfectly knew that they [*i.e.*, Third Rock] should talk to [SRT] to get rights to the technology. ***I honestly do not see what they are seeking . . . besides them doing competitive intelligence***.

(emphasis added).

100.   In a May 27, 2010 email, Finer wrote to Patrick Girondi (SRT) stating the following:

I want to introduce myself as the CSO of Genetix.  I don't want to get in the way with the business discussions that you are having with Nick [Third Rock] and Phil

20

[Third Rock], but I want to reiterate our commitment to have a serious discussion with you and your colleagues. . . . I've been in the gene therapy field doing research and drug development through market launch for 25+ years . . . Michel [Sadelain] can provide a reference for the quality of my science.

I also understand your sense of urgency of having these discussions – I'm also the parent of a child with a genetic disorder and while her condition is not as severe as beta thalassemia, that life experience has pushed [me] very hard . . . when working with companies, foundations and when I was actively doing drug development in the field of her disorder harder compared to people who are only doing drug development as an academic or business pursuit.

So please accept our apologies in the delay in getting back to you – Nick [Third Rock] and Phil [Third Rock] will contact you soon.  I have the greatest scientific respect for Michel [Sadelain's] . . . work and its potential to impact the thalassemia community.

Thanks for your patience.

101.    In a June 1, 2010 email, Finer wrote to Patrick Girondi (SRT) about scheduling a meeting with the Third Rock Team, and in that email Finer copied Leschly (Third Rock), Neil Exter (Third Rock), and Reilly (Third Rock).

102.    On or about June 8, 2010, Sam Salman and Patrick Girondi visited Leschly of Third Rock to discuss a potential collaboration for a meaningful therapy.

103.    In June 2010, Third Rock attempted to collaborate with SRT and/or acquire rights to SRT's TNS9 Vector and its proprietary know-how related to globin lentiviral vectors, but the negotiations broke down.

104.    In a June 2010 email, Dr. Sadelain wrote to SRT stating: "The stakes are very high now and in the next few weeks.  You can count on Genetix [later renamed bluebird] to proactively sabotage all your efforts."

105.    In a June 18, 2010, email with the subject line "updated list," Leschly wrote to Finer stating:

Pat Girondi – need to shut him down…curious what he called about…my emails were clear **want to get him to buy into a CDA to review Michel [Sadelain's]**

**data. Be nice, suck up, etc… if you think (and I think) that Michel has valuable data.**

(Bold and ellipses in original).

106.    On June 20, 2010, in response to Leschly's June 18, 2010 email with the subject line "updated list," Finer responded as follows:

> See below in red.
> Pat Girondi – need to shut him down…curious what he called about…my emails were clear **he really wants to do a deal with us and wants to learn more about our program.  He just has a screwed up way of interacting with people like us.  I told him you would follow-up. Perhaps he should go to France when we are there, meet Yves, Marina, etc… I want to have a review under CDA of Michel [Sadelain's] data.  This is all we have to get out of him. I can get that out of him**.

(bold, red and ellipses in original).

107.    In June 2010, the negotiations between Third Rock and SRT broke down when SRT refused to execute a confidential disclosure agreement ("CDA") with Leschly and Finer.

108.    In a September 9, 2010 press release, Genetix stated that (i) "it has changed the company name from Genetix Pharmaceuticals, Inc. to bluebird bio, Inc., effective immediately," and (ii) "bluebird bio has also announced that Leschly, formerly interim president of bluebird bio and partner of Third Rock Ventures, has been appointed the company's president and chief executive officer."

109.    Genetix's / bluebird's September 9, 2010 press release further states that Leschly is a "partner of Third Rock Ventures since its founding in 2007, he became interim president of bluebird bio in March 2010 in conjunction with Third Rock's investment in the company's Series B round.  Leschly has played an integral role in the identification, formation and business strategy of several of Third Rock's portfolio companies."

110.    After Third Rock finalized its $35 million investment in Genetix, sometime in 2010, Leschly "got bad news," according to an interview Leschly gave to the New York Times,

published in November 2017.  Bluebird could not efficiently and safely produce lentiviral vectors

that were safe for clinical use in patients.  The New York Times published an article titled "Gene

Therapy Hits a Peculiar Roadblock: A Virus Shortage," which discuss the events that happened at

bluebird:

> Few gene-therapy companies have the factories or expertise to make the viruses for
> use in clinical trials, where **standards are exacting and comprehensive** . . . .
>
> [A]s officials at Bluebird Bio can attest, whether you have any product at all.  The
> company was formed in 2010 . . . Then, said Nick Leschly, the company's chief
> executive, he got bad news. ***Using Bluebird's recipe, the manufacturing company
> said it was going to cost Bluebird a million dollars to create enough viruses to treat
> one patient***.
>
> The company scurried to find ways to ***improve the efficiency of its recipe***. Finally,
> they were ready to start anew. Manufacturing began, but months later there was
> nothing to show for it.
>
> "***We got no virus***," Mr. Leschly said.  "It was an Apollo 13 moment," he added. "We
> put everyone in a room and said, 'We have to figure this out. Everything at the
> company is now stopped. Nothing can be done without virus.'"

*See* Gina Kolata, *Gene Therapy Hits a Peculiar Roadblock: A Virus Shortage*, N.Y. Times, (Nov.

27, 2017) (emphasis added).

111.    Around the time of this "Apollo 13 moment," Defendants Third Rock, bluebird,

Leschly, Finer, and Reilly realized that access to SRT's proprietary lentiviral vector production

and formulation technology was essential in overcoming the problems plaguing the BB305 Vector

and bluebird's formulation manufacturing process for lentiviral vectors.

112.    Prior to October 2010, SRT delivered its proprietary TNS9 Vector made to cGMP

standards, which was enough vector to treat at least 7-10 Beta Thalassemia patients.

113.    Unable to acquire the TNS9 Vector directly from SRT, Defendants bluebird, Third

Rock, Leschly, Finer, and Reilly entered into and engaged in a conspiracy to fraudulently induce

SKI into an agreement where they fraudulently obtained samples of SRT's clinical grade TNS9

Vector, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT.

114.     Unable to convince SRT to execute a CDA and share SRT's trade secrets and confidential data with bluebird, Defendants Third Rock, Leschly, Finer, Reilly, and bluebird entered into and engaged in a conspiracy to fraudulently obtain SRT's trade secrets and confidential information, which was part of their scheme to eliminate bluebird's only competitor and obtain FDA approval with market exclusivity ahead of SRT.

115.     Unbeknownst to SRT, on October 29, 2010, Leschly executed a 2010 CDA between bluebird and SKI as part of Defendants' scheme to steal unlawful competitive intelligence (confidential information) and trade secrets related to the TNS9 Vector and belonging to SRT.

116.     The 2010 CDA was signed by Leschly on October 29, 2010 and Andrew Maslow (Director, Office of Industrial Affairs, MSK) on November 2, 2010.

117.     With respect to confidential information, section 2 of the 2010 CDA states:

As used in this Agreement, the term "Confidential Information" means any technical or business information furnished by a Disclosing Party in any manner to a Recipient in connection with the proposed business relationship, regardless of whether such information is specifically designated as confidential and regardless of whether such information is in written, oral, electronic, or other form. Such Confidential Information may include, without limitation, trade secrets, know-how, inventions, technical data or specifications, testing methods, business or financial information, research and development activities, control and inspection practices, manufacturing processes and methods; product and marketing plans, and customer and supplier information . . . Each Recipient acknowledges that each Disclosing Party's Confidential Information is that Disclosing Party's sole, exclusive and extremely valuable property. Accordingly; each Recipient agrees to segregate all Confidential Information from information of other companies.

118.     Defendants Leschly, Third Rock, Finer, Reilly, Thompson, and bluebird were aware that MSK was disclosing confidential information that was exclusive and extremely valuable property.  However, each Defendant had the intent of misappropriating the confidential information, including SRT's trade secrets related to the clinical grade TNS9 Vector.

24

119.    With respect to the non-disclosure of confidential information, section 3 of the 2010 CDA states:

> The Recipient shall hold in confidence and shall not disclose any Confidential Information of the Disclosing Party, except (i) as expressly permitted under this Agreement, or (ii) as required by applicable law or legal process, in which instance the Recipient shall provide the Disclosing Party with prior written notice of any such disclosure so that the Disclosing Party can seek an appropriate protective order.  The Recipient shall disclose such Confidential Information only to its employees and consultants, and to those employees and consultants of its affiliates . . . The Recipient shall use Confidential Information only for the purpose for which it was disclosed and shall not use or exploit such Confidential Information for the Recipient's own benefit or for the benefit of another without the prior written consent of the Disclosing Party, including without limitation, for the filing or support of any patent application.  Each Recipient shall not use or attempt to use any such Confidential Information in any manner which may injure or cause loss, or may be calculated to injure or cause loss, whether directly or indirectly, to the Disclosing Party.

120.    Defendants Leschly, Third Rock, Finer, Reilly, Thompson, and bluebird knew of the requirement not to use or exploit the confidential information for bluebird's own benefit. However, each Defendant had the intent of using and exploiting SRT's TNS9 Vector and trade secrets related thereto as well as the competitive intelligence (confidential information) embodied in the IND for the TNS9 Vector.

121.    With respect to the return and destruction of confidential information, section 7 of the 2010 CDA states:

> Each Recipient acknowledges and agrees that all Property of a Disclosing Party shall be and remain the Disclosing Party's property.  At the Disclosing Party's direction, the Recipient shall, within thirty (30) days of the Expiration Date, return to the Disclosing Party or destroy all such "Property" . . . based on or embodying any of the Confidential Information received by the Recipient pursuant to this Agreement, whether in writing or presented, stored or maintained in or by electronic, magnetic or other means.  Notwithstanding the foregoing, if the Disclosing Party has not directed the Recipient to return or destroy the foregoing, the Recipient shall return all of the foregoing to the Disclosing Party in accordance with this Section 7.

122.    According to the 2010 CDA, sections 3 and 7 shall survive the expiration or earlier termination of the 2010 CDA.

123.    Defendants Leschly, Third Rock, Reilly, Finer, and bluebird intentionally caused bluebird to not comply with its obligation and/or intentionally caused bluebird to breach its objections set forth in the 2010 CDA.  Indeed, Defendants never had any intentions of complying with the 2010 CDA.

124.    Defendants Leschly, Third Rock, Reilly, Finer, and bluebird were further assisted by Defendant Thompson, who became CEO of MSK in 2010, and Thompson joined in the efforts to fraudulently obtain SRT's trade secrets and confidential information, which was part of the scheme, at that time, to eliminate bluebird's only competitor and for bluebird to obtain FDA approval with market exclusivity ahead of SRT.

125.    Prior to and after joining MSK, Third Rock funded Thompson's Agios Pharma business.  Defendants Leschly, Third Rock, Reilly, Finer, and Thompson leveraged Thompson's position within MSK to assist in acquiring SRT's trade secrets.

126.    In a 2011 internal presentation, Defendants Leschly, Third Rock, Reilly, Finer, and bluebird acknowledged that SRT's TNS9 Vector has had "significant progress on vectorology versus [bluebird] leading to 3–5x improvement in per copy expression versus [the bluebird] vector."   In the 2011 presentation Defendants indicated that obtaining SRT's TNS9 Vector "eliminates [bluebird's] most threatening competitor," and "increases probability of success and magnitude of success," which is written in the pros-versus-con discussion part of the presentation.

127.    With the objective of destroying bluebird's only competitor and protecting their individual investments, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson were involved in the negotiation of a November 2011 option agreement (the "2011 Option

Agreement") between bluebird and SKI.  Ex. A.  However, these Defendants caused bluebird to enter into the 2011 Option Agreement under false pretenses in order to fraudulently obtain SRT's TNS9 Vector and proprietary know-how related thereto, and Defendants were fully aware that the clinical grade GMP formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets.

128.    According to the 2011 Option Agreement, bluebird expressed an interest to SKI regarding an option agreement in the area of gene therapy for hemoglobinopathies, and SKI desired to grant bluebird the right to exclusively license certain of SKI's intellectual property, and bluebird desired a period of time in which to evaluate the intellectual property and determine whether to execute a license.

129.    Defendants Third Rock, Leschly, Finer, Reilly, and Thompson caused bluebird and MSK to execute the 2011 Option Agreement under false pretenses in order to gain access to SRT's TNS9 Vector and proprietary know-how related thereto, fully aware that the clinical grade GMP formulation of the TNS9 Vector was created by SRT and embodied SRT's trade secrets.

130.    With respect to licensed know-how, section 1.4 of the 2011 Option Agreement states:

> "Licensed Know-How" means all know-how and information developed by SKI or its former licensees [SRT] that is necessary or reasonably useful (a) in the Field; and (b) to either (i) practice any of the Licensed Patents or (ii) make, use and/or sell the Vector.

131.    The "Licensed Know-How" under the 2011 Option Agreement included the patent applications listed in Appendix A, titled "Licensed Patent."

132.    The Licensed Know-How under the 2011 Option Agreement included U.S. Patent Application No. 10/188,221, filed on July 1, 2002, "Vector Encoding Human Globin Gene and Use thereof in Treatment of Hemoglobinopathies"; U.S. Provisional Applications Nos.

60/301,861, filed on June 29, 2001 and 60,302,852 filed on July 2, 2001; and International Application No. PCT/US2002/020988, which were previously the intellectual property listed in the 2005 Agreement between SRT and MSK.

133.    The Licensed Know-How under the 2011 Option Agreement included U.S. Patent Nos. 7,541,179 ("the '179 Patent") and 8,058, 061 ("the '061 Patents"). The '179 and '061 Patents were also included in the intellectual property licensed in the 2005 Agreement between SRT and MSK.

134.    With the objective of destroying bluebird's only competitor and protecting their individual investments and to individually obtain financial gains, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson caused bluebird and MSK to execute the 2011 Option Agreement for the purpose of obtaining SRT's know-how (*i.e.*, trade secrets) related to the TNS9 Vector, and they were fully aware the SRT's know-how (*i.e.*, trade secrets) was incorporated into the TNS9 Vector.

135.    MSK and bluebird executed the 2011 Option Agreement on November 18, 2011. Just prior to the execution of the 2011 Option Agreement, Defendant Third Rock (where Leschly and Reilly were partners) made an additional substantial investment (many millions of dollars) in Agios Pharma. On November 17, 2011 Agios Pharma announced that it secured $78 million dollars in Series C financing led by its major investor, Third Rock. During this time, Thompson, as founder, was a major shareholder in Agios Pharma and CEO of MSK. This further motivated Thompson to work with Third Rock, bluebird, Leschly, Reilly, and Finer to carry out their improper, unlawful, and fraudulent schemes.

136.    In November 2011, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson were fully aware that SRT was the "former licensee" of MSK's patent applications

related to the TNS9 Vector.  In addition, Defendants Third Rock, bluebird, Leschly, Reilly, Finer,

and Thompson were fully aware that the development of SRT's TNS9 Vector was years ahead of

bluebird's BB305 Vector.  In November 2011, Defendants Third Rock, bluebird, Leschly, Reilly,

Finer, and Thompson included SRT's know-how into the definition of "Licensed Know-How"

because their objective was to steal SRT's trade secrets related to the TNS9 Vector, but the only

way to get SRT's trade secrets was to falsely represent that bluebird was interested in helping MSK

with the IND for the TNS9 Vector.

137.    With respect to vector, section 1.6 of the 2011 Option Agreement states:

"Vector" means clinical grade vector TNS9.3.55 that was manufactured for use in
a clinical trial for beta-thalassemia patients and any modification of such that was
reasonably within contemplation of SKI and [SRT] at the time the vector was
finalized as of September 30, 2010, for the purpose of using the vector TNS9.3.55
for the treatment of sickle cell disorder as opposed to thalassemia.

138.    Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson were

aware that the "Vector" referenced in section 1.6 of the 2011 Option Agreement was SRT's clinical

grade vector TNS9.3.55 that was manufactured by SRT for use in a clinical trial for Beta

Thalassemia patients.  Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson

caused bluebird and MSK to execute the 2011 Option Agreement even though they had no

intention of advancing the TNS9 Vector for the treatment of sickle cell disorder.  Instead, they

sought to advance bluebird's competing BB305 Vector.

139.    With respect to modified vector, section 1.7 of the 2011 Option Agreement states:

"Modified Vector" means any modification or improvement of the Vector, but only
to the extent that such modification or improvement is such that the US Food and
Drug Administration ("FDA") would not require a new Investigational New Drug
Application (an "IND") to be filed over the existing IND for the TNS9.3.55 vector.

140.    Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson were

aware that the "Modified Vector" referenced in section 1.7 of the 2011 Option Agreement referred

to modifications and variations of SRT's clinical grade vector TNS9.3.55 that were manufactured using SRT's know-how.

141.    With respect to the option, section 2.1 of the 2011 Option Agreement states:

SKI hereby grants to [bluebird] (a) the exclusive right to obtain an exclusive license under the (i) Licensed Patents, (ii) Biological Materials and (iii) any other SKI-owned or controlled intellectual property reasonably required or necessary to make, use and/or sell the Vector, Modified Vector, or Independent Vector that is available for licensing ; and (b) the right to obtain a non-exclusive license under the Licensed Know-How, in each case in the Field in the Territory for the duration of the Option Period (the "Option").

142.    Eventually, bluebird did not exercise its Option under the 2011 Option Agreement because Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson never intended for bluebird to exercise such Option.

143.    Unable to acquire the TNS9 Vector directly from SRT, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson entered into and engaged in a conspiracy and fraud to obtain SRT's TNS9 Vector and trades secrets embodied therein as part of Defendants' objective to eliminate SRT as a direct competitor.

144.    Bluebird fraudulently obtained physical possession of SRT's TNS9 Vector and its proprietary recipe and titration process related to the formulation of safe clinical grade lentiviral vectors.

145.    In a January 27, 2012, email from Leschly to Finer, Dr. Gabor Veres (Vice President of Pre-clinical Research and Development, bluebird), Jeffrey Walsh (Chief Strategy Officer, bluebird), Cyrus Mozayeni (Vice President, Global Head of Business Development, bluebird), and Anne-Virginie Eggimann (Vice President, Regulatory Science, bluebird), with the subject line titled "MSK/Michel Discussion," Leschly wrote the following:

Let's schedule a breakfast meeting early'ish next week to about this one as a small group since this we all know could be problematic on many levels if not quarterbacked in the right manner.  First and foremost getting Michel to agree to

process the same via **Dr. Christof von Kalle** is critical as you said (if he doesn't **we need to go postal**).

Anyway let's make sure we get on same page with plan/timing etc…this has diligence/etc implications that we should discuss as well as we sort out when we will know what, when and/should we share and with whom.

Gabor/Cyrus mentioned you are talking to Michel today or over the weekend – this I think is VERY IMPORTANT – we MUST get him to see this the right way.

(capitalization in original; bold added).

146.    It was critical for bluebird to send SRT's TNS9 Vector to Dr. Christof von Kalle (one of bluebird's collaborating scientists in Germany) in order to gain access to SRT's trade secrets and proprietary information embodied in the TNS9 Vector formulation.

147.    At the direction of Third Rock, Leschly, Finer, Reilly, and bluebird, samples of the TNS9 Vector containing SRT's proprietary formulation and made by SRT's proprietary vector production process was sent to bluebird's collaborating scientists in Germany, such as Dr. von Kalle.

148.    Defendants instructed bluebird's Dr. Veres to send SRT's TNS9 Vector to Dr. von Kalle in Germany.

149.    In addition, Dr. Veres testified that he sent samples of tumors that had developed in mice treated with SRT's TNS9 Vector to an unidentified collaborator in Germany.  In March 2012, Dr. Veres sent the tumor samples treated with SRT's TNS9 Vector to Dr. Cynthia Bartholoma in Germany.

150.    On May 17, 2012, Sadelain emailed Mozayeni, Veres, and Finer about the TNS9 Vector data update and IND response, in which Sadelain wrote the following:

Dear Cyrus [Mozayeni], Gabor [Veres], and Mitch [Finer]:

The FDA did not approve the IND.  The reason is: insufficient characterization of the lymphoma.  Can you get your German collaborators to do something  **It isn't really believable that they could not analyze three tumor samples in 5 months**.

151.    In 2012, Defendants Third Rock, Leschly, Reilly, Finer, and bluebird conspired to delay the analysis of the tumor samples that was supposed to be conducted by bluebird's German collaborators.

152.    In 2012, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson, either directly and/or indirectly, caused bluebird's German collaborators to perform analyses on SRT's TNS9 Vector for the purpose of stealing and misappropriating SRT's trade secrets.

153.    In 2012, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson, either directly and/or indirectly, instructed bluebird's German collaborators to perform reverse engineering analyses and testing of SRT's TNS9 Vector.

154.    In 2012, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson, either directly and/or indirectly, instructed bluebird's German collaborators to delay and stall testing of tumor samples in order to intentionally sabotage the IND for the TNS9 Vector that was submitted to the FDA.

155.    In 2012, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson fraudulently obtained the physical TNS9 Vector; stole SRT's trade secrets embodied in the TNS9 Vector; fraudulently obtained unlawful competitive intelligence (confidential information) related to SRT's TNS9 Vector; and then used SRT's trade secrets and competitive intelligence (confidential information) in connection with bluebird's development of its lentiviral vector, which was purportedly identified as the BB305 Vector, and in connection with bluebird's IND for the BB305 Vector submitted to the FDA.

156.    MSK filed the IND for SRT's TNS9 Vector with FDA in November 2010, which was over two years before bluebird submitted its IND for the BB305 Vector in December 2012.

157.     Based on Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson fraudulent representations, bluebird obtained a copy of the IND for the TNS9 Vector, which was submitted to the FDA years before bluebird submitted the IND for its BB305 Vector, for the purpose of obtaining unlawful competitive intelligence (confidential information) and to shut down SRT, bluebird's only competitor.

158.     Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson conspired and engaged in a scheme to obtain SRT's proprietary clinical grade TNS9 Vector from MSK under the fraudulent pretense that bluebird was interested in assisting with the IND submission to the FDA; and they did so in order to obtain unlawful competitive intelligence (confidential information) about SRT's TNS9 Vector and proprietary methods for making a clinical grade lentiviral vector for gene therapy.

159.     Bluebird had no intention of actually helping MSK file its IND with the FDA. Based on false representations, Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson obtained SRT's TNS9 Vector and proprietary information related thereto.

160.     Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson never had any intentions of bluebird actually collaborating with and assisting MSK with the IND for the TNS9 Vector.

161.     Defendants Third Rock, bluebird, Leschly, Reilly, and Finer fraudulently induced MSK to provide bluebird and Dr. Veres with SRT's TNS9 Vector and related proprietary information, including the confidential IND for the TNS9 Vector for the common purpose of obtaining unlawful competitive intelligence (confidential information), eliminating bluebird's only competitor, and stealing SRT's proprietary information to get ahead of SRT in the market.

162.    Defendants Third Rock, bluebird, Leschly, Reilly, and Finer engaged in a scheme to obtain access to SRT's confidential information embodied in the IND for the TNS9 Vector so that bluebird could (i) benefit from the confidential information and competitive intelligence embodied in the IND; (ii) use such information to gain a commercial advantage over SRT; and (iii) use such unlawful competitive intelligence (confidential information) in connection with the submission of the IND for bluebird's BB305 Vector.

**Thompson's Actions Compromise And Harm MSK**

163.    From 2010 through the present, Thompson has taken actions that are in direct conflict to the financial interests and to the detriment of MSK.   Thompson's self-interested dealings, and unlawful and improper actions expose MSK (a non-profit institution) to potential violations of certain federal and state statutes and financial liabilities. Thompsons' unlawful actions compromised MSK and harmed SRT.

164.    Defendant Thompson founded Agios Pharma in 2007 and continues to maintain his relationship with Agios Pharma today.  Agios Pharma is currently listed on Third Rock's website as a portfolio company.

165.    As discussed, bluebird and MSK entered into the November 2011 Option Agreement, wherein Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson sought to unlawfully transfer SRT's trade secrets to bluebird in support of bluebird's BB305 Vector and to the detriment of SRT and MSK's competing TNS9 Vector.

166.    Thompson caused MSK to execute the 2011 Option Agreement, which conflicted with MSK's financial interest and undermined MSK's and SRT's joint research and development efforts for the TNS9 Vector, including efforts that led to the FDA's Orphan Drug Designation of SRT's gene therapy treatment in Beta Thalassemia and SCD.

167.   The 2011 Option Agreement substantially disadvantaged MSK.   In addition to exposing MSK to its own liability, the agreement contained a blanket indemnification of bluebird (a fellow Third Rock portfolio company) for any claim by SRT—regardless of the relationship to MSK and including "willful misconduct" on bluebird's part.   The indemnification had no legitimate business purpose for MSK and was contrary to the interests of MSK.   Ex. A.

168.   Specifically, MSK agreed to indemnify bluebird "and its directors, officers, employees, successors, assigns and other representatives from and against all damages, losses, expenses (including reasonable attorneys' fees) and liabilities resulting or arising from a claim brought by [SRT] as determined by a court of competent jurisdiction in a final and non-appealable decision or in a binding settlement." Ex. A.   In other words, in 2011, Thompson caused MSK (a non-profit institution) to indemnify Defendants Leschly, Reilly, Finer, bluebird, and Third Rock from and against all damages, losses, expenses (including reasonable attorneys' fees), and liabilities resulting or arising from claims brought by SRT even though Thompson, Leschly, Reilly, Finer, bluebird, and Third Rock were conspiring to fraudulently obtain SRT's trade secrets and proprietary TNS9 Vector.

169.   Unlike other indemnification agreements with SKI, language limiting bluebird's indemnification to "arising out of performance" of the contract with SKI or excluding "willful misconduct" were omitted.   Ex. A.   Blanket indemnification of bluebird was also the opposite of MSK's stated policy of having the prospective licensee indemnify MSK.   Ex. B   The indemnification was also specifically drafted to "survive the termination and expiration of this Agreement."

170.   In other words, Thompson caused MSK to become financially responsible for even "willful misconduct" by bluebird, Leschly, Finer, Reilly, and Third Rock against SRT.

Furthermore, there was no upper limit placed on the indemnification, thereby exposing MSK to potentially catastrophic—indeed infinite—liability for the actions of Defendants bluebird, Leschly, Finer, Reilly, and Third Rock.

171.    MSK received nothing in return for its expansive indemnification of bluebird, Leschly, Finer, Reilly, and Third Rock.  Bluebird made a sham offer to consider a deal with MSK in the future at bluebird's discretion.  Ex. A.  Bluebird never exercised the option under the 2011 Option Agreement, but the indemnification was specifically carved out to survive termination of the 2011 Option Agreement.  Ex. A.

172.    As discussed, just prior to Thompson causing MSK to agree to the indemnification of bluebird (a Third Rock portfolio company) under the 2011 Option Agreement, Third Rock made an additional substantial investment (many millions of dollars) in Agios Pharma.  Just prior to the execution of the 2011 Option Agreement, on November 17, 2011 Agios Pharma announced that it secured $78 million dollars in Series C financing led by its major investor, Third Rock.

173.    Accordingly, after Thompson's Agios Pharma received another substantial investment from Third Rock, Thompson caused MSK to not only provide Defendants Leschly, Reilly, Finer and bluebird with access to SRT's trade secrets but also exposed MSK to whatever liabilities bluebird (and its "directors, officers, employees, successors, assigns and other representatives") owes to SRT, even for willful misconduct having nothing to do with MSK.  In essence, MSK's assets were used in this secret conspiracy as collateral to protect the private and for-profit business interests of Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson.

174.   Thompson and Leschly tried to cover up the Leschly Enterprise's conspiracies, unlawful conduct, and conflicts of interest with MSK in furtherance of their scheme to shut down SRT and harm SRT's business and property.

175.   On December 7, 2010 and March 29, 2011, MSK's Ad Hoc Committee on Technology Transfer held committee meetings.  Dr. Anthony "Tony" Evnin is Chairman of MSK's Ad Hoc Committee on Technology Transfer, and as Chairman, he led both the December 7, 2010 and March 29, 2011 committee meetings.  At the March 29, 2011 meeting, with Thompson in attendance, Tony Evnin had the following text deleted from the minutes of meeting held on December 7, 2010:  ***"Efforts are underway to terminate the license with EGT*** [now, called SRT], ***and once completed, negotiate a license with Bluebird bio."*** Ex. C (emphasis added).

176.   It is apparent that in 2010 Tony Evnin was aware and had planned to help Thompson direct MSK to terminate its contract with SRT and negotiate a license with bluebird.

177.   In a June 9, 2012 email to Finer, Leschly wrote the following:

Fyi – Craig Thompson just called me…had brief chat.  We agreed it was best for him to stay clear as the appearance of conflict is too great given my past history [with] him and Third Rock.  He agreed that Tony [Evnin] was the guy and he has already spoken to him about the situation.

178.   Thompson was aware that Tony Evnin had a previous business relationship with Leschly.  In fact, Leschly admitted that Tony Evnin was his long time mentor in an answer to an interrogatory submitted in the New York Litigation.  It is apparent that Thompson's assignment of Leschly's mentor and their "guy" Tony Evnin was a sham designed to avoid the "appearance of a conflict" but not the conflict itself.

179.   Thompson used Tony Evnin and other MSK employees as proxies with Defendants Leschly, Finer, Reilly, bluebird and Third Rock.

180.    In 2015, Finer resigned as Chief Science Officer of bluebird and became managing director of MPM Capital, a biotechnology investment firm co-founded by and then employer of Luke Evnin, who is the son of Tony Evnin.  To this day, Finer remains connected to the Leschly Enterprise.

181.    Attached hereto as Exhibit D is a demonstrative of the relationships of individuals and companies connected to the Leschly Enterprise.

182.    In 2011–2012, Thompson assisted with bluebird's theft of SRT's intellectual property from MSK, thereby exposing MSK to civil (and criminal) liability with no legitimate business purpose for MSK and contrary to the interests of MSK.

183.    This was not the first time that Thompson has leveraged his position for personal benefit.  Prior to joining MSK, Thompson worked for the University of Pennsylvania and the Abramson Family Cancer Research Institute.  These non-profit entities funded Thompson's work and had an interest in the resultant intellectual property.  Despite owing contractual and fiduciary obligations to his employers, Thomson hid the resultant intellectual property and instead gave it to his personal and for-profit company, Agios Pharma.  In 2011 and 2012, the University of Pennsylvania and the Abramson Family Cancer Research Institute sued Thompson for breach of contract, breach of fiduciary duty, and fraud. *See The Leonard and Madlyn Abramson Family Cancer Research Institute at the Abramson Cancer Center of the University of Pennsylvania v. Craig Thompson, et al.* (1:11-cv-09108 S.D.N.Y.) and *Trustees of the University of Pennsylvania v. Craig Thompson, et al.* (1:12-cv-01330 S.D.N.Y.).  Thompson settled the case with the entry of a licensing agreement.  Notably, Thompson continued to focus on his personal for-profit endeavors while ostensibly CEO of MSK.  For example, Thompson was forced to resign from two company boards as part of "the latest fallout from a widening institutional reckoning over relationships

between cancer center leaders and for-profit health care companies" following "tense meetings at [MSK] . . . spurred by articles by *The New York Times* and *ProPublica*, about insider deals among hospital officials and undisclosed industry relationships." Ex. E.

184.     Defendants Leschly, Finer, Reilly, bluebird, and Third Rock leveraged Thompson's control and direction over MSK, after execution of the Settlement Agreement, to disrupt SRT's access to its confidential information held by MSK, delay SRT's competing lentiviral vectors used in the treatment of Beta Thalassemia and SCD in favor the BB305 drug products, and otherwise damage SRT.

185.     Current and former employees of MSK have informed SRT that Thompson remained actively in control over MSK and involved with MSK's relationship with SRT and bluebird, seeking to advantage bluebird to the detriment of SRT.

186.     Current and former employees of MSK have informed SRT that Thompson continued to maintain quasi-control over MSK's involvement and actions with respect to bluebird and SRT after "resigning" as MSK's CEO in 2022.

187.     The current employee(s) of MSK informed SRT that he or she is concerned about retaliation by Thompson and his cohorts at MSK.  Selwyn M. Vickers, MD, FACS, is now the President and CEO of MSK.  Dr. Vickers did not officially assume the role until September 19, 2022.  Even though Thompson's title changed, he continues to exert control over a large number of employees and board members at MSK.

188.     Thompson hired and/or controlled the appointment of the heads of departments at MSK.  Thompson continues to reign control and influence over the departments at MSK. Thompson hired and appointed Greg Raskin, M.D. as Senior Vice President, Head of the Technology Department at MSK.  Currently and under Thompson's control, Dr. Raskin leads the

Office of Technology Developments' three units: Technology Management and Commercialization, Contracts, and Operations and Finance.  Thompson hired Dr. Raskin for the purpose of aiding and abetting the Leschly Enterprise and to assist Thompson in his objective of sabotaging SRT's business and property.

**Background Related To Defendants' Deceit And Fraud During The New York Litigation**

189.    On January 18, 2019, Dr. Veres was deposed in the New York Litigation and such deposition was held in Boston, Massachusetts.  During his deposition, Dr. Veres testified that bluebird conducted experiments on SRT's TNS9 Vector.

190.    On April 11, 2019, Dr. Veres testified that bluebird received SRT's proprietary TNS9 Vector from SKI.  Dr. Veres testified that he and other bluebird scientists were given SKI's information, which included SRT's TNS9 Vector for the limited purpose of conducting comparative analyses between the BB305 and TNS9 Vector.  Dr. Veres further testified he and the other bluebird scientists were aware that SKI's information, which included SRT's TNS9 Vector, must not be used for bluebird's own purposes.  And,  as instructed by bluebird, Dr. Veres falsely testified that bluebird abided by this restriction.

191.    During his deposition, Dr. Veres testified that bluebird had received the plasmid and genetic sequencing of the TNS9 Vector.

192.    During his deposition, Dr. Veres testified that bluebird was able to create the TNS9 Vector in its laboratory based on obtaining the TNS9 Vector itself from MSK.  In other words, once bluebird fraudulently obtained SRT's TNS9 Vector, bluebird began to create exact copies of the TNS9 Vector.  Bluebird did not have permission or authority to create or retain copies of SRT's TNS9 Vector.

193.    Defendants were aware that the TNS9 Vector was created using SRT's proprietary lentiviral vector manufacturing process.

194.    Defendants were aware that the clinical grade TNS9 Vector complied with the GMP standards because the vector was created using SRT's proprietary vector production process.

195.    During the New York Litigation, on March 25, 2019, Leschly submitted a notarized verification of his interrogatory responses attesting that his responses were true to the best of his personal knowledge.  Leschly's interrogatory responses were completed in Massachusetts and electronically submitted from Massachusetts to New York.

196.    In responding to the interrogatories, Leschly intentionally falsely testified that no one at bluebird used any information from SKI to develop or improve bluebird's lentiviral vector.

197.    In responding to the interrogatories, Leschly intentionally falsely testified that he never directly or indirectly discussed or planned with anyone associated with SKI to have bluebird misappropriate the TNS9 Vector or any of SRT's know-how, proprietary information, or intellectual property.  In responding to interrogatories, Leschly intentionally falsely testified that he had no involvement in negotiating agreements signed between SKI and bluebird.

198.    During the New York Litigation, Dr. Veres, at Defendants' direction, intentionally misrepresented that bluebird did not use SRT's proprietary TNS9 Vector and confidential information related thereto for bluebird's business purposes.

199.    During this deposition, Dr. Veres testified that bluebird examined a sample of SRT's TNS9 Vector, which was delivered to bluebird by SKI.

200.    On April 11, 2019, Dr. Veres testified that he cloned a new globin gene vector for bluebird, which was named BB305, in May 2011.  Dr. Veres further testified that, if changes were made to the sequence of the BB305, then it would have been given a new name; however, this testimony was false.

201.    During his deposition, Dr. Veres testified as follows:

Q. Have any other vectors been developed by bluebird for gene therapy of thalassemia since the BB305 was cloned?
A. No.

202.    During his deposition, Dr. Veres testified as follows:

Q. So Bluebird doesn't have several vectors in development for the treatment of thalassemia.
A. No.

203.    Contrary to Dr. Veres' testimony, a May 3, 2011 entry in a bluebird lab notebook titled "New Globin Vector" specifically identifies other lentiviral vectors in development to treat Beta Thalassemia, and such vectors were identified as BB304, BB305, BB306, BB307, BB308, BB309, BB310, and BB311.

204.    Contrary to Dr. Veres' testimony, a bluebird lab notebook titled "New Globin Vector" that predates Dr. Veres' testimony shows that bluebird had multiple names for an identical construct of the vector, and which specifically states: "BB305 (and other identical constructs terms BB304, BB306, BB307)."

205.    At the direction of Third Rock, Leschly, Reilly, Finer, and bluebird, Dr. Veres falsely testified that bluebird did not have several vectors in development for the treatment of Thalassemia other than the BB305 Vector.

206.    Contrary to Dr. Veres' testimony, in the New York Litigation, bluebird's attorney told Judge Ostrager that bluebird had multiple lentiviral vectors designed to treat hemoglobinopathies, such as Beta Thalassemia.

207.    After a series of negotiations between the parties, the New York Litigation settled the day before Thompson was supposed to testify in Court.

**The 2020 Settlement Agreement**

208.    On November 2, 2020, the parties executed the Settlement Agreement, which included mutual general release and dispute resolution provisions that were specifically discussed and negotiated by the parties.  D.I. 36-1, at ¶ 5 ("Mutual Releases") and ¶ 7 ("Dispute Resolution").

209.    The Mutual Release provision states that "[t]he Parties exchange mutual general releases . . . the mutual general releases shall release all claims, both at law and in equity, accrued or unaccrued, known or unknown, suspected, or unsuspected that were brought or could have been brought by [SRT] in the New York Litigation and the Massachusetts Litigation."

210.    The Mutual Release provision additionally states:

[SRT] Releasors fully, finally, and forever release, relinquish, acquite [*sic*] and discharge . . . (collectively the "BBB Releasees") from and against any and all claims, causes of action, demands, disputes, suits, debts, dues, liabilities, sums of money, accounts, reckonings, specialties, bonds, covenants, contracts, agreements, controversies, promises, assessments, rights, damages, costs and/or expenses whether based on a tort, contract or any other theory of recovery, in law, admiralty or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, that [SRT] Releasors may have, ever had or now has against the BBB Releasees or any of them, for upon or by reason of any cause or thing, ***from the beginning of the world to the Parties' execution of this Confidential Settlement Agreement***.

(emphasis added) (the "Release").

211.    Likewise, MSK provided an identical Mutual Release to SRT and bluebird.  And, bluebird provided the same Mutual Release to MSK and SRT.

212.    Bluebird and MSK were co-defendants in the New York Litigation.  MSK was not a party in the Massachusetts Litigation.  Bluebird and MSK did not assert any cross-claims against each other during the prior State Court Litigations.  Yet, MSK and bluebird insisted upon the inclusion of the general mutual Release in the Settlement Agreement and negotiated the language therein.

213.    All of the Release provisions in the Settlement Agreement concerned causes of action existing prior to the Settlement Agreement.  There was no release of causes of action that arose after execution of the Settlement Agreement.

214.    The Dispute Resolution only applies to disputes concerning the "Confidential Settlement Agreement, its construction, or its actual or alleged breach[.]"  D.I. 36-1, ¶ 7.

215.    Given that the construction of the first paragraph 2.a. of the Settlement Agreement—unambiguously and unequivocally—provides that "MSK shall: Give [SRT] an exclusive, royalty-free commercial license to the intellectual property licensed in the 2005 Agreement," which includes U.S. Patent Nos. 7,541,179 and 8,058,061, SRT agreed to the Release and Dispute Resolution provisions.  SRT agreed to enter into the Dispute Resolution since there would be no dispute concerning the construction of paragraph 2.a of the Settlement Agreement with respect to SRT having an exclusive commercial license to the intellectual property licensed in the 2005 Agreement.

216.    To assure, and make it further clear, that SRT had an exclusive (worldwide) commercial license to the intellectual property licensed in the 2005 Agreement, the second paragraph 2.a (which the parties have referred to as paragraph 2.[e]) was included in the Settlement Agreement.  Pursuant to paragraph 2.[e] of the Settlement Agreement, SRT was granted "an exclusive, royalty-free commercial license to any intellectual property, whether owned in whole by MSK or jointly with any other party, or licensed to MSK, to the extent MSK has the rights to do so, and for which developing making, having made, using, importing, selling or offering to sell . . . any modified or related lentiviral vector *would be or could be infringed*."  (emphasis added).

217.    In the Settlement Agreement, bluebird did not reserve any rights or waivers to make, market, and sell any lentiviral vector, like the BB305 lentiviral vector, that would come

within the scope of the claims of the Licensed Patents.  This fact is also not surprising, especially (i) given that MSK (the patent owner) has never accused bluebird or Third Rock of patent infringement; and (ii) the specifics of the BB305 lentiviral vector were concealed from SRT prior to and at the time of the execution of the Settlement Agreement.

218.    Under the Settlement Agreement, bluebird was not granted any type of license, including without limitation, a commercial license to the '179 and '061 Patents or use of SRT's trade secrets.  Bluebird has never had or has never been granted a commercial license to the '179 and '061 Patents or use of SRT's trade secrets.

219.    The Dispute Resolution provision in the Settlement Agreement only applies to disputes concerning the "Confidential Settlement Agreement, its construction, or its actual or alleged breach[.]"

220.    The Dispute Resolution provision in the Settlement Agreement does not apply to causes of action that arose after execution of the Settlement Agreement.

221.    The Settlement Agreement did not involve ongoing payments or royalties to SRT.

222.    SRT's release provision covered only past causes of action.  SRT's release to bluebird and MSK was not a license for bluebird and MSK, through Thompson, to continue to commit unlawful and harmful acts against SRT, including continuing with their conspiracy to harm SRT's business and property after execution of the Settlement Agreement.

**Defendants' Fraudulent Inducement Is Exposed In 2022**

223.    In September 2021, bluebird announced the submission of its Biologics License Application ("BLA") to the FDA for betibeglogene autotemcel (Zynteglo), which is manufactured using (and containing) the BB305 Vector.  On November 22, 2021, bluebird announced the BLA received priority review.  However, bluebird engaged in non-regulatory conduct and post-FDA submission activities related to the commercialization of the BB305 Vector, which infringed

SRT's Licensed Patents.   On August 17, 2022, bluebird announced the FDA approved betibeglogene autotemcel (Zynteglo) for the treatment of beta thalassemia.

224.    On April 24, 2023, bluebird announced the submission of a Biologics License Application (BLA) to the US Food and Drug Administration (FDA) for lovotibeglogene autotemcel (lovo-cel) gene therapy in patients with SCD.

225.    Patent infringement was not a claim that could have been brought by SRT against bluebird in the New York and Massachusetts Litigations because SRT did not have an exclusive (worldwide) license for the patents until after November 2, 2020, and the cause of action for patent infringement arose in 2021.

226.    On October 21, 2021, SRT filed a complaint in the United States District Court for the District of Delaware against bluebird alleging willful infringement of the Licensed Patents, *San Rocco Therapeutics, LLC v. Bluebird Bio*, No. 21-1478 RGA (D. Del. Jul. 26, 2022) (the "Delaware Action").

227.    On November 17, 2021, SRT filed an Amended Complaint in the Delaware Action, adding Third Rock as a defendant and alleging that Third Rock willfully induced bluebird's direct infringement of the Licensed Patents.

228.    On January 14, 2022, bluebird and Third Rock filed a motion to dismiss or, alternatively, compel arbitration and stay the Delaware Action.  SRT filed an unopposed motion for leave to file a Second Amended Complaint on March 4, 2022, which was granted on March 7, 2022.  On April 6, 2022, bluebird and Third Rock filed another motion to dismiss the Delaware Action under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of constitutional standing and lack of statutory standing, respectively.

229.    Around early February 2022, bluebird and Third Rock asked SRT whether MSK, as the patent owner, will voluntarily join the Delaware Action.  Given that SRT did not want to burden the presiding Judge in the Delaware Action with unnecessary motion practice, on February 7, 2022, SRT's Delaware counsel wrote to MSK's Delaware counsel to request MSK's position as to the following:  (1) confirmation that MSK is not a necessary party under Fed. R. Civ. P. 19 because SRT has standing to sue in its own right; and (2) if MSK is unable or unwilling to so confirm, whether MSK consents to join the Delaware lawsuit as a co-plaintiff.

230.    In a February 10, 2022, response email, Thompson (who was CEO of MSK), instructed MSK's Delaware counsel to write in an email that SRT's patent infringement suit was "improper, at least, because the claims were released by the 2020 agreement," and when doing so MSK's Delaware counsel added counsel for bluebird and Third Rock to that email correspondence.

231.    On April 6, 2022, bluebird and Third Rock filed a motion to dismiss or, alternatively, to compel arbitration in the Delaware Action.  In their Opening Brief to dismiss SRT's patent infringement action, bluebird and Third Rock claim that the mutual Release of the Settlement Agreement bars SRT's patent infringement action.  Bluebird and Third Rock relied on MSK's February 10, 2022 email, which was incorporated as an exhibit attached to their Opening Brief.

232.    Defendants Leschly, bluebird, Third Rock and Thompson orchestrated MSK's February 10, 2022 email so that bluebird and Third Rock could use that email to convince the court in the District of Delaware to dismiss SRT's patent infringement claims.

233.    In their brief submitted on May 20, 2022 in the Delaware Action, bluebird and Third Rock claimed that the Settlement Agreement granted bluebird a right to practice (*e.g.*, an

implied commercial license) to the very same patents exclusively licensed to SRT under the Settlement Agreement.

234.    In their May 20, 2022, reply brief, bluebird and Third Rock state that "SRT cannot cure its lack of statutory standing by joining MSK because MSK provided identical releases as SRT in the 2020 Settlement Agreement, and, thus, it too released any infringement claims against [bluebird and Third Rock] relating to the patents-in-suit."

235.    In their May 20, 2022, reply brief, bluebird and Third Rock further state that (i) "the patent owner state[s] that any claims of infringement were released in the same agreement from which SRT allegedly received its license rights"; (ii) "MSK—the owner and licensor of the patents-in-suit— provided identical release[s] to [bluebird and Third Rock] in the 2020 Settlement Agreement"; and (iii) "MSK has stated that the alleged claims of infringement of the patents-in-suit were released in the 2020 Settlement Agreement as to [bluebird and Third Rock]."

236.    On July 26, 2022, Judge Andrews stayed the Delaware Action pending the determination of an arbitrator regarding the interpretation of the license and release provisions.

237.    The Delaware Action was referred to arbitration to resolve the following issues: whether, pursuant to the Settlement Agreement: (i) SRT has an exclusive commercial license to the Patents-in-Suit, with all substantial rights, including the right to exclude others from commercially using the Patents-in-Suit; and (ii) the Release precludes SRT from asserting patent infringement claims against bluebird and Third Rock.

238.    On August 30, 2022, SRT filed a Demand for Arbitration and Statement of Claim against bluebird and Third Rock Ventures before the American Arbitration Association, Case No. 01-22-0003-6927 (the "Arbitration").

239.     On February 7, 2023, the Arbitrator correctly rejected all of bluebird and Third

Rock's arguments. In particular, the arbitrator noted the Settlement Agreement's language calling

for "exclusive, royalty-free commercial license" to SRT for US 7,541,179 and US 8,058,061.

Furthermore, the arbitrator noted the Settlement Agreement did not release SRT for future claims

of infringing US 7,541,179 and US 8,058,061. That makes sense, as the releases were framed

relative to past conduct but not post-settlement conduct.

240.     The Arbitrator determined that:

Based on the ***plain, unambiguous language of the Settlement Agreement***, SRT
did not release its Delaware Litigation claims that bluebird's competing BB305
vector infringed the MSK '179 and '061 Patents-in-Suit.  One principal reason for
this is that at the time of execution of the releases, it is ***undisputed*** that SRT did not
yet have any patent rights to release.

Moreover, one of the two principal items of compensation that SRT was receiving
in the Settlement Agreement was the transfer back by MSK to SRT of the
"exclusive" commercial rights to the Patents-in-Suit, the TNS 9.3.55 vector and
other intellectual property that had once been licensed to or developed by SRT
under the 2005 Agreement.

(emphasis added).

241.     In ruling in favor of SRT, the Arbitrator stated that "[t]he transfer by MSK of 'an

exclusive, royalty free commercial license' to the '179 and '061 patents would have had ***made no***

***sense if SRT's one and only commercial competitor, bluebird***, was being given a release to

practice the very patent that was being promised in the same agreement to be commercially

exclusive."

242.     The Arbitration issued a final award holding:

Pursuant to paragraph 2 of the November 2, 2020 Settlement Agreement, as
supplemented by the December 1, 2022 Exclusive Patent License Agreement
among MSK and SRT under the "further action" provision of paragraph 2 of the
Settlement Agreement, SRT has an "exclusive, royalty-free commercial license" to
U.S. patent Nos. 7,541,179 and 8,058,061, with (a) exclusionary rights and (b) all
substantial rights.

243.     During the Arbitration, on October 18, 2022, bluebird and Third Rock filed two petitions for *inter partes* review ("IPR") to invalidate SRT's Licensed Patents with the United States Patent Trial and Appeal Board ("PTAB") despite bluebird's claims that it had the right to use SRT's Licensed Patents under the Settlement Agreement.

244.     The Arbitrator was so perplexed by bluebird's and Third Rock's IPR petitions that he presented the parties with the following question:

> Are bluebird's petitions for Inter Partes Review seeking invalidation of the MSK/SRT '179 and '061 Patents-in-Suit ***inconsistent with*** bluebird's position in this Arbitration that the mutual releases in the Settlement Agreement were intended to release patent claims within their scope? Why? Why not?

(emphasis added).

245.     Bluebird's IPR petitions filed against MSK (patent owner) seeking to invalidate the '179 and '061 Patents was contrary to the mutual general Release provision in the Settlement Agreement.  For example, the Arbitrator presented the parties with the following question:

> Given that the Settlement Agreement releases are mutual, does the Settlement Agreement release all claims of any kind, known or known, by all three of SRT, bluebird and MSK, against one another, including patent claims at least up to the execution of the settlement agreement? Why? Why not?

246.     Unlike continued use of trade secrets or patent infringement after the Settlement Agreement, the *inter partes* Review Petitions claimed the patents were improperly issued prior to the Settlement Agreement and therefore violated the release of claims then in existence.

**Fraudulent Inducement Causing The Release And Dispute Resolution Provisions To Be Incorporated Into The Settlement Agreement**

247.     In November 2020, during discussions about the Release provisions, prior to the execution of the Settlement Agreement, Defendants Thompson, Leschly, and bluebird made intentional omissions of material facts, which included that Thompson and Leschly agreed to later misrepresent the Release provision to excuse bluebird from its infringement of the intellectual

property licensed owned by MSK but exclusively licensed to SRT, and, Defendants Thompson, Leschly and bluebird knew that an omission of such material facts would induce SRT into agreeing to the Release provisions of the Settlement Agreement.  In other words, Thompson, Leschly, and bluebird had a secret side-agreement to undermine the express terms of the Release.  SRT would not have agreed to the Release provision had it known of this secret side agreement.

248.    In November 2020, during discussions about the Release provisions, prior to the execution of the Settlement Agreement, Defendants Thompson, Leschly, and bluebird represented that SRT would be the only company to operate within the scope of the claims of the intellectual property in the 2005 Agreement.  This representation was false at the time, as Defendants Thompson, Leschly, and bluebird knew their upcoming BB305 product did and would operate within the scope of the claims of the intellectual property in the 2005 Agreement prior to expiration of the '179 and '061 Patents.  Bluebird was supposed to wait until the patents expired before engaging in any infringing activity, including the stockpiling, ramp-up, and pre-marketing commercial launch of the BB305 product.

249.    In November 2020, during discussions about the Release provisions, prior to the execution of the Settlement Agreement, Defendants Thompson, Leschly, and bluebird made the representation that intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents, were valid and enforceable against any company, including bluebird.  Defendants Thompson, Leschly, and bluebird believed this was false at the time, and are presently arguing the '179 and '061 Patents are invalid and unenforceable.  Under Leschly and bluebird's position the '179 and '061 Patents are invalid and unenforceable, the representation that the '179 and '061 Patents were valid and enforceable was materially false.  SRT would not have signed the Release

provision had it known Defendants Thompson, Leschly, and bluebird's position that the '179 and '061 Patents were invalid and unenforceable relative to bluebird.

250.     In November 2020, during discussions about the Release provisions, prior to the execution of the Settlement Agreement, Defendants Thompson, Leschly, and bluebird made the representation that bluebird reviewed and evaluated the intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents, under the 2011 Option Agreement; and bluebird waived all future rights to challenge the validity of the intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents, as against the patent owner, SKI.  Defendants Thompson, Leschly, and bluebird believed this was false at the time, and are presently challenging the validity of the intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents, against the patent owner, SKI. SRT would not have signed the Release provision had it known Defendants Thompson, Leschly, and bluebird's position that it did not waive all future rights to challenge the validity of the intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents, as against the patent owner, SKI.

251.     Defendants Thompson, Leschly, and/or bluebird had a duty to disclose the material fact that Thompson had directed MSK to cooperate with bluebird in challenging the validity and enforceability of the intellectual property licensed in the 2005 Agreement, including the '179 and '061 Patents.  In addition, Thompson, Leschly, and/or bluebird possessed superior knowledge of bluebird's cooperation with Thompson and MSK, including their secret agreement, which was not readily available to SRT.

252.     Defendants Thompson, Leschly, and bluebird knowingly misled SRT into believing bluebird was waiving all future rights to challenge the validity of the intellectual property

licensed in the 2005 Agreement, including the '179 and '061 Patents, as against the patent owner, SKI.

253.    Defendants Thompson, Leschly, and bluebird knowingly misled SRT into believing SRT would be the only company to operate within the scope of the claims of the '179 and '061 Patents.

254.    SRT's reliance of Defendants Thompson, Leschly, and bluebird's false representation related to the Release provisions was reasonable, at least, because: (i) the 2011 Option Agreement was key evidence in the New York Litigation; (ii) bluebird evaluated the validity '179 and '061 Patent under the 2011 Option Agreement; (iii) and bluebird's claims against the patent owner, SKI, challenging to the validity of the '179 and '061 Patent are claims that bluebird had at the time of the execution of the Settlement Agreement.  While the scope of the claims of the '179 and '061 Patent and patent infringement was not discussed during settlement negotiations, bluebird's Release of any claims against the patent owner, SKI, and the 2011 Option Agreement were discussed during settlement negotiations.

255.    Accordingly, SRT was fraudulently induced into agreeing to the insertion of the Release and Dispute Resolution provisions in the Settlement Agreement.

256.    To its detriment, SRT relied on Defendants Thompson, Leschly, and bluebird's false representations and omissions.

257.    As a result of Defendants Thompson, Leschly, and bluebird's material omissions and false representations, SRT has suffered an injury and damages to be determined at trial.

258.    As a result of material omissions and false representations made by Defendants Thompson, Leschly, and bluebird, SRT gave up viable claims and causes of action (both asserted and non-asserted) against Third Rock and Leschly that arose from the beginning of the world to

the parties' execution of the Release and Dispute Resolution provisions of the Settlement Agreement.

259.    As a result of material omissions and false representations made by Defendants Thompson, Leschly, and bluebird, SRT incurred substantial legal fees and expenses in connection with asserting its legal rights.

260.    During settlement negotiations, Thompson, Leschly, and bluebird were conspiring with the Leschly Enterprise to fraudulently induce SRT to agree to the insertion of the Release and Dispute Resolution provisions, which was done in furtherance of Defendants' scheme to shut-down SRT and eliminate bluebird's competition after execution of the Settlement Agreement.

**The Fraudulent "Spin-off" of 2seventy Bio**

261.    Defendants Leschly, Finer, Reilly, Third Rock, and bluebird knew that the purported BB305 Vector approved by the FDA was within the scope of the claims of SRT's Licensed Patents, and, thus, these Defendants anticipated that SRT could discover the identity of the BB305 Vector approved by the FDA and bluebird's infringement prior to expiration of the Licensed Patents.  Defendants Leschly, Finer, Reilly, Third Rock, and bluebird knew that if their concealment and fraud was eventually discovered by SRT, then SRT would file a willful patent infringement suit against bluebird.

262.    In furtherance of Defendants' scheme and to protect their assets derived from their prior fraudulent acts, Defendants Leschly, Finer, Reilly, Third Rock, and bluebird knew that depleting bluebird of valuable assets would preclude SRT from recovering monetary damages against bluebird, which would also protect their investments in bluebird.

263.    On January 11, 2021, bluebird transmitted a press release via electronic wire announcing an intent to separate its severe genetic disease and oncology businesses into

differentiated and independent publicly-traded companies, and that Leschly would lead the new entity, Oncology NewCo, as CEO.

264.    On May 5, 2021, bluebird transmitted another press release via electronic wire stating that Oncology NewCo would be named 2seventy bio and the members of the leadership team would include Leschly as CEO.  This same press release quotes Leschly as stating: "The name 2seventy was selected to signify this speed and our team's translation of thought to action as we advance our next generation pipeline of transformative cell therapies to help cancer patients urgently in need."

265.    Bluebird's May 5, 2021 press release also states that bluebird anticipated the separation of its severe genetic disease and oncology businesses into two independent, publicly-traded companies (bluebird bio and 2seventy bio) to be completed by the end of 2021.

266.    On September 8, 2021, bluebird transmitted a press release via electronic wire stating that bluebird entered into an agreement for a $75 million private placement of common stock and common stock equivalents with a healthcare investment fund selected as part of a competitive process and proceeds from the financing would support ongoing R&D and commercialization investments for bluebird bio and for 2seventy bio, which planned to launch as independent companies in October 2021.

267.    In bluebird's September 8, 2021 press announcement, which was transmitted via electronic wire, Leschly made the following public statements:

> When combined with the approximately $900 million of cash expected at the time of separation, this $75 million equity investment further strengthens the starting financial position of both businesses[.] . . . We look forward to sharing more detail on the innovative and transformative therapies being developed as well as the pipeline, milestones, and strategic outlook for both companies as we head into separation and beyond.

268.     On October 8, 2021, bluebird transmitted a press release via electronic wire, *inter alia*, announcing the filing by 2seventy bio of an updated Form 10 Registration Statement with the U.S. Securities and Exchange Commission (SEC) and stating that this Form 10 reflected bluebird's plans for a tax-free spin-off of its oncology programs and portfolio into 2seventy bio as a publicly-traded company.

269.     In bluebird's October 8, 2021 press announcement, which was transmitted via electronic wire, Leschly made the following public statements:

> "As we approach separation, we have been strategic and diligent in setting up each business for success," said Nick Leschly, chief bluebird and expected chief kairos officer, 2seventy bio. "The first part of this year was largely directed toward focusing and shaping our internal operations and continuing to advance the transformative gene and cell therapy products that sit on both sides of the current business."

270.     The October 8, 2021, bluebird announcement further states:

> The company anticipates that its cash, cash equivalents and marketable securities balance at separation will be approximately $1.0B . . . . bluebird bio expects to fund 2seventy bio with approximately $480M in cash upon separation, with the balance to be retained by bluebird bio. Together with existing and emerging sources of revenue and other anticipated cash inflows, which includes the potential sale of priority review vouchers that would be issued with anticipated U.S. regulatory approvals of BLAs for bluebird's therapies in beta-thalassemia and cerebral adrenoleukodystrophy, the Company expects its cash, cash equivalents and marketable securities balance will be sufficient to fund operations for bluebird bio and 2seventy bio into 2023 under current business plans.

271.     At the launch of 2seventy, Defendants Leschly, Finer, Reilly, Third Rock, and bluebird stripped bluebird of profitable assets, which included bluebird's immune-oncology cell therapy products and $480,000,000 in cash.

272.     Nearly bluebird's entire executive team and board of directors exited in late 2021, amidst the recent spin-off of bluebird's so-called oncology division.

273.     In October 2021, Daniel Lynch, Sarah Glickman, Ramy Ibrahim, Denice Torres, Marcela Maus, and William Sellers each resigned from bluebird's board of directors, and they all

joined the board of 2seventy.  Now, bluebird's former board of directors Lynch, Glickman, Maus, and Torres are currently on the board of directors of 2seventy.  Ibrahim served on 2seventy's board from October 2021 until his resignation from the board effective June 16, 2023.

274.    Unsurprisingly, all of the directors who resigned joined 2seventy's initial board of directors.  Bluebird's top management also resigned from their positions with bluebird to take top management positions with 2seventy.

275.    At its launch, 2seventy bio's assets included bluebird's immune-oncology cell therapy products for solid tumors and hematologic malignancies, as well as $442 million in cash to fund its operations into 2023.  Not only did bluebird fund the company with over $480 million, bluebird retained all the debt on its balance sheet while being drastically short on cash for the rest of its operations.

276.    Most of the foregoing cash and investments resulted from Defendants' ongoing fraudulent scheme to harm SRT and eliminate bluebird's competition and obtain FDA approval for the BB305 Vector with market exclusivity, which continued even after execution of the Settlement Agreement.

277.    In addition, after execution of the Settlement Agreement, the foregoing cash and investments were used by Defendants in furtherance of their schemes involving fraud and violations of criminal statutes to make certain that bluebird's BB305 Vector drug product will get ahead and stay ahead of SRT in the market, and to make sure that the BB305 Vector drug product does not have competition in the market from SRT's competing gene therapy treatments for Beta Thalassemia and SCD.

278.    On November 4, 2021, bluebird transmitted a press release via electronic wire stating that it has completed the tax-free spin-off of its oncology programs and portfolio into

2seventy bio, Inc., an independent, publicly-traded company, and that bluebird bio would continue its work focused on severe genetic disease.

279.     Defendants Leschly, Finer, Reilly, Third Rock, and bluebird caused bluebird to announce that they created 2seventy to spin off the oncology program; however, these statements were false and/or intentionally misleading and were part of Defendants Leschly's, Reilly's, Finer's, Third Rock's, and bluebird's fraudulent scheme to transfer their capital gains and investments out of bluebird into another company as a way to avoid paying subsequent damages and liabilities owed to SRT.

280.     Defendants Leschly, Finer, Reilly, Third Rock, and bluebird caused bluebird to announce that they created 2seventy to spin off the oncology program; however, these statements were false and/or intentionally misleading because, *inter alia*, bluebird subsequently granted and transferred to 2seventy rights and/or ownership in the BB305 Vector.

281.     After SRT filed its patent infringement suit against bluebird, on February 23, 2023, bluebird assigned to 2seventy rights, obligations, and interests under the license agreement as of September 13, 2011, by and between Institut Pasteur and bluebird pertaining to any and all uses of the licensed intellectual property in connection with lentiviral vectors (*e.g.*, BB305 Vector) to treat Beta Thalassemia and SCD patients.

282.     According to 2seventy's May 2023 quarterly statement: "On February 23, 2023, the Company entered into a Partial Assignment and Assumption Agreement (the 'Assignment and Assumption Agreement') with Institut Pasteur ('Institut Pasteur') and bluebird bio. Pursuant to the Assignment and Assumption Agreement, bluebird bio assigned to the Company bluebird bio's rights, obligations and interests under a license agreement with Institut Pasteur that were previously licensed to the Company by bluebird bio under the License Agreement." Ex. F. The

Institut Pasteur license agreement appended to the May 2023 quarterly statement defined the field to include "beta hemoglobinopathies (including but not limited to beta-thalassemia and sickle cell anemia)" and concerned "lentivirus vectors."

283.    In addition, bluebird sublicensed certain intellectual property rights to 2seventy under an intellectual property license agreement, by and between bluebird bio and 2seventy, which was entered into in connection with the separation of the 2seventy from bluebird, and which allows 2seventy to use bluebird's intellectual property related to lentiviral vectors for gene therapy treatments.

284.    Defendants Leschly, Third Rock, Finer, Reilly, and bluebird caused bluebird to sublicense the rights to the BB305 Vector to 2seventy as part of their ongoing scheme of fraud and to shut down SRT, obtain FDA approval with market exclusivity ahead of SRT, and protect their capital gains derived from their fraudulent scheme.

285.    Defendants Leschly, Third Rock, Finer, Reilly, and bluebird caused bluebird to assign and transfer ownership of the intellectual property related to the BB305 Vector to 2seventy so that 2seventy could then market and sell the BB305 Vector for the treatment of SCD and Beta Thalassemia patients, and this was a part of their ongoing scheme of fraud to shut down SRT, obtain FDA approval with market exclusivity ahead of SRT, and protect their capital gains derived from their fraudulent scheme.

286.    2seventy states on its website under "our technologies" and "Lentiviral Vector (LVV) Design and Manufacturing," "[w]ith decades of experience in LVV technology, we have extensively optimized the componentry and methodology behind LVV design and manufacturing."

59

287.    2seventy's career postings list "Senior Scientist/Manager" and "Senior Associate Scientist" positions referring to lentiviral vectors.  For example, the "Senior Scientist/Manager" position states "[w]illingness to work with lentiviral vector and human biological samples such as primary human cells"; and BB305 is a lentiviral vector, and, in general, is used to treat Beta Thalassemia and SCD by extracting patent cells (*i.e.*, primary human cells), processing them with BB305, and returning treated cells to the patient.

288.    Defendants Leschly, Third Rock, Finer, Reilly, and bluebird positioned 2seventy to take over the BB305 product and revenue stream.

289.    Leschly is currently the President, CEO, and a member of the board of directors at 2seventy.  As founding member and partner at Third Rock, Leschly (i) was a substantial shareholder of bluebird stock; (ii) played an integral role in the overall formation, development, and business strategy of bluebird; (iii) served as the CEO at bluebird for eleven years; and (iv) currently serves as a Board member of bluebird.

290.    In 2018, Leschly was the highest compensated CEO in biopharma, raking in $24,000,000; and between 2010 and 2021, Leschly sold over $100,000,000 in shares of bluebird. Leschly currently owns substantial stock in 2seventy.  A December 18, 2020 the Boston Globe Media publication describes Leschly one of the "worst biopharma CEOs of 2020," and also specifically states:

> "In six years, Leschly has gone from best to worst CEO.  Why?  Because those same gene therapies that offered patients so much hope are still out of reach–not because they're ineffective or unsafe, but because Bluebird has badly mismanaged the regulatory and manufacturing steps necessary to secure approvals.  Bluebird's market value peaked at $11 billion; today it's down to $3 billion."

Feuerstein, A., "*Kulkarni victorious in best biopharma CEO vote; Leschlys tops worst list*," Boston Globe Life Sciences Media, LLC, Dec. 18, 2020.

291.    As a founding member and partner at Third Rock, Reilly served in a key leadership role at bluebird.  As a partner at Third Rock, Reilly (i) was instrumental in creating bluebird; (ii) served on the scientific advisory board of bluebird; and (iii) served as the Chief Medical Officer at bluebird.  Upon creation of 2seventy, Reilly served as its Chief Scientific Officer.  Reilly has sold millions of dollars of shares of bluebird and currently owns stock in 2seventy.

292.    As Chief Scientific Officer and major shareholder of bluebird bio, Finer (i) played an integral role in the overall formation, development, and business strategy of bluebird; and (ii) served as the Chief Scientific Officer at bluebird for over 5 years.  Finer has sold millions of dollars of shares of bluebird.

293.    Each Defendant received income and/or investments that were generated as a direct or proximate result of Defendants' ongoing fraud and scheme (i) to shut down SRT (bluebird's only competitor) by fraudulently inducing SRT to agree to the Release and Dispute Resolution provisions of the Settlement Agreement; (ii) to sabotage SRT's TNS9 drug product by submitting false information to the FDA in violation of 18 U.S.C. §1001; and (iii) to achieve Defendants' objective of increasing the stock price and value of bluebird.  Each Defendant profited from the increase in the stock price and market valuation of bluebird prior to spinning off 2seventy.

294.    Each individual Defendant currently owns shares of stock in 2seventy.

295.    Third Rock currently owns shares of stock in 2seventy.

296.    Each individual Defendant has derived income and capital gains as a direct result of their fraudulent schemes.

297.    At the time of the spin-off, the majority of 2seventy's shares were owned by Leschly, Finer, Reilly, and Third Rock.

298.    Each Defendant profited from an increase in the stock price and market valuation of 2seventy, which was a direct result of Defendants' ongoing fraud and scheme (i) to shut down SRT (bluebird's only competitor); and (ii) fraudulently obtain unlawful competitive intelligence (confidential information) that they used in the submission of bluebird's IND for the BB305 Vector, which resulted in FDA approval and Orphan Drug market exclusivity.

299.    Each Defendant used the income generated and/or received from bluebird (*e.g.*, stock, salary, profits, bonuses) and invested part of that income into 2seventy and/or another biotechnology company created by Third Rock.

**After Execution of the Settlement Agreement Defendants Conspired to Falsify FDA Regulatory Submissions In Violation of Criminal Statute 18 U.S.C. § 1001**

300.    Based upon a reasonable investigation in 2023, SRT discovered that Thompson conspired with the Leschly Enterprise after November 2, 2020, to carry out a scheme to sabotage SRT's business and property by, *inter alia*, intentionally concealing material information related to the Investigation New Drug ("IND") No. 0148209 for the TNS9 Vector ("TNS9 IND"), and/or willfully submitting false information on the TNS9 IND Form to the FDA.

301.    On January 11, 2006, the FDA granted Orphan Drug Designation for SRT's TNS9 Vector (Thalagen™) for the treatment of Beta Thalassemia major and Beta Thalassemia intermedia. *See* Ex. G (January 11, 2006 letter from the FDA to EGT).

302.    Each Defendant was aware that the FDA granted SRT an Orphan Drug Designation for the TNS9 Vector (Thalagen™) in January 2006, which was years ahead of bluebird obtaining Orphan Drug Designation for its BB305 Vector.

303.    On January 12, 2021, Dr. Alan L. Ho, Chairman, MSK's Investigational New Drug Committee, submitted a letter to the FDA's Office of Orphan Products Development stating: "By this letter, we transfer all ownership rights in the orphan-drug designation for Thalagen™

(Lentiviral vector encoded with a human beta-globin gene plasmid) from Memorial Sloan Kettering Cancer Center to Errant Gene Therapeutics, LLC," now known as SRT.  Ex. H (Jan. 12, 2021 letter from MSK to the FDA).

304.    The FDA's IND, (Title 21, CFR Part 312), Form states: "WARNING: A willfully false statement is a criminal offense (U.S.C. Title 18, Sec. 1001)."

305.    Title 18 U.S.C. § 1001(a) states:

Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully — (1) *falsifies, conceals*, or covers up by any trick, *scheme*, or device **a** ***material fact***; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or ***uses any false writing or document knowing the same to contain any materially false***, fictitious, or ***fraudulent statement*** or entry; shall be fined under this title, ***imprisoned not more than 5 years*** or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.

(emphasis added)

306.    Thus, a violation of 18 U.S.C. § 1001(a) for an act such as submitting knowingly false material information in connection with the submission of the FDA's IND Form could subject the violator to, *e.g.*, criminal perjury, criminal conspiracy, and/or criminal fraud changes.

307.    After execution of the Settlement Agreement, the Leschly Enterprise led by Leschly and Thompson conspired to sabotage the TNS9 IND and interfere with SRT's ability to complete its FDA regulatory submissions through Thompson's directing and causing MSK to intentionally withhold TNS9 IND documents from SRT and willfully falsify information on the TNS9 IND Forms submitted to the FDA for SRT's TNS9 drug product.

308.    In conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to obstruct SRT's regulatory efforts and improperly file amendments to SRT's TNS9 IND in furtherance of their objective to inhibit or delay SRT's entry into the gene therapy market for Beta Thalassemia and SCD.

309.     The FDA's IND Form for the TNS9 Vector (the "TNS9 IND Form") asks whether the TNS9 drug product has an FDA Orphan Designation for the indication for use, which is Beta Thalassemia Major.  As discussed, in January 2021, Dr. Alan L. Ho submitted a letter to the FDA's Office of Orphan Products Development that illustrates his (and MSK's) awareness that the FDA granted SRT's Thalagen™ (TNS9 drug product) Orphan Drug Designation for the indication of Beta Thalassemia Major.  *See* Ex. H (Jan. 12, 2021 letter from MSK to the FDA).  At this time Dr. Alan L. Ho and Richard Ellis reported to and was controlled by Thompson.

310.     In July 2023, SRT discovered that Thompson directed and caused MSK to willfully obstruct SRT's regulatory efforts and insert knowingly false information that is material to SRT's TNS9 drug product in furtherance of Defendants' scheme to inhibit and/or delay SRT's entry into the gene therapy market for Beta Thalassemia and SCD by submitting willfully material false information on the TNS9 IND Form to the FDA.  In addition, Dr. Alan L. Ho and Richard Ellis continues to report to and/or be controlled by Thompson.

311.     On December 1, 2021, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product **does not** have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and in conspiracy with the Leschly Enterprise.  Ex. I.  This particular TNS9 IND Form was submitted on December 1, 2021 in connection with MSK filing an administrative update amendment for the TNS9 IND to the FDA. Through the direction and control of Thompson, MSK's December 1, 2021 TNS9 IND submission to the FDA was not disclosed, and, in fact, intentionally withheld from SRT until July 2023.  The Leschly Enterprise caused and directed MSK to submit false information to the FDA on December

1, 2021, with the intent to harm SRT's business or property and did so in furtherance of their conspiracy.

312.    On December 23, 2021, Thompson again directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product ***does not*** have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and in conspiracy with the Leschly Enterprise.  Ex. J.  This particular TNS9 IND Form was submitted on December 23, 2021, in connection with MSK providing an annual report to the FDA detailing patients' clinical trial follow-up for the TNS9 drug product.  Through the direction and control of Thompson, MSK's December 23, 2021 TNS9 IND submission to the FDA was not disclosed, and, in fact, was intentionally withheld from SRT until July 2023.  The Leschly Enterprise caused and directed MSK to submit false information to the FDA on December 23, 2021, with the intent to harm SRT's business or property and did so in furtherance of their conspiracy.

313.    On August 19, 2022, Thompson again directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product ***does not*** have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and in conspiracy with the Leschly Enterprise.  Ex. K.  This particular TNS9 IND Form was submitted on August 19, 2022 in connection with MSK filing documents to the FDA for an amendment to the TNS9 IND.  Through the direction and control of Thompson, MSK's August 19, 2022 TNS9 IND submission to the FDA was not disclosed, and, in fact, was intentionally withheld from SRT until July 2023.  The Leschly Enterprise caused and directed MSK to submit false information to the FDA on August

19, 2022, with the intent to harm SRT's business or property and did so in furtherance of their conspiracy.

314.    Also on October 28, 2022, Thompson again directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product **does not** have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and in conspiracy with the Leschly Enterprise. Ex. L. This particular TNS9 IND Form was submitted on October 28, 2022 in connection with MSK providing an annual report to the FDA detailing patients' clinical trial follow-up for the TNS9 drug product. Through the direction and control of Thompson, MSK's October 28, 2022 TNS9 IND submission to the FDA was not disclosed, and, in fact, was intentionally withheld from SRT until July 2023. The Leschly Enterprise caused and directed MSK to submit false information to the FDA on October 28, 2022, with the intent to harm SRT's business or property and did so in furtherance of their conspiracy.

315.    And on May 12, 2023, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product **does not** have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and in conspiracy with the Leschly Enterprise. Ex. M. This particular TNS9 IND Form was submitted on May 12, 2023 in connection with MSK providing additional information to the FDA about SRT's TNS9 drug product. Through the direction and control of Thompson, MSK's May 12, 2023 TNS9 IND submission to the FDA was not disclosed, and, in fact, was intentionally withheld from SRT until July 2023. The Leschly Enterprise caused and directed MSK to submit false information to the FDA on May 12, 2023, with the intent to harm SRT's business or property and did so in furtherance of their conspiracy.

316.    At all times relevant hereto, at least, Defendants Leschly, Reilly, Finer, bluebird, Third Rock, and Thompson knew there is an obligation pursuant to, *inter alia*, 21 CFR Part 312 to submit truthful and accurate information to the FDA and were under an obligation to certify that all statements made in the FDA's IND Form were true and with knowledge that whoever "knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry," shall be subject to the penalties set forth under 18 U.S.C. § 1001.

317.    At all times relevant hereto, at least, Defendants Leschly, Finer, Reilly, Third Rock, and bluebird were aware that Defendant Thompson, working in conspiracy with the Leschly Enterprise, knew that by directing MSK to submit the TNS9 IND Forms with false information to the FDA was a violation of 18 U.S.C. § 1001.

318.    At all times relevant hereto, at least, Defendants Leschly, Finer, Reilly, Third Rock, and bluebird were aware that Defendant Thompson, working in conspiracy with the Leschly Enterprise, was purposefully directing and causing MSK to submit the TNS9 IND Forms with false information to the FDA in a violation of 18 U.S.C. § 1001.

**The Substantial Harm Cause By Defendants' Unlawful Conduct**

319.    SRT has suffered harm to its business and property, including economic injuries as a result of Defendants' fraud and harmful acts occurring after November 2, 2020 that were carried out to shut down SRT, delay SRT's entry into the gene therapy market, and eliminate bluebird's competition.

320.    For example, SRT has lost profits as a result of Defendants' actions occurring after November 2, 2020.  But for Defendants' actions, SRT would have received FDA approval sooner

than currently expected with market exclusivity for lentiviral gene therapy treatments in Sickle Cell and Beta Thalassemia patients before bluebird.

321.    But for Defendants' actions SRT's TNS9 drug product would have obtained FDA approval with Orphan Drug Designation ahead of bluebird.

322.    As a result of Defendants' actions SRT's TNS9 drug product has suffered a substantially delayed entry into the market for lentiviral vector gene therapy treatments for Beta Thalassemia and SCD.

323.    Defendants' actions against SRT, which occurred after execution of the Settlement Agreement, have caused substantial harm to SRT's business and property.

324.    SRT relied on Defendants' misrepresentations and omissions of material facts to its detriment, which caused SRT to dismiss, with prejudice, its civil action filed against Third Rock and Leschly in the Massachusetts Litigation where SRT's damages were in excess of $100 million.

325.    Because Defendants directed and caused bluebird and Third Rock to submit the IPR petitions against the patent owner, SKI, to invalidate SRT's Licensed Patents, which was carried out in furtherance of Defendants' fraudulent schemes and conspiracies, SRT has spent significant funds to file responsive papers, exhibits, and inventor and expert declarations, all of which include filing fees, litigation costs, and attorney fees.

326.    Because Defendants directed and caused bluebird and Third Rock to continue their fraudulent claims during Arbitration, which was carried out in furtherance of their fraudulent scheme and conspiracies, SRT has incurred substantial and needless legal cost and fees.

327.    As a direct result of Defendants' harmful and fraudulent actions, SRT has suffered an economic injury from Defendants' interference, including its ability to recover monetary

damages from bluebird, which is on the verge of insolvency, and such insolvency was intentionally set up by Defendants Leschly, Reilly, Finer, and bluebird.

328.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion.

329.    As a direct result of Defendants' harmful and fraudulent actions, patients continue to suffer from a disease treatable with SRT's competing lentiviral vector gene therapy treatments, which are clinically more efficacious and safer, and over $2 million less in cost for patients.  Those patients are faced with a lack of access to SRT's competing lentiviral gene therapy treatments due to Defendants' actions as discussed above, as well as Defendants' $2.8 million dollar price tag for the BB305 treatment.

## FIRST CLAIM FOR RELIEF: FEDERAL RICO

330.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

331.    Defendants' scheme encompasses acts of artifice or deceit that are intended to deprive SRT of its business, property, and money.

332.    Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(a).  For example, "racketeering" includes wire fraud or committing fraud by means of electronic transmissions over wire.

333.    Defendants have engaged in multiple fraudulent and unlawful actions after execution of the Settlement Agreement that has separately caused harm to SRT's business and property.

334.    Defendants used fraud to induce SRT to execute the Settlement Agreement.

335.    Defendants used fraud to obtain arbitration in 2022–2023 to delay the Delaware Litigation for delay's sake and to allow time to file IPRs (*e.g.*, by bluebird and Third Rock falsely representing the negotiations and contract provided bluebird with a right to practice the claims).

336.    Defendants used fraud to protect their assets by falsely representing 2seventy as a legitimate spinout of bluebird in 2021 and 2022 while transferring cash and rights in BB305.

337.    Defendants used wire and mail in furtherance of their fraudulent and criminal schemes, which includes, at least, the following acts of wire and mail fraud:

(i)     transmitting a settlement payment and submitting the executed Settlement Agreement via wire on November 2, 2020;

(ii)    submitting documents to the Securities and Exchange Commission and distributing materials related to the spinoff of 2seventy via wire and mail in 2021;

(iii)   transmitting numerous press announcements about the spin-off of 2seventy via wire and mail in 2021;

(iv)    on December 1, 2021, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(v)     on December 23, 2021, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(vi)    on August 19, 2022, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(vii)   submitting two IPR petitions to the PTAB via wire in October 2022;

(viii)  on October 28, 2022, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(ix)     transmitting documents and making payments to the American Arbitration Association (AAA) for administrative fees via wire in December 2022 and January 2023;

(x)     submitting payment to SRT for the reimbursement of administrative fees of the AAA and compensation for the Arbitration, pursuant to the arbitration award, via wire in March 2023; and

(xi)     on May 12, 2023, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001.

338.     To the extent the release provision of the Settlement Agreement is voidable due to Defendants' fraudulent inducement of SRT, Defendants' theft of SRT's trade secrets and transport of SRT's illegally obtained TNS9 Vector to Germany becomes other predicate actions.

339.     Defendants committed the predicate acts willfully and/or with actual knowledge of the illegal activities.  All of the foregoing illegal acts were part of a pattern of racketeering activity and done in furtherance of, *inter alia*, Defendants' fraud and illegal scheme to shut down SRT (bluebird's only competitor) and obtain FDA approval for the BB305 Vector with market exclusivity status ahead of SRT and in order to protect Defendants' capital gains and profits derived from their fraudulent scheme.  The predicate acts were related, having the same or similar purposes and results (*e.g.*, to shut down SRT, eliminate competition and advance the BB305 Vector, and shield associated assets); involved the same or similar participants (*e.g.*, Defendants) and victims (*e.g.*, SRT); and involved the same or similar methods of commission or otherwise were interrelated by distinguishing characteristics.  The predicate acts were also continuous, as part of a past and ongoing scheme to shut down SRT, advance the competing BB305 Vector, and shield associated assets.

340.    SRT's cause of action to bring civil Federal RICO alleged herein arose after execution of the Settlement Agreement.

341.    Multiple Defendants' predicate acts required to establish a Federal RICO civil action occurred after November 2, 2020 and each predicate act has caused substantial harm to SRT's business and/or property.

342.    SRT alleges four different causes of action for federal RICO violations.   In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, Section 1962(a) provides relief against parties who use income generated through a pattern of racketeering activity, Section 1962(b) provides relief against parties who use a pattern of racketeering activity to acquire or maintain an interest or control over an enterprise, and Section 1962(d) provides relief against those who conspire to violate the racketeering laws.   Defendants are liable under each of these four sections of the statute.

***Culpable Persons and Enterprise***

343.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

344.    18 U.S.C. § 1961(3) defines a culpable "person" as an "individual or entity capable of holding a legal or beneficial interest in property[.]"

345.    The culpable persons are Defendants Leschly, Finer, Reilly, Thompson, Third Rock, bluebird, and 2seventy, which are referred to, collectively, as the "Leschly Enterprise."

346.    The Leschly Enterprise consists of the Defendants acting collectively as an association in fact to shut down SRT as a competitor of bluebird, obtain FDA approval for the BB305 Vector with market exclusivity ahead of SRT, fraudulently induce SRT to execute the Settlement Agreement, preclude subsequent enforcement damages owed to SRT by the fraudulent

creation of 2seventy, and submit materially false information about the TNS9 drug product to the FDA in violation of 18 U.S.C. § 1001.

347.   All of the Defendants have worked together and coordinate as the Leschly Enterprise, and each of the Defendants contributes to the operation and organization of the Leschly Enterprise.

348.   Leschly was the ringleader.   Leschly was a partner at Third Rock and founded bluebird out of Genetix.   Leschly was assisted by Reilly (another partner at Third Rock who became Chief Medical Officer at bluebird), Finer (Chief Scientific Officer at bluebird), and Thompson (former CEO of MSK).   Leschly, Reilly, Finer, Thompson bluebird, and Third Rock conspired to take and use SRT's technology and sabotage SRT's efforts.   Thompson (former CEO of MSK), was their inside-man at MSK, and Thompson used his position to advance Defendants' conspiracy to shut down SRT as a competitor of bluebird, obtain FDA approval for the BB305 Vector with market exclusivity ahead of SRT, fraudulently induce SRT to execute the Settlement Agreement, preclude subsequent enforcement damages owed to SRT by the fraudulent creation of 2seventy, and submit materially false information about the TNS9 drug product to the FDA in violation of 18 U.S.C. § 1001 to purposely delay SRT's gene therapy treatments into the market. For example, there was no legitimate reason for (i) MSK to submit false information to the FDA about the TNS9 drug product; (ii) Defendants to interfere with the development of SRT's TNS9 drug product; (iii) Defendants to delay SRT's competing lentiviral vectors, which are clinically more efficacious safer, and more affordable for patients; and (iv) Defendants to direct and cause MSK to enter into a blanket indemnification of competitor bluebird against SRT for even willful misconduct of bluebird.   The spin-off of 2seventy was done to protect the Leschly Enterprise and carry on the anticompetitive work, by acquiring large assets (*e.g.*, $480 million in cash), personnel,

and rights to BB305 from bluebird to protect the ill-gotten gains and maintain the monopoly should bluebird be sued.  Given that 2seventy was ostensibly an oncology spinout of bluebird and on paper a separate company from bluebird, there was no procompetitive justification for bluebird to provide 2seventy with rights in the BB305 drug product (a non-oncology drug product)—rather, this was part of the anticompetitive tactics of Defendants to maintain their monopoly.  Defendants are part of a common effort to sabotage SRT, eliminate market competition, and protect the BB305 drug product from competition in the market in order to advance their personal financial gain.

***Interstate and Foreign Commerce***

349.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

350.    The cost of bluebird's BB305 Vector is $2.8 million per treatment.  However, SRT's TNS9 Vector will cost less than $700,000 per treatment.

351.    Defendants' racketeering activities have a nexus to interstate and foreign commerce.

352.    The Leschly Enterprise has a substantial effect on interstate and foreign commerce. Each Defendant has a substantial effect on interstate and/or foreign commerce.

353.    As discussed above, Defendants engaged in multiple acts of wire and mail fraud.

354.    In furtherance of Defendants' fraudulent inducement of SRT, Defendants engaged in and affected interstate commerce by way of wiring the money in connection with their fraud and using interstate wires to further Defendants' scheme.

355.    In furtherance of Defendants' fraudulent inducement of SRT, Defendants used the Internet and other electronic facilities to carry out the IPR petitions in their attempt to invalidate the Licensed Patents, thereby engaging in and affecting interstate commerce.

356.     The Leschly Enterprise is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce through each of their individual activities and/or collective involvement in the business operations of Third Rock, bluebird, and 2seventy.

357.     Bluebird is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

358.     2seventy is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

359.     Third Rock is directly engaged in the production, distribution, or acquisition of goods and services in interstate commerce.

*Racketeering*

360.     SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

361.     SRT alleges that Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c).  For example, under Federal law "racketeering" is defined to include fraudulent inducement, wire fraud, or committing fraud by means of electronic transmission over wire, as well as theft of trade secrets and transportation/receipt of stolen goods.  *See* 18 U.S.C. § 1961.

362.     As detailed herein, SRT alleges four different causes of action for federal RICO violations.  In summary, Section 1962(c) provides relief against parties who engage in a pattern of racketeering activity, Section 1962(a) provides relief against parties who use income generated through a pattern of racketeering activity, Section 1962(b) provides relief against parties who use a pattern of racketeering activity to acquire or maintain an interest or control over an enterprise, and Section 1962(d) provides relief against those who conspire to violate the racketeering laws. Defendants are liable under each of these four sections of the statute.

363.    18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

364.    Defendants engaged in a pattern of racketeering that is closed-ended and/or open-ended in continuity.  Defendants' racketeering predicates are related and they amount to and/or pose a threat of continued unlawful activity.

365.    Defendants have a continuous and ongoing scheme to shut down bluebird's direct competitor based on an intent to defraud, and Defendants use mail and/or wires in furtherance of their scheme.  Defendants' scheme encompasses acts of artifice or deceit intended to deprive SRT of its business and/or property.

366.    In furtherance of their conspiracies and schemes, Defendants used mail and wires in connection with the following fraudulent and unlawful activities:

(i)     transmitting a settlement payment and submitting the executed Settlement Agreement via wire on November 2, 2020;

(ii)    submitting documents and distributing materials related to the spinoff of 2seventy via wire and mail in 2021;

(iii)   transmitting numerous press announcements about the spin-off of 2seventy via wire and mail in 2021;

(iv)    on December 1, 2021, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(v)     on December 23, 2021, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(vi)     on August 19, 2022, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(vii)    submitting two IPR petitions to the PTAB via wire in October 2022;

(viii)   on October 28, 2022, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001;

(ix)     transmitting documents and making payments to the American Arbitration Association (AAA) for administrative fees via wire in December 2022 and January 2023;

(x)      submitting payment to SRT for the reimbursement of administrative fees of the AAA and compensation for the Arbitration, pursuant to the arbitration award, via wire in March 2023; and

(xi)     on May 12, 2023, submitting willfully false information to the FDA, which was done in violation of 18 U.S.C. § 1001.

### Count I: Violation of 18 U.S.C. § 1962(c)

367.     SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

368.     18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . . " 18 U.S.C. § 1962(c).

369.     As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

77

370.     As discussed above, the Defendants are each employed by or associated with the Leschly Enterprise.

371.     As discussed above, the Leschly Enterprise is engaged in, or the activities of which affect, interstate or foreign commerce.

372.     As discussed above, the Defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. This includes a pattern of mail and wire fraud, and transmitting materially false information to the FDA in violation of 18 U.S.C. § 1001.

373.     Defendants' activities include at least two acts of racketeering activity since November 2, 2020 occurring after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

374.     One such predicate act took place in November 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

375.     Another such predicate act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird, which involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

Case 1:23-cv-10919-ADB   Document 42   Filed 08/07/23   Page 79 of 124

376.    Another such predicate act occurred on December 1, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. §. 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

377.    Another such predicate act occurred on December 23, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

378.    Another such predicate act occurred on August 19, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

379.    Another such predicate act occurred on October 28, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information

to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

380.     Another such predicate act occurred on May 12, 2023, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

381.     SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion and/or said damages to be proven at the time of trial.  But for Defendants' actions, (i) SRT would have remained ahead of bluebird in the relevant market; (ii) SRT's lentiviral vector drug product would have commercially launched ahead of bluebird and with orphan drug designation; (iii) SRT's competing lentiviral vector gene therapy treatments would enter the market much sooner than now anticipated; and (iv) SRT would have obtained a majority of the market share because the cost of SRT's TNS9 drug product is over $2 million dollars less than the cost of bluebird's BB305 drug product.

382.     For example, Defendants (i) delayed and sabotaged the TNS9 IND, (ii) derailed legal proceedings through fraudulent inducement into Release and Dispute Resolution provisions of the Settlement Agreement, (iii) continued to use SRT's trade secrets to enable and accelerate

bluebird's clinical vector, (iv) obtained early launch by violating SRT's intellectual property, and (v) delayed the entry of SRT's competing lentiviral vector gene therapy treatments.  Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' unlawful actions.

383.    In addition to the injuries incurred as a result of Defendants' predicate acts themselves, Defendants' investments of their racketeering proceeds in 2seventy have, to date, helped protect Defendants from liability to SRT and disrupt any monetary judgements against bluebird. As set forth above, 2seventy benefits from the infusion of income procured through Defendants' racketeering activities.

384.    Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to SRT for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## Count II: Violation of 18 U.S.C. § 1962(a)

385.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

386.    18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

387.    As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

388.    As discussed above, Defendants have received income derived, directly and indirectly, from a pattern of racketeering activity.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

389.    Defendants' activities include at least two acts of racketeering activity that occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

390.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

391.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

392.    Another such predicate act occurred on December 1, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. §. 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

393.    Another such predicate act occurred on December 23, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

394.    Another such predicate act occurred on August 19, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

395.    Another such predicate act occurred on October 28, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

396.    Another such predicate act occurred on May 12, 2023, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to

the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

397.    Defendants used or invested, directly and indirectly, part of such income, or the proceeds of such income in the acquisition of an interest in, and the establishment and operation of 2seventy, which has affected interstate and foreign commerce.  For example, Defendants invested proceeds from the pattern of racketeering activity in the development and launch of 2seventy.

398.    As discussed above, the Leschly Enterprise is engaged in, and the activities of which affect interstate and foreign commerce.

399.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion and/or said damages to be proven at the time of trial. But for Defendants' actions, (i) SRT would have remained ahead of bluebird in the relevant market; (ii) SRT's lentiviral vector drug product would have commercially launched ahead of bluebird and with orphan drug designation; (iii) SRT's competing lentiviral vector gene therapy treatments would enter the market much sooner than now anticipated; and (iv) SRT would have obtained a majority of the market share because the cost of SRT's TNS9 drug product is over $2 million dollars less than the cost of bluebird's BB305 drug product.  Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

400.    In addition to the injuries incurred as a result of Defendants' predicate acts themselves, Defendants' investments of their racketeering proceeds in 2seventy bio have, to date, helped protect Defendants from liability to SRT and disrupt any monetary judgements against bluebird. As set forth above, 2seventy bio benefits from the infusion of income procured through Defendants' racketeering activities.

401.    Because of Defendants' violations of 18 U.S.C. § 1962(a), Defendants are liable to SRT for three times the damages SRT has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### Count III: Violation of 18 U.S.C. § 1962(b)

402.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

403.    18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).

404.    As discussed above, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

405.    Defendants' activities include at least two acts of racketeering activity which occurred after November 2, 2020. Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

406.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

407.   Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird and maintain control of the Leschly enterprise.

408.   Another such predicate act occurred on December 1, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. §. 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

409.   Another such predicate act occurred on December 23, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

410.   Another such predicate act occurred on August 19, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and

proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

411.     Another such predicate act occurred on October 28, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

412.     Another such predicate act occurred on May 12, 2023, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

413.     Defendants used the pattern of racketeering to acquire and maintain, directly and indirectly, an interest in and control of the Leschly Enterprise.  For example, Defendants used the pattern of racketeering activity to acquire and maintain interest in and control over the BB305 Vector operations, bluebird, and 2seventy.

414.     As discussed above, the Leschly Enterprise is engaged in, and the activities of which affect, interstate and foreign commerce.

415.     As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.  But for Defendants' actions, (i) SRT would have remained ahead of bluebird in the relevant market; (ii) SRT's lentiviral vector drug product would have commercially launched ahead of bluebird and with orphan drug designation; (iii) SRT's competing lentiviral vector gene therapy treatments would enter the market much sooner than now anticipated; and (iv) SRT would have obtained a majority of the market share because the cost of SRT's TNS9 drug product is over $2 million dollars less than the cost of bluebird's BB305 drug product.  Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

416.     In addition to the injuries incurred as a result of Defendants' predicate acts themselves, Defendants' investments of their racketeering proceeds in 2seventy bio have, to date, helped protect Defendants from liability to SRT and disrupt any monetary judgements against bluebird. As set forth above, 2seventy bio benefits from the infusion of income procured through Defendants' racketeering activities.

417.     Because of Defendants' violations of 18 U.S.C. § 1962(b), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## Count IV: Violation of 18 USC §1962(d)

418.     SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

419.     18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section" 18 U.S.C. § 1962(d).

420.     As discussed above, the Defendants violated 18 U.S.C. § 1962(a), (b), and (c).

421.    As discussed above, the Defendants conspired to violate 18 U.S.C. § 1962(a), (b), and (c).

422.    As discussed above, the Defendants agreed to facilitate the operation of the Leschly Enterprise through a pattern of racketeering activity.  Furthermore, and as discussed above, the Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme.  This includes a pattern of mail and wire fraud, theft of trade secrets, and transport/receipt of stolen goods.

423.    Defendants' activities include at least two acts of racketeering activity which occurred after November 2, 2020.  Defendants' conduct constitutes a "pattern" of racketeering activity established after November 2, 2020 under 18 U.S.C. § 1961(5).

424.    One such act took place in 2020, when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, falsely and fraudulently executed and transmitted the Settlement Agreement using interstate wires.

425.    Another such act took place in 2021 when Defendants, in furtherance of the activities, purpose, and scheme of the Leschly Enterprise, fraudulently created and spun off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

426.    Another such predicate act occurred on December 1, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. §. 1001 and involved the use of interstate wires.  As a direct

and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

427.    Another such predicate act occurred on December 23, 2021, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

428.    Another such predicate act occurred on August 19, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

429.    Another such predicate act occurred on October 28, 2022, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

430.    Another such predicate act occurred on May 12, 2023, when in conspiracy with the Leschly Enterprise, Thompson directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit the TNS9 IND Form with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation, which was done in violation of 18 U.S.C. § 1001 and involved the use of interstate wires.  As a direct and proximate consequence of this particular unlawful action and conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property.

431.    Defendants actions constitute a conspiracy to violate 18 U.S.C. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

432.    As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, SRT has been injured in its business and property, causing SRT to suffer monetary damages in excess of $1 billion, said damages to be proven at the time of trial.  But for Defendants' actions, (i) SRT would have remained ahead of bluebird in the relevant market; (ii) SRT's lentiviral vector drug product would have commercially launched ahead of bluebird and with orphan drug designation; (iii) SRT's competing lentiviral vector gene therapy treatments would enter the market much sooner than now anticipated; and (iv) SRT would have obtained a majority of the market share because the cost of SRT's TNS9 drug product is over $2 million dollars less than the cost of bluebird's BB305 drug product.  Furthermore, the TNS9 Vector would have launched in place of the BB305 Vector absent Defendants' actions.

433.    In addition to the injuries incurred as a result of Defendants' predicate acts themselves, Defendants' investments of their racketeering proceeds in 2seventy bio have, to date, helped protect Defendants from liability to SRT and disrupt any monetary judgements against

bluebird. As set forth above, 2seventy bio benefits from the infusion of income procured through Defendants' racketeering activities.

434. Because of Defendants' violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF: ANTITRUST

### Count V: Monopolization In Violation Of Section 2 Of The Sherman Act

435. SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

436. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

437. The relevant market for purposes of this count is lentiviral vector gene therapy treatments for Beta Thalassemia in the United States. Bluebird announced FDA priority review of its SCD product, lovotibeglogene autotemcel, with a PDUFA date of December 20, 2023.

438. Defendants, by and through bluebird, have monopoly power with respect to lentiviral vector gene therapy treatments for Beta Thalassemia and SCD in the United States.

439. Defendants obtained their monopoly power in 2022 with the commercial launch of bluebird's Zynteglo (BB305) in the United States.

440. With the commercial launch Zynteglo (BB305), Defendants have 100% market share for lentiviral vector gene therapy treatments for Beta Thalassemia in the United States.

441. Due to Defendants' anticompetitive conduct, there is no alternative lentiviral vector gene therapy treatment for Beta Thalassemia in the United States.

442.    Non-gene therapy treatments for Beta Thalassemia are not substitutable with lentiviral vector gene therapy treatments for Beta Thalassemia.  For example, the non-gene therapy treatment of bone marrow transplant risks rejection, graft-versus-host disease, compromised immune system, and other serious or fatal complications.  Because lentiviral vector gene therapy alters the patient's own cells, these risks are substantially reduced.  Likewise, the non-gene therapy treatment of transfusion and chelation therapy merely delay progression of Beta Thalassemia and risk organ damage (*e.g.*, due to iron buildup), pain, and death (*e.g.*, due to organ failure caused by iron buildup).  Furthermore, the decision to perform lentiviral vector gene therapy for the treatment of Beta Thalassemia is made by a doctor (or team of doctors) because it is in the best interest of the patient despite non-gene therapy treatments.  If faced with a price increase to the already inflated $2.8 million Zynteglo (BB305) price, patients would be forced to accept the increased price.

443.    Many Beta Thalassemia patients are minors, due to the genetic origin of the disease and shortened lifespan.  As such, parents make the ultimate decision of whether to accept the treatment that lentiviral vector gene therapy offers or proceed with stopgap (blood transfusion and chelation) or risky (bone marrow transplant) non-gene therapy approaches.  With blood transfusion and chelation, quality of life suffers and many do not survive past age 30.  With bone marrow transplant, overall survival rates for children have been reported as 82% (*i.e.*, about one in five children die).  Ex. N.  This number drops as the patient transitions to adulthood after living with the disease, with a survival rate of 66% being reported (*i.e.*, about one in three die).  *Id.*  Estimated survival for the lentiviral vector gene therapy treatment is substantially better, with no deaths being reported in clinical trials. This is not surprising, as the lentiviral vector gene therapy alters the

patient's own cells and thereby avoids major risks from transplanting donor cells (*e.g.*, rejection, graft-versus-host disease, compromised immune system, *etc.*)

444.    Leveraging their monopoly power, bluebird charges a supracompetitive price for Zynteglo (BB305).  Defendants directed and caused bluebird to charge $2.8 million per treatment for Zynteglo (BB305) in the United States.

445.    The $2.8 million per treatment cost of Zynteglo (BB305) makes it one of the most expensive medical treatments in the United States.

446.    In the presence of competition, the price for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States would be less than $1 million.  For example, SRT's lentiviral vector gene therapy for the treatment of Beta Thalassemia would be approximately $700,000 per treatment (which is on par with a bone marrow transplant used in the inferior and non-gene therapy treatment for Beta Thalassemia).

447.    In fact, bluebird raised the price of its lentiviral vector gene therapy for Beta Thalassemia in response to the successful anticompetitive tactics against SRT.  In 2013, when SRT was ahead of bluebird, the cost of bluebird's Zynteglo (BB305) treatment for Beta Thalassemia was proposed to be priced around $400,000 to $500,000 per treatment.  In 2013, J.P. Morgan called "$500,000" a "conservative pricing assumption," assumed a "base case price of $750,000 per treatment," and noted a "more aggressive pricing assumption of $1 million per treatment."  In 2018, William Blair forecast a price of $550,000 for therapy as a blended average of the U.S. and EU.  "A more modest price of $200,000 is predicted for the rest of the world for the therapy." With respect to the inferior transplant approach, conventional stem cell transplants cost anywhere between $500,000 and $1 million, while also carrying the risk of having to treat adverse events

such as graft versus host disease for example. Accordingly, back in 2013, bluebird attempted to competitively price its treatment against SRT's treatment.

448.     In light of Defendants unlawful acts against SRT and unlawful anticompetitive tactics, Defendants caused bluebird to increase the price of the Zynteglo (BB305) treatment for Beta Thalassemia to $2.8 million at launch in 2022. This is a 373% increase over the "base" price of $750,000 and 280% over even the most "aggressive" $1 million per treatment suggested by J.P. Morgan.

449.     Defendants knew that SRT's offering of a $700,000 lentiviral vector gene therapy for the treatment of Beta Thalassemia (on par with the cost of a bone marrow transplant) would prevent bluebird from charging the supracompetitive price of $2.8 million per treatment. As such, Defendants have used anticompetitive tactics to unlawfully monopolize, delay SRT, and increase the price of lentiviral vector gene therapy for the treatment of Beta Thalassemia by millions of dollars.

450.     The market for lentiviral vector gene therapy treatments for Beta Thalassemia in the United States is subject to high barriers to entry. Developing a lentiviral vector gene therapy treatment for Beta Thalassemia requires a substantial investment of time and resources, including manufacturing, clinical trials, and review by the FDA for safety and efficacy.

451.     Defendants, by and through bluebird, obtained and maintained this market power with respect to lentiviral vector gene therapy treatments for Beta Thalassemia willfully and not as a consequence of superior product, business acumen, or historic accident.

452.     Defendants, by and through bluebird, engaged in anticompetitive conduct through, *inter alia*, (i) bluebird's continued use of SRT's lentiviral vector design and purification process after November 2, 2020 that was misappropriated and stolen from SRT prior to November 2, 2020;

(ii) Defendants' conspiracy to shut down SRT as a competitor of bluebird, and obtain FDA approval for the BB305 Vector with market exclusivity ahead of SRT; (iii) the fraudulent inducement of SRT in connection with the Settlement Agreement; (iv) bluebird's submitting materially false information about the TNS9 drug product to the FDA in violation of 18 U.S.C. § 1001 to purposely delay SRT's gene therapy treatments into the market; (v) Thompson's improper control over and direction of MSK to unlawfully delay SRT's competing lentiviral vectors, which are clinically more efficacious, safer, and more affordable for patients than bluebird's BB305 Vector; and (vi) other acts of anticompetitive conduct discussed above.

453.   As discussed above, Defendants misappropriated SRT's trade secrets in the development of BB305.  Even after the Settlement Agreement, Defendants caused bluebird to continue to possess and use SRT's trade secrets (without permission) to complete development and commercially manufacture the clinical grade BB305 Vector.  This includes at least trade secret information about the TNS9 vector design and purification process.  For example, the TNS9 purification process solved Defendants' inability to manufacture clinical grade BB305 suitable for commercial launch.  Despite the Settlement Agreement not authorizing use of SRT's trade secrets, Defendants are using SRT's trade secrets and proprietary vector purification process to manufacture competing BB305 vector for commercial use.

454.   To the extent the release provision of the Settlement Agreement is voidable due to Defendants' fraudulent inducement of SRT, Defendants' theft of SRT's trade secrets is another unlawful anticompetitive action.

455.   As discussed above, Defendants have been interfering with SRT's business relationships and delaying SRT's competing lentiviral vector gene therapy treatments for Beta Thalassemia.  For example, MSK worked with SRT to develop lentiviral vectors gene therapy

treatments for Beta Thalassemia that compete against the BB305 Vector.  Defendants by and through Thompson (then and former CEO of MSK) have directed and caused MSK to go from supporting a competing lentiviral vector, which MSK co-developed with SRT, to delaying development of that same competing lentiviral vector.  After November 2, 2020, Defendant Thompson caused and directed MSK to withhold and delay providing material regulatory documents and materials to SRT and delayed SRT's ability to continue with the development of competing lentiviral vectors.  In addition, Defendants (working with Thompson as their inside man at MSK) directed and caused MSK to submit materially false information about the TNS9 drug product to the FDA in violation of 18 U.S.C. § 1001 to purposely delay SRT's gene therapy treatments into the market, which are clinically more efficacious, safer, and more affordable for patients than bluebird's BB305 Vector.

456.    Current and former employees of MSK have informed SRT that Thompson continues to be in control over MSK's interactions with SRT and employees involved in the TNS9 IND submissions to the FDA.

457.    Leschly was the ringleader.  Leschly was a partner at Third Rock and founded bluebird out of Genetix.  Leschly was assisted by Reilly (another partner at Third Rock who became Chief Medical Officer at bluebird), Finer (Chief Scientific Officer at bluebird), and Thompson (former CEO of MSK).  Leschly, Reilly, Finer, Thompson bluebird, and Third Rock conspired to take and use SRT's technology and sabotage SRT's efforts.  Thompson (former CEO of MSK) was their inside-man at MSK, and Thompson used his position to advance Defendants' conspiracy to shut down SRT as a competitor of bluebird, obtain FDA approval for the BB305 Vector with market exclusivity ahead of SRT, fraudulently induce SRT to execute the Settlement Agreement, preclude subsequent enforcement damages owed to SRT by the fraudulent creation of

2seventy, and submit materially false information about the TNS9 drug product to the FDA in violation of 18 U.S.C. § 1001 to purposely delay SRT's gene therapy treatments into the market. Thompson, as their inside-man at MSK, used his position to advance Defendants' efforts to sabotage SRT's TNS9 drug product and launch the BB305 drug product to the detriment of SRT and MSK's competing programs.  For example, there was no procompetitive reason for (i) MSK to submit false information to the FDA about the TNS9 drug product; (ii) Defendants to interfere with the development of SRT's TNS9 drug product; (iii) Defendants to delay SRT's competing lentiviral vectors, which are clinically more efficacious and safer, and more affordable for patients; and (iv) Defendants to direct and cause MSK to enter into a blanket indemnification of competitor bluebird against SRT for even willful misconduct of bluebird.  The spin-off of 2seventy was done to protect the Leschly Enterprise and carry on the anticompetitive work, by acquiring large assets (*e.g.*, $480 million in cash), personnel, and rights to BB305 from bluebird to protect the ill-gotten gains and maintain the monopoly should bluebird be sued.  Given that 2seventy was ostensibly an oncology spinout of bluebird and on paper two separate companies, there was no pro-competitive justification for bluebird to provide 2seventy with rights in the BB305 drug product (a non-oncology drug product —rather, this was part of the anticompetitive tactics of Defendants to maintain their monopoly.  Defendants are part of a common effort to sabotage SRT, eliminate market competition, and protect the BB305 drug product from competition in the market in order to advance their personal financial gain.

458.   Defendants' anticompetitive acts are an abuse of Defendant bluebird's monopoly power in the relevant market and establish a violation of Section 2 of the Sherman Act.

459.    The cumulative anticompetitive acts of Defendants are an abuse of Defendant bluebird's monopoly power in the relevant market and establish a violation of Section 2 of the Sherman Act.

460.    SRT has been harmed by Defendants' anticompetitive acts, including through the delay of launching its lentiviral vector gene therapy treatments for Beta Thalassemia at a substantially lower cost than Zynteglo (BB305).

461.    Furthermore, Defendants by and through bluebird have improperly locked in Zynteglo (BB305) using orphan drug designation by the FDA.    But for Defendants' anticompetitive conduct, SRT's competing lentiviral vector drug product would have launched ahead of bluebird's Zynteglo (BB305) drug product.

462.    SRT developed a lentiviral vector gene therapy for the treatment of Beta Thalassemia with Orphan Drug Designation ahead of bluebird, and SRT's gene therapy treatment used in Beta Thalassemia patients performed well in clinical trials—also ahead of bluebird's clinical trials.  SRT would have been on the market in the United States with this lentiviral vector gene therapy for the treatment of Beta Thalassemia but for Defendants' anticompetitive conduct.

463.    SRT developed an improved lentiviral vector (with an insulator) gene therapy for the treatment of Beta Thalassemia, which is purported to be clinically safer for patients.  The insulator is a safety mechanism, designed to reduce the risk of cancer present with gene therapy. SRT would have been on the market in the United States with this lentiviral vector gene therapy for the treatment of Beta Thalassemia but for Defendants' anticompetitive conduct.

464.    Defendants, by and through bluebird, injure competition, including SRT, by (i) excluding alternative lentiviral vector gene therapy treatments for Beta Thalassemia, and (ii) raising the cost of lentiviral vector gene therapy for the treatment of Beta Thalassemia to exorbitant

amounts (*e.g.*, $2.8 million per treatment).  As a direct and proximate result of Defendants' unlawful monopolization, patients, insurance providers, and other payors must pay exorbitant amounts (*e.g.*, $2.8 million per treatment) to bluebird instead of substantially lower amounts (and on par with existing, but inferior, non-gene therapy treatments, approximately $700,000) to SRT.

465.    Defendants' anticompetitive conduct delays SRT's launch of a competing product and obtaining access to competitive resources (such as MSK and other institutions).

466.    The anticompetitive injury also extends to downstream parties, such as patients, insurance providers, and other payors in the form of increased prices, reduced innovation, and effectively no choice between a painful and life threatening disease on the one hand and Zynteglo (BB305) on the other.

467.    Defendants have leverage over competitors and suppliers it would not possess but for its anticompetitive tactics.

468.    Absent Defendants' anticompetitive conduct, SRT would have launched with an alternative vector at substantially lower prices (on par with existing, but inferior, non-gene therapy treatments, approximately $700,000).

469.    Absent Defendants' anticompetitive conduct, SRT would have treated the patients treated or being treated with Zynteglo (BB305) for over two million dollars less, including patients residing and receiving treatments in Massachusetts.  Those patients, once treated, are unavailable to SRT.  This represents a loss in revenue for SRT.

470.    Absent Defendants' anticompetitive conduct, SRT would have treated patients who will be treated with Zynteglo (BB305), including patients residing and receiving treatments in Massachusetts.  This represents a loss in revenue for SRT.

471.    Absent Defendants' anticompetitive conduct, SRT would have treated patients who would benefit from lentiviral vector gene therapy but are unable to access or pay Zynteglo (BB305)'s $2.8 million price tag, including patients residing and receiving treatments in Massachusetts.  This represents a loss in revenue for SRT.

472.    Absent Defendants' anticompetitive conduct, SRT would have treated patients who would benefit from lentiviral vector gene therapy but have died from Beta Thalassemia or related complications, including patients residing and receiving treatments in Massachusetts.   This represents a loss in revenue for SRT.

473.    Absent Defendants' anticompetitive conduct, SRT would have had first mover advantage and additional time treating patients before additional competition entered the market through normal competitive means.  This represents a loss in revenue for SRT.

474.    Because SRT's price is approximately $700,000 and on par with the cost of the existing (but inferior) bone marrow transplants, SRT would be able to reach a wider market and more favorable payor coverage (*e.g.*, insurance providers who are already used to paying for bone marrow transplants).

475.    Enjoining Defendants from further anticompetitive conduct is in the public interest. Beta Thalassemia is a serious disease and is responsible for the deaths of children and adults, either through natural progression or through complications in treatment (*e.g.*, one in five children and one in three adults not surviving bone marrow transplant).  Gene therapy offers many of these patients, children and adults, and their families hope for a normal life.  SRT delivered, with a viable treatment years prior to bluebird that cost on par with a bone marrow transplant.  Clinical trials were favorable.  But those efforts at FDA approval were sabotaged by Defendants so that they could get to market later, but first and with a supracompetitive $2.8 million dollar per treatment

price tag.  This is not how competition should work: SRT and Defendants should have been in a legal and fair race to launch a safe and effective product.  Instead, Defendants unlawfully sabotaged SRT's competing lentiviral vector gene therapy treatment after bluebird's BB305 drug product was far behind SRT's TNS9 drug product.  Unless Defendants' anticompetitive tactics are stopped, both Beta Thalassemia patients, the medical community, and SRT will continue to be harmed.

476.    To remedy and prevent further harm to SRT's business and property and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

**Count VI: Attempted Monopolization In Violation Of Section 2 Of The Sherman Act**

477.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

478.    The anticompetitive actions described in Count V above also establish attempted monopolization in violation of Section 2 of the Sherman Act.

479.    The relevant market is lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States.

480.    The market for lentiviral vector gene therapy treatments for Beta Thalassemia in the United States is subject to high barriers to entry.  Developing lentiviral vector gene therapy treatments for Beta Thalassemia requires a substantial investment of time and resources, including manufacturing, clinical trials, and review by the Food and Drug Administration (FDA) for safety and efficacy.

481.    As discussed above, Defendants engaged in predatory and anticompetitive conduct.

482.    As discussed above, Defendants acted with specific intent to monopolize.

483.    Defendants have a dangerous probability of success in achieving monopoly power.

484.    To the extent Defendants deny that they achieved monopoly power in lentiviral vector gene therapy for the treatment of Beta Thalassemia, there is a dangerous probability of success in achieving monopoly power with the launch of Zynteglo (BB305) in 2022.

485.    As discussed above, Defendants have 100% of the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States. Defendants' anticompetitive conduct has delayed entry of a competing lentiviral vector to Zynteglo (BB305).

486.    As discussed above, Defendants have demonstrated the ability to charge prices ($2.8 million) above that which would exist in a competitive market (*e.g.*, matching SRT's approximate $700,000 price) for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States.

487.    Defendants have used anticompetitive efforts to delay SRT from entering the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States. By using anticompetitive efforts to delay SRT from entering the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States with a substantially more affordable product, Defendants have a dangerous probability of success in achieving monopoly power to the extent not already attained.

488.    SRT has been injured by Defendants' anticompetitive conduct, including through the delayed launch of a competing Beta Thalassemia lentiviral vector gene therapy and associated loss in revenue to SRT.

489.    To remedy and prevent harm to SRT's business and property, including its competing treatment, and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

**Count VII: Attempted Monopolization In Violation Of Section 2 Of The Sherman Act**

490.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

491.    Defendants have also violated Section 2 of the Sherman Act with respect to the market for lentiviral vector gene therapy for the treatment of SCD in the United States.

492.    The market for lentiviral vector gene therapy treatments for SCD in the United States is subject to high barriers to entry.  Developing a lentiviral vector gene therapy treatment for SCD requires a substantial investment of time and resources, including manufacturing, clinical trials, and review by the FDA for safety and efficacy.

493.    Beta Thalassemia and SCD share a similar genetic origin. Specifically, alterations in the globin gene result in degraded production (Beta Thalassemia) and/or polymerization (Sickle Cell Disease) of the resultant hemoglobin.

494.    Non-gene therapy treatments for SCD are not substitutable with gene therapy treatments for SCD. Non-gene therapy treatments for SCD focus on management or bone marrow transplant. Management still results in a substantially reduced lifespan and quality of life issues, and bone marrow transplant carries additional risks (*e.g.*, rejection, graft versus host disease, compromised immune system, *etc.*). Because gene therapy alters the patient's own cells, these risks are substantially reduced.

495.    Defendants' BB305 introduces a replacement beta globin gene, and is therefore a treatment for both Beta Thalassemia and SCD.

496.    SRT's competing gene therapies introduce a replacement beta globin gene, and is therefore a treatment for Beta Thalassemia and SCD.

497.    Because of this overlap, Defendants' anticompetitive conduct against SRT (such as discussed in Counts V and VI above) is also anticompetitive conduct with respect to the lentiviral

vector gene therapy market for lentiviral vector gene therapy for the treatment of SCD in the United States.

498.    Accordingly, Defendants have engaged in anticompetitive conduct with respect to the market for lentiviral vector gene therapy for the treatment of SCD in the United States.

499.    Defendants launched BB305 as a treatment for Beta Thalassemia in the United States in 2022. Defendants are currently seeking approval to launch BB305 for the treatment of SCD in the United States. In 2023, the FDA undertook an expedited review of BB305 for the treatment of SCD in the United States.

500.    On June 21, 2023, bluebird announced FDA priority review of "lovo-cel" (BB305) for the treatment of SCD. Ex. O.

501.    Defendants anticipate an early 2024 commercial launch for their BB305 gene therapy for the treatment of SCD in the United States. Ex. P.

502.    Defendants have the specific intent to monopolize the market for lentiviral vector gene therapy for the treatment of SCD in the United States, similar to the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States.

503.    There is a dangerous probability of success in achieving monopoly power. By engaging in anticompetitive conduct, Defendants have delayed SRT's lentiviral vector gene therapy (which applies to both Beta Thalassemia and SCD).

504.    Defendants achieved and maintained 100% of the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States upon launch. Defendants are likely to obtain 100% of the market for lentiviral vector gene therapy for the treatment of SCD in the United States upon launch since Defendants, through anticompetitive conduct, delayed SRT. By launching first, Defendants will also have a first mover advantage.

505.    Because it is the same treatment, Defendants are likely to charge the same exorbitant prices for their BB305 gene therapy for the treatment of SCD in the United States as they currently do for their BB305 gene therapy for the treatment for Beta Thalassemia in the United States.

506.    Absent Defendants' anticompetitive conduct, SRT would have launched with an alternative vector at a substantially lower price in the market for lentiviral vector gene therapy for the treatment of SCD in the United States.

507.    Defendants have used anticompetitive efforts to delay SRT from entering the market for lentiviral vector gene therapy for the treatment of SCD in the United States. By using anticompetitive efforts to delay SRT from entering the market for lentiviral vector gene therapy for the treatment of SCD in the United States with a substantially lower cost product, Defendants have a dangerous probability of success in achieving monopoly power.

508.    SRT has been injured by Defendants' anticompetitive conduct, including through the delayed launch of a competing SCD lentiviral vector gene therapy and associated loss in revenue to SRT.

509.    To remedy and prevent harm to SRT's business and property, including its competing treatment, and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

**Count VIII: Conspiracy To Monopolize In Violation Of Section 2 Of The Sherman Act**

510.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

511.    Defendants form a combination and conspiracy to monopolize the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States.

512.    Defendants have agreed, between and among each Defendant, to monopolize the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States.

513.    Defendants have engaged in overt acts in furtherance of the conspiracy, for example the anticompetitive conduct discussed above (*e.g.*, Counts V-VI) and commercial launch of Zynteglo (BB305) in the United States.

514.    Defendants had specific intent to monopolize the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia in the United States. This is evidenced by at least the anticompetitive conduct discussed above (*e.g.*, Counts V-VI). Defendants goal was not simply to gain market share, but to eliminate the competition and obtain total monopoly through improper means.

515.    To remedy and prevent harm to SRT's business and property, including its competing treatment, and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

**Count IX: Conspiracy To Monopolize In Violation Of Section 2 Of The Sherman Act**

516.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

517.    Defendants form a combination and conspiracy to monopolize the market for lentiviral vector gene therapy for the treatment of SCD in the United States.

518.    Defendants have agreed, between and among each Defendant, to monopolize the market for lentiviral vector gene therapy for the treatment of SCD in the United States.

519.    Defendants have engaged in overt acts in furtherance of the conspiracy, for example the anticompetitive conduct discussed above (*e.g.*, Counts V-VIII) and by seeking expedited review of BB305 for commercial launch in the United States.

107

520.    Defendants had specific intent to monopolize the market for lentiviral vector gene therapy for the treatment of SCD in the United States. This is evidenced by at least the anticompetitive conduct discussed above (*e.g.*, Counts V-VIII). Defendants goal was not simply to gain market share, but to eliminate the competition and obtain total monopoly through improper means.

521.    To remedy and prevent harm to SRT's business and property, including its competing treatment, and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

### Count X: Contract, Combination, and Conspiracy in Restraint of Trade or Commerce In Violation Of Section 1 Of The Sherman Act

522.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

523.    Section 1 of the Sherman Act makes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" unlawful.

524.    The TNS9 Vector was co-developed by SRT and MSK.  The TNS9 Vector (*i.e.*, TNS9 drug product) is and always has been a competing drug product to the BB305 Vector.  After execution of the Settlement Agreement—through Thompson's direction—MSK continued to control the IND for the TNS9 drug product and submit amendments and updates for the TNS9 IND to the FDA.

525.    The Defendants Leschly, Reilly, Finer, bluebird, Third Rock, and 2seventy (*i.e.*, Leschly Arm's BB305 Vector) formed an "agreement" with MSK through Thompson's improper influence and control as CEO of MSK (*i.e.*, Thompson Arm's TNS9 Vector) that unreasonably restrained trade and affected interstate commerce.

526.    The Leschly Arm (*e.g.*, BB305 Vector) and Thompson Arm (*e.g.*, the TNS9 Vector) constitute at least two separate legal entities.  Each are independent economic actors with separate economic interests.  Ostensibly, they are two separate groups with competing drug products (BB305 Vector in the Leschly Arm and TNS9 Vector in the Thompson Arm).

527.    The agreement between the Leschly Arm and Thompson Arm eliminates independent centers of decision making from the marketplace.  Through Thompson's unlawful actions, the Leschly Arm and Thompson Arm agreed that there would be no independence of the two lentiviral drug products.  Instead, Thompson unlawfully and improperly used MSK to support the Leschly Arm's BB305 and engaged in conduct to sabotage, shelve, and/or delay the TNS9 drug product in the market.

528.    Leading up to and after the launch of BB305 (known as Zynteglo) in 2022, Thompson caused MSK to sabotage and delay SRT's competing lentiviral vectors for the benefit of Defendants.

529.    The Leschly Arm and the Thompson Arm of the conspiracy engaged in concerted actions, which restrained trade or commerce in the U.S., which includes conspiring to prevent and/or sabotage the TNS9 lentiviral vector gene therapies for the treatment of Beta Thalassemia and SCD from launching in competition with the Leschly Arm's BB305.

530.    For example, Defendants engaged in parallel conduct, including the Leschly Arm's decision to launch the BB305 drug product and the Thompson Arm's sabotage and delay of the TNS9 drug product.

531.    The Leschly Arm and Thompson Arm also had a motive and opportunity to conspire.  As discussed above, Thompson was CEO of MSK and an employee with shared business interests with Third Rock.  For example, within days of Third Rock contributing additional funding

to Thompson's Agios Pharma business, MSK (where Thompson was CEO) entered into a highly abnormal contract to indemnify bluebird for even willful misconduct against SRT with no legitimate business purpose for MSK. By delaying SRT's competing lentiviral vector drug product, the Thompson Arm gains personal benefits for its CEO and employee, while the Leschly Arm gets monopoly power over the market for lentiviral vector gene therapy for the treatment of Beta Thalassemia and SCD in the United States.

532.    After execution of the Settlement Agreement, Thompson continued to work with the Leschly Enterprise, and in furtherance of additional unlawful schemes, Thompson directed and caused MSK to delay providing regulatory documents and materials to SRT in connection with SRT's competing lentiviral vector gene therapy treatment to prevent and/or delay market entry of a competing treatment to bluebird's gene therapy treatments.

533.    After execution of the Settlement Agreement, in connection with an anticompetitive agreement with the Leschly Arm, Thompson directed and caused MSK to submit false information about the TNS9 drug product to the FDA to prevent and/or delay market entry of a competing treatment to bluebird's gene therapy treatments.

534.    The Leschly Arm's Zynteglo (BB305) product launched in the United States in August 2022. While Thompson stepped down as CEO of MSK in September 2022, certain current or former employees of MSK informed SRT that Thompson continued to control MSK's decisions about the lentiviral vector gene therapy program, including the TNS9 Vector. Thompson accomplished the chief goal of the conspiracy—launching BB305 without competition—and then remained operating behind the scenes to prevent competition from materializing.

535.    There is a lack of economic justification for the Leschly Arm and Thompson Arm's behavior absent a conspiracy.  In the absence of Thompson's unlawful control, MSK has no

110

legitimate interest in the success of the BB305 drug product.  The conspiracy for the Leschly Arm and the Thompson Arm to sabotage, shelve, and sabotage the competing TNS9 drug product was contrary to MSK's interests.

536.    The changes to regular business practices also evidence a conspiracy.  Per the Settlement Agreement, MSK was to cooperate with SRT with respect to TNS9 and modified vectors related thereto.  Thompson directed and caused MSK to withhold critical TNS9 IND documents from SRT, and also misrepresent their existence of critical TNS9 IND documents submitted to the FDA.

537.    The Defendants' lentiviral vector "agreement" unreasonably restrains trade.  For example, by agreeing to advance BB305 and delay SRT's competing lentiviral vector drug product, the Defendants' "agreement" was an "agreement not to compete" with the BB305 drug product.  Furthermore, Defendants' "agreement" allocated customers (*i.e.* patients) and the market for lentiviral vector gene therapy treatments to bluebird (and the Leschly Arm) with respect to such gene therapy treatments for Beta Thalassemia and SCD in the United States. In the absence of Defendants' "agreement," the BB305 drug product would have remained in competition with the TNS9 drug product.

538.    Defendants' anticompetitive conduct also substantially suppresses or destroys competition.  For example, SRT's TNS9 drug product would have been available for the treatment of Beta Thalassemia and SCD ***first*** but for the anticompetitive "agreement" of the Leschly Arm and Thompson Arm.  SRT's TNS9 drug product is over $2 million dollar lower in price for customers (*e.g.*, patients, third-party payors).

539.    As a result of the anticompetitive "agreement" between the Leschly Arm and the Thompson Arm, the BB305 drug product has obtained 100% of the market for lentiviral vector

gene therapy for the treatment of Beta Thalassemia and is poised to obtain 100% of the market for lentiviral vector gene therapy for the treatment of SCD.  This has enabled Defendants to charge patients a supracompetitive price ($2.8 million per treatment) for the BB305 drug.  But for Defendants' anticompetitive conduct, SRT would have offered patients a competing lentiviral vector gene therapy treatment at a substantially lower (approximately $700,000 per treatment) price-tag.  SRT and Defendants would have shared the relevant market and fairly competed in the market but for the "agreement" between the Leschly Arm and the Thompson Arm.

540.    There was no procompetitive justification for the "agreement" between the Leschly Arm and Thompson Arm.  MSK has no rights in the BB305 Vector, and, therefore, stands not to make any money or prestige by the success of the BB305 drug products.  To the contrary, MSK had been working with SRT on competing lentiviral vectors and, without Thompson's unlawful control, MSK had every reason to want the TNS9 Vector to succeed given that the TNS9 Vector was co-developed by and involved patents invented by MSK's scientists.  However, Thompson (then CEO of MSK and current employee of MSK) abused his position at MSK to disrupt the competing lentiviral vectors in favor of the Leschly Arm's BB305 Vector.

541.    Even if there was some procompetitive benefit, the anticompetitive effect of the Defendant's conduct outweighs any procompetitive benefit.  For example, the BB305 drug product (i) sells for $2.8 million per treatment; (ii) has 100% market share in lentiviral vector gene therapy treatment of Beta Thalassemia; and (iii) is poised to do the same for the market for lentiviral vector gene therapy treatment of SCD.  Accordingly, this has resulted in harm to SRT in the form of lost revenue and the public (*e.g.*, patients, insurance payors, Medicaid) in terms of supracompetitive prices.

542.     Defendants' challenged conduct affects interstate commerce.  For example, the Leschly Arm is based in Massachusetts, MSK is based in New York, and SRT is based in Florida. Furthermore, the markets for lentiviral vector gene therapy for Beta Thalassemia and SCD are nationwide.

543.     SRT has been harmed by the violation of Section 1 of the Sherman Act.  For example, SRT was collaborating with MSK in developing gene therapies for the treatment of Beta Thalassemia and SCD.  The agreement between the Leschly Arm and Thompson Arm not to compete and allocate lentiviral vector gene therapy for the treatment of Beta Thalassemia and SCD to the Leschly Arm had the purpose and effect of delaying SRT's market entry and thus costing SRT its first mover advantage and revenue (*e.g.*, revenue derived from patients being treated with BB305).  But for the violation, SRT would have been the first mover, in the relevant market much sooner, and obtained revenue derived from the treatment of patients with SRT's lentiviral vector gene therapy instead of BB305.  SRT's injuries flow directly from and are proximately caused by Defendants' unlawful conduct.

544.     To remedy and prevent harm to SRT's business and property, including its competing treatment, and prevent further harm to competition and consumers more generally, SRT brings this action for treble damages, declaratory relief, and injunctive relief.

### THIRD CLAIM FOR RELIEF: FRAUDULENT INDUCEMENT

**Count XI: Defendants Fraudulently Induced SRT To Include The Mutual Release and Dispute Resolution Provisions In The Settlement Agreement**

545.     SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

546.     The Settlement Agreement is governed by New York law.  Under New York law, fraudulently inducing SRT to include the Release and Dispute Resolution Provisions of the

Settlement Agreement voids the Release provision in the Settlement Agreement as to bluebird and related entities as recited in the Settlement Agreement.

547.    As previously discussed, in 2020, prior to execution of the Settlement Agreement, Defendants made materially false representations that caused SRT to agree to the Release and Dispute Resolution provisions in the Settlement Agreement.

548.    As previously discussed, in 2020, prior to execution of the Settlement Agreement, Defendants made false statements and omissions of material facts with the intent of inducing SRT into entering into the Dispute Resolution provision.

549.    Defendants knew that such representations were false and that SRT would reasonably rely on Defendants' false representations.

550.    Defendants made false statements and omissions of material facts with the intent of inducing SRT into entering into the Dispute Resolution provision.

551.    SRT reasonably relied on Defendants' misrepresentations and omissions, which caused SRT to execute the Settlement Agreement with bluebird and the related bluebird entities as recited in the Settlement Agreement.

552.    As a result of material omissions and false representations made by Defendants, SRT gave up viable claims and causes of action (both asserted and non-asserted) against Third Rock and Leschly in the Massachusetts Litigation that arose from the beginning of the world to the parties' execution of the Mutual Release and Dispute Resolution provisions.

553.    As a result of Defendants' actions, SRT has been harmed and damaged.  For example, as a result of Defendants' material omissions and false representations, SRT incurred substantial legal fees in connection with asserting its legal rights under the Settlement Agreement.

554.    SRT is also entitled to recover punitive damages because, in addition to Defendants knowingly committing a fraudulent inducement upon SRT, Defendants also committed a fraud upon patients and the respective courts, and, therefore, directed these actions not only against SRT but the public generally, evincing a high degree of moral turpitude and demonstrating such wanton dishonesty to imply criminal indifference to civil obligations.

## FOURTH CLAIM FOR RELIEF: VIOLATION OF MASS GEN. LAWS CH. 93A, § 11

### Count XII: Violation of Mass Gen. Laws Ch. 93A, § 11

555.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

556.    By way of background, deceptive business practices and unlawful actions by pharmaceutical companies repeatedly have had an adverse impact on patients and individuals located in Massachusetts, by risking patient lives and costing billions to taxpayers located within Massachusetts.  For example, according to public records and publications, the U.S. Department of Justice issued a $3 billion dollar fine to SmithKline Beecham involving the drug Paxil® that was administered to patients located in Massachusetts, where the company was accused of hiding and falsifying clinical data that resulted in deaths of over 60,000 children, some of which are located in Massachusetts; and at this time the CEO of SmithKline Beecham was Jan Leschly. Deceptive business practice and unlawful actions in the pharmaceutical industry have included falsifying clinical data, sabotaging competitors with competing products, "shelving" superior and safer products and bribing doctors to prescribe drugs through commissions and kickbacks—all of which adversely impacts and harms other competing pharmaceutical companies that lawfully distribute safe, effective and lower cost treatment to patients located in Massachusetts.

557.     Mass. Gen. Laws ch. 93A, § 11 makes it unlawful to engage in an unfair method of competition or commit an unfair or deceptive act or practice, as defined by Mass. Gen. Laws ch. 93A, § 2.

558.     As defined by Mass. Gen. Laws ch. 93A, § 11, SRT engaged in trade or commerce with each of the Defendants such that SRT was acting within a "business context" with Defendants.

559.     In violation of Mass Gen. Laws ch. 93A, § 11, Defendants' unfair and deceptive business acts include fraud and conspiracy as discussed above.

560.     In addition to being unlawful, for the reasons set forth in detail above, Defendants' actions include extreme and egregious business wrongs under the totality of the circumstances.

561.     Furthermore, as evidenced above, 2seventy was fraudulently created as a spin-off of bluebird in order to deplete the assets of bluebird and, therefore, prevent SRT from recovering any monetary judgements against bluebird.

562.     At all times relevant, Defendants committed their acts of deceit and carried out their racketeering activities in the Commonwealth of Massachusetts.

563.     While located in Massachusetts, Defendants engaged in multiple unfair methods of competition and committed multiple unfair and/or deceptive acts or practices by, *inter alia*, fraudulently obtaining and sending SRT's TNS9 Vector and trade secrets embodied therein, to Germany; knowingly misrepresenting facts and their intentions, which misled SRT into executing the Settlement Agreement with bluebird and dismissing the Massachusetts Litigation against bluebird; and fraudulently creating and spinning off 2seventy to deplete the assets of bluebird in order to prevent SRT from recovering any monetary judgements award against bluebird.

564.     As a result of Defendants' multiple unfair and/or deceptive acts, and multiple unfair methods of competition, SRT has been deprived of, *inter alia*, its intellectual property, including

the value of its trade secret, and Defendants' actions have also delayed SRT's ability to obtain FDA approval with market exclusivity for a treatment that impacts Beta Thalassemia and SCD patients located in Massachusetts.  In addition, SRT has been delayed from providing a safer and a much less expensive (over $1.8 million dollars less) lentiviral vector gene therapy treatment to patients located in Massachusetts. This has deprived SRT of revenue.

565.    Furthermore, acting on the fraud committed by the Defendants, SRT gave up viable claims and causes of action (both asserted and non-asserted) against Third Rock and Leschly in the Massachusetts Litigation.

566.    In addition, SRT incurred legal expenses including, inter alia, attorneys' fees and costs, as it was forced to bring the present action as a result of Defendants' fraudulent conduct. SRT has also incurred attorneys' fees and costs related to Delaware Arbitration and the IPR proceedings. Defendants intended to cause SRT to expend fees within these previous proceedings.

567.    There is a causal connection between Defendants' actions and SRT's losses incurred in the Commonwealth of Massachusetts.  For example, Defendants' fraudulently induced SRT to dismiss its claims asserted in the Massachusetts Litigation, which resulted in a loss of monetary damages owed to SRT in excess of over 100 million as a result of Defendants Third Rock's and Leschly's intentionally misappropriation of SRT's trade secrets and other crimes against SRT.

568.    Each of Defendants' acts have engaged primarily and substantially in Massachusetts, as the majority of Defendants' deceptive acts occurred within the Commonwealth, including, inter alia, the execution of the Settlement Agreement and the spinoff of 2seventy bio; SRT was substantially deceived within Massachusetts; and the situs of much of SRT's losses occurred within Massachusetts.

569.     Third Rock aided and abetted and engaged in civil conspiracy with Leschly and 2seventy to create unfair competition, deceptive business act, and fraud against SRT within Massachusetts.

570.     As discussed, Defendants committed the majority of their deceptive acts within Massachusetts, and as a direct and proximate result of Defendants' actions, SRT was substantially deceived and acted on the deception within Massachusetts.

571.     Because of Defendants' knowing and/or willful violations of Mass. Gen. Laws ch. 93A, § 11, Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

572.     Defendants are further entitled to any equitable relief that the Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF: VIOLATION OF MASSACHUSETTS ANTITRUST ACT

### Count XIII: Violation of Mass Gen. Laws Ch. 93, § 5

573.     SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

574.     Mass. Gen. Laws ch. 93, § 5 makes it unlawful "for any person or persons to monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce in the commonwealth."

575.     Mass. Gen. Laws ch. 93, § 5 is similar to Section 2 of the Sherman Act, which makes unlawful "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." *See* 15 U.S.C. § 2.

576.     As discussed above, Defendants violated Section 2 of the Sherman Act by monopolizing, or attempting to monopolize, and combining or conspiring by and between the

Defendants, to monopolize lentiviral vector gene therapy for the treatment of Beta Thalassemia and SCD. These acts also constitute a violation of Mass. Gen. Laws ch. 93, § 5.

577.    The conduct violating Mass. Gen. Laws ch. 93, § 5 occurred and had its competitive impact primarily and predominantly within Massachusetts. Defendants bluebird, Third Rock, 2seventy, Leschly, Finer, and Reilly are based in Massachusetts and violated Mass. Gen. Laws ch. 93, § 5 in Massachusetts. Defendant Thompson was CEO (then employee) of MSK in New York but was controlled from Massachusetts by the other Defendants, and Thompson sought to bolster his Massachusetts-based company (Agios Pharma) through the relationship with the other Defendants (*e.g.*, where Massachusetts-based Third Rock provided funding to Massachusetts-based Agios Pharma to the benefit of Thompson), constituting a violation of Mass. Gen. Laws ch. 93, § 4 in Massachusetts.  Defendants' overarching goal was to restrain trade in favor of the Massachusetts-based Zynteglo (BB305) offered by bluebird in Massachusetts. Defendants' violation of Mass. Gen. Laws ch. 93, § 5 took place in Massachusetts.

578.    SRT has been injured in its business and property by reason of a violation of the provisions of the Massachusetts Antitrust Act.  For example, Defendants' anticompetitive acts to protect Zynteglo (BB305) from competition delayed SRT's commercial launch of a competing lentiviral vector gene therapy in Massachusetts thereby depriving SRT of revenue in Massachusetts.

579.    SRT seeks actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

580.    Defendants engaged with malicious intent to injure SRT. Accordingly, SRT seeks three times the amount of actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

581.    SRT seeks injunctive relief to prevent threatened damage to its business or property under the same conditions and principles as injunctive relief is granted by courts of equity.

**Count XIV: Violation of Mass Gen. Laws Ch. 93, § 4**

582.    SRT repeats and re-alleges each and every allegation contained in each of the preceding paragraphs, as if fully set forth herein.

583.    Mass. Gen. Laws ch. 93, § 4 makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth."

584.    Mass. Gen. Laws ch. 93, § 4 is similar to Section 1 of the Sherman Act, which makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *See* 15 U.S.C. §1.

585.    As discussed above, Defendants violated Section 1 of the Sherman Act by engaging in a contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States with respect to lentiviral vector gene therapy for the treatment of Beta Thalassemia and SCD. These acts also constitute a violation of Mass. Gen. Laws ch. 93, § 4.

586.    The conduct violating Mass. Gen. Laws ch. 93, § 4 occurred and had its competitive impact primarily and predominantly within Massachusetts. Defendants bluebird, Third Rock, 2seventy, Leschly, Finer, and Reilly are based in Massachusetts and violated Mass. Gen. Laws ch. 93, § 4 in Massachusetts. Defendant Thompson was CEO (then employee) of MSK in New York but was controlled from Massachusetts by the other Defendants and Thompson sought to bolster his Massachusetts-based company (Agios Pharma) through the relationship with the other Defendants (*e.g.*, where Massachusetts-based Third Rock provided funding to Massachusetts-based Agios Pharma to the benefit of Thompson), constituting a violation of Mass. Gen. Laws ch. 93, § 4 in Massachusetts.  Defendants' overarching goal was to restrain trade in favor of the

Massachusetts-based Zynteglo (BB305) offered by bluebird in Massachusetts. Defendants' violation of Mass. Gen. Laws ch. 93, § 4 took place in Massachusetts.

587.    SRT has been injured in its business and property by reason of a violation of the provisions of the Massachusetts Antitrust Act.  For example, Defendants' anticompetitive acts to protect Zynteglo (BB305) from competition delayed SRT's commercial launch of a competing lentiviral vector gene therapy in Massachusetts thereby depriving SRT of revenue in Massachusetts.

588.    SRT seeks actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

589.    Defendants engaged with malicious intent to injure SRT. Accordingly, SRT seeks three times the amount of actual damages sustained, together with the costs of suit, including reasonable attorneys' fees.

590.    SRT seeks injunctive relief to prevent threatened damage to its business or property under the same conditions and principles as injunctive relief is granted by courts of equity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor against Defendants, and provide Plaintiff with the following relief:

A.  That all Defendants are jointly and severally liable for all damage caused to SRT;

B.  That Defendants have fraudulently induced SRT into the Release provision of the Settlement Agreement;

C.  That SRT's Release to bluebird under the Settlement Agreement is to be void;

D.  That SRT shall revive and refile all claims previously filed in *Errant Gene Therapeutics, LLC v. Third Rock Ventures, LLC and Nick Leschly*, Civil Action No.

19-1832, in the Commonwealth of Massachusetts, Superior Court Department of the Trial Court;

E.  Awarding SRT monetary damages in an amount not less than $1 billion, said amount to be proven at trial;

F.  Awarding SRT enhanced (treble) monetary damages pursuant to 18 U.S.C. § 1961, *et seq.* and Mass. Gen. Laws, ch. 93, § 11;

G.  Awarding SRT enhanced (treble) monetary damages, the cost of suit, attorney's fees, and interest pursuant to 15 U.S.C. § 15;

H.  Awarding SRT enhanced (treble) monetary damages, the cost of suit, attorney's fees, and interest pursuant to Mass Gen. Laws Ch. 93, § 4;

I.  Awarding SRT its litigation expenses, including reasonable attorneys' fees, costs, and disbursements;

J.  Awarding SRT punitive damages in the sum of not less than $250 million or an amount otherwise to be decided by a jury; and

K.  Granting SRT such relief as the case may require or as the Court deems equitable and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.


Dated: August 7, 2023                    Respectfully submitted,

                                         /s/ Erika Page
                                         Erika Page
                                         FOX ROTHSCHILD LLP
                                         33 Arch Street, Suite 3110
                                         Boston, MA 02110
                                         (617) 848 4000
                                         epage@foxrothschild.com

                                         Wanda French-Brown (admitted pro hac vice)
                                         Erika Levin (admitted pro hac vice)
                                         Howard Suh (admitted pro hac vice)
                                         James McConnell (admitted pro hac vice)
                                         FOX ROTHSCHILD LLP
                                         101 Park Avenue, 17th Floor
                                         New York, NY 10178
                                         (646) 601-7617
                                         wfrench-brown@foxrothschild.com
                                         elevin@foxrothschild.com
                                         hsuh@foxrothschild.com
                                         jmcconnell@foxrothschild.com

                                         Lenore Horton (admitted pro hac vice)
                                         Shatilla Shera B. Cairns
                                         HORTON LEGAL STRATEGIES PLLC
                                         11 Broadway, Suite 615
                                         New York, NY 10004
                                         (212) 888-9140
                                         lenore@hortonlegalstrategies.com
                                         shatilla@hortonlegalstrategies.com

                                         *Attorneys for Plaintiff San Rocco Therapeutics,*
                                         *LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I, Erika Page, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF and paper copies will be sent to those indicated as non-registered participants on the date below.

 /s/ Erika Page
Erika Page, BBO 700052

Dated:  August 7, 2023