UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SAN ROCCO THERAPEUTICS, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 23-cv-10919-ADB |
| | * | |
| | * | |
| NICK LESCHLY, MITCHELL FINER, | * | |
| PHILIP REILLY, CRAIG THOMPSON, | * | |
| THIRD ROCK VENTURES, LLC, | * | |
| BLUEBIRD BIO, INC., and 2SEVENTY | * | |
| BIO, INC., | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff San Rocco Therapeutics, LLC ("SRT" or "Plaintiff") and Defendants Nick

Leschly ("Leschly"), Mitchell Finer ("Finer"), Philip Reilly ("Reilly"), Craig Thompson

("Thompson"), Third Rock Ventures, LLC ("Third Rock"), bluebird bio, Inc. ("bluebird"), and

2seventy bio, Inc. ("2seventy" and, collectively, "Defendants") compete in developing

treatments for genetic diseases including Sickle Cell Disease ("SCD") and Beta Thalassemia

("Thalassemia"). See, e.g., [ECF No. 42 ("Amended Complaint" or "Am. Compl.") ¶ 8]. In this

case, SRT brings fourteen claims against Defendants including under the Federal Racketeering

Influenced and Corrupt Organizations Act ("RICO"), Federal and State antitrust law, and Mass.

General Laws Chapter 93A, as well as for fraudulent inducement. See [Am. Compl. ¶¶ 330–

590]. Before the Court are two motions to dismiss filed by Leschly, Finer, Reilly, Third Rock,

bluebird, and 2seventy, (the "Non-Thompson Defendants"), [ECF No. 56] and by Thompson, [ECF No. 63].  For the reasons set forth below, the motions to dismiss are <u>GRANTED</u>.

## I.    BACKGROUND

### A.    Factual Background

The facts are drawn primarily from the Amended Complaint and the attachments thereto. As it must, the Court "accept[s] the truth of all well-pleaded facts and draw[s] all reasonable inferences therefrom" in favor of Plaintiff.  <u>Grajales v. P.R. Ports Auth.</u>, 682 F.3d 40, 44 (1st Cir. 2012).

#### 1.    The Parties

SRT is a biopharmaceutical company "dedicated . . . to developing treatments for life-threatening diseases."  [Am. Compl. ¶ 52].  It was founded in 1993 and focuses on "gene therapy — a scientific technique that treats genetic disorders by modifying, replacing, and/or inactivating mutated genes responsible for causing [a] disease," [<u>id.</u>].  Partick Girondi ("Girondi") founded SRT and served as its CEO.  [<u>Id.</u> ¶ 76].

Leschly and Reilly were partners at Third Rock, a venture capital firm.  <u>See</u> [Am. Compl. ¶ 79].  In 2010, Third Rock acquired Genetix Pharmaceuticals, Inc. ("Genetix"), which was founded in 1992.  [<u>Id.</u> ¶ 78].  Upon its acquisition, Leschly and Third Rock changed the name of Genetix to "bluebird bio, Inc." ("bluebird"), and bluebird became a portfolio company of Third Rock.  [<u>Id.</u> ¶¶ 78, 108].

Reilly and Finer both worked at bluebird.  [Am. Compl. ¶¶ 80–81].  Reilly "became the 'founding' Chief Medical Officer of bluebird in 2010."  [<u>Id.</u> ¶ 80].  The Amended Complaint is not clear as to when Reilly left the company, but it does identify him as bluebird's "former Chief

Medical Officer."  [Id. ¶ 36].  Finer "joined Genetix in March 2010" and "became Chief Scientific Officer at bluebird" until he resigned in 2015.  [Id. ¶¶ 81, 180].

2seventy bio ("2seventy"), formed in 2021, with Leschly as its CEO, is a spinoff of bluebird focused on oncology.  See [Am. Compl. ¶¶ 264, 268].

Thompson became the CEO of Memorial Sloan Kettering Cancer Center ("MSKCC") and Sloan Kettering Institute for Cancer Research, ("SKI" and, together with MSKCC, "MSK") in 2010.  [Am. Compl. ¶¶ 5, 124].

### 2.    SRT Background

Since its founding in the early 1990s, SRT has developed "recombinant vectors that can be used in gene therapy treatment of rare genetic diseases, such as [SCD] and [] Thalassemia." [Am. Compl. ¶ 53].

Initially, SRT "ran clinical trials . . . using [] experimental, gene-enhancing drugs" and "opened [the] San Rocco Medical Center" in Italy to treat Thalassemia patients.  [Am. Compl. ¶¶ 58–59].  In 2000, SRT "began financially supporting the research of Drs. Michel Sadelain [('Sadelain')] and Stefano Rivella [('Rivella')]," researchers and scientists at MSK.  [Id. ¶¶ 5, 60].  SRT's work with Sadelain and Rivella led to the development of the TNS9.3.55 lentiviral vector (the "TNS9 Vector"), which can be used to treat SCD and Thalassemia.  [Id. ¶ 61].

SRT "committed every available resource to producing the TNS9 Vector," which it trademarked as Thalagen™.  [Am. Compl. ¶ 62].  Specifically, between 2005 and 2010, SRT invested "several million dollars and, together with MSK, improved the TNS9 Vector."  [Id. ¶ 66].

### 3.    Defendants' Background

Genetix, bluebird's predecessor, was also focused on developing gene therapies, [Am.

Compl. ¶ 78], and "[l]ike SRT's TNS9 vector," its "gene therapy relied on a lentiviral vector

delivery system," [id. ¶ 84].  Its vector was known as the BB305 Vector.  See [id. ¶ 85].

Genetix was "far behind SRT in its research and development of gene therapy treatments

for [] Thalassemia and SCD."  [Am. Compl. ¶ 82].  For example, comparing the TNS9 and

BB305 Vectors, Sadelain wrote that

> [w]e've [i.e., SRT and MSK] just spent 2 years improving the manufacturing.  We
> made enough vector for 10 patients in one production run. [bluebird/Genetix]
> makes one batch at [a] time for one patient.  That is not viable.  [SRT's] process is.
> [bluebird's] vector has an unstable structure (it "rearranges," as found in their
> second patient).  That makes it very unlikely that it will ever be commercialized, at
> least with its current sequence.  Our vector [i.e., TNS9 Vector] is structurally very
> stable.  Based on published mouse studies, our vector expresses better than theirs.

[Id. ¶ 86 (second, third, and fifth through seventh alterations in original)].  SRT alleges that

Defendants Leschly, Reilly, Finer, Third Rock, and bluebird came up with "a solution" to enable

them to catch up to SRT's technology, which was to "steal trade secrets from SRT using MSK,"

"with the assistance of Thompson."  [Id. ¶ 87].

### 4.    Initial Negotiations in 2009 and 2010

SRT alleges it has taken "great care to protect and guard the secrecy of its clinical data,

know-how, and other trade secrets, including the TNS9 Vector."  [Am. Compl. ¶ 88].  For

example, it has entered into nondisclosure agreements ("NDAs") with partners and vendors,

restricts access to computers, hosts email and web servers on a secure platform, "requires a

private key to make modifications to electronic files containing highly sensitive information,"

and marks certain documents as confidential.  [Id.].

4

Nonetheless, beginning in 2009, Leschly and Third Rock began to "prob[e] for SRT's confidential information." [Am. Compl. ¶ 89]. In October 2009, Leschly requested a meeting with Sadelain. [Id. ¶ 90]. Sadelain responded that MSK was working with SRT and recommended that Leschly and Reilly reach out to SRT instead. [Id. ¶¶ 90–91]. Leschly and Reilly had a meeting with SRT shortly thereafter, during which they "expressed Third Rock's desire to develop a 'platform' for the development of gene therapies for Thalassemia and SCD," and told SRT that "Third Rock was considering an investment in the gene therapy invented by Dr. Sadelain (and under development by SRT) and/or the competing gene therapy purportedly invented by a Dr. Leboulch (and under development by Genetix)." [Id. ¶ 94].

Months later, in March 2010, Finer and Reilly contacted Sadelain again, "seeking a meeting to discuss potential synergies and how Genetix/bluebird may be able to work with Sadelain and MSK." [Am. Compl. ¶ 95]. They apparently met on approximately May 12, 2010. See [id. ¶ 96].[1]

Also in May 2010, "Leschly, Finer, Reilly, bluebird, and Third Rock, again approached MSKCC to purchase the TNS9 Vector, knowing that the TNS9 Vector incorporated SRT's trade secrets and know-how related to producing clinical and commercial grade globin lentiviral vectors." [Am. Compl. ¶ 97]. Specifically, Finer, Leschly, and Reilly, wrote Sadelain and said that, among other things, they "would like to . . . update [him] on [their] progress and plans in thal[assemia] and other activities at [Genetix,] . . . would like to get an update on [Sadelain's] progress and plans as well[,]" and "would follow-up with a discussion of what potential

_____

[1] The Amended Complaint does not directly plead that such a meeting occurred, but, in May 2021, Finer emailed Sadelain saying "great meeting with you." [Am. Compl. ¶ 96]

synergies and how [they] could work together."  [Id. ¶ 98].  In response to these efforts, someone

at the Office of Industrial Affairs at MSK wrote Sadelain saying that

> they [*i.e.*, Third Rock] know that we entered into a license with [SRT], and they are
> coming to you, not to [SRT] when they [*i.e.*, Third Rock] perfectly knew that they
> [*i.e.*, Third Rock] should talk to [SRT] to get rights to the technology.  I honestly
> do not see what they are seeking . . . besides them doing competitive intelligence.

[Id. ¶ 99 (alterations in original) (emphasis omitted)].

Meanwhile, Finer, Leschly, Reilly, and Third Rock were still speaking with SRT and

having "business discussions."  See [Am. Compl. ¶ 100].  In May 2010, Finer, as a partner in

Third Rock, wrote Girondi, the founder of SRT, stating, among other things, that he didn't "want

to get in the way with the business discussions that you are having with [Leschly] [Third Rock]

and [Reilly] [Third Rock], but I want to reiterate our commitment to have a serious discussion

with you and your colleagues."  [Id. (second and fourth alterations in original)].  He then said

"please accept our apologies in the delay in getting back to you – [Leschly] [Third Rock] and

[Reilly] [Third Rock] will contact you soon.  I have the greatest scientific respect for Michel

[Sadelain's] . . . work and its potential to impact the thalassemia community."  [Id. (second,

fourth, and fifth alterations in original)].  Girondi then met with Leschly on June 8, 2010, "to

discuss a potential collaboration for a meaningful therapy," [id. ¶ 102], and that month "Third

Rock attempted to collaborate with SRT and/or acquire rights to SRT's TNS9 Vector and its

proprietary know-how related to globin lentiviral vectors," [id. ¶ 103].

Thereafter, "Sadelain wrote SRT stating '[t]he stakes are very high now . . . [and y]ou can

count on Genetix . . . to proactively sabotage all your efforts.'"  [Am. Compl. ¶¶ 103–04].

Meanwhile, Leschly wrote to Finer on June 18 stating that they "need[ed] to shut [Girondi]

down," and that they wanted "him to buy into a [confidential disclosure agreement ("CDA")] to

review . . . [Sadelain's] data.  Be nice, suck up, etc. . . . if you think (and I think) that [Sadelain]

has valuable data." [Id. ¶ 105 (fourth alteration in original) (emphasis omitted)].  Finer

responded that "I want to have a review under CDA of . . . [Sadelain's] data.  This is all we have

to get out of him.  I can get that out of him." [Id. ¶ 106 (alteration in original) (emphasis

omitted)].  The negotiations between Third Rock and SRT ultimately broke down in June 2010

because SRT refused to sign a CDA. [Id. ¶ 107].

　　　　Sometime after September 2010, after Third Rock invested in Genetix and it became

bluebird, [Am. Compl. ¶¶ 108–09], "Leschly 'got bad news'" that "[b]luebird could not

efficiently and safely produce lentiviral vectors that were safe for clinical use in patients," [id. ¶

110].  Around this time, and after SRT had "delivered its proprietary TNS9 Vector . . . which

was enough vector to treat at least 7–10 Beta Thalassemia patients," [id. ¶ 112], "Third Rock,

bluebird, Leschly, Finer, and Reilly realized that access to SRT's proprietary lentiviral vector

production and formulation technology was essential in overcoming the problems plaguing the

BB305 Vector and bluebird's formulation manufacturing process for lentiviral vectors," [id. ¶

111].

### 5.　　　　Bluebird and SKI Agreements

　　　　After having failed "to convince SRT to execute a CDA and share SRT's trade secrets

and confidential data with bluebird," [Am. Compl. ¶ 114], in October 2010, "Leschly executed a

2010 CDA between bluebird and SKI" (the "2010 bluebird-SKI CDA"), without the knowledge

of SRT, [id. ¶ 115].  SRT alleges that around this same time, bluebird, Third Rock, Leschly,

Finer, and Reilly began working with Thompson, who had become the CEO of MSK in 2010, to

"acquir[e] SRT's trade secrets." [Id. ¶¶ 124–25].  SRT further alleges that these parties entered

into the 2010 bluebird-SKI CDA for the purpose of improperly accessing SRT's "confidential

information, including SRT's trade secrets related to the clinical grade TNS9 Vector," e.g., [id. ¶ 118], without any intention of complying with the 2010 bluebird-SKI CDA, [id. ¶ 123].

In November 2011, bluebird executed an option agreement with SKI (the "2011 bluebird-SKI Option Agreement"), [Am. Compl. ¶ 127], in which bluebird "expressed an interest to SKI regarding an option agreement in the area of gene therapy for hemoglobinopathies," SKI expressed "its desire[] to grant bluebird the right to exclusively license certain of SKI's intellectual property [sic]," and bluebird said that it wanted "a period of time in which to evaluate the intellectual property and determine whether to execute a license," [id. ¶ 128]; see also [ECF No. 42-1 at 2 ("2011 bluebird-SKI Option Agreement")].  The "Licensed Know-How" definition under the 2011 bluebird-SKI Option Agreement included patent applications and patents (the "Licensed Patents") that "were also included in the intellectual property licensed in the 2005 Agreement between SRT and MSK."  [Am. Compl. ¶¶ 130–33].  In addition, the 2011 bluebird-SKI Option Agreement defined "Vector" as

> clinical grade vector TNS9.3.55 that was manufactured for use in a clinical trial for beta-thalassemia patients and any modification of such that was reasonably within contemplation of SKI and [SRT] at the time the vector was finalized as of September 30, 2010, for the purpose of using the vector TNS9.3.55 for the treatment of sickle cell disorder as opposed to thalassemia.

[Am. Compl. ¶ 137 (alteration in original)].  SRT alleges that bluebird entered the agreement not because it was "interested in helping MSK with the . . . TNS9 Vector," [id. ¶ 136], but rather because it "sought to advance bluebird's competing BB305 Vector," [id. ¶ 138].  The Amended Complaint notes that bluebird never exercised the option, [id. ¶ 142], and SRT alleges that bluebird entered the 2011 bluebird-SKI Option Agreement only "to obtain SRT's TNS9 Vector and trades secrets embodied therein as part of Defendants' objective to eliminate SRT as a direct competitor," [id. ¶ 143].

### 6. Bluebird Obtains and Shares the TNS9 Vector

In January 2012, after bluebird had "obtained physical possession of SRT's TNS9 Vector and its proprietary recipe and titration process related to the formulation of safe clinical grade lentiviral vectors," [Am. Compl. ¶ 144], Leschly, Finer, and others at bluebird discussed the need to share the materials with Dr. Christof von Kalle ("Kalle"), [id. ¶ 145], one of bluebird's collaborating scientists in Germany, [id. ¶ 146]. They sent him "samples of the TNS9 Vector containing SRT's proprietary formulation and made by SRT's proprietary vector production process," [id. ¶ 147], which was a critical step for bluebird "in order to gain access to SRT's trade secrets and proprietary information embodied in the TNS9 Vector formulation," [id. ¶ 146].

In May 2012, the Food and Drug Administration ("FDA") denied the Investigational New Drug ("IND") application for the TNS9 Vector, [Am. Compl. ¶ 150], which MSK had submitted in 2010, [id. ¶ 156]. Thereafter, Sadelain wrote to Finer and other bluebird-affiliated scientists stating that "[t]he FDA did not approve the IND. The reason is: insufficient characterization of the lymphoma. Can you get your German collaborators to do something[.] It isn't really believable that they could not analyze three tumor samples in 5 months." [Id. ¶ 150].

According to SRT, rather than analyze the TNS9 Vector to help with the IND application as bluebird, Third Rock, Leschly, Reilly, Finer, and Thompson suggested they would, [Am. Compl. ¶ 158], they had "bluebird's German collaborators [] perform analyses on SRT's TNS9 Vector," [id. ¶ 152], including "reverse engineering analyses and testing," [id. ¶ 153], "for the purpose of stealing and misappropriating SRT's trade secrets," [id. ¶ 152]. They also told their "German collaborators to delay and stall testing of tumor samples in order to intentionally sabotage the IND." [Id. ¶ 154]. SRT alleges that bluebird, Third Rock, Leschly, Reilly, Finer and Thompson never intended to assist or work with MSK or SRT, [id. ¶¶ 159–60], and instead

meant to use the information they gained from the TNS9 Vector to advance its own IND application for BB305, which it filed in December 2012, [id. ¶¶ 155–56]. In sum, SRT alleges that Third Rock, bluebird, Leschly, Reilly, and Finer "fraudulently induced MSK to provide" them and their German collaborators "with SRT's TNS9 Vector and related proprietary information, including the confidential IND for the TNS9 Vector" to gain "unlawful competitive intelligence (confidential information), eliminat[e] bluebird's only competitor, and steal[] SRT's proprietary information to get ahead of SRT in the market." [Id. ¶ 161].

### 7.    Thompson's Involvement

Thompson became the CEO of MSK in 2010. [Am. Compl. ¶ 124]. Three years prior to that, in 2007, he founded Agios Pharma ("Agios"). [Id. ¶ 164]. Third Rock funded Agios, [id. ¶ 125], and it is currently listed as a "portfolio company" on Third Rock's website, [id. ¶ 164]. Thompson also maintains a relationship with Agios. [Id.].

SRT alleges that Thompson has compromised MSK and harmed SRT by "caus[ing] MSK to execute the 2011 [bluebird-SKI] Option Agreement, which conflicted with MSK's financial interest and undermined MSK's and SRT's joint research and development efforts for the TNS9 Vector." [Am. Compl. ¶¶ 163, 166]. For example, "the agreement contained a blanket indemnification of bluebird (a fellow Third Rock portfolio company) for any claim by SRT — regardless of the relationship to MSK and including 'willful misconduct' on bluebird's part." [Id. ¶ 167]. "Unlike other indemnification agreements with SKI, language limiting bluebird's indemnification to 'arising out of performance' of the contract with SKI or excluding 'willful misconduct' were omitted." [Id. ¶ 169]. In addition, the "indemnification of bluebird was [] the opposite of MSK's stated policy of having the prospective licensee indemnify MSK." [Id.]. Finally, it was "drafted to 'survive the termination and expiration of th[e] Agreement.'" [Id.].

"[J]ust prior to Thompson causing MSK to agree to the indemnification . . .  Third Rock made a . . . many millions of dollars" investment in Agios.  [Am. Compl. ¶ 172].  "Accordingly," SRT alleges,

> after Thompson's Agios Pharma received another substantial investment from Third Rock, Thompson caused MSK to not only provide Defendants Leschly, Reilly, Finer and bluebird with access to SRT's trade secrets but also exposed MSK to whatever liabilities bluebird (and its "directors, officers, employees, successors, assigns and other representatives") owes to SRT, even for willful misconduct having nothing to do with MSK.  In essence, MSK's assets were used in this secret conspiracy as collateral to protect the private and for-profit business interests of Defendants Third Rock, bluebird, Leschly, Reilly, Finer, and Thompson.

[Id. ¶ 173].

Rather than engage in the "conspiracy" directly, Thompson used another individual at MSK — Tony Evnin ("Evnin") — who himself "had a previous business relationship with Leschly."  [Am. Compl. ¶ 178]; see also [id. ¶ 175].  Leschly wrote to Finer, for example, stating that he and Thompson "agreed it was best for [Thompson] to stay clear as the appearance of conflict is too great given my past history [with] him and Third Rock[, and h]e agreed that Tony [Evnin] was the guy and he has already spoken to him about the situation."  [Id. ¶ 177 (second and fourth alterations in original)].  Evnin, for his part, had once deleted the following text from the minutes of an MSK committee meeting on technology transfer in 2010: "Efforts are underway to terminate the license with EGT [now, called SRT], and once completed, negotiate a license with [b]luebird bio."  [Id. ¶ 175 (first alteration in original)].  Notwithstanding Evnin's apparent role, "[c]urrent and former employees of MSK have informed SRT that Thompson continued to maintain quasi-control over MSK's involvement and actions with respect to bluebird and SRT after 'resigning' as MSK's CEO in 2022."  [Id. ¶ 186].

8.    **Prior Litigation**

i.    New York and Massachusetts Litigation and 2020
     Settlement Agreement

Based in large part on the factual citation above, in 2017 and 2019, SRT initiated two

lawsuits, separate from the current case, against an array of the parties involved in the dispute now

before this Court.   In 2017, SRT and associated entities sued in New York state court:

> In January 2017, SRT commenced a civil action against SKI and bluebird in the
> Supreme Court of the State of New York, entitled Errant Gene Therapeutics, LLC
> v. Sloan Kettering Institute for Cancer Research and Bluebird Bio, Inc., Index No.
> 150856/2017 ([] the "New York Litigation"), alleging the following causes of
> action: (1) fraud against SKI; (2) breach of contract against SKI based on the 2011
> Agreement; (3) breach of contract against SKI based on the 2005 [SRT-MSK]
> Agreement; (4) civil conspiracy to defraud against SKI and bluebird; (5) unfair
> competition against bluebird; (6) injunctive relief against bluebird; and (7) unjust
> enrichment against bluebird.

[Am. Compl. ¶ 13].  More than two years later, SRT brought a separate action in Massachusetts

state court.

> In June 2019, SRT commenced a civil action against Third Rock and Leschly in
> the Superior Court of Massachusetts, entitled Errant Gene Therapeutics, LLC v.
> Third Rock Ventures, LLC and Nick Leschly, Civil Action No. 19-1832 ([] the
> "Massachusetts Litigation"), alleging the following causes of action: (1) tortious
> interference with contractual relations; (2) tortious interference with business
> relations; (3) misappropriation of trade secrets; (4) violations of Massachusetts
> General Laws ch. 93, § 42; (5) civil conspiracy; (6) unjust enrichment; and (7)
> violations of Massachusetts General Laws ch. 93A, § 11.

[Am. Compl. ¶ 14].

The parties settled the New York and Massachusetts state court cases on November 2,

2020.  [Am. Compl. ¶¶ 207–08]; see also [ECF No. 36-1 (the "2020 Settlement Agreement")][2].

---

[2] In determining the motion to dismiss, the Court may consider the Settlement Agreement
because "[its] authenticity… [is] not disputed by the parties" and it is "central to the plaintiffs'
claim[s]."   Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Two provisions of the 2020 Settlement Agreement are particularly relevant to the current dispute: (1) Mutual Releases, [ECF No. 36-1 ¶ 5 (the "Mutual Release Provision")]; and (2) Dispute Resolution, [id. ¶ 7 (the "Dispute Resolution Provision")].

The Mutual Release Provision provides, among other things, that "[t]he Parties exchange mutual general releases . . . the mutual general releases shall release all claims, both at law and in equity, accrued or unaccrued, known or unknown, suspected, or unsuspected that were brought or could have been brought by [SRT] in the New York Litigation and the Massachusetts Litigation." [Am. Compl. ¶ 209 (quoting 2020 Settlement Agreement ¶ 5) (alterations in original)].  Additionally,

> [SRT] Releasors fully, finally, and forever release, relinquish, acquite [sic] and discharge . . . (collectively the "BBB Releasees")[3] from and against any and all claims, causes of action, demands, disputes, suits, debts, dues, liabilities, sums of money, accounts, reckonings, specialties, bonds, covenants, contracts, agreements, controversies, promises, assessments, rights, damages, costs and/or expenses whether based on a tort, contract or any other theory of recovery, in law, admiralty or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, that [SRT] Releasors may have, ever had or now has against the BBB Releasees or any of them, for upon or by reason of any cause or thing, from the beginning of the world to the Parties' execution of this Confidential Settlement Agreement.

[id. ¶ 210 (quoting 2020 Settlement Agreement ¶ 5) (first and third alterations in original) (emphasis omitted)].  "MSK provided an identical Mutual Release to SRT and bluebird[, a]nd, bluebird provided the same Mutual Release to MSK and SRT."  [Id. ¶ 211].  SRT maintains that the Mutual Release Provision "concerned causes of action existing prior to the [2020] Settlement Agreement[, and t]here was no release of causes of action that arose after execution of the [2020] Settlement Agreement."  [Id. ¶ 213].

---

[3] BBB refers to bluebird.  See [2020 Settlement Agreement at 1].

13

Separately, the Dispute Resolution Provision provided a mechanism for resolving potential future controversies after the settlement:

> The Parties shall make all reasonable efforts to resolve any dispute concerning this Confidential [2020] Settlement Agreement, its construction, or its actual or alleged breach, by face-to-face negotiations between senior executives.  Should such negotiation fail to resolve the matter, as defined by either party sending written notice to the other party of an impasse after at least one face-to-face negotiation meeting among senior executives of the parties, the matter shall be finally decided by David Ichel of X-Dispute, LLC or, if Mr. Ichel is not available, three (3) neutral arbitrators (the "Tribunal") seated in New York, New York under the AAA Arbitration Rules (the "Rules").

[Dispute Resolution Provision].  SRT takes the position that "[t]he Dispute Resolution [Provision] only applies to disputes concerning the 'Confidential [2020] Settlement Agreement, its construction, or its actual or alleged breach[,]'" [Am. Compl. ¶ 214 (quoting Dispute Resolution Provision)], and not "to causes of action that arose after execution of the Settlement Agreement," [id. ¶ 220].

The 2020 Settlement Agreement also provides that MSK granted SRT an "exclusive . . . license to the intellectual property licensed in the 2005 [SRT-MSK] Agreement," [Am. Compl. ¶ 215], which included the Licensed Patents, [id. ¶ 133].  MSK further granted SRT an exclusive license

> to any intellectual property, whether owned in whole by MSK or jointly with any other party, or licensed to MSK, to the extent MSK has the rights to do so, and for which developing[,] making, having made, using, importing, selling or offering to sell . . . any modified or related lentiviral vector would be or could be infringed[,]

[id. ¶ 216 (emphasis omitted)].  Because of these provisions, "SRT agreed to the Release and Dispute Resolution provisions."  See [id. ¶¶ 215–16].  SRT further asserts that "the specifics of the BB305 lentiviral vector were concealed from SRT prior to and at the time of the execution of the Settlement Agreement."  [Id. ¶ 217].

14

ii.    <u>The Delaware Litigation</u>

In October 2021, SRT brought suit for willful infringement of the Licensed Patents in

<u>San Rocco Therapeutics, LLC v. Bluebird Bio</u>, No. 21-cv-1478, 2024 WL 2747111 (D. Del. Jul.

26, 2022) (the "Delaware Litigation").  [Am. Compl. ¶ 226]; <u>see also</u> [<u>id.</u> ¶¶ 130, 141, 216–17].

Approximately one month later, SRT joined Third Rock to the suit, alleging that Third Rock

induced bluebird's patent infringement.  [<u>Id.</u> ¶ 227].

Bluebird and Third Rock then moved to dismiss or, alternatively, to arbitrate.  [Am.

Compl. ¶ 231].  The case was submitted to arbitration.  [<u>Id.</u> ¶ 240].  During the arbitration,

bluebird and Third Rock separately "filed two petitions for inter partes review ("IPR") to

invalidate SRT's Licensed Patents . . . despite bluebird's claims that it had the right to use SRT's

Licensed Patents under the [2020] Settlement Agreement."  [<u>Id.</u> ¶ 243].

**9.    Alleged Fraudulent Inducement to Enter the 2020 Settlement Agreement**

With the above background as its apparent basis, SRT alleges that Defendants made

omissions of material facts and misrepresentations prior to the 2020 Settlement Agreement.  <u>See</u>

[Am. Compl. ¶¶ 247–60].  SRT alleges, among other things, that "[i]n November 2020, during

discussions about the Release [P]rovision [and] prior to the execution of the Settlement

Agreement, [] Thompson, Leschly, and bluebird" materially misrepresented certain facts, as well

as made intentional omissions of material fact.  [<u>Id.</u> ¶¶ 247–50].  These include, among other

things, representing that "SRT would be the only company to operate within the scope of the

claims of the intellectual property in the 2005 Agreement," [<u>id.</u> ¶ 248], that "intellectual property

licensed in the 2005 Agreement, including the [Licensed] Patents, were valid and enforceable

against any company, including bluebird," [<u>id.</u> ¶ 249], and that "bluebird waived all future rights

to challenge the validity of the intellectual property licensed in the 2005 Agreement," [<u>id.</u>

15

¶ 250].[4]  SRT further alleges that "Defendants Thompson, Leschly, and bluebird knew" these representations were false when made.  [Id. ¶¶ 247–50].

### 10.   The "Spin-Off" of 2seventy

In January 2021, bluebird announced its "intent to separate its severe genetic disease and oncology businesses into differentiated and independent publicly traded companies," [Am. Compl. ¶ 263], and about four months later announced that the oncology business would be named 2seventy bio, and that Leschly would be its CEO, [id. ¶ 264].  Then, "[a]t the launch of 2seventy, Defendants Leschly, Finer, Reilly, Third Rock, and bluebird stripped bluebird of profitable assets, which included bluebird's immune-oncology cell therapy products and $480,000,000 in cash."  [Id. ¶ 271].  Meanwhile, "bluebird retained all the debt on its balance sheet while being drastically short on cash for the rest of its operations."  [Id. ¶ 275].

Around the same time, several bluebird directors resigned and then "joined 2seventy's initial board of directors."  [Am. Compl. ¶¶ 273–74].  In addition, "bluebird's top management [] resigned from their positions with bluebird to take top management positions with 2seventy." [Id. ¶ 274].

SRT alleges that "[m]ost of the foregoing cash and investments resulted from Defendants' ongoing fraudulent scheme to harm SRT and eliminate bluebird's competition and obtain FDA approval for the BB305 Vector with market exclusivity."  [Am. Compl. ¶ 276].  It further states that, in general, the spinoff of 2seventy was meant "to protect their assets derived from their prior fraudulent acts" as Defendants "knew that depleting bluebird of valuable assets

---

[4] SRT relatedly alleges that "Defendants Thompson, Leschly, and/or bluebird had a duty to disclose that Thompson had directed MSK to cooperate with bluebird in challenging the validity and enforceability of the" Licensed Patents.  [Am. Compl. ¶ 251].

would preclude SRT from recovering monetary damages against bluebird, which would also protect their investments in bluebird."  [Id. ¶ 262]; see also [id. ¶ 279 (similar)].  In fact, bluebird eventually "sublicensed the rights to the BB305 Vector to 2seventy," [id. ¶ 284], and "assign[ed] and transfer[ed] ownership of the intellectual property related to the BB305 Vector to 2seventy so that 2seventy could then market and sell the BB305 Vector for the treatment of SCD and Beta Thalassemia patients," [id. ¶ 285].  In other words, Defendants "positioned 2seventy to take over the BB305 product and revenue stream."  [Id. ¶ 288].

### 11.   Defendants' FDA Submissions after the 2020 Settlement Agreement

SRT alleges that on several occasions between 2021 and 2023, Thompson "directed and caused MSK to submit willfully false information to the FDA by instructing Dr. Alan L. Ho and Richard Ellis to submit [] TNS9 IND Form[s] with the certification that the TNS9 drug product does not have FDA Orphan Drug Designation."  [Am. Compl. ¶¶ 311–15].  Because SRT in fact obtained Orphan Drug Designation in January 2006, [id. ¶ 68], SRT asserts that this was a violation of 18 U.S.C. § 1001, which criminalizes willful and materially false statements to the government, including to the FDA, [id. ¶ 304].  The submissions were "intentionally withheld from SRT until July 2023" in order to "harm SRT's business or property and . . . in furtherance of [Defendant's] conspiracy."  [Id. ¶ 315]; see also [id. ¶¶ 311–14].

### B.   Procedural History

As relevant here, SRT filed the Amended Complaint on August 7, 2023.  [ECF No. 42].  On September 18, 2023, the Non-Thompson Defendants moved to dismiss.  [ECF No. 56].  SRT opposed on October 12, 2023, [ECF No. 60], the Non-Thompson Defendants replied on October 30, 2023, [ECF No. 71], and SRT sur-replied on November 2, 2023, [ECF No. 74].

Thompson separately moved to dismiss on October 23, 2023.  [ECF No. 63].[5]  SRT opposed on November 22, 2023, [ECF No. 75], Thompson replied on December 27, 2023, [ECF No. 84], and SRT sur-replied on January 8, 2024, [ECF No. 91].

## II.        Lack of Personal Jurisdiction (Fed. R. Civ. P. 12(b)(2))

In his motion to dismiss, Thompson asserts that this Court lacks personal jurisdiction over him (but not the other Defendants) and that Plaintiff's complaint fails to state a claim upon which relief may be granted.  See generally [ECF No. 64].  This Court would typically "address the personal jurisdiction challenge[] before assessing the adequacy of the complaint."  Cumby v. Am. Med. Response, Inc., No. 18-30050, 2019 WL 9244983, at *3 (D. Mass. Oct. 31, 2019).  "However, in cases such as this one with multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, [the court] may address first the facial challenge to the underlying cause of action and, if [it] dismiss[es] the claim in its entirety, decline to address the personal jurisdiction claims made by some defendants."  Id. (quoting Chevron Corp. v. Naranjo, 667 F.3d 232, 247 n.17 (2d Cir. 2012)).  This is appropriate "[w]here, as here, the affected defendant does not insist that the jurisdictional issue be determined first."  Feinstein v. Resol. Tr. Corp., 942 F.2d 34, 40 (1st Cir. 1991).  This approach is also appropriate because 1)

---

[5] On December 15, 2023, Thompson moved to file a corrected declaration in support of his motion to dismiss.  [ECF Nos. 76 (the motion); 76-1 (the corrected declaration, seeking to replace the declaration at ECF No. 64-1)].  On December 20, 2023, SRT moved for sanctions, arguing that  "Thompson has submitted false, sworn testimony and materially misleading statements in his Declaration (ECF 64-1)," [ECF No. 78], namely that, among other things, he "has (i) 'never held a position at Agios'; (ii) 'had no role in operating Agios,' (iii) 'never served as a director or officer of Agios;' and (iv) 'never invested with Third Rock.'" [ECF No. 79 at 6].  After a hearing, Magistrate Judge Boal recommended that the motion to file a corrected declaration be granted, and that the motion for sanctions be denied.  [ECF No. 95].  The Court adopted that recommendation on February 22, 2024.  [ECF No. 97].

for reasons articulated <u>infra</u>, the Court ultimately dismisses the federal claims and declines to

exercise jurisdiction on the supplemental claims; 2) Thompson has not insisted on the resolution

of the personal jurisdiction question before reaching the merits; and 3) deciding the personal

jurisdiction question could require resolution of unsettled jurisdictional questions regarding

RICO.  <u>See id.</u> at 40 ("[W]e cannot fault the district court for eschewing difficult jurisdictional

and venue-related issues in favor of ordering dismissal on the merits."); <u>see also</u> <u>Naicom Corp. v.</u>

<u>DISH Network Corp.</u>, No. 3:21-cv-01405, 2024 WL 1363755, at *20 (D.P.R. Mar. 29, 2024)

(concluding court better able to assess RICO claims on the merits "than to break new ground on

[the] unsettled jurisdictional issue"); <u>Cumby</u>, 2019 WL 9244983, at *3 ("The court believes this

approach is especially appropriate in this case where, for the reasons explained below, it

dismisses the foundational federal claims and declines to exercise supplemental jurisdiction over

the remaining state-law claims.").

### III.        Failure to State a Claim (Fed. R. Civ. P. 12(b)(6))

Both Thompson and the Non-Thompson Defendants have moved to dismiss for failure to

state a claim pursuant to Rule 12(b)(6).  On such a motion, the Court must accept as true all well-

pleaded facts, analyze them in the light most favorable to the plaintiffs, and draw all reasonable

inferences from those facts in favor of the plaintiffs.  <u>U.S. ex rel. Hutcheson v. Blackstone Med.,</u>

<u>Inc.</u>, 647 F.3d 377, 383 (1st Cir. 2011).  Additionally, "a court may not look beyond the facts

alleged in the complaint, documents incorporated by reference therein and facts susceptible to

judicial notice."  <u>MIT Fed. Credit Union v. Cordisco</u>, 470 F. Supp. 3d 81, 84 (D. Mass. 2020)

(citing <u>Haley v. City of Bos.</u>, 657 F.3d 39, 46 (1st Cir. 2011)).  A complaint "must provide 'a

short and plain statement of the claim showing that the pleader is entitled to relief[,]'" <u>Cardigan</u>

<u>Mt. Sch. v. N.H. Ins. Co.</u>, 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and

set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

### A.      Federal RICO (Counts I–IV)

Counts I to IV allege violations of various subsections of RICO, specifically 18 U.S.C. § 1962(a)–(d).  [Am. Compl. ¶¶ 330–434].  To sustain any of these four RICO counts, SRT must allege a pattern of "racketeering activity," defined by the "exhaustive list" of predicate offenses in 18 U.S.C. § 1961(1), which includes violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  As predicate acts, SRT alleges eleven instances of mail and wire fraud occurring between November 2, 2020 and May 12, 2023.  [Am. Compl. ¶ 337].[6]

In moving to dismiss, both Thompson and the Non-Thompson Defendants argue that SRT's RICO claims are time barred.  [ECF No. 57 at 18–20; ECF No. 64 at 20–21].  The Non-Thompson Defendants specifically argue, among other things, that the RICO claims are time

---

[6] Along with the eleven instances of mail and wire fraud, SRT also argues that the "new predicate acts committed by Defendants include, inter alia, Defendants' fraudulent inducement of SRT in connection with the Settlement Agreement, their fraudulent spinoff of 2seventy, and their conspiracy to make materially false statements about SRT's drug product to the FDA in violation of 18 U.S.C. § 1001."  [ECF No. 60 at 10, 12].  None of these are predicate acts pursuant to 18 U.S.C. § 1961(1).

barred because "the alleged RICO violations accrued no later than 2017, [more than] six years ago, when SRT filed the New York Litigation alleging a fraudulent conspiracy to 'take possession of [SRT's] technology,' 'sabotage all the efforts' of SRT, and 'eliminate Bluebird's competition.'"  [ECF No. 57 at 19 (quoting Ex. 5, ¶ 253 (Second Amended Complaint in New York Litigation)].  The Non-Thompson Defendants further aver that any predicate acts alleged within the limitations period "all relate to the same alleged RICO enterprise causing the same alleged RICO injury — the supposed loss of SRT's competitive advantage resulting from the theft and continued use of its intellectual property and alleged 'sabotage.'"  [ECF No. 57 at 19]. In response, SRT argues that it has pled additional predicate acts in connection with and subsequent to the November 2, 2020 Settlement Agreement, which "have caused new and separately distinct injuries against SRT."  [ECF No. 60 at 12; ECF No. 75 at 19].

"Although the RICO statute is silent on the matter, the Supreme Court has established a four-year statute of limitations for civil RICO actions."  Lawson v. FMR LLC, 554 F. Supp. 3d 186, 194 (D. Mass. 2021) (citing Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 132, 152 (1987)).  The action accrues "when a plaintiff knew or should have known of his injury."  Id. (quoting Rodriguez v. Banco Cent. Corp., 917 F.2d 664, 666 (1st Cir. 1990)); see also Alvarez-Mauras v. Banco Popular of P. R., 919 F.3d 617, 628 (1st Cir. 2019) (stating "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock" (citations omitted)).  Although "commission of a separable, new predicate act within [the] limitations period permits a plaintiff to recover for the additional damages caused by that act . . . the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."  Klehr v. A.O. Smith Corp., 521 U.S. 179, 190 (1997).  Additionally, any new alleged injury must "be

caused by the predicate acts, and be of the sort intended by the defendants." <u>Eagle Inv. Sys. Corp. v. Tamm</u>, 146 F. Supp. 2d 105, 110 (D. Mass. 2001).[7]

Viewing the Complaint's well-pled allegations favorably to SRT, SRT does in fact allege new predicate acts of mail and wire fraud occurring within the limitations period.  [Am. Compl. ¶ 366].  SRT fails, however, to allege any new (i.e., post-settlement) injury related to those predicate acts as necessary to plead a new RICO violation and restart the limitations clock. <u>Klehr</u>, 521 U.S. at 190.  SRT argues that its new injuries include 1) "the substantial delay of entry of [the] TNS9 drug product into the market," 2) "significant financial losses due to filing fees, litigation costs, attorneys' fees SRT was forced to incur in response to Defendants' IPR petitions," and 3) the "dismissal of the Massachusetts Litigation, with prejudice, where damages were in excess of 100 million dollars."  [ECF No. 60 at 12 (citing Am. Compl. ¶¶ 322, 324–26, 566); ECF No. 75 at 19–20].  These alleged "new injuries," however, are either not new or are not recognized as a valid form of injury for RICO purposes.

Starting with the delayed entry of the TNS9 product into the market, this injury is not new.  In fact, it is precisely the injury that SRT repeatedly alleged in the New York Litigation

---

[7] SRT raises an argument under the doctrine of fraudulent concealment in opposing Defendants' motion to dismiss, presumably to argue that the statute of limitations based on the earlier predicate acts should be tolled.  [ECF No. 60 at 11].  It is unclear, however, what facts SRT is alleging Defendants fraudulently concealed that would have tolled the limitations period.  In its argument, SRT references only the alleged fraudulent inducement of the 2020 Settlement Agreement.  [ECF No. 60 at 11].  Thus, any claim of fraudulent concealment is not relevant to the Court's analysis of the statute of limitations issue because the statute of limitations clock started to run prior to the Settlement with the theft of the original trade secret.  Additionally, fraudulent inducement is not a predicate act pursuant to 18 U.S.C. § 1961(1), and, as discussed, SRT fails to assert any new injury from instances of mail or wire fraud allegedly underlying the fraudulent inducement as necessary to restart the statute of limitations clock.

more than six years ago.  [ECF No. 57-6[8] ¶ 264 ("In 2011, [SRT] was years ahead of Bluebird. Thereafter the conspiracy between SKI and Bluebird allowed Bluebird to catch up and surpass [SRT] . . . .  Clinical trials of the [SRT] Vector [TNS9] were hopelessly delayed . . . leaving Bluebird as the sole company developing a gene therapy.")]; see also [id. ¶¶ 150, 192, 194, 198, 256, 265–66, 268 (alleging bluebird and MSK conspired to "delay" the development of SRT's gene therapy)].  SRT cannot use allegedly new predicate acts to bootstrap a recovery for an injury it has long known about and in fact litigated and settled in the Settlement Agreement. Klehr, 521 U.S. at 190; see also [Mutual Release Provision].

SRT's remaining allegations of new injury are not cognizable under RICO.  Regarding costs incurred by SRT in responding to Defendants' IPR petitions, "[l]itigation costs alone. . . can constitute RICO injury, but only when they are the intended consequence of the defendant's racketeering activities."  Eagle, 146 F. Supp. 2d at 110.  SRT has failed to allege that the litigation costs it incurred were an intended consequence of Defendants' racketeering activity (namely, submitting the IPR petitions, see [Am. Compl. ¶ 337]).  Defendants filed the IPRs as a defensive measure in response to SRT bringing an action for patent infringement, and SRT alleges no facts to support the notion that the object of Defendants' IPR filings was to force SRT to expend legal fees, rather than to achieve victory on the patent infringement action.  Given this posture, the notion that Defendants' intended consequence of bringing the IPR petitions was to increase SRT's attorneys' fees is at best attenuated and at worst in conflict with the overall conspiracy SRT repeatedly alleges — namely, to bring a product to market with market

---

[8] In determining the motion to dismiss, like the Settlement Agreement, the Court may consider the complaint from the New York Litigation because "[its] authenticity. . . [is] not disputed by the parties" and it is "central to the plaintiffs' claim[s]."  Watterson, 987 F.2d at 3.

exclusivity at SRT's expense.  See Capasso v. CIGNA Ins. Co., 765 F. Supp. 839, 842 (S.D.N.Y. 1991) (finding no injury where "it cannot reasonably be suggested that the harm contemplated by the alleged fraudulent scheme was an increase in . . . attorney's fees").  Finally, as to the dismissal of the Massachusetts litigation, the alleged economic injury is insufficient to support a RICO claim because it is entirely speculative, relying on the supposition that but for the settlement, SRT would have collected damages on the merits.  Lawson, 554 F. Supp. 3d at 196.

For the reason articulated, SRT's RICO claims are dismissed as untimely.

**B.      Federal Antitrust (Counts V–X)**

Counts V–X allege violations of the Sherman Act, including violations of monopolization (Count V), attempted monopolization (Counts VI–VII), and conspiracy (Counts VIII–IX) under 15 U.S.C. § 2, and conspiracy (Count X) under 15 U.S.C. § 1.  [Am. Compl. ¶¶ 435–544].  As a threshold issue, both Thompson and the Non-Thompson Defendants argue that the antitrust claims fail because SRT has not alleged an antitrust injury.  [ECF No. 57 at 12; ECF No. 64 at 41–42].[9]  The Court agrees.

An antitrust plaintiff "bears the burden of proving antitrust injury."  Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011); see also SAS of P. R., Inc. v. P. R. Tel. Co.,

---

[9] The majority of the parties' briefing on this issue misses the mark.  The Non-Thompson Defendants argue that SRT fails to allege antitrust injury because "courts recognize that there is no antitrust injury – and thus no viable antitrust claim – when a plaintiff's allegation is, as SRT alleges here, that it should have a defendant's place in the relevant market."  [ECF No. 57 at 31].  SRT responds that Defendants misrepresent the Amended Complaint, which "does not allege unlawful competition based on a single monopoly" and instead alleges "unlawful competition on the market rather than competition for a single slot."  [ECF No. 60 at 24].  SRT further argues that as a competitor, it is presumptively a proper plaintiff.  [ECF No. 60 at 23].  SRT is correct that its allegations amount to more than competition for a monopoly spot; however, as discussed infra, as a potential competitor to the market, rather than an actual competitor, SRT is required to plead an intent and preparedness to enter the market, which it has not done.

48 F.3d 39, 43 (1st Cir. 1995) (affirming dismissal of case at motion to dismiss state for lack of antitrust injury).  "Plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause to competition." Sterling Merch., 656 F.3d at 121.  "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999).  That said, because antitrust laws are aimed at harm to competition in the consumer marketplace as a whole, not just to a single competitor, "[a] competitor may suffer injury" despite a lack of "injury to competition or to consumers, and so lack standing." Sterling Merch., 656 F.3d at 121.  This is true in part because, unlike consumers, "competitors have incentives to bring antitrust suits for purposes which are anti-competitive, for example to induce the defendant competitor to moderate their competition." Id.  "As a result, there is reason for courts to be properly skeptical of many rivals' suits, particularly when the practices are not obviously exclusionary." Id. (internal quotations and citations omitted).

When a plaintiff is a competitor who has not yet entered the market, the potential competitor must plead "intent and preparedness to enter a market" to establish antitrust standing. Amgen, Inc. v. F. Hoffmann-La Roche Ltd., 480 F. Supp. 2d 462, 468 (D. Mass. 2007).  In assessing intent and preparedness to enter the market, "[t]he presence of [a] regulatory scheme and the need for [FDA] approval" can "cut the causal chain and convert what might have been deemed antitrust injury in a free market into only a speculative exercise." Bristol-Myers Squibb Co. v. Copley Pharm., Inc., 144 F. Supp. 2d 21, 24 (D. Mass. 2000) (internal quotation and citation omitted).

Here, SRT has certainly pled facts regarding its intention to enter the market; however, it has failed to plead facts sufficient to demonstrate a preparedness to do so.  For example, although it has pled a number of facts regarding the product's early development efforts, [Am. Compl. ¶¶ 62–75], SRT has not pled a single fact post-2012 regarding its efforts at product development, the resources devoted to development and FDA approval, the success (or lack thereof) of its clinical trials, or any other indicia of preparedness.  See Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 807 (D.C. Cir. 2001) ("Indicia of preparedness include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment.'"); see generally [Am. Compl.]. Compounding the issue, SRT does not plead any facts to indicate when, if at all, its FDA approval is anticipated; notably, the only facts pled about the likelihood of products being further approved by the FDA relate to Defendants products.  See, e.g., [Am. Compl. ¶ 499 ("In 2023, the FDA undertook an expedited review of BB305 for the treatment of SCD in the United States.")]; [id. ¶ 500 ("On June 21, 2023, bluebird announced FDA priority review of "lovo-cel" (BB305) for the treatment of SCD.")]; [id. ¶ 501 ("Defendants anticipate an early 2024 commercial launch for their BB305 gene therapy for the treatment of SCD in the United States.")]; see also Bristol-Myers Squibb, 144 F. Supp. 2d at 24.

To the extent that SRT is pleading that its preparedness was sabotaged by Defendants' causing materially false forms to be submitted to the FDA, the Amended Complaint does not

bear out these allegations.[10]  SRT fails to allege how any Defendants were involved in any FDA submissions made by non-party MSK, other than pleading conclusory that Thompson "directed and caused" the reports to be filed by virtue of the fact that he "continues to be in control over MSK's interactions with SRT and employees involved in the TNS9 IND submissions to the FDA."  [Am. Compl. ¶¶ 455–56].  The speculation that Thompson was involved in the specific FDA forms at issue is not grounded in any factual averments and thus is insufficient to defeat a motion to dismiss.  Rather, the facts as pled and the exhibits attached to the Complaint make clear that no defendant — Thompson or otherwise — signed the Form 1571s, and there are no plausible allegations that any of them were even aware of the forms — or the checkmarks at issue — prior to SRT filing the Amended Complaint.

As such, SRT's claims under the Sherman Act are dismissed for lack of antitrust injury.

### C.    State Law Claims

SRT's remaining claims are for fraudulent inducement, governed by New York law, [Am. Compl. ¶¶ 545–54 (Count XI)], violations of Massachusetts General Laws Chapter 93A, [id. ¶¶ 555–72 (Count XII)], and violations of the Massachusetts Antitrust Act, [id. ¶¶ 573–90 (Counts XIII and XIV)].  Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under [the supplemental jurisdiction statute] if — . . . (3)

---

[10] Moreover, to the extent SRT is pleading that its preparedness was sabotaged by Defendants' alleged theft of its trade secrets, this conduct is both time barred (having occurred over a decade ago) and released in the Settlement Agreement.  See Zenith Radio Corp. v. Hazeltine Rsch., Inc., 401 U.S. 321, 338 (1971) (establishing a four-year statute of limitations for the Sherman Act); see also In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 399 (D. Mass. 2013) ("Generally, a cause of action accrues under the Sherman Act when the plaintiff suffers an injury that is traceable to the defendant's conduct."); see generally [Mutual Release Provision].

the district court has dismissed all claims over which it has original jurisdiction."[11]  Further, "[a]s a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims."  Rossi v. Gemma, 489 F.3d 26, 39 (1st Cir. 2007) (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)).  "In determining whether to retain jurisdiction on such an occasion, the court must take into account considerations of judicial economy, convenience, fairness to the litigants, and comity."  Delgado v. Pawtucket Police Dep't, 668 F.3d 42, 48 (1st Cir. 2012).  The decision "is a 'pragmatic and case-specific' one."  Id. (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 257 (1st Cir. 1996)).

Here, the Court has dismissed the only claims over which it had original jurisdiction, namely the federal RICO and antitrust claims.  The case is still in the early stages of litigation.  The complaint has been amended, but there has been no discovery.  The remaining claims turn on questions of state law that have not been extensively briefed to this Court given the parties' focus on the RICO and federal antitrust claims.  The Court therefore declines to exercise supplemental jurisdiction over the state law claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, [ECF Nos. 56, 63] are GRANTED.

---

[11] It is clear from the face of the Amended Complaint that diversity jurisdiction does not exist, as SRT is incorporated in Delaware, as are several Defendants.  [Am. Compl. ¶¶ 31–38]; see 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated and of the State . . . where it has its principal place of business . . . .").

**SO ORDERED.**

September 30, 2024                                    _/s/ Allison D. Burroughs_
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE